MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
ERIC C. PAI (CA SBN 247604)
EPai@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0794

Attorneys for Plaintiff
NEVRO CORP.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEVRO CORP.,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION,<br><br>Defendants. | Case No.    3:16-cv-06830-VC-MEJ<br><br>**NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NEVRO'S MOTION FOR SUMMARY ADJUDICATION**<br><br>Date:    June 20, 2018<br>Time:    10:00 a.m.<br>Ctrm:    4, 17th Floor<br>Judge:    Hon. Vince Chhabria<br><br>Trial Date:  November 5, 2018 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ............................................................................vii

NOTICE OF MOTION AND MOTION ................................................................ 1

CONCISE STATEMENT OF RELIEF SOUGHT .................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.      INTRODUCTION ........................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................... 3

     A.    Nevro's Novel High Frequency Paresthesia-Free SCS Technology ..... 3

     B.    BSC Copied Nevro's Technology ...................................................... 4

     C.    BSC Challenged Nevro's '102 Patent Before the PTO and Lost............. 5

     D.    Nevro Filed This Lawsuit .................................................................. 5

III.    CLAIM CONSTRUCTION ........................................................................ 5

     A.    Claim Construction Principles .......................................................... 6

     B.    "Configured to" ................................................................................. 6

     C.    "Frequency" .................................................................................... 10

     D.    "Paresthesia" .................................................................................. 12

     E.    "Therapy signal" ............................................................................ 15

     F.    "Implantable" ................................................................................. 16

     G.    "Means for generating . . ." and "means for delivering . . ." ............... 16

     H.    "Programming a signal generator" / "programming the signal generator" ........... 17

     I.    "Machine-readable medium containing instructions for generating and transmitting" / "executable instructions to generate" ........................... 18

     J.    "Non-paresthesia-producing therapy signal" / "non-paresthesia-producing spinal modulation signal" / "paresthesia-free therapy signal" / "without generating paresthesia" / "without generating the sensation of paresthesia in the patient" ........................................................................................... 19

IV.   THE PRECISION WITH MULTIWAVE INFRINGES NEVRO'S CLAIMS................ 19

     A.    The Precision with MultiWave System Infringes Claim 7 of the '533 Patent under Nevro's Construction of "Configured To." ........................... 20

          1.    Claim 1, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:" ........................ 20

          2.    Claim 1, Element [a]: "a signal generator configured to generate a non-paresthesia-producing therapy signal" ................................................ 21

          3.    Claim 1, Element [c]: "an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region" ................. 21

          4.    Claim 7: "the system of claim 1, wherein the frequency range is from 1.5 kHz to 50 kHz" ................................................................... 22

**TABLE OF CONTENTS**
(continued)

Page

B. BSC Infringes Claim 11 of the '102 Method Patent ██████████████ ████████████████████ .......................... 22

    1. Claim 1, Preamble: "A method for treating a patient, comprising:" ......... 23

    2. Claim 1, Element [a]: "delivering or instructing delivery of an electrical signal to the patient's spinal cord via at least one implantable signal delivery device" ............................................................ 23

    3. Claim 1, Element [b]: "wherein the electrical signal has a frequency of from about 1.5 kHz to about 50 kHz" .................................................. 23

    4. Claim 1, Element [c]: "and does not create paresthesia in the patient" ....................................................................................................... 24

    5. Claims 2 (unasserted) and 11: "The method of claim 1 wherein the electrical signal is delivered to the patient to treat pain in the patient" and "The method of claim 2 wherein the pain in the patient includes at least one of low-back pain and leg pain" ................................ 24

C. Safe Harbor Does Not Apply to Programming of Patients who Exited the ACCELERATE study. .......................................................................................... 25

    1. Programming of Patients Who Exited the Study is Not Reasonably Related to Development or Submission of Information to the FDA ........ 25

V. VALIDITY OF ASSERTED PATENT CLAIMS ............................................................ 26

A. Nevro's Asserted Claims Are Not Abstract Under 35 U.S.C. § 101 .................. 26

B. BSC's Undisclosed New Theories Concerning the Precision SCS System Fail ........................................................................................................................ 30

    1. "Frequency harmonics" do not meet the "frequency" limitations ........... 31

    2. The Precision SCS system was neither designed nor used to generate the claimed stimulation frequencies .......................................... 32

C. The Fang Reference Is Not Section 102(e) Prior Art ........................................... 33

    1. Section 102(e) Forbids Using an Inventor's Own Work Against Him .......................................................................................................... 33

    2. BSC Relies on Fang's Disclosure of High-Frequency, Paresthesia-Free ........................................................................................................... 34

    3. The Later Addition of Alataris and Walker to Fang Does Not Undermine the Sworn Testimony of the Nine Nevro Inventors ............... 37

    4. None of the Other Portions of Fang Relied Upon by BSC for a High Frequency, Paresthesia-free Signal Is Prior Art. ..................................... 37

VI. THE COURT SHOULD GRANT  SUMMARY ADJUDICATION OF NO INEQUITABLE CONDUCT .......................................................................................... 38

A. BSC Cannot Establish That the Yearwood References Are But-For Material .................................................................................................................. 39

B. BSC Cannot Establish That the Yearwood References Were Non-Cumulative ............................................................................................................ 40

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
5
 882 F.3d 1121 (Fed. Cir. 2018).................................................................27

6

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
 134 S.Ct. 2347 (2014)..................................................................27, 28
7

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
8
 768 F.3d 1185 (Fed. Cir. 2014).................................................................38

9

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
10
 672 F.3d 1335 (Fed. Cir. 2012)...................................................................7

11

*BASF Corp. v. Johnson Matthey Inc.*,
 875 F.3d 1360 (Fed. Cir. 2017)....................................................................6
12

*Baxter Int'l, Inc. v. Carefusion Corp.*,
13
 No. 14-CV-09986,
 2016 WL 2770787 (N.D. Ill. May 13, 2016) ............................................30
14

15
*Berkheimer v. HP Inc.*,
 881 F.3d 1360 (Fed. Cir. 2018).................................................................27
16

*Boston Sci. Corp. v. Cordis Corp.*,
17
 No. C 02-01474 JW,
 2006 U.S. Dist. LEXIS 94329 (N.D. Cal. Dec. 20, 2006) .......................7
18

19
*Chamberlain Grp., Inc. v. Linear LLC*,
 114 F. Supp. 3d 614 (N.D. Ill. 2015) .......................................................29
20

21
*Classen Immunotherapies, Inc. v. Biogen IDEC*,
 659 F.3d 1057 (Fed. Cir. 2011)................................................................26
22

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
 567 F.3d 1314 (Fed. Cir. 2009)................................................................40
23

24
*Diamond v. Diehr*,
 450 U.S. 175 (1981)........................................................................28, 29, 30

25

*Elec. Power Grp., LLC v. Alstom S.A.*,
26
 830 F.3d 1350 (Fed. Cir. 2016)................................................................28

27
*Eli Lilly & Co. v. Medtronic, Inc.*,
 496 U.S. 661 (1990)..................................................................................25

28

*EmeraChem Holdings, LLC .v. Volkswagen Grp. of Am.*,
  859 F.3d 1341 (Fed. Cir. 2017)...............................................................................34, 35

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016).......................................................................................27

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016).......................................................................................29

*In re Giannelli*,
  739 F.3d 1375 (Fed. Cir. 2014).........................................................................................7

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
  711 F. App'x 1012 (Fed. Cir. 2017) ...............................................................................28

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016).......................................................................................28

*In re Katz Interactive Call Processing Patent Litig.*,
  821 F. Supp. 2d 1135 (C.D. Cal. 2011) ..........................................................................40

*Kegel Co. v. AMF Bowling, Inc.*,
  127 F.3d 1420 (Fed. Cir. 1997).......................................................................................20

*In re Man Mach. Interface Techs. LLC*,
  822 F.3d 1282 (Fed. Cir. 2016).........................................................................................7

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)...........................................................................................................6

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016).......................................................................................28

*Microsoft Corp. v. I4I Ltd. P'ship*,
  564 U.S. 91 (2011)...........................................................................................................34

*Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  809 F.3d 610 (Fed. Cir. 2015), *cert. denied*, 137 S. Ct. 68 (2016) ...........................26

*Mount Hamilton Partners, LLC v. Groupon, Inc.*,
  No. C-12-1700-SI,
  2014 U.S. Dist. LEXIS 34556 (N.D. Cal. Mar. 14, 2014)................................................7

*Nalco Co. v. Turner Designs, Inc.*,
  No. 13-cv-02727 BC,
  2014 U.S. Dist. LEXIS 21362 (N.D. Cal. Feb. 19, 2014)...............................................40

*Network Signatures, Inc. v. State Farm Mutual Automobile Insurance Co.*,
  731 F.3d 1239 (Fed. Cir. 2013).......................................................................................38

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ..................................................................34, 35

*Oracle Corp. v. DrugLogic, Inc.*,
807 F. Supp. 2d 885 (N.D. Cal. 2011) .........................................................40

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .............................................6, 10

*POWERbahn, LLC v. Found. Fitness LLC*,
No. 3:15-cv-00327-MMD-WGC,
2016 WL 4318978 (D. Nev. Aug. 11, 2016) ................................................29

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) ....................................................................30

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
324 F.3d 1346 (Fed. Cir. 2003) ....................................................................33

*Sciele Pharma Inc. v. Lupin Ltd.*,
684 F.3d 1253 (Fed. Cir. 2012) ....................................................................34

*Siemens, AG v. Seagate Tech.*,
No. SACV 06-788 JVS(ANx),
2009 U.S. Dist. LEXIS 132523 (C.D. Cal. Jan. 8, 2009) ..........................40

*SZ DJI Tech. Co. v. Yuneec Int'l Co.*,
No. 5:16-CV-595 BRO (KKx),
2016 WL 8931302 (C.D. Cal. Oct. 13, 2016) .............................................29

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) .......................................................................................6

*Thales Visionix, Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017) ....................................................................27

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ..............................................................38, 39

*Vapor Point LLC v. Moorhead*,
832 F.3d 1343 (Fed. Cir. 2016) ....................................................................37

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ....................................................................27

*Viveve, Inc. v. Thermigen, LLC*,
2017 WL 1425606 (E.D. Tex. Apr. 20, 2017) ............................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

35 U.S.C.

§ 101 ................................................................................................... *passim*
§ 102(e) .................................................................................................. 33, 38
§ 271(a) ........................................................................................................ 20
§ 271(e) ........................................................................................................ 25
§ 271(e)(1) .................................................................................................... 25

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| Ex. | Documents attached to the attorney Declaration of Eric C. Pai in Support of Nevro's Motion for Summary Adjudication |
| Adair Dep. | Deposition of Kaoru Lee Adair, BSC's Vice President of Regulatory and Clinical, dated May 10, 2017 |
| Carbunaru Dep. | Deposition of Rafael Carbunaru, BSC's Vice President of Research & Development, dated May 18, 2017 and November 15, 2017 |
| Cassidy Dep. | Deposition of Jim Cassidy, BSC's Vice President of Marketing, dated May 17, 2017 |
| Fridman Rpt. | Opening Expert Report of BSC Expert Gene Fridman, Ph.D., Regarding Claim Construction |
| Fridman Rbtl. | Rebuttal Expert Report of BSC Expert Gene Fridman, Ph.D., Regarding Claim Construction |
| Fridman Dep. | Deposition of BSC Expert Gene Fridman, dated March 7, 2018 |
| Mihran Dep. | Deposition of BSC Expert Richard Mihran, dated March 12, 2018 |
| Mihran Rbtl. | Rebuttal Expert Report of BSC Expert Richard T. Mihran, Ph.D. |
| Mihran Rpt. | Opening Expert Report of Richard T. Mihran, Ph.D Regarding Invalidity |
| Pai Decl. | Declaration of Eric C. Pai in Support of Nevro's Motion for Summary Adjudication |
| Pless Decl. | Declaration of Ben Pless in Support of Nevro's Motion for Summary Adjudication |
| The '102 patent | U.S. Patent No. 8,359,102 |
| The '533 patent | U.S. Patent No. 8,712,533 |
| The '472 patent | U.S. Patent No. 8,768,472 |
| The '988 patent | U.S. Patent No. 8,792,988 |
| The '125 patent | U.S. Patent No. 9,327,125 |
| The '357 patent | U.S. Patent No. 9,333,357 |
| The '842 patent | U.S. Patent No. 9,480,842 |
| Asserted Patents | U.S. Patent Nos. 8,359,102; 8,712,533; 8,792,988; 9,327,125; 9,333,357, 9,480,842, and U.S. Patent No. 8,768,472. |

**NOTICE OF MOTION AND MOTION**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 20, 2018, or as soon thereafter as counsel may be heard before the Honorable Vince Chhabria in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff Nevro Corp. will and hereby does move for an order granting summary adjudication. Nevro's motion is based on the pleadings, records, and files in this action; documents in the public record; the accompanying memorandum of points and authorities; the declarations of Eric C. Pai, Konstantinos Alataris, and Ben Pless and accompanying exhibits; and any other evidence and argument that the parties may present.

**CONCISE STATEMENT OF RELIEF SOUGHT**

Nevro seeks an order from the Court construing certain terms. Nevro seeks summary adjudication that: (1) BSC infringes claim 7 of the '533 patent and claim 11 of the '102 patent in connection with its Precision with MultiWave; (2) BSC's safe harbor affirmative defense does not apply to patients that exited the ACCELERATE trial; (3) BSC's Section 101 defense fails because the Asserted Claims are not abstract; (4) BSC's undisclosed new theories concerning the Precision SCS system do not invalidate the Asserted Patents; (5) an application ("Fang") owned by Nevro and related to the '472 patent is not prior art to the other six Patents-in-Suit; and (6) the '357 and '988 patents are not unenforceable due to inequitable conduct.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Nevro pioneered a new and far more effective form of spinal cord stimulation therapy for pain. Its implantable systems rely on stimulation with a high-frequency signal that does not generate "paresthesia," while traditional SCS providers like Boston Scientific rely on stimulation with low-frequency signals that mask the pain by generating paresthesia.

The clinical effectiveness and other benefits Nevro demonstrated with its innovations led to market-place success. ████████████████████████████████████████████ ████████████████████████████████████, decided to copy Nevro. BSC developed two infringing systems: the Precision with MultiWave and the Spectra WaveWriter. It also attempted

1    to invalidate Nevro patent claims through two IPR petitions.  Those petitions failed.  BSC

2    nonetheless ████████████████████████████████████████████████████████████

3    ████████████████ and commercially launched the system in Europe.

4         Nevro sued for patent infringement.  Since then, the parties exchanged the required Patent

5    Local Rules contentions and developed the factual record through discovery.  This motion

6    addresses some of the defenses BSC has thrown up to try to defend its copy products.

7         On claim construction, BSC seeks a very narrow, litigation-driven construction of

8    "configured to" to support its non-infringement argument that while its systems are designed to

9    provide high-frequency therapy, they are not "configured to" do so until after the system is

10   implanted and the patient confirms therapeutic paresthesia-free relief.  This definition is without

11   support.  On the other hand, BSC seeks a broad, implausible definition of "frequency" that would

12   allow low-frequency prior art systems to be seen as generating high-frequency signals because the

13   waveforms generate "harmonics."  This construction is refuted not only by the common meaning

14   of "frequency" and its usage in the patents but by BSC's own usage.

15        Applying a proper construction, BSC has no non-infringement arguments.  Nevro

16   therefore seeks summary judgment of infringement of an asserted system and an asserted method

17   claim.  This motion also seeks a ruling that ████████████████████████████████████████

18   ████████████████ is not immune under the FDA "Safe Harbor" provision of the Patent Act.

19        Nevro also seeks summary judgment on several of BSC's invalidity arguments.  BSC's

20   Section 101 defense fails because the asserted claims are not directed to an abstract idea, law of

21   nature, or a natural phenomenon.  Two of BSC's theories were improperly disclosed only in

22   BSC's expert reports; Nevro's co-pending motion to strike is all the Court needs to review in

23   order to grant Nevro's motion on these theories.  But under a proper claim construction, these

24   invalidity arguments are also meritless.

25        Another of BSC's invalidity theories seeks to hold Nevro's later patents invalid on the

26   basis of an earlier filed application—the Fang application.  But under the "common inventive

27   entity" rule, the Fang application is not cognizable as prior art to Nevro's later patents because the

28   relevant subject matter in all of them was invented by the same individuals.

1    Finally, Nevro seeks summary judgment on BSC's remaining inequitable conduct

2    defense.  BSC's defense fails because BSC has no evidence that an allegedly withheld set of

3    documents—the Yearwood References—are "material" to patentability.

4    **II.    FACTUAL BACKGROUND**

5        **A.    Nevro's Novel High Frequency Paresthesia-Free SCS Technology**

6        Nevro was founded to provide a solution to chronic pain without the drawbacks of

7    traditional SCS therapy.  Nevro's patented SCS technology represents a paradigm shift in SCS

8    therapy and is significantly more effective than traditional systems.

9        Nevro's SCS technology differs from traditional SCS technology in two fundamental

10   ways.  First, it operates at higher frequencies.  Traditional SCS systems typically operate at a

11   frequency range of between 40-60 Hz, with an upper FDA-approved limit of 1,200 Hz.  (Ex.[1] 9 at

12   NEVRO_BSXCA0057095.)  The commercial embodiment of Nevro's technology, HF10™

13   therapy, operates at 10 kHz.  (*See id.*)  Applying such high frequencies to the spinal cord was

14   previously viewed as unnecessary and potentially unsafe.  (Pless Decl. ¶¶ 5-9; *see also* (Ex. 10 at

15   202) ("there is no physiological evidence that increasing the pulse rate beyond physiological

16   limits (~300 pps) will provide therapeutic benefit[.]")

17       Second, Nevro's therapy is paresthesia-free.  Before Nevro performed its clinical studies,

18   the view in the industry was that generating paresthesia was not a mere side effect but *the means*

19   for providing pain relief.  (Ex. 11 at NEVRO_BSXCA0057246.)  When BSC presented the poster

20   for its ACCLERATE clinical study comparing high and low-frequency therapies, it stated:

21           Spinal Cord Stimulation (SCS) has been shown to be an effective
             treatment option for the treatment of chronic intractable pain since
22           the 1990s.  *This has relied on the understanding that in order to
             successfully achieve pain relief, paresthesia has to be generated to*
23           *cover the area of pain.* However, studies indicate that effective pain
             relief may be obtained by employing stimulation without
24           paresthesia at high frequency settings up to 10 kHz.

25   (Ex.12 (emphasis added).)  The referenced 10 kHz studies used Nevro's system.

26       To obtain FDA approval, Nevro was required to conduct an extensive randomized clinical

27   study monitored by the FDA ("the Senza-RCT"), which consisted of a head-to-head comparison

28   ───────────────
             [1] "Ex." are documents attached to the Pai Declaration unless otherwise noted.

1  of Nevro's systems with BSC's then most-current system, the Precision Plus.  In the study, BSC's

2  systems were implanted by physicians who normally worked with BSC systems and were

3  programmed by BSC's representatives at parameters of their choosing.  (*See* Ex. 9 at

4  NEVRO_BSXCA0057094-96.)  The outcome was stunning.  After 12 months, a much higher

5  number of patients responded to Nevro's therapy compared to BSC's traditional therapy and

6  Nevro's therapy was nearly *twice as effective* as BSC's in providing pain relief for both leg and

7  back pain.  (*Id.* at NEVRO_BSXCA0057099.)  The study results were so strong that the FDA

8  approved Nevro's therapy with a rare superiority label, allowing it to promote its system as

9  superior to BSC's traditional SCS therapy.  (Ex. 13 (Caraway Ex. 3128); Ex. 74, Caraway Dep.

10  163:4-164:23.)  At the 24-month mark, the results of the Senza-RCT study continued to be

11  sustained.  (*See* Ex. 11 at NEVRO_BSXCA0057249-50.)  These same outcomes are reflected in

12  commercial use outside the study.  (Ex. 14 at NEVRO_BSXCA0093967.)

13  **B.     BSC Copied Nevro's Technology**

14  BSC began to lose market share to Nevro and decided to develop its own high-frequency

15  SCS system in response.  In an April 2012 email chain, BSC lamented losing business from one

16  of its previously loyal physicians who was switching to Nevro.  (Ex. 15 at BSC-

17  NVRO_00310706 (Carbunaru Ex. 149); Ex. 16, Carbunaru Dep. 624:20-628:7.)  BSC VP of

18  Engineering, Rafael Carbunaru, said, "We should also ask Marketing to get as much information

19  as possible on what Nevro's use model and programming is so that we can make something that

20  addresses the need and not something that gets close to it only." (*Id.* at BSC-NVRO-00310705;

21  Ex. 16, Carbunaru Dep. 624:20-627:24.)

22

23

24

25

26

27

28

1  [REDACTED] (Ex. 20, Carbunaru Dep. 136:2-139:21.)

2  In 2014, BSC launched the Precision with MultiWave in Europe.  BSC also used the

3  system in the United States for the first phase of its ACCELERATE study, which applied

4  parameters essentially identical to Nevro's HF10 therapy.  (Ex. 12.)  The first phase of the study

5  was completed in 2016, [REDACTED] (Ex. 22,

6  Adair Dep. 384:18-386:9; Ex. 23, Adair Dep. 239:22-241:22.)

7  [REDACTED]

8  [REDACTED]

9  (Ex. 24, BSC's Suppl. Resp. to Rog No. 8.)  After patients exited the study, [REDACTED]

10 [REDACTED] (Ex. 23, Adair Dep. 247:21-

11 248:6; Ex. 25 (BSC's 2nd Suppl. Resp. to Rog No. 8).)

12 [REDACTED]

13 [REDACTED].

14 **C.**    **BSC Challenged Nevro's '102 Patent Before the PTO and Lost**

15 On May 14, 2015, just six days after Nevro received FDA approval, BSC filed two

16 petitions for *inter partes* review seeking to challenge the validity of 16 claims of asserted Patent

17 No. 8,359,102 ("the '102 patent").   The PTO denied both petitions.  (*See* Exs. 26-27.)

18 **D.**    **Nevro Filed This Lawsuit**

19 Nevro filed suit in November 2016 on six patents, which are from the same family—the

20 "'533 patent family"—and share the same specification.[2]  Nevro added U.S. Patent No. 8,768,472

21 (the "'472 patent"), which has an earlier November 2007 priority date.

22 **III.**    **CLAIM CONSTRUCTION**

23 Three terms for construction are the most significant.  First, the term "configured to" is

24 used in 10 of Nevro's 18 asserted claims, and its construction affects the infringement analysis for

25 those claims.  While BSC infringes under either party's construction of the term, the facts are

26 undisputed under Nevro's construction, as shown in the motion below regarding claim 7 of the

27

28 [2] In addition to the '102 patent, the six patents are U.S. Patent Nos. 8,712,533 (the "'533 patent"), 8,792,988 (the "'988 patent"), 9,327,125 (the "'125 patent"), 9,333,357 (the "'357 patent"), and 9,480,842 (the "'842 patent") (Exs. 2-8).

1   '533 patent.  Second, the construction of "frequency" is significant to BSC's late-disclosed

2   "frequency harmonics" invalidity theory, which is also the subject of Nevro's motion to strike.

3   That theory cannot apply if "frequency" is correctly construed to have its ordinary meaning.  If

4   the Court does not strike BSC's untimely theory, it should nonetheless eliminate the theory on

5   summary judgment based on "frequency's" correct construction.  Third, the parties previously

6   agreed that the construction of "paresthesia" is significant.  (ECF No. 185 at 4 (JCCS).)  While it

7   does not affect Nevro's summary judgment motion, it is relevant to certain asserted prior art.

8           Many of the additional terms that BSC seeks to construe do not require construction at all.

9   For several terms, BSC does not actually seek construction but instead asserts that they are

10   indefinite, a defense BSC must prove by clear and convincing evidence.  *BASF Corp. v. Johnson*

11   *Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).  If BSC pursues those arguments in its

12   summary judgment motion, Nevro will address them in its opposition.

13           **A.    Claim Construction Principles**

14           Claim construction is a matter of law for the Court.  *Markman v. Westview Instruments,*

15   *Inc.*, 517 U.S. 370, 372 (1996).  Claim terms "are generally given their ordinary and customary

16   meaning" as understood by one of ordinary skill in the art.  *Phillips v. AWH Corp.*, 415 F.3d

17   1303, 1312-13 (Fed. Cir. 2005) (en banc) (citation omitted).  Claim construction begins with an

18   examination of the claim language.  *Id.* at 1312.  In addition to the claim language, the Court

19   should consider the patent's specification and prosecution history.  *Id.* at 1315-1317.  The Court

20   may consult extrinsic evidence to understand "the background science or the meaning of a term in

21   the relevant art during the relevant time period."  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.

22   Ct. 831, 841 (2015) (citation omitted).  Such extrinsic evidence may include technical dictionaries

23   and expert testimony.  *Philips*, 415 F.3d at 1317-18.

24           **B.    "Configured to"**

| Nevro's construction | BSC's construction |
|---|---|
| Designed to | This is a structural limitation not drawn to mere capability. If a construction is required: a signal generator which requires no further configuration to generate/deliver a signal delivery device which requires no further configuration to deliver |

1  The term "configured to" is commonly used in patent claims to mean "designed to," and

2  has repeatedly been interpreted and understood that way by the Federal Circuit, this Court, and

3  BSC itself.  Because it is undisputed that BSC's accused systems are designed to provide high

4  frequency paresthesia-free therapy, such a construction will lead to a finding of infringement.

5  BSC therefore proposes to construe "configured to" to mean, in effect, that the system has already

6  been implanted in a patient and that the specific programming parameters for treating that patient

7  have been entered into the system.  BSC's expert admits this definition would lead to different,

8  conflicting definitions of the term, not just within the same patent but even *within the same claim*.

9  The Federal Circuit has addressed the meaning of "configured to" in construing another

10  term, "adapted to," which it has held to have a similar meaning, and the court views "designed to"

11  as a synonym.  *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016)

12  ("[T]he phrase 'adapted to' generally means 'made to,' 'designed to,' or 'configured to,' though it

13  can also be used more broadly to mean 'capable of' or 'suitable for.'"); *see also In re Giannelli*,

14  739 F.3d 1375, 1379 (Fed. Cir. 2014) (same); *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672

15  F.3d 1335, 1349 (Fed. Cir. 2012) (same).  This Court has done so as well.  In *Mount Hamilton*

16  *Partners, LLC v. Groupon, Inc.*, the Court construed claims reciting a "module *configured to*"

17  perform a function or task as "components which are *designed to* perform a defined task(s)."

18  2014 U.S. Dist. LEXIS 34556, at *20 (N.D. Cal. Mar. 14, 2014) (emphases added).  In another

19  case involving BSC, the Court adopted BSC's proposal to construe "adapted to" as "configured

20  to" to convey that "the elongate tip portion was *designed (i.e., configured)* to multiply fold upon

21  itself."  *Boston Sci. Corp. v. Cordis Corp.*, 2006 U.S. Dist. LEXIS 94329, at *4 (N.D. Cal.

22  Dec. 20, 2006) (emphasis added) (citation omitted).

23  The Nevro patents also use "configured to" to mean "designed to."  The claims that

24  contain this term are directed to implantable spinal cord stimulation or modulation systems.  The

25  claim language and structure demonstrate that "configured to" is used to describe what the

26  systems are designed to do.  For example, claim 1 of the '533 patent recites:

27      1. A spinal cord modulation system for reducing or eliminating pain in a
        patient, the system comprising:

28

1
2

> a signal generator configured to generate a non-paresthesia-producing therapy signal, wherein at least a portion of the therapy signal is at a frequency in a frequency range from 1.5 kHz to 100 kHz; and

3
4

> an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region.

5    One component of the system is a "signal generator" designed to generate a non-paresthesia-

6    producing therapy signal within a specified frequency range.  Another component is an

7    "implantable signal delivery device" (a lead) designed to deliver that therapy signal.  The claim

8    says that the signal delivery device is "implantable," not that it has already been implanted.  The

9    claim is drawn to how the system is designed; it does not require that the system have been used.

10        Claim 12 of the '533 patent, which depends from claim 1, confirms that "configured to"

11   means "designed to":

12
13

> 12.  The system of claim 1, wherein the signal delivery device is a percutaneous lead configured to be implanted in the patient's epidural space.

14   The claim states that the lead is "configured to be implanted," not that it is implanted.  The logical

15   reading of this language is that the percutaneous lead is designed to be implanted.  Several other

16   asserted claims, including claims 1 and 22 of the '842 patent and claim 55 of the '125 patent, also

17   contain this "configured to be implanted" language, confirming that the claims use "configured

18   to" to mean that the lead is designed to be implanted, not that it has been implanted.

19        The specifications also support this interpretation of "configured to."  The '533 patent

20   states: "For example, the manufacturer can use a stencil or other arrangement to guide the

21   removal process, which can include, but is not limited to, an ablative process.  This arrangement

22   allows the same overall configuration of the lead 910 to be used for a variety of applications and

23   patients without major changes."  ('533 patent at 22:63-23:1.)  Here, the specification describes

24   the "configuration" of a lead in terms of how it has been designed by the manufacturer.  It

25   explains that these features of the lead design will increase its versatility and allow it to be used

26   with a variety of different patients.  (*Id.*)  This reinforces that the patents use "configured"

27   language to refer to how a system is designed, not how it is used after implantation in a patient.

28        BSC does not provide any meaningful construction of "configured to."  For several

1    phrases containing "configured to," BSC asserts that "[t]his is a structural limitation not drawn to

2    mere capability," but BSC does not say what "configured to" affirmatively requires.  BSC

3    proposes that "[i]f a construction is required," these phrases be construed so that "configured to"

4    means "which requires no further configuration to."  This proposal simply uses another form of

5    the word, "configuration," and sheds no light on the meaning of that word.

6         BSC's claim construction expert Dr. Fridman explained BSC's position in more detail,

7    and confirmed that BSC's position is untenable.  Dr. Fridman opined that "configured to" has

8    different meanings in different parts of the claims.  (Ex. 29, Fridman Rbtl. ¶ 39; Ex. 30, Fridman

9    Dep. 150:18-151:6, 152:10-153:12.)  He agreed that "configured to be implanted" means that the

10   lead "is *designed to* be put into the epidural space."  (Ex. 30, Fridman Dep. 152:23-153:4

11   (emphasis added).)  He also agreed that "configured *to be implanted*" refers to "a future event that

12   has not happened," meaning that the lead "has not yet been implanted."  (Ex. 29, Fridman Rbtl. ¶

13   39 (emphasis in original); Ex. 30, Fridman Dep. 157:21-25.)  In contrast, Fridman opined that

14   "configured to deliver" and "configured to generate" mean that the lead "has been implanted in

15   the spinal cord and connected to a signal generator" (Ex. 29, Fridman Rbtl. ¶¶ 39, 48) and that the

16   signal generator has been programmed with specific parameters for a patient.  (Ex. 31, Fridman

17   Rpt. ¶¶ 114-115; Ex. 29, Fridman Rbtl. ¶¶ 39, 42.)

18        The problem is that BSC's different meanings of "configured to" are irreconcilable in the

19   context of the claims.  Several claims contain both "configured to be implanted" and "configured

20   to deliver"/"configured to generate" limitations.  Claim 1 of the '842 patent is illustrative:

21            1. A spinal cord modulation system, comprising:

22               a signal generator **configured to generate** a therapy signal having a
                 frequency of 10 kHz, an amplitude up to 6 mA, and pulses having a
23               pulse width between 30 microseconds and 35 microseconds; and

24               an implantable signal delivery device electrically coupleable to the
                 signal generator and **configured to be implanted** within a patient's
25               epidural space to deliver the therapy signal from the signal generator
                 to the patient's spinal cord.
26

27   (Ex. 8 (emphasis added).)  BSC's different interpretations of the two "configured to" phrases

28   would result in an internal contradiction in the claim.  On the one hand, BSC interprets

"configured to generate" to mean that the lead has already been implanted and the signal generator has already been programmed for a specific patient.  On the other hand, BSC agrees that "configured to be implanted" refers to a future event and means that the lead has not yet been implanted.  When asked about this contradiction in BSC's reading of this claim, as well as several other claims having both "configured to be implanted" and "configured to generate"/"configured to deliver" language, Dr. Fridman admitted it was "confusing" and "doesn't make sense." (Ex. 30, Fridman Dep. 162:13-163:4, 164:8-170:2; 172:20-173:8.)  He said, "I don't know how to reconcile that." (*Id.* 163:25.)

The way to reconcile BSC's confusion is to correctly construe "configured to" to mean "designed to" throughout the claims.  It is a basic principle of claim construction that "claim terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314 (citation omitted).  That is true here with respect to "configured to," and the Court should so construe it.

### C.    "Frequency"

| Nevro's construction | BSC's construction |
|---|---|
| This term does not require construction and should have its plain and ordinary meaning. | The therapy signal has … a frequency component in a frequency range |

BSC's expert reports advanced a previously undisclosed theory of invalidity—its "harmonics" theory—that turns on adopting its peculiar definition of "frequency."  The patents use "frequency" in accordance with its plain and ordinary meaning to refer to the pulse rate – the number of pulses occurring over a given unit of time.  (Pless Decl. ¶¶ 32-33.)  The standard unit of measure of frequency is the hertz (Hz), which the patents use to refer to the number of pulses per second.  (*Id.*)  One kilohertz (kHz) is equal to 1000 Hz.

The patents consistently use "frequency" in an ordinary way to refer to the stimulation pulse rate.  The specification contrasts traditional low frequency SCS known in the prior art with Nevro's novel high frequency SCS.  ('533 patent at 6:51-63.)  It describes "standard SCS treatment" as "stimulation at a frequency of less than 1500 Hz (e.g., 60-80 Hz)."  (*Id.* at 6:41-44.)  By contrast, the specification describes the claimed "high frequency modulation" techniques as stimulation at a "significantly higher" frequency "from about 1.5 kHz to about 100 kHz."  (*Id.* at 6:59-63.)  The rest of the specification and the file histories also use "frequency" the same way to

1  refer to pulse rate.  ('533 patent at 10:16-24, 12:21-22, 19:26-29; Pless Decl. ¶¶ 138-141.)

2        This plain and ordinary meaning of frequency is well understood by persons of ordinary

3  skill in the art and used throughout the field of SCS.  (Pless Decl. ¶ 154.)  BSC's own manuals,

4  specifications, and documentation for its SCS systems all use frequency this way.

5

6

7                 (Ex. 32, Adair Ex. 4, at BSC-NVRO_00014492; Ex. 23, Adair Dep. 112:25-115:8).)

8

9

10

11

12

13  (*Id.* at BSC-NVRO_00127833; *id.* at BSC-NVRO_00127835.)  Thus, outside of this litigation,

14  BSC's own definitions confirm that in SCS the ordinary meaning of frequency is the pulse rate.

15  And BSC's own physician expert in this litigation, Dr. Lipson, agrees with this ordinary meaning

16  as well: "Evidence suggests that *pulse repetition rate* (commonly referred to as 'frequency' in the

17  clinical literature) is not exclusive in the ability to produce pain . . . ."  (Ex. 33, Lipson Rpt. ¶ 24.)

18        BSC proposes the following construction for several different claim phrases that refer to

19  frequency:  "The therapy signal has…a frequency component in a frequency range."  BSC's

20  proposal creates unnecessary ambiguity and confusion.  For example, one of the claims to which

21  BSC seeks to apply this construction, claim 5 of the '357 patent, states that "the therapy signal

22  has a frequency of 10 kHz."  It does not make sense to reinterpret "a frequency of 10 kHz" as "a

23  frequency component in a frequency range."  10 kHz is a frequency, not a frequency range.

24  Further, BSC's addition of the word "component" is unsupported by the claim language and

25  introduces potential confusion to a term with a well-understood ordinary meaning.

26        While BSC's construction of "frequency" is already unclear and confusing, Dr. Fridman's

27  opinion carries it even deeper into the woods.  Fridman postulates that the word "frequency" calls

28  for performing a highly complex, abstract, mathematical signal "decomposition" analysis using

the "Fourier transform" or "Fourier series" to convert the signal into a representation of its "harmonics" or "spectral components" in the frequency domain.  (Ex. 31, Fridman Rpt. ¶¶ 84-85.)  The patents say nothing of the sort.  There is no discussion of spectral components, the Fourier transform or Fourier series, signal decomposition analysis, spectral analysis, or representations of signals in the frequency domain anywhere in the patents.  (Pless Decl. ¶ 145; Ex. 30, Fridman Dep. 110:25-111:5, 111:6-11, 111:16-21, 144:2-11.)

Dr. Fridman ignores all of the intrinsic evidence using "frequency" to refer to the pulse rate.  His argument is based on a misinterpretation of a single phrase from a sentence in an introductory part of the specification that states:

> The present technology is directed generally to spinal cord modulation and associated systems and methods for inhibiting pain via waveforms with high frequency elements or components (e.g., portions having high fundamental frequencies), generally with reduced or eliminated side effects.

('533 patent at 2:49-56.)  This general, introductory sentence does not define "frequency" or any specific embodiments of the claimed inventions.  Dr. Fridman seizes on the phrase "high frequency elements or components."  But the claims recite "frequency," not "frequency elements or components."  Moreover, Dr. Fridman ignores the explanatory parenthetical that refers to "portions having high fundamental frequencies."  He agrees that the "fundamental frequency" of a signal refers to its pulse rate.  (Ex. 31, Fridman Rpt. ¶¶ 83, 88.)  Read in context, this sentence simply means that, for at least some periods of time, the SCS signal may have a high pulse rate.  There is no basis to read spectral decomposition, the Fourier transform, or the Fourier series into the claims, and the Court should reject BSC's proposal to do so.

**D.**     **"Paresthesia"**

| Nevro's Construction | BSC's Construction |
| --- | --- |
| Any abnormal sensation caused by a spinal cord stimulation or modulation signal. Examples of paresthesia include the sensation of burning, pricking, pressure, formication, tickling, numbness, tingling, a 'pins and needles' feeling, or creeping on the skin. | Tingling |

The parties dispute two issues: (1) whether the claimed "paresthesia" is a sensation caused by spinal cord stimulation signals, and (2) whether "paresthesia" includes abnormal sensations

1    other than tingling.  Nevro's asserted patents claim "paresthesia-free" therapy, so the scope of the

2    "paresthesia" definition may distinguish the relevance of certain prior art to Nevro's claims.

3          On the first issue, the patents clearly refer to "paresthesia" as a sensation caused by SCS

4    signals.  The claims are directed to systems and methods for providing SCS signals that are "non-

5    paresthesia-producing" or "paresthesia-free."  ('533 patent claims 1, 21, 37, 58; '125 patent

6    claims 18, 34.)  In describing traditional paresthesia-based SCS, the '472 patent states: "For

7    example, applying a low-frequency (LF) therapy signal to the nerve fibers of a patient can

8    stimulate the nerve fibers to create an effect known in the art as 'paresthesia,' which creates a

9    sensation of numbness in the patient."  (Ex. 4, '472 patent at 7:19-23.)  The '533 patent states: "In

10   pain treatment, the pulse generator applies electrical pulses to the electrodes, which in turn can

11   generate sensations that mask or otherwise alter the patient's sensation of pain.  For example, in

12   many cases, patients report a tingling or paresthesia that is perceived as more pleasant and/or less

13   uncomfortable than the underlying pain sensation."  ('533 patent at 1:44-47.)  Similarly, BSC's

14   claim construction expert, Dr. Fridman, agreed that in the context of the claims, paresthesia "is

15   the effect of spinal cord stimulation."  (Ex. 30, Fridman Dep. 82:16-83:1.)  Nevro's construction

16   accounts for this link between paresthesia and SCS.  BSC's construction does not.

17         On the second issue, it is well understood in the art that tingling is just one example of

18   how paresthesia may be felt by a patient, and there is a wide range of other exemplary sensations

19   associated with how paresthesia may be perceived.  (Pless Decl ¶¶ 19-23, 101-105.)  The patents

20   use "tingling" and "numbness" as different examples of how paresthesia sensations may be

21   perceived.  ('533 patent at 1:47-49; Ex. 4, '472 patent at 7:19-23.)  Medical dictionaries and

22   references define paresthesia as including a variety of abnormal sensations, such as burning,

23   pricking, pressure, formication, tickling, numbness, tingling, or a 'pins and needles' feeling.  (*See*

24   Pless Decl. ¶¶ 19-20 (citing definitions of paresthesia); Ex. 34, NEVRO_BSXCA0094011-94013

25   (Stedman's Medical Dictionary), Ex. 35 (Dorland's Illustrated Medical Dictionary), Ex. 36,

26   NEVRO_BSXCA0056998-57001 (Mosby's Medical Dictionary), Ex. 37 (NIH Paresthesia

27   Information Page).)

28         Dr. Fridman agreed that paresthesia may feel different to different people.  (Ex. 30,

1   Fridman Dep. 62:2-24.)  He agreed that paresthesia sensations include pricking, formication,

2   tickling, numbness, buzzing, pins and needles, and creeping.  (*Id.* 62:2-13, 71:3-14.)  In his expert

3   report, he claimed that all of these different sensations are synonyms for the "tingling" in BSC's

4   proposed construction.  (Ex. 31, Fridman Rpt. ¶ 31.)  This defies common sense.  When asked if

5   numbness and tingling are the same, Dr. Fridman retreated to the position that these sensations

6   are "in the same realm" and "along the same lines," but that it is "a personal description that

7   depends on people's prior experiences."  (Ex. 30, Fridman Dep. 63:24-65:1.)  When asked if

8   numbness and tickling are the same, he said: "I don't know.  I don't think so necessarily.  I think

9   it's -- it's part of that same family of tingling sensation, in general described as tingling."  (*Id.*

10  71:24-72:11.)  Dr. Fridman's equivocal answers demonstrate that these paresthesia sensations are

11  not merely synonyms for tingling.

12       Dr. Fridman argues that burning and pressure are not paresthesia sensations because they

13  are painful, and it would not make sense to use them to mask pain.  (Ex. 31, Fridman Rpt. ¶ 34.)

14  This argument is wrong in at least three ways.  First, Dr. Fridman admitted that in SCS there is

15  paresthesia that does not mask pain.  (Ex. 30, Fridman Dep. 66:25-68:14.)  For example, if the

16  paresthesia is not covering the correct area of the body, it will not mask pain, but the sensation is

17  still paresthesia.  (*Id.*)  Second, the medical dictionary that Dr. Fridman cites in his report,

18  Stedman's Medical Dictionary, expressly includes "burning" in its definition of paresthesia and

19  supports Nevro's construction of paresthesia as an "abnormal sensation."  (Ex. 31, Fridman Rpt. ¶

20  30; Ex. 34, NEVRO_BSXCA0094011-94013 ("An abnormal sensation, such as of burning,

21  pricking, tickling, or tingling.").)  Third, Dr. Fridman's assertion that pressure is painful is his

22  arbitrary "personal interpretation" of the word.  (Ex. 30, Fridman Dep. 86:13-87:22.)  He

23  admitted that pressure can be subtle and that there is pressure that is not painful, such as the

24  sensation felt when people squeeze each other's hands lightly during a handshake.  (*Id.* 88:13-18,

25  90:1-91:8.)  There is no basis to exclude the sensations of burning and pressure.

26

27

28

1

### E.   "Therapy signal"

| Nevro's construction | BSC's construction |
|---|---|
| a spinal cord stimulation or modulation signal to treat pain | Indefinite.  Alternatively, a signal which produces a measurable therapeutic effect. |

The patents use the term "therapy signal" to mean a spinal cord stimulation or modulation signal to treat pain.  The '533 patent states that "aspects of many of the following embodiments are directed to producing a therapeutic effect that includes pain reduction in the patient."  ('533 patent at 3:11-13.)  In describing a lead for providing "therapy signals," the patent states that it "can include one or more electrodes or electrical contacts that direct electrical signals into the patient's tissue, such as to provide for patient relief."  (*Id.* at 3:39-45.)  Similarly, the '472 patent describes "therapy signals" that can be generated by "a representative therapy system 100 for providing relief from chronic pain, arranged relative to the general anatomy of a spinal cord SC of a patient."  ('472 patent at 5:35-38.)  The patent describes "[d]etailed treatment processes for administering therapy signals for chronic pain management."  (*Id.* 8:6-7.)

BSC's main argument on this term is indefiniteness.  Its backup construction, "a signal which produces a measurable therapeutic effect," has several problems.  First, it refers generally to a "signal" rather than a spinal cord stimulation or modulation signal.  Dr. Fridman agreed that, in the context of the claims, a "therapy signal" is a spinal cord stimulation or modulation signal (Ex. 30, Fridman Dep. 100:22-101:7), but BSC's construction does not reflect that.  Second, BSC does not meaningfully construe "therapy"; it merely uses another form of the word, "therapeutic," without defining it.  Dr. Fridman testified that "therapy signal means a signal that is -- that is delivered with the intent of relieving -- relieving pain" (*id.* 95:8-13), but BSC's construction says nothing about relieving pain.  Third, BSC has arbitrarily added the word "measurable," which does not appear in the patents and is not supported by intrinsic or extrinsic evidence.

Reading "measurable" into the claims creates ambiguities that even BSC cannot keep straight.  In his expert report, Dr. Fridman opined that "measur*able*" means that there must be "a measur*ed* effect" in a specific patient.  (Ex. 29, Fridman Rbtl. ¶ 25 (emphasis added).)  He said that aspirin "is a therapy" when it cures a headache but "is not a therapy" if the headache persists or gets worse.  (*Id.*)  This interpretation would require "measuring the effect of the signal" in

1    every patient to determine whether a signal is or is not a "therapy signal" on a patient-by-patient

2    basis.  (*Id.*)  But Dr. Fridman admitted that "therapy signals," such as those in SCS, are "not

3    necessarily effective every time" in relieving pain in all patients.  (Ex. 30, Fridman Dep. 101:13-

4    19.)  This is a more logical understanding of "therapy signal," but Dr. Fridman's inconsistent

5    statements show that adding "measurable" confuses rather than clarifies the term.

6        **F.    "Implantable"**

7
| Nevro's construction | BSC's construction |
| --- | --- |
| Suitable for long-term implantation | Plain meaning |

8

9        BSC has asserted prior art in which electrodes are placed on the surface of the skin or

10   inserted into the skin.  In the context of the patents, however, the signal generators and signal

11   delivery devices (leads) for providing SCS are "implantable."  (*See, e.g.*, '533 patent claims 37,

12   58.)  It is well understood in the field of SCS and a matter of common sense that these devices are

13   and must be suitable for long-term implantation.  (Pless Decl. ¶ 163.)  SCS requires that a

14   physician perform an invasive surgical procedure to implant the signal generator and leads.  Dr.

15   Fridman agreed that, in the context of the patents, "implantable" refers to "surgically implantable

16   devices" and "putting something in the body as a result of cutting it."  (Ex. 30, Fridman Dep.

17   133:4-14, 134:1-9.)  BSC's website explains that its SCS system is a "long-term implant" and "is

18   intended for long-term therapy."  (*See* Ex. 75 (website)).

19       BSC proposes that "implantable" be given its plain meaning, but Dr. Fridman's expert

20   report illustrates that BSC is interpreting the term too broadly and out of context.  He states that

21   "in a hospital setting, devices may be implantable for a number of days (e.g., feeding tube,

22   catheter, intramuscular stimulation devices)."  (Ex. 31, Fridman Rpt. ¶ 110.)  But he admitted that

23   his examples of a feeding tube or catheter were "a little broader" and "implies insertion into the

24   body in other ways other than surgery" (Ex. 30, Fridman Dep. 134:17-23), whereas in the context

25   of the patents, the SCS devices must be surgically implantable.  (*Id.* 134:1-9.)  BSC's proposal is

26   overbroad because it does not account for the context in which the term is used.

27       **G.    "Means for generating . . ." and "means for delivering . . ."**

28       Asserted claims 18, 34, and 55 of the '125 patent are means-plus-function claims.  Each of

1   these claims is directed to a spinal cord modulation system with a "means for generating" a

2   paresthesia-free therapy signal and a "means for delivering" the therapy signal.  The opening

3   expert report of Ben Pless identifies recited function and corresponding structure for these claims.

4   (Pless Decl. ¶¶ 88-99.)  In each of these claims, the corresponding structure for the "means for

5   generating . . ." is a pulse generator, and the corresponding structure for the "means for

6   delivering . . ." is a lead.  (*Id.*)

7          As with the system claims that contain "configured to" language, BSC's constructions

8   again seek to transform these system claims into method claims.  Dr. Fridman asserts that the

9   "means for delivering" must be "connected to the configured pulse generator . . . and at least

10   partially implanted in the patient's body" (Ex. 29, Fridman Rbtl. ¶ 73) and that the "means for

11   generating" must be "configured/programmed" with specific parameters.  (*Id.* ¶ 69.)  But Dr.

12   Fridman agreed that the part of the specification that he cited to support his construction describes

13   a *process* by which a practitioner may use a device to treat a patient.  (Ex. 30, Fridman Dep.

14   175:11-176:11 (quoting '125 patent at 4:64-5:5).)  It does not describe a system.

15          As with its position on "configured to," BSC's proposed constructions of these limitations

16   would create an internal contradiction within the same claim.  Claim 55 of the '125 patent states

17   that "the means for delivering the therapy signal is *configured to be implanted* in the patient's

18   epidural space" (emphasis added).  As discussed above, Dr. Fridman agreed that "configured *to*

19   *be implanted*" refers to "a future event that has not happened," meaning that the lead "has not yet

20   been implanted."  (Ex. 29, Fridman Rbtl. ¶ 39 (emphasis in original); Ex. 30, Fridman Dep.

21   157:21-25.)   As Dr. Fridman admitted, this directly contradicts his construction that the "means

22   for delivering" must be "at least partially implanted in the patient's body."  (Ex. 30, Fridman Dep.

23   170:11-173:8.)  Again, Dr. Fridman admitted that he found this contradiction "confusing."  (*Id.*)

24   As with the construction of "configured to," this contradiction can be avoided by adopting the

25   correct construction of these terms as Nevro proposes.

26          **H.       "Programming a signal generator" / "programming the signal generator"**

| Nevro's construction | BSC's construction |
|---|---|
| This term does not require construction and should have its plain and ordinary meaning. | Entering selected signal delivery parameters into the signal generator |

1    These terms appear in asserted method claims 1 and 18 of the '988 patent.  While the

2    parties now do not appear to have a substantive dispute over the meaning of these terms, BSC's

3    construction includes an unnecessary ambiguity.  The patent specification teaches and the parties

4    agree that programming may be done wirelessly.  ('533 patent at 5:17-27.)  The parameters are

5    entered into a wireless physician's programmer or wireless patient programmer, and wirelessly

6    transferred to the signal generator.  They are not directly entered into the signal generator.  Dr.

7    Fridman clarified that BSC's construction is not intended to exclude wireless programming.

8    (Ex. 29, Fridman Rbtl. ¶ 52; Ex. 30, Fridman Dep. 147:17-148:3.)  Nonetheless, BSC's

9    construction introduces this potential ambiguity, does not help to clarify the meaning of the term,

10   and does not aid in resolving any disputed issues of infringement or validity.

### I.    "Machine-readable medium containing instructions for generating and transmitting" / "executable instructions to generate"

| Nevro's construction | BSC's construction |
|---|---|
| This term does not require construction and should have its plain and ordinary meaning. | This is a structural limitation not drawn to mere capability.<br>If a construction is required:<br>  a signal generator having instructions which require no further programming to generate and deliver / transmit |

17   BSC's constructions for these terms essentially track the position it took on "configured

18   to."  For example, claim 58 of the '533 patent is directed to a "fully implantable medical device"

19   that includes "an implantable signal generator having a *machine-readable medium containing*

20   *instructions for generating and transmitting* a non-paresthesia-producing spinal modulation

21   signal."  As with "configured to," BSC argues that this term applies to a signal generator only

22   after a clinician has programmed the device with specific parameters for a patient.  (Ex. 31,

23   Fridman Rpt. ¶ 126.)  BSC is wrong for the same reasons it is wrong on "configured to."

24   Dr. Fridman ignores the specification disclosure of these terms in his expert reports:

> The pulse generator 101 can include a ***machine-readable (e.g., computer-readable) medium containing instructions for generating and transmitting*** suitable therapy signals.  The pulse generator 101 and/or other elements of the system 100 can include one or more processors 107, memories 108 and/or input/output devices.  Accordingly, the process of providing modulation signals and executing other associated functions can be performed by ***computer-executable instructions*** contained on computer-readable media, e.g., at the processor(s) 107 and/or memory(s) 108.

1  ('533 patent at 3:56-65 (emphases added).)  This description is consistent with the ordinary usage

2  of these terms in the context of computer hardware and software.  (Pless Decl. ¶¶ 57, 177.)

3  Nothing in this part of the specification or any other part of the intrinsic record states that the

4  signal generator must have already been programmed for a specific patient.

5          **J.**      **"Non-paresthesia-producing therapy signal" / "non-paresthesia-producing**
                       **spinal modulation signal" / "paresthesia-free therapy signal" / "without**
6                      **generating paresthesia" / "without generating the sensation of paresthesia in**
                       **the patient"**
7

8          For all of these different terms, BSC's main argument is indefiniteness.  For the terms

9  "non-paresthesia-producing therapy signal," "non-paresthesia-producing spinal modulation

10  signal," and "paresthesia-free therapy signal," Nevro's construction is "a spinal cord stimulation

11  or modulation signal to treat pain without causing paresthesia."  This is supported by the

12  specification, which states that "irrespective of the level of pain relief the patients received, 88%

13  of the patients preferred the presently disclosed therapy to standard SCS therapy because it

14  reduced their pain without creating paresthesia."  ('533 patent at 9:6-15.)  Dr. Fridman

15  acknowledges that BSC's backup constructions for these terms omit the type of signal described

16  in the respective claims in which they appear, and he agrees that Nevro's construction is correct

17  in identifying the type of signal.  (Ex. 29, Fridman Rbtl. ¶ 63.)

18          For the terms "without generating paresthesia" and "without generating the sensation of

19  paresthesia in the patient," Nevro's construction is "the spinal cord stimulation or modulation

20  signal treats pain without causing paresthesia."  Dr. Fridman argues that these terms "include no

21  'signal' at all."  (*Id.* ¶ 64.)  But in the context of the claims, there clearly is a spinal cord

22  stimulation or modulation signal.  (*See, e.g.*, claim 14 of the '988 patent recites "programming the

23  signal generator to generate and deliver the therapy signal at a frequency and amplitude that

24  alleviates the patient's pain without generating the sensation of paresthesia in the patient."  While

25  it does not appear that this issue affects any disputed issues of infringement or validity, Nevro's

26  construction is more accurate.

27  **IV.     THE PRECISION WITH MULTIWAVE INFRINGES NEVRO'S CLAIMS**

28          Nevro bears the burden of proving infringement under a "preponderance of the evidence"

standard.  *See Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997) (affirming summary judgment of infringement).  Nevro readily meets this burden under the proper construction of key claim terms as described above.  (Pless Decl. ¶¶ 183-245.)  BSC's safe harbor defense does not apply to patients who have exited the ACCELERATE study.

### A.   The Precision with MultiWave System Infringes Claim 7 of the '533 Patent under Nevro's Construction of "Configured To."

BSC infringes Claim 7 of the '533 patent under 35 U.S.C. § 271(a) ███████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████).)  Under Nevro's construction of "configured to" (as "designed to"), the Precision MultiWave system meets every element of the claim.  BSC's non-infringement defense herefore hinges on its construction of that term.  Claim 7 reads as follows:

> Claim 1 (unasserted): A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising: a signal generator configured to generate a non-paresthesia-producing therapy signal, wherein at least a portion of the therapy signal is at a frequency in a frequency range from 1.5 kHz to 100 kHz; and an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region.

> Claim 7: The system of claim 1, wherein the frequency range is from 1.5 kHz to 50 kHz.

#### 1.   Claim 1, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:"

BSC's technical expert, Dr. Richard Mihran, confirmed that the Precision with MultiWave is "a spinal-cord-modulation system for reducing or eliminating pain."  (Ex. 38, Mihran Dep. 94:9-13.) ███████████████████████████████████████████████████ ████████████████████████████████████ (Ex. 39 at 4 (Carbunaru Ex. 36); Ex. 20 (Carbunaru Dep. 168:13-169:2).)  BSC has not disavowed Dr. Mihran's statement or otherwise set forth any evidence that Precision with MultiWave does not meet this limitation.  (*See, e.g.*, Ex. 40 at 13 (BSC's Suppl. Resp. to Rog No. 9); Ex. 41, Mihran Rbtl. ¶¶ 234-35.)

1

2.      **Claim 1, Element [a]: "a signal generator configured to generate a non-paresthesia-producing therapy signal"**

2

3        The Precision with MultiWave system includes an implantable pulse generator ("IPG")

4   which is a "signal generator."  (Ex. 20, Carbunaru Dep. 11:7-17.)  Precision with MultiWave ████

5   ██████████████████████████████  (Ex. 42, Cassidy Dep. 60:21-61:2.)

6        In the ████████████████████████████████████████████  (*see* Ex. 43, Adair

7   Ex. 13 at 1; Ex. 23, Adair Dep. 240:1-11), BSC was ███████████████████████████████

8   ██████████████████████████████████  (Ex. 20, Carbunaru Dep. 204:2-5.)

9   After patients exited the study, █████████████████████████████████████████████████

10  █████████████████████████████████.  (*See* Ex. 44 at 1-2, Adair Ex. 12 (████████████

11  █████████████████████████████████); Ex. 23, Adair. Dep. 234:2-235:17,

12  253:14-24, 254:5-255:6 *and* Ex. 45, Adair Ex. 16 (many ACCELERATE patients █████

13  ████████████████████████████████████████); Ex. 23, Adair Dep. 258:3-259:6 *and*

14  Ex. 46, Adair Ex. 17 (████████████████████████████████████████████████████████████

15  ████████████████████████████████████); Ex. 23, Adair Dep., 258:3-

16  259:6.)  Further, ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████████████

18  █████████  (Ex. 16, Carbunaru Dep. 567:9-16.) ████████████████████████████████████████

19  ████.  (*See* Ex. 25 at 6 (BSC's 2nd Suppl. Resp. to Rog No. 2).)

20       BSC does not dispute the evidence but instead relies on its own claim construction in an

21  attempt to escape liability.  For example, ███████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████████████████

24  ████████████████████  (Ex. 40 at 14 (BSC's Suppl. Resp. to Rog No. 9) (emphasis added);

25  Ex. 41, Mihran Rbtl. ¶¶ 48-52, 235-39.)

26       3.      **Claim 1, Element [c]: "an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region"**

27

28       Dr. Mihran admits specifically that Precision with MultiWave uses "implantable" leads.

1  (Ex. 38, Mihran Dep. 95:16-24.)  The leads ███████████████████████████

2  ██████████████████████████ (Ex. 39 at 2, Carbunaru Ex. 36; Ex. 20, Carbunaru Dep.,

3  168:13-169:2.) ███████████████████████████████████████████████████████

4  ████████████████████ (*Id.* at 30-31.)  BSC has not controverted this evidence, but rather

5  again relies on its flawed construction of "configured to."  (*See* Ex. 41, Mihran Rbtl. ¶ 244 ("[i]t

6  is not BSC that configures the leads"); Ex. 40 at 17 (BSC's Suppl. Resp. to Rog No. 9).)

7      **4.**    **Claim 7: "the system of claim 1, wherein the frequency range is from**

8                **1.5 kHz to 50 kHz"**

9      The Precision with MultiWave ██████████████████████████████

10  ████████████████████████████████████████████████ (Ex. 39 at 51, Carbunaru Ex.

11  36.)  After patients exited ACCELERATE, ██████████████████████████████████

12  ████████████████████████████████████████████████████ via Precision with

13  MultiWave.  (*See, e.g.*, Ex. 46, Adair Ex. 17; Ex. 23, Adair Dep. 258:9-259:6; Ex. 25 at 22,

14  (BSC's 2nd Suppl. Resp. to Rog No. 8).)  Again, BSC disputes only whether the system is so

15  "configured."  (*See* Ex. 40 at 16-17, (BSC's Suppl. Resp. to Rog No. 9) ████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████

18  ██████████████ (emphasis added)); Ex. 41, Mihran Rbtl. ¶¶ 48-52, 240-43, 245.).)  In sum, if

19  Nevro's construction of "configured to" is accepted, BSC infringes claim 7 of the '533 patent.

20      **B.**    **BSC Infringes Claim 11 of the '102 Method Patent** ████████████

21  ███████████████████████████████

22      BSC infringes method claim 11 of the '102 Patent ███████████████████████

23  ████████████████████████████████████████████.  Claim 11 reads:

24          Claim 1 (unasserted): A method for treating a patient, comprising:
   delivering or instructing delivery of an electrical signal to the

25          patient's spinal cord via at least one implantable signal delivery
   device; and wherein the electrical signal has a frequency of from

26          about 1.5 kHz to about 50 kHz and does not create paresthesia in
   the patient.

27

28          Claim 2 (unasserted): The method of claim 1 wherein the electrical
   signal is delivered to the patient to treat pain in the patient.

Claim 11: The <u>method</u> of claim 2 wherein the pain in the patient includes at least one of low-back pain and leg pain.

### 1. Claim 1, Preamble: "A method for treating a patient, comprising:"

Dr. Mihran confirmed that the Precision with MultiWave—██████████████████ ████████████████ (Ex. 25 at 22 (BSC's 2nd Suppl. Resp. to Rog No. 8)—is "a spinal-cord-modulation system for reducing or eliminating pain."  (Ex. 38, Mihran Dep. 94:9-13; *see also* Ex. 39 at 4, Carbunaru Ex. 36; Ex. 47, Adair Ex. 20 at 1; Ex. 23, Adair Dep. 284:20-23.) BSC has not presented evidence to the contrary.  (*See, e.g.*, Ex. 41, Mihran Rbtl. ¶ 363; Ex. 40 at 45-46 (BSC's Suppl. Resp. Rog No. 9).)

### 2. Claim 1, Element [a]: "delivering or instructing delivery of an electrical signal to the patient's spinal cord via at least one implantable signal delivery device"

As described above, Precision with MultiWave employs percutaneous leads implanted in the patient to deliver a therapy signal to the spinal cord.  Moreover, for patients who have completed ACCELERATE, ██████████████████████████.  (Ex. 25 at 23 (BSC's 2nd Suppl. Resp. to Rog No. 8) ████████████████████████████████ ████████████████████████████████████████████ ████████"); *see also* Ex. 23, Adair Dep. 247:21-248:12.)  BSC has not set forth any evidence that it does not deliver or instruct delivery to the patients who █████████████████ ████████████████.  (*See, e.g.*, Ex. 41, Mihran Rbtl. ¶¶ 364-66; Ex. 40 at 45-46 (BSC's Suppl. Resp. to Rog No. 9).)

### 3. Claim 1, Element [b]: "wherein the electrical signal has a frequency of from about 1.5 kHz to about 50 kHz"

BSC has ███████████████████████████████████████████████ ████████████████████████████████████ (Ex. 23, Adair Dep. 258:9-259:6; Ex. 46 at *e.g.*, 1, Adair Ex. 17 (███████████████), 10 ████████).)  BSC does not suggest otherwise in its expert report or interrogatory responses.  (*See, e.g.*, Ex. 41, Mihran Rbtl. ¶¶ 367-68; Ex. 40 at 46-47 (BSC's Suppl. Resp. to Rog No. 9).)

**4.      Claim 1, Element [c]: "and does not create paresthesia in the patient"**

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ (Ex. 25 at 22 (BSC's 2nd Suppl. Resp. to Rog No. 8); *see also* Ex.

23, Adair. Dep. 253:14-24, 254:5-255:6 *and* Ex. 45, Adair Ex. 16 (███████████████████████

███████████████████████████████████████████).)  BSC

████████████████████████████████████████████. (*See* Ex. 46,

Adair Ex. 17; Ex. 23, Adair Dep. 258:3-259:6 (██████████████████████████████████████

████████████████████████████████████████████████).)

According to BSC, ████████████████████████████████████████████

██████████████████████████████████████ (Ex. 44 at 2, Adair

Ex. 12; *see also* Ex. 43 at 1, Adair Ex. 13; Ex. 23, Adair Dep., 230:9-231:13, 239:22-240:11).)

BSC's only explanation is that ██████████████████████████████████

███████████████████████████████████. (*See, e.g.*, Ex. 25 at

22 (BSC's 2nd Suppl. Resp. to Rog No. 8); Ex. 41, Mihran Rbtl. ¶¶ 369-70; Ex. 40 at 47 (BSC's

Suppl. Resp. to Rog No. 9).)

**5.      Claims 2 (unasserted) and 11: "The method of claim 1 wherein the
electrical signal is delivered to the patient to treat pain in the patient"
and "The method of claim 2 wherein the pain in the patient includes at
least one of low-back pain and leg pain"**

BSC describes the Precision with MultiWave ███████████████████████████████████

██████████████████████████ (Ex. 43 at 1, Adair Ex. 13.)  The inclusion criteria for

ACCELERATE also required "[c]omplaint of persistent or recurrent low back pain."  (Ex. 12,

Mihran Ex. 355; Ex. 38, Mihran Dep. 127:16-129:16.)  BSC has not set forth any evidence to the

contrary.  (*See, e.g.*, Ex. 41, Mihran Rbtl. ¶¶ 372; Ex. 40 at 45-46, 48 (BSC's Suppl. Resp. to Rog

No. 9) (disputing infringement only to the extent that BSC itself does not "treat[] patients").)

1

**C.**     **Safe Harbor Does Not Apply to Programming of Patients who Exited the ACCELERATE study.**

2

3     BSC's assertion of the 35 U.S.C. § 271(e) Safe Harbor as an affirmative defense against

4     infringement does not apply to programming of patients after they have exited the

5     ACCELERATE study.  (ECF No. 165 at 16 (BSC's 6th Affirmative Defense).)  The Safe Harbor

6     covers only activity that is reasonably related to the development and submission of information

7     under certain federal laws, such as to the FDA.  Because BSC ███████████████████████████

8     ████████████████████████████████████████████████, it does not apply here.

9     **1.**     **Programming of Patients Who Exited the Study is Not Reasonably Related to Development or Submission of Information to the FDA**

10

11     BSC's acts of infringement after patients exit the study are not immunized under the FDA

12     "Safe Harbor."  The Safe Harbor applies only if the conduct is "solely for uses reasonably related

13     to the development and submission of information under a Federal law which regulates the

14     manufacture, use, or sale of drugs."  35 U.S.C. § 271(e)(1).  The Safe Harbor was designed to

15     allow competitors to engage in otherwise infringing activity if necessary to obtain regulatory

16     approval.  *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 671 (1990).

17     Programming of patients who have exited the study has nothing to do with the study or

18     collection of information for submission to the FDA.  By BSC's own admissions, BSC is

19     ████████████████████████████████████████████████████.  Any

20     continued infringing use thus cannot be related to submission of information to the FDA.

21     ████████████████████████████████████████.  (*See* Ex. 24 (BSC's Suppl. Resp. to

22     Rog No. 7).)  ████████████████████████████████

23     ████████████████  (Ex. 22, Adair Dep. 384:18-386:9; Ex. 23, Adair Dep. 239:22-241:22.)

24     ████████████████████████████████████████████████████████

25     ████████████████████████████████████████████████████████  (Ex. 24

26     (BSC's Suppl. Resp. to Rog No. 8).)  ████████████████████████████████

27     ████  (*Id.*)  ████████████████████████████████████████

28     ████████████  (Ex. 22, Adair Dep. 402:9-406:17)  ████████████████

1   ████████████████████████████████████████ (Ex. 24

2   (BSC's Suppl. Resp. to Rog No. 8).)

3   ████████████████████████████████████████

4   ████████ BSC's VP of Regulatory & Clinical, Kaoru Lee Adair made this clear:

5   ████████████████████████████████████

6   ████████████████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████████████████████████

10  (Ex. 23, Adair Dep. 247:21-248:6 (emphasis added).)

11  ████ BSC is likewise unequivocal in its verified interrogatory response that "████████████

12  ████████████████████████ (Ex. 24 (BSC's Suppl. Resp. to Rog No. 8).)

13  ████ BSC's admissions make clear ████████████████████

14  ████████████████████████████ In *Classen*

15  *Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1070, 1072 (Fed. Cir. 2011), the Federal

16  Circuit held that the statute does not apply to activities that are "not related to producing

17  information for an IND or NDA" such as "information that may be routinely submitted to the

18  FDA", or "are not a 'phase of research' possibly leading to marketing approval." *See also*

19  *Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.,* 809 F.3d 610 (Fed. Cir. 2015) (holding that

20  routine QC control testing of generic drugs as part of a commercial production process was not

21  "reasonably related" to the development of submission of information to the FDA), *cert. denied*,

22  137 S. Ct. 68 (2016).  The Safe Harbor therefore does not apply.

23  **V.      VALIDITY OF ASSERTED PATENT CLAIMS**

24  **A.      Nevro's Asserted Claims Are Not Abstract Under 35 U.S.C. § 101**

25  BSC's affirmative defenses include a challenge to the patentability of the Asserted Claims

26  under 35 U.S.C. § 101.  (ECF No. 165 at 15.)  BSC's invalidity contentions argue that at least

27  some of the Asserted Claims are unpatentable because they are directed to the "abstract idea of

28  alleviating [patient] pain using spinal electrical therapy without causing paresthesia."  (*See* Ex. 49

1    at 75-104, BSC's 2nd Am. Prelim. Invalidity Contentions.)  The Asserted Claims are not directed

2    to an abstract idea; nor are they directed to an unpatentable law of nature or natural phenomenon.

3    Nevro therefore moves for summary judgment that Asserted Claims are not directed to patent-

4    ineligible subject matter.

5            Under Section 101, "any new and useful process, machine, manufacture, or composition

6    of matter, or any new and useful improvement thereof" is eligible for patent protection.

7    However, claims directed to no more than abstract ideas, laws of nature, or natural phenomena

8    are exceptions; such claims are not patent-eligible.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134

9    S.Ct. 2347, 2354 (2014).  To assess patent-eligibility, a court must first "determine whether the

10   claims at issue are ***directed to*** one of those patent-ineligible concepts." *Id.* at 2354 (emphasis

11   added) (citation omitted).  A court must "articulate what the claims are directed to with . . .

12   specificity," *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017), rather

13   than "simply ask[ing] whether the claims ***involve*** a patent-ineligible concept." *Enfish, LLC v.*

14   *Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  In particular, the claims should not be

15   read "at such a high level of abstraction" that they become "untethered from the language of the

16   claims[,] all but ensur[ing] that the exceptions to § 101 swallow the rule." *Id.* at 1337.  The

17   Federal Circuit has consistently stated that "the first-stage filter is a meaningful one." *Visual*

18   *Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (citation omitted).  Only if

19   the claim fails this first step must the court proceed to step two—analyzing whether claim

20   elements, either individually or as an ordered combination, contain an "inventive concept." *Id.*

21           As a whole, the test for "[p]atent eligibility under 35 U.S.C. § 101 is ultimately an issue of

22   law." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  Any underlying factual

23   issues are confined to the second, "inventive concept," step of the analysis.  *See Aatrix Software,*

24   *Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  The first step of the

25   analysis is a legal inquiry which asks the court to "compare claims at issue to those claims"

26   whose patent-eligibility was already considered "in previous cases." *Enfish*, 822 F.3d at 1334.

27           Supreme Court precedent confirms that claims which produce a "physical" result and

28   "describe in detail a step-by-step method for accomplishing such" are non-abstract. *Diamond v.*

1   *Diehr*, 450 U.S. 175, 185 (1981).  In *Diehr*, the Court considered claims involving a mathematical

2   equation as part of an "industrial process" for curing rubber.  *Id.* at 188, 193.  The Court found

3   that, "considered as a whole," the claims are directed to a concrete, patent-eligible process rather

4   than the abstract mathematical equation on which they rely, adding that "in determining the

5   eligibility of respondents' claimed process for patent protection under § 101 . . . . [i]t is

6   inappropriate to dissect the claims." *Id.* at 188.

7           Conversely, while courts have not "delimit[ed] the precise contours of . . . 'abstract

8   ideas,'" *Alice*, 134 S.Ct. at 2357, claims directed to "collecting," "presenting," and "analyzing"

9   information, mental processes, and "longstanding commercial practice[s]" have often been found

10  to be patent-ineligible. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed.

11  Cir. 2016) (collecting cases); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313

12  (Fed. Cir. 2016).  In addition, claims that "appl[y] a well-known idea using generic computers"

13  and claims that abstractly cover results where 'it matters not by what process or machinery the

14  result is accomplished.'" are frequently found to be directed to an abstract idea. *Intellectual

15  Ventures I LLC v. Erie Indem. Co.*, 711 F. App'x 1012, 1017 (Fed. Cir. 2017); *McRO, Inc. v.

16  Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

17          Comparing the Asserted Claims to claims considered in previous cases confirms that they

18  are not directed to an abstract idea.  The Asserted Claims are directed to Nevro's novel SCS

19  systems using physically implanted pulse generators and the tangible therapy methods using those

20  physical devices.  Nevro's SCS comprises an invasive medical treatment in which electrodes are

21  implanted in the epidural space of the patient's spinal cord to receive an electric signal through

22  leads connected to implanted pulse generators.  (*See, e.g.*, '533 patent at 1:24-53.)  The pulse

23  generator, which operates at particular parameters (e.g., frequencies, amplitudes, and pulse

24  widths), is configured to deliver a signal which "profoundly activat[es] the interneuron pool and

25  thus increas[es] the inhibition of inputs into the second order neurons," thereby physically and

26  measurably altering natural neuronal activity and changing how the brain perceives pain.  (*See,

27  e.g.*, *id.* at 14:45-51.)  Nevro developed and patented a therapy that departs from—and improves

28  upon—"standard SCS" by applying a high-frequency signal that does not rely on paresthesia to

1   mask pain.  (*See, e.g.*, *id.* at 2:49-56, 6:51-7:5, 9:6-15.)  That therapy and the systems to deliver it

2   are explicitly recited in the Asserted Claims.  To that end, each Asserted Claim requires

3   specialized, tangible medical devices designed to deliver particular therapy parameters.[3]  *See*

4   *Chamberlain Grp., Inc. v. Linear LLC*, 114 F. Supp. 3d 614, 630 (N.D. Ill. 2015) (finding that the

5   "vital connection to the mechanical and electrical elements of the claim renders the claims at

6   issue patent-eligible") (citation omitted).  Each claim further explicitly recites that these devices

7   are used to deliver an electrical signal having particular treatment parameters to the patient's

8   spinal cord to produce a physical result.[4]  *See SZ DJI Tech. Co. v. Yuneec Int'l Co.*, 2016 WL

9   8931302, at *6 (C.D. Cal. Oct. 13, 2016) ("The claims articulate a physical system and specific

10  parameters for how the UAV and/or imaging device should be adjusted, namely, number and

11  orientation of rotational axes, navigation path of the UAV, and maximum angular speed.").

12      The Asserted Claims therefore have nothing in common with those determined to be

13  directed to abstract ideas; they do not "merely graft generic computer components onto

14  otherwise-ineligible method claims."  *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089,

15  1096 (Fed. Cir. 2016).  Rather, as in *Diehr*, the claims "describe in detail" systems and methods

16  for achieving a physical result—in this case, a medical therapy using special-purpose implantable

17  medical devices—and the systems for administering that therapy.  *Diehr*, 450 U.S. at 184.  As one

18  court recently put it, the claims "describe[] a way of running a specific type of machine in order

19  to achieve a particular type of [therapy].  This is not the type of broad idea that threatens to

20  monopolize 'basic tools of scientific and technological work' or 'the building blocks of human

21  ingenuity.'"  *POWERbahn, LLC v. Found. Fitness LLC*, 2016 WL 4318978, at *5 (D. Nev.

22  Aug. 11, 2016) (citing *Alice*, 134 S. Ct. at 2354).

23      The Asserted Claims are also not directed to a law of nature or natural phenomenon.  In

24  *Rapid Litigation*, the Federal Circuit overturned a decision in which the district court found

25  _____

26      [3] *See, e.g.*, '533 patent, claims 7 ("signal generator," "implantable signal delivery device");'472 patent, claim 1 ("percutaneous lead" that is "implant[ed] . . . in the patient's epidural space" and "includes at least one electrode," "implant[ed] . . . signal generator").

27      [4] *See, e.g.*,'533 patent, claim 37 ("the therapy signal is at a frequency of 10 kHz, and at a current amplitude in a current amplitude range from 0.1 mA to 20 mA ");'472 patent, claim 5 ("a frequency range of from about 3,000 Hz to about 10,000 Hz").

28

1    claims that recite a method for preserving liver cells to be directed to a law of nature.  *See Rapid*

2    *Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016).  The Federal Circuit found

3    that while "[t]he inventors certainly discovered the cells' ability to survive multiple freeze-thaw

4    cycles, [] that is not where they stopped, nor is it what they patented"—instead, the claims are

5    directed to the implementation of that discovery in "a new and useful laboratory technique for

6    preserving hepatocytes."  *Id.* at 1048 (citation omitted).  Like the claims in *Rapid Litigation*, the

7    Asserted Claims do not "stop" at the discovery that pain relief can be provided without

8    paresthesia.  Instead, they explicitly recite particular medical devices and "a number of concrete

9    steps to achieve the desired" therapy results.  *Id.* at 1047.  The Asserted Claims are each targeted

10   to achieve particular therapeutic goals—pain relief without paresthesia—using special-purpose

11   medical devices with specific treatment parameters.  (*See, e.g.*, '533 patent at claim 7.)  Thus, like

12   other medical treatments that the Federal Circuit has found eligible for patent protection, the

13   Asserted Claims fall squarely within the realm of patentable subject matter.  *See Rapid Litig.*, 827

14   F.3d at 1049 (finding that claims directed to medical preservation of cells cannot be patent-

15   ineligible because "[i]f that were so, we would find patent-ineligible methods of, say, . . . treating

16   cancer with chemotherapy . . . or treating headaches with aspirin . . . .");  *see also Viveve, Inc. v.*

17   *Thermigen, LLC*, 2017 WL 1425606, at *5 (E.D. Tex. Apr. 20, 2017) (finding claims that

18   "dictate[], with specificity, the concrete steps which a doctor should take in performing the

19   claimed" medical treatment patent-eligible); *Baxter Int'l, Inc. v. Carefusion Corp.*, 2016 WL

20   2770787, at *10 (N.D. Ill. May 13, 2016) (finding claims directed to infusion pump for

21   administering medical treatment patent-eligible where claims are "anchored . . . to a concrete

22   form, and to a particular application.") (citation omitted).

23        As with *Diehr*, *Rapid Litigation*, and other decisions, the Asserted Claims are directed to a

24   "function which the patent laws were designed to protect": a medical therapy relying on special-

25   purpose implanted medical devices configured in a particular manner.  *Diehr*, 450 U.S. at 192.

26   Accordingly, the Asserted Claims are not patent ineligible.

27        **B.    BSC's Undisclosed New Theories Concerning the Precision SCS System Fail**

28        BSC's experts opine that the asserted claims are invalid over the Precision SCS system

1    based on two entirely new theories: a "frequency harmonics" theory and a ███████████

2    theory.  Neither theory was disclosed in BSC's invalidity contentions.  Both were disclosed for

3    the first time in BSC's expert reports and should be stricken as set forth in Nevro's motion to

4    strike.  If this improper material is stricken, BSC will have no evidence on these theories and

5    summary judgment of no invalidity based on them will be appropriate.  And even if the Court

6    does not strike these theories, it should grant summary judgment of no invalidity based on a

7    proper claim construction.

8               1.      "Frequency harmonics" do not meet the "frequency" limitations

9          All of the asserted claims require SCS systems or methods for providing stimulation at a

10   frequency of 1,500 Hz or higher.  BSC's own witnesses have sworn that the Precision SCS prior

11   art system was not capable of being programmed to generate stimulation frequencies greater than

12   1,200 Hz.  Dr. Rafael Carbunaru stated that "the Precision™ SCS System was capable of being

13   programmed by a user to generate pulse frequencies in the range of 0 to 1,200 Hz" and described

14   the system's "frequency range" as having an "upper limit of 1,200 Hz."  (Ex. 50, Carbunaru Decl.

15   ¶ 11.)  He stated that the software and firmware of the Precision system limited the frequency to

16   this range, and that changes to the software and firmware would be required to render the system

17   programmable to generate frequencies greater than 1,200 Hz.  (*Id.*)  Adair also stated that "BSC's

18   commercially distributed SCS systems have been providing stimulation at a frequency range up to

19   1,200 Hz since 2004."  (Ex. 51, Adair Decl. ¶ 4.)  Under the plain and ordinary meaning of

20   "frequency," as used by BSC's own witnesses, the Precision SCS prior art system did not provide

21   stimulation at a frequency of 1,500 Hz or higher.

22         Dr. Mihran offered an invalidity opinion in his opening expert report regarding alleged

23   "frequency harmonics" in the Precision system that is not based on this ordinary meaning of

24   "frequency."  His report describes a complicated series of experiments using an assembled

25   Precision system and abstract mathematical signal decomposition analyses using the Fourier

26   series purporting to show that the "spectral energy" of the "frequency harmonics" exceeds 1,500

27   Hz when the system is operated at frequencies that do not exceed the Precision system's upper

28   limit of 1,200 Hz.  (Ex. 52, Mihran Rpt. ¶¶ 402-476.)  Nevro has moved to strike this late

1   disclosed theory—even though BSC attempts to tie the new theory to its claim construction, it

2   never sought leave to amend its invalidity contentions.  But in addition, Dr. Mihran's theory

3   depends on BSC's peculiar construction of "frequency" as "frequency components in a frequency

4   range."  (*Id.* ¶¶ 1411-1442.)  As discussed above, there is no basis for construing "frequency" as

5   BSC proposes, and the Court should adopt its plain and ordinary meaning.  On that construction,

6   the Court should grant summary judgment of no invalidity because it is undisputed that the

7   Precision system's stimulation frequencies had an upper limit of 1,200 Hz and do not meet the

8   frequency limitations of the asserted claims.

9               **2.      The Precision SCS system was neither designed nor used to generate
                         the claimed stimulation frequencies**

10

11          In their rebuttal non-infringement reports, Dr. Mihran and Dr. Lanovaz opined that

12

13

14

15                                                    (Ex. 41, Mihran Rbtl. ¶¶ 133-145; Ex. 53, Lanovaz Rbtl.

16   ¶¶ 44, 57-58.)  They suggest that this capability renders certain Asserted Claims invalid. (Ex. 41,

17   Mihran Rebtl. ¶¶ 112-115; Ex. 53, Lanovaz Rbtl. ¶¶ 44, 57-58.)

18          Nevro has also moved to strike this theory as improperly disclosed.  But this theory fails

19   for the additional reason that under a proper construction of "configured to," the Precision prior

20   art system was not "configured to" generate such signals as the relevant Asserted Claims require.

21          Nevro's construction of "configured to" is "designed to."  As discussed above, BSC's own

22   witnesses have sworn that the Precision prior art system was not capable of being programmed to

23   generate stimulation frequencies greater than 1,200 Hz.  (Ex. 50, Carbunaru Decl. ¶ 11; Ex. 51,

24   Adair Decl. ¶ 4.)  Dr. Carbunaru described the design process that BSC later undertook to

25   transform the Precision system into the high frequency Precision with MultiWave as including

26   software and firmware changes that required about a year of R&D development and as many as

27   50 people.  (Ex. 20, Carbunaru Dep. 136:2-139:21.)  Mihran and Lanovaz's

28   theory cannot change the sworn admissions of BSC's witnesses that the Precision system was not

1    designed to generate high frequency stimulation.

2         **C.**     **The Fang Reference Is Not Section 102(e) Prior Art**

3         BSC claims the Fang reference, a patent application owned by Nevro that is related to the

4    asserted '472 Patent, anticipates the Asserted Claims of the other six Patents-in-Suit (the "'533-

5    family patents"). (*See* Ex. 49 at 22 (2nd Am. Invalidity Contentions).) The "common inventive

6    entity" rule defeats BSC's theory. 35 U.S.C. § 102(e) does not allow challengers to use an

7    inventor's own work against him. Fang cannot be prior art because the disclosures BSC relies on

8    in Fang were invented by the same inventors as the inventors of the relevant subject matter in the

9    '533-family patents. BSC relies on Fang's disclosure of a high-frequency, paresthesia-free pain

10   treatment. The undisputed evidence establishes that named inventors Konstantinos Alataris and

11   Andre Walker are the common inventors of that material and of that same subject matter in the

12   '533-family Patents. In the face of that evidence, BSC cannot show a material dispute of fact

13   sufficient to meet its burden of proof of showing invalidity by clear and convincing evidence.

14        **1.**     **Section 102(e) Forbids Using an Inventor's Own Work Against Him**

15        Under 35 U.S.C. § 102(e), "[a] person shall be entitled to a patent unless- . . . (e) the

16   invention was described in – (1) an application for patent, published under section 122(b), ***by***

17   ***another*** filed in the United States before the invention by the applicant for patent . . . ." 35

18   U.S.C. § 102(e) (emphasis added). Because Section 102(e) requires art to be "by another," it is

19   unavailable as a defense where the reference asserted as prior art—here Fang—and the later

20   issued patents—here the '533-family patents—represent the work of a common inventive entity.

21        This rule applies even if the named inventors on Fang and the '533-family patents are not

22   the same so long as the inventors of the subject matter at issue are the same. *Riverwood Int'l*

23   *Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003). The Court must first determine

24   what part of Fang is being asserted as prior art before deciding whether that disclosure represents

25   the work of the same inventors of claims being asserted in litigation. *See id*. at 1356-1357 ("We

26   hold that by not deciding who invented the portion of the subject matter disclosed in the

27   [reference] patent that served as the basis for [the alleged infringer's] obviousness contentions,

28   the district court erred."); *see also EmeraChem Holdings, LLC .v. Volkswagen Grp. of Am.*,

1   859 F.3d 1341, 1345 (Fed. Cir. 2017) (holding relevant question is not whether the references list

2   different inventors, but who invented the portions of reference relied on as prior art and the

3   subject matter of the claims in question).

4       A defendant raising an invalidity defense must prove that defense by clear and convincing

5   evidence.  *See Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 102 (2011).  Although a patentee

6   must produce rebuttal evidence once a challenger has presented a *prima facie* case of invalidity,

7   the burden of persuasion remains with the challenger.  *See Novo Nordisk A/S v. Caraco Pharm.*

8   *Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013).  Moreover, as Fang was considered and

9   rejected as prior art during the prosecution of the '533 patent (*see* Ex. 54 at 1598-1599

10  (NEVRO_BSXCA0000510)), it is even more difficult for BSC to meet its "clear and convincing"

11  burden of proof.  *See Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012)

12  ("[T]he fact that references were previously before the PTO goes to the weight the court or jury

13  might assign to the proffered evidence.") (citation omitted).

14      **2.     BSC Relies on Fang's Disclosure of High-Frequency, Paresthesia-Free**

15      Although most of Fang describes a combination therapy involving both high-frequency

16  and low-frequency signals (*see, e.g.*, Ex. 55 at Abstract (BSC-NVRO_00005950).), Fang also

17  contains a brief disclosure of a high-frequency, paresthesia-free therapy signal that can be used

18  alone.  Paragraph 54 of Fang states that "[t]his [high-frequency] blocking signal can be applied to

19  the dorsal column DC in place of an [low frequency] stimulation signal to replace the pain relief

20  provided by the paresthesia."  (*Id.* at ¶ 54.)  Claim 62 claims a high frequency signal without

21  producing paresthesia.  BSC contends this disclosure anticipates the Asserted Claims of the '533-

22  family Patents.  (*See, e.g.*, Ex. 52, Mihran Rpt. ¶ 2514, citing paragraph 54 and claim 62 of Fang,

23  as well as paragraphs 24-25, 42, 50, and 55.)

24      Nevro has put forth undisputed evidence that Dr. Alataris and Mr. Walker are the sole

25  inventors of Nevro's high frequency, paresthesia-free therapy signal in Fang and the '533-family

26  Patents.  In addition, Nevro has corroborated the testimony of Dr. Alataris and Mr. Walker with

27  documents and testimony from the other named inventors and has more than met its burden of

28  production.  *See EmeraChem*, 859 F.3d, at 1345) (corroboration may be required in certain cases).

1    BSC has not been able to challenge Nevro's evidence and thus cannot "prov[e] to the

2    decisionmaker by a clear and convincing standard that, after all of the evidence has been placed

3    on the table for consideration, the claim is invalid," *Novo Nordisk*, 719 F.3d at 1353.

4           BSC deposed all five named inventors on Fang.  The testimony of each was consistent:

5    Dr. Alataris and Mr. Walker invented the high frequency, paresthesia-free therapy signal in Fang

6    and the '533-family Patents.  They both testified that they alone invented Nevro's high frequency,

7    paresthesia-free therapy signal based on animal studies conducted at Stanford University and UC

8    Davis.  (*See, e.g.*, Ex. 56, Alataris Dep. 183:12-19 ("[T]he Stanford rat data and . . . continuation

9    to the Davis larger animals . . . started giving me -- me, at least, a lot more confidence that we can

10   do it to have a therapeutic effect, and without paresthesia . . . ."), 240:20-22 ("I think Andre

11   [Walker] and myself were the ones that contributed to the paresthesia-free pain relief."); Ex. 57,

12   Walker Dep. 173:24-174:22 ("Who contributed to what is described in Paragraph 54 of [Fang]? . .

13   . [Walker]: I think this describes the studies basically that we did at Stanford and Davis…. So this

14   describes what Konstantinos [Alataris] and I did at Davis . . . That particular paragraph I think

15   was the sole contribution of Konstantinos and mine."), 177:12-14 ("Myself and Konstantinos

16   [Alataris] I would say is Paragraph 54, which describes the high frequency alone."); *see also* Ex.

17   56, Alataris Dep. 244:20-24, 246:19-247:7, 249:5-12; Ex. 57, Walker Dep. 168:4-169:25.)

18          The other inventors—Zi-Ping Fang, Anthony Caparso, and Brian Erickson—confirmed

19   that they did not invent using the high frequency signal alone to provide paresthesia-free therapy.

20   (*See, e.g.*, Ex. 58, Fang Dep. 85:17-:21 ("[A]re you the person who generated that idea of using

21   high frequency blocking signal alone? . . . [Fang]: No."); Ex. 59, Caparso Dep. 85:8-14 ("Q. And

22   how about the high frequency fields, was that something on a stand-alone basis, before the idea of

23   combining  them was generated, was that something you came up with individually? . . .

24   [Caparso]: No."); Ex. 60, Erickson Dep. 257:9-14 ("[W]ere you the person who conceived of the

25   idea of high-frequency therapy applied to the dorsal column alone? . . . A. I was not."); *see also*

26   Erickson Dep., 257:16-258:2.)  Instead, the other inventors testified that they contributed to the

27   combination therapy in Fang.  *See* Ex. 59, Caparso Dep. 83:23-84:21; Ex. 58, Fang Dep. 26:2-13,

28   85:13-16; Ex. 60, Erickson Dep. 254:9-21.)  The other inventors on the '533-family Patents—

1   Sangsoo Wesley Park, Jon Parker, Yougandh Chitre, and James Thacker—also testified that they

2   did not invent a high frequency, paresthesia-free therapy signal and instead contributed to other

3   aspects of the '533-family patents.  (*See, e.g.*, Ex. 61, Chitre Dep. 97:6-97:23; Ex. 62, Park Dep.

4   67:20-68:11; Ex. 63, Parker Dep. 94:4-95:8; Ex. 64, Thacker Dep. 32:22-33:25.)

5   Contemporaneous documents also corroborate Dr. Alataris's and Mr. Walker's testimony that

6   they invented Nevro's high frequency, paresthesia-free therapy signal based on animal studies

7   conducted at Stanford University and UC Davis.  (*See* Alataris Decl., Ex. 4 at 45438

8   (NEVRO_BSXCA0045422) (June 2007 presentation indicating that testing at Stanford and UC

9   Davis "established" Nevro's therapy); *id.* Ex. 3 at NEVRO_BSXCA00131357 (Sept. 2007 email

10  indicating that Nevro's therapy was different from traditional paresthesia-based SCS).)

11          To defeat Nevro's showing of a common inventive entity for this subject matter, BSC

12  alleges that Dr. Alataris did not conceive of any of the inventions in the Patents-in-Suit because a

13  physician from the Mayo Clinic conceived of a high frequency, paresthesia-free therapy signal,

14  and that Mr. Walker also did not conceive of this idea because "those aspects of the claimed

15  invention had already been conceived prior to Mr. Walker joining Nevro."  (Ex. 66 at 7 (BSC's

16  Suppl. Resp. to Rog No. 10).)  The evidence indisputably refutes BSC's allegation.  Dr. Alataris

17  and Mr. Erickson testified that the animal studies performed at the Mayo Clinic before

18  Mr. Walker joined Nevro were failures.  (*See, e.g.*, Ex. 56, Alataris Dep. 82:5-10, 94:11-16,

19  96:19-97:6; Ex. 60, Erickson Dep. 118:22-119:19; 143:2-15; 148:5-14, 149:12-17, 166:7-12;

20  233:6-238:14, 238:24-241:20; 241:21-243:3; 243:4-244:20; 251:10-252:11; 252:13-253:16.).

21  This is corroborated by documents showing that the Mayo studies were not successful.  (*See, e.g.*,

22  Alataris Decl. Ex. 1 at NEVRO_BSXCA0040739, ("Our current practice is likely to provide

23  undesirable motor block.") Ex. 2 at 40734 (NEVRO_BSXCA0040729) ("We have not observed

24  nerve blocking in the absence of stimulation.").)  Mr. Erickson further testified that, while he was

25  working with the Mayo Clinic and at Nevro, he did not see anything indicating that the idea of

26  high frequency, paresthesia-free therapy came from the Mayo Clinic.  (Ex. 60, Erickson Dep.

27  258:4-20.)  Mr. Walker testified that Nevro "started everything from scratch" at Stanford and UC

28  Davis and did not use data from the Mayo studies.  (Ex. 57, Walker Dep. 73:11-74:6.)

3.      **The Later Addition of Alataris and Walker to Fang Does Not Undermine the Sworn Testimony of the Nine Nevro Inventors**

BSC attempts to undermine this consistent record by arguing that Alataris and Walker were not on the original Fang application, and that Nevro's request to correct inventorship was improper because it occurred years after the application was filed and does not indicate the relative contributions of the additional inventors.  (*See* Ex.49 at 2 (2nd Am. Invalidity Contentions, Ex. A10).)  This theory is belied by the record.  The 2008 Fang application, and the 2007 provisional application to which it claims priority, listed only Fang, Caparso, and Erickson as inventors, but neither application originally recited claims directed to a high frequency, paresthesia-free therapy signal (*see* Ex. 67 at 381459, 381493-381499 (NEVRO_BSXCA0381455); Ex. 68 at 381424-381434 (NEVRO_BSXCA0381386)), and inventorship is determined on a claim-by-claim basis.  *See Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1349 (Fed. Cir. 2016).  These claims were first added to the Fang application in 2009. (*See* Ex. 69 at 427853 (NEVRO_BSXCA0427767).)  In 2012, over four years before this lawsuit was filed, Nevro undertook a review of its IP, discovered the oversight, and filed a request to correct inventorship.  (*See* Ex. 56, Alataris Dep. 226:6-231:20; Ex. 70, Walker Ex. 3017; Ex. 57, Walker Dep. 115:14-117:17, at 115:14-117:17; Ex. 69, at 428987-429023 (NEVRO_BSXCA0427767).)  The other inventors also executed declarations accompanying Nevro's request.  (*See* Ex. 70, Walker Ex. 3017; Ex. 57, Walker Dep. 115:14-117:17; Ex. 69 at 428987-429023 (NEVRO_BSXCA0427767).)  BSC has identified no evidence that the request was improper.

4.      **None of the Other Portions of Fang Relied Upon by BSC for a High Frequency, Paresthesia-free Signal Is Prior Art.**

In addition to paragraph 54 and claim 62 of Fang, BSC alleges that paragraphs 24-25, 42, 50, and 55 of Fang also constitute a disclosure of a high frequency, paresthesia-free therapy signal.  (*See, e.g.*, Ex. 52, Mihran Rpt. ¶ 2514.)  Although these portions of Fang do not refer to a signal that is paresthesia-free, to the extent BSC may argue that these other portions disclose such a signal, they too would not be prior art under Section 102(e) for the same reason: the undisputed

1   evidence shows that Dr. Alataris and Mr. Walker are the inventors of a high-frequency,

2   paresthesia-free therapy.  As BSC has set forth no evidence to the contrary, there is no genuine

3   issue of material fact that Fang is not prior art under Section 102(e).

4   **VI.   THE COURT SHOULD GRANT  SUMMARY ADJUDICATION OF NO**
    **        INEQUITABLE CONDUCT**

5

6          BSC's inequitable conduct defense seeks a finding that the '357 patent and '988 patent are

7   unenforceable because Nevro's inventors failed to disclose supposedly material prior art—the

8   Yearwood References—during prosecution, but BSC cannot make the requisite showing of

9   materiality.  (ECF No. 165 at 19-21.)  Courts have long recognized that the inequitable conduct

10  doctrine "has plagued not only the courts but also the entire patent system."  *Therasense, Inc. v.*

11  *Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011).  As a result, the Federal Circuit

12  tightened the standard for inequitable conduct and ruled that an accused infringer must show that

13  (1) "the patentee acted with the specific intent to deceive the PTO" and (2) the prior art was

14  material such that the claims would not have issued "but-for" the failure to disclose the prior art

15  to the PTO.  *Id.* at 1290-1291.  The accused infringer must separately establish but-for materiality

16  and specific intent by clear and convincing evidence; while assessing but-for materiality the court

17  must look to the preponderance of the evidence standard used by the PTO during

18  examination.  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014).[5]

19  BSC has no evidence of "but-for" materiality.

20         BSC contends that the Yearwood Case Report and the Yearwood Poster (together the

21  "Yearwood References") were material because they disclose paresthesia-free therapy at low

22  amplitudes with pulse widths between 10 and 100 μsec.  (ECF No. 165 at 20.)  If this defense

23  proceeds to trial—inequitable conduct is an issue for the Court—Nevro will show that BSC

24  cannot prove the requisite intent to deceive.  But this issue is ripe for summary judgment because

25              [5] As noted in *Network Signatures, Inc. v. State Farm Mutual Automobile Insurance Co.*,
26  "[t]here is some dispute in our post-*Therasense* case law over the correct standard of materiality,"
    with some Federal Circuit panels adopting a clear and convincing standard and some adopting a
27  preponderance standard.  731 F.3d 1239, 1244 n.1 (Fed. Cir. 2013) (Clevenger, J., dissenting).
    Nevro believes this authority can be reconciled: the accused infringer bears the burden of proving
28  to the district court by clear and convincing evidence that the PTO, applying its preponderance of
    the evidence standard, would have found the reference invalidating.

1    BSC cannot legally prove materiality:  BSC's expert applies the wrong legal standard for

2    materiality; BSC has not included the Yearwood References in its list of prior art for trial (despite

3    having the space to include them); and BSC cannot prove the Yearwood References were non-

4    cumulative to prior art disclosed to the PTO.

5              **A.      BSC Cannot Establish That the Yearwood References Are But-For Material**

6              The Yearwood References report preliminary clinical findings from three patients who

7    each tested paresthesia-based and paresthesia-free pain management programs.  The Yearwood

8    References conclude that the *paresthesia-based* program "provide[d] the highest percentage of

9    pain relief, and was preferred by all three subjects."  (Ex. 71 at 1 (Carbunaru Ex. 138); Ex. 72 at 2

10   (Carbunaru Ex. 137); *see* Ex. 73, Carbunaru Dep. 462:11-464:9.)  BSC nonetheless contends that

11   the Yearwood References are material to Nevro's claims concerning *paresthesia-free* therapy.

12   (*See* ECF No. 165 at 20 (asserting Yearwood References against '357 claim 1 and '988 patent

13   claims 1 and 8); Ex. 7 ('357 patent); Ex. 5 ('988 patent).)  BSC will be unable to establish that the

14   Yearwood References are material because Dr. Mihran, the only BSC expert who opines on the

15   Yearwood References, applies a materiality standard that the Federal Circuit rejected in

16   *Therasense*.  Dr. Mihran uses the standard of whether "a reasonable patent examiner would find

17   [the reference] *important* to a determination of patentability" and concludes that "[a] person of

18   skill in the art would have viewed Yearwood's work as *important* to understanding subthreshold

19   stimulation. . . ."  (Ex. 52, Mihran Rpt. ¶¶ 38, 167-173 (emphasis added).).  But in *Therasense*,

20   the Federal Circuit, sitting *en banc*, expressly abrogated the importance to a reasonable examiner

21   standard as a "previous[]" and "broad view of materiality."  *Therasense*, 649 F.3d at 1288

22   (citation omitted).  The court ruled that it "now tightens" the standard for materiality to require

23   proof that "the PTO *would not have allowed the claim* if it had been aware of the undisclosed

24   [reference]."  *Id.* at 1291 (emphasis added).

25             Dr. Mihran nowhere applies the legally required "but-for" standard for materiality.

26   (Ex. 38, Mihran Dep. 241:7-13 (admitting but-for materiality test is "not the legal guideline that I

27   was provided")).  Dr. Mihran thus cannot provide any relevant testimony on materiality.

28             Nor does BSC have any other way of meeting the legally required but-for standard.  BSC

1   failed to include the Yearwood References in its narrowed list of prior art references for trial.

2   (*See* ECF No. 88; Pai Decl. ¶ 77.)  And BSC neither charted the Yearwood References in its

3   invalidity contentions.  The references teach away from Nevro's claimed paresthesia-free systems

4   and methods.  All of the claims at issue require paresthesia-free therapy, but the Yearwood

5   References teach that *no* patient preferred paresthesia-free therapy over paresthesia-based

6   therapy.  The Yearwood References also show that all patients selected the paresthesia-based

7   program for their permanent implants.  (Ex. 71 at 1 (Carbunaru Ex. 138); Ex. 72 at 2 (Carbunaru

8   Ex. 3336); Pless Rbtl. ¶¶ 248-250); *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567

9   F.3d 1314, 1327 (Fed. Cir. 2009) (reference teaches away where it discourages a particular path);

10  *Siemens, AG v. Seagate Tech.*, 2009 U.S. Dist. LEXIS 132523, at *21-22 (C.D. Cal. Jan. 8, 2009)

11  (finding undisclosed art non-material in part due to teaching away).  BSC's inequitable conduct

12  defense fails as a matter of law.

13      **B.      BSC Cannot Establish That the Yearwood References Were Non-Cumulative**

14          Additionally, BSC bears the burden of proving that the Yearwood References were not

15  cumulative of information considered by the examiner.  *Nalco Co. v. Turner Designs, Inc.*, 2014

16  U.S. Dist. LEXIS 21362, at *17 (N.D. Cal. Feb. 19, 2014).  Dr. Mihran performs no such

17  analysis.  *See In re Katz Interactive Call Processing Patent Litig.*, 821 F. Supp. 2d 1135, 1160

18  (C.D. Cal. 2011) (granting summary judgment when defendant presented only "unsupported

19  conclusory statements" as to cumulativeness); *Oracle Corp. v. DrugLogic, Inc.*, 807 F. Supp. 2d

20  885, 899 (N.D. Cal. 2011) (dismissing inequitable conduct claim at pleading stage where

21  defendant had not alleged facts showing non-cumulative nature of prior art).  To the contrary,

22  Dr. Mihran opines that "many additional" prior art references disclosed paresthesia-free SCS

23  therapy, which, according to him, is central to the importance of the Yearwood References.

24  (Ex. 52, Mihran Rpt. ¶¶ 173-74.)  Some of this prior art was before the PTO.  (*See* Pless Rbtl. ¶¶

25  258-263; Exs. 21, 28.)  BSC will therefore be unable to establish that the Yearwood References

26  were non-cumulative to information already before the examiner.

27

28

1    Dated: April 12, 2018                    MORRISON & FOERSTER LLP

2

3                                       By:    /s/ Kenneth A. Kuwayti
                                               Kenneth A. Kuwayti
4
                                               Attorneys for Plaintiff
5                                              NEVRO CORP.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28