1    Krista M. Carter (State Bar No. 225229)
     Email address:  krista.carter@arnoldporter.com
2    Thomas T. Carmack (State Bar No. 229324)
     Email address:  tom.carmack@arnoldporter.com
3    ARNOLD & PORTER KAYE SCHOLER LLP
     3000 El Camino Real
4    Five Palo Alto Square, Suite 500
     Palo Alto, California  94306
5    Telephone:     (650) 319-4500
     Facsimile:     (650) 319-4700
6
     Matthew M. Wolf (admitted *pro hac vice*)
7    Email address:  matthew.wolf@arnoldporter.com
     Edward Han (admitted *pro hac vice*)
8    Email address:  edward.han@arnoldporter.com
     Marc A. Cohn (admitted *pro hac vice*)
9    Email address:  marc.cohn@arnoldporter.com
     Amy L. DeWitt (admitted *pro hac vice*)
10   Email address:  amy.dewitt@arnoldporter.com
     ARNOLD & PORTER KAYE SCHOLER LLP
11   601 Massachusetts Ave., NW
     Washington, DC 20001-3743
12   Telephone:     (202) 942-5000
     Facsimile:     (202) 942-5999
13
     Attorneys for Defendants
14   BOSTON SCIENTIFIC CORPORATION and
     BOSTON SCIENTIFIC NEUROMODULATION
15   CORPORATION

16                    **UNITED STATES DISTRICT COURT**

17                  **NORTHERN DISTRICT OF CALIFORNIA**

18                     **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 19   NEVRO CORP., | Case No. 3:16-cv-06830-VC |
| 20                    Plaintiff, | **BOSTON SCIENTIFIC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF, OPPOSITION TO NEVRO'S MOTION** |
| 21           v. | **FOR SUMMARY JUDGMENT AND OPENING MOTION FOR SUMMARY JUDGMENT** |
| 22   BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC | |
| 23   NEUROMODULATION CORPORATION, | Date:        June 20, 2018 |
| 24                    Defendants. | Time:        10:00 a.m. |
| 25 | Courtroom:   4, 17th Floor |
|  | Judge:       Hon. Vince Chhabria |

26

27

28

---

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................. 1

II.   RESPONSE TO NEVRO'S "FACTUAL BACKGROUND"........................................ 2

    A.   BSC Is A Pioneer In The SCS Market......................................................... 3

    B.   Nevro's 10 kHz Therapy Is Neither New Nor Superior ............................... 4

    C.   Nevro Mischaracterizes BSC's Competitive Intelligence Activities...................... 5

III.  LEGAL STANDARDS ......................................................................................... 5

    A.   Summary Judgment ................................................................................... 5

    B.   Claim Construction ................................................................................... 6

IV.   CLAIM CONSTRUCTION.................................................................................... 6

    A.   "Configured to generate" and "configured to deliver" ............................... 6

    B.   "Frequency" ........................................................................................... 12

    C.   "Paresthesia" ......................................................................................... 14

    D.   "Therapy signal" .................................................................................... 16

    E.   "Implantable" ........................................................................................ 19

    F.   "Means for generating ..." and "means for delivering ..." ...................... 20

    G.   "Programming [a/the] signal generator".................................................. 21

    H.   "Machine-readable medium containing instructions for generating and
         transmitting" / "executable instructions to generate" ............................. 21

    I.   The "paresthesia-free" Limitations .......................................................... 22

V.    BSC IS ENTITLED TO SUMMARY JUDGMENT OF NO DIRECT
      INFRINGEMENT WITH RESPECT TO ALL ACCUSED PRODUCTS ...................... 24

    A.   BSC Does Not Directly Infringe The Asserted Claims Under 35 U.S.C
         § 271(a) ............................................................................................... 24

    B.   BSC Does Not Infringe The Asserted Claims Under 35 U.S.C. § 271(f)............. 27

    C.   The FDA Safe Harbor Applies, As A Matter of Law, To Patients Who
         Participated In The ACCELERATE Study............................................... 28

VI.   THE CLAIMS ARE INVALID UNDER 35 U.S.C. § 101 ...................................... 31

    A.   First *Mayo* Factor:  Under Nevro's Proposed Constructions, The Paresthesia-
         Free Apparatus Claims Are Directed To A Patent-Ineligible Concept................. 32

    B.   Second *Mayo* Factor:  The Claims Do Not Contain An Inventive Concept
         That Transforms Them Into Something Patentable ................................... 34

VII.  BSC IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY OF THE
      ALATARIS PATENTS IN VIEW OF FANG................................................................ 36

    A.   Fang Is Prior Art To The Alataris Patents Under 35 U.S.C. § 102(e) ................. 36

    B.   Fang Anticipates The Asserted Claims Of The Alataris Patents ......................... 38

| | 1. | Fang Discloses Groups (i) And (ii):  A Signal Generator To Generate A Therapy Signal And Spinal Cord Leads To Deliver That Signal ......... 38 |
|---|---|---|
| | 2. | Fang Discloses Group (iii):  Amplitudes And Pulse Widths ................... 38 |
| | 3. | Fang Discloses Group (iv):  High-Frequency Therapy............................ 41 |
| | 4. | Fang Discloses Group (v):  A Signal Generator Designed To Generate Paresthesia-Free Therapy ....................................................... 42 |

VIII. BSC IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY OF THE ASSERTED CLAIMS IN VIEW OF BSC'S PRIOR ART PRECISION SCS SYSTEM............................................................................................................ 42

    A.    Precision Discloses Groups (i) And (ii):  A Signal Generator To Generate A Therapy Signal And Spinal Cord Leads To Deliver That Signal ........................ 43

    B.    Precision Discloses Group (iii):  Amplitudes And Pulse Widths ........................ 43

    C.    Precision Discloses Group (iv):  High-Frequency Therapy................................. 44

    D.    Precision Discloses Group (v):  A Signal Generator Designed To Generate Paresthesia-Free Therapy ...................................................................... 45

IX. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT ........................................................ 47

    A.    A Reasonable Factfinder Could Find That Yearwood Was Material ................... 48

    B.    A Reasonable Factfinder Could Find That Yearwood Was Not Cumulative........ 50

X. CONCLUSION............................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abtox, Inc. v. Exitron Corp.*,
  122 F.3d 1019 (Fed. Cir. 1997) .................................................................. 28, 29, 31

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003) .......................................................................... 21

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016), *cert. denied sub nom. Affinity Labs of Tex., LLC
  v. DIRECTTV, LLC*, 137 S. Ct. 1596 (2017) ...................................................... 32, 33

*Alice Corp. Pty. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ............................................................................ 31, 32, 35

*Amazon.com, Inc. v. barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ............................................................................ 9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................. 6

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016) ...................................................................... 32, 33

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) .......................................................................... 34

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
  Case No. C-12-4498 EMC, 2014 WL 4090400 (N.D. Cal. Aug. 19, 2014) ............... 24

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  133 S. Ct. 2107 (2013) ....................................................................................... 31

*Atlas IP, LLC v. Medtronic, Inc.*,
  809 F.3d 599 (Fed. Cir. 2015) ............................................................................ 13

*Boston Scientific Corp. v. Cordis Corp.*,
  No. C02-01474 JW, 2006 WL 3782840 (N.D. Cal. Dec. 20, 2006) ........................ 12

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
  576 F.3d 1348 (Fed. Cir. 2009) .......................................................................... 27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................. 6

iii

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
    659 F.3d 1057 (Fed. Cir. 2011)................................................................................. 30

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
    668 F.3d 1340 (Fed. Cir. 2012)............................................................................ 40, 42

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)................................................................................. 34

*Crane Co. v. Sandenvendo Am., Inc.*,
    No. 2:07-CV-42-CE, 2009 WL 1586704 (N.D. Cal. Jun. 5, 2009) ........................ 17, 18, 22, 23

*D Now, Inc. v. TPF Toys, Ltd.*,
    267 F. Supp. 3d 1254 (N.D. Cal. 2017) ................................................................. 5, 6

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) (abrogated on other grounds) ........................... 18, 23

*Edwards Lifesciences AG v. Corevalve, Inc.*,
    No. CV 08-91-GMS, 2010 WL 11032982 (D. Del. Feb. 16, 2010) ......................... 10

*Eli Lilly & Co. v. Medtronic, Inc.*,
    496 U.S. 661 (1990)................................................................................................ 28

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
    279 F.3d 1022 (Fed. Cir. 2002)............................................................................... 20

*Epistar Corp. v. Int'l Trade Comm'n*,
    566 F.3d 1321 (Fed. Cir. 2009)................................................................................. 6

*Flexuspine, Inc. v. Globus Medical, Inc.*,
    No. 6:15-CV-201-JRG-KNM, 2016 WL 4161887 (E.D. Tex. 2016).......................... 9

*Fortinet, Inc. v. SRI Int'l, Inc.*,
    No. C 12-02540 JSW, 2013 WL 12174686 (N.D. Cal. Oct. 22, 2013) ................. 10, 11

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013).................................................................................. 50

*Genetic Techs. Ltd. v. Merial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016)................................................................................ 32

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003)........................................................................ 17, 22, 23

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)............................................................................. 17, 22

*Housey Pharms., Inc. v. Astrazeneca UK Ltd.*,
    366 F.3d 1348 (Fed. Cir. 2004)................................................................................ 13

iv

*HVAC Tech. LLC v. Southland Indus.*,
No. 5:15-cv-02934-PSG, 2016 WL 3092182 (N.D. Cal. June 2, 2016)....................................14

*Ineos USA LLC v. Berry Plastics Corp.*,
783 F.3d 865 (Fed. Cir. 2015)..............................................................................................40, 42

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
946 F.2d 821 (Fed. Cir. 1991)......................................................................................................10

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
850 F.3d 1332 (Fed. Cir. 2017)....................................................................................................32

*Intermedics, Inc. v. Ventritex, Inc.*,
775 F. Supp. 1269 (N.D. Cal. 1991), *aff'd sub nom. Intermedics, Inc. v.*
*Ventritex Co.*, 991 F.2d 808 (Fed. Cir. 1993) ..................................................................29, 30, 31

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015)....................................................................................................33

*Largan Precision Co., Ltd. v. Fujifilm Corp.*,
No. C 10-01318 SBA, 2012 WL 4097719 (N.D. Cal. 2012).......................................................20

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
481 F.3d 1371 (Fed Cir. 2007)......................................................................................................36

*Lucent Techs. Inc. v. Gateway, Inc.*,
470 F. Supp. 2d 1163 (S.D. Cal. 2007).........................................................................................37

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)....................................................................................................32, 33, 34

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005).......................................................................................................................29

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
Case No. 14-804-RGA, 2017 WL 5985561 (D. Del. Dec. 1, 2017).............................10, 11, 26

*Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*,
809 F.3d 610 (Fed. Cir. 2015).......................................................................................................30

*Mount Hamilton Partners, LLC v. Groupon, Inc.*,
No. C-12-1700-SI, 2014 WL 1047408, ..............................................................................11, 12

*Nautilus, Inc. v. BioSig Instrs., Inc.*,
134 S. Ct. 2120 (2014).....................................................................................................................6

*Nexell Therapeutics, Inc. v. AmCell Corp.*,
143 F. Supp. 2d 407 (D. Del. 2001).................................................................................29, 30, 31

v

*Ohio Willow Wood Co. v. Alps S., LLC*,
  735 F.3d 1333 (Fed. Cir. 2013).................................................................................. 48, 49

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................................... 6, 9, 13

*Plantronics, Inc. v. Aliph, Inc.*,
  No. C 09-01714 WHA, 2014 WL 789115 (N.D. Cal. 2014) ........................................ 9

*Rapid Litigation Management Ltd. v. CellzDirect, Inc.*,
  827 F.3d 1042 (Fed. Cir. 2016)................................................................................... 36

*Regeneron Pharms., Inc. v. Merus N.V.*,
  864 F.3d 1343 (Fed. Cir. 2017)............................................................................. 48, 50

*Regents of the Univ. of Calif. v. Eli Lilly & Co.*,
  119 F.3d 1559 (Fed. Cir. 1997)................................................................................... 50

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000)................................................................................... 26

*Semmler v. Am. Honda Co.*,
  990 F. Supp. 967 (S.D. Ohio 1997) ............................................................................ 23

*Solocron Media, LLC v. Verizon Communications Inc.*,
  No. 2:13-CV-1059-JRG-RSP, 2015 WL 1011310 (E.D. Tex. 2015) ........................... 9

*State Indus., Inc. v. Rheem Mfg. Co.*,
  No. 3-83-0362, 1984 WL 1243 (M.D. Tenn. June 5,1984), *aff'd in part, rev'd in
  part*, 769 F.2d 762 (Fed. Cir. 1985) ........................................................................... 37

*STX, Inc. v. Brine, Inc.*,
  37 F. Supp. 2d 740 (D. Md. 1999)......................................................................... 17, 23

*Sungkyunkwan Univ., Research & Bus. Found. v. LMI Techs. (USA) Inc.*,
  No. 16-CV-06966-VC, 2017 WL 1900737 (N.D. Cal. 2017) (Chhabria, J.) ............. 32

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*,
  982 F.2d 1520 (Fed. Cir. 1992)............................................................................. 30, 31

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  723 F.3d 1363 (Fed. Cir. 2013), *vacated on other grounds,* 135 S. Ct. 831
  (2015) ............................................................................................................................ 6

*TVIIM, LLC v. McAfee, Inc.*,
  No. 13-cv-04545-HSG, 2015 WL 3956313 (N.D. Cal. June 28, 2015) ...................... 49

*Tyler Refrigeration Corp. v. Kysor Indus. Corp.*,
  601 F. Supp. 590 (D. Del. 1985), *aff'd sub nom. Tyler Refrigeration v. Kysor
  Indus. Corp.*, 777 F.2d 687 (Fed. Cir. 1985) ............................................................. 37

**Statutes**

35 U.S.C. § 101 ............................................................................................................. *passim*

35 U.S.C. § 102(e) .................................................................................................... 36, 37

35 U.S.C. § 112 ¶ 6 ........................................................................................................ 20

35 U.S.C. §§ 271(a), (e), (f) .......................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................... 6

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| The '533 patent | U.S. patent 8,712,533 |
| The '125 patent | U.S. patent 9,327,125 |
| The '102 patent | U.S. patent 8,359,102 |
| The '842 patent | U.S. patent 9,480,842 |
| The '357 patent | U.S. patent 9,333,357 |
| The '988 patent | U.S. patent 8,792,988 |
| The '472 patent | U.S. patent 8,768,472 |
| Alataris patents | Asserted U.S. patents 8,712,533, 9,327,125, 8,359,102, 9,480,842, 9,333,357, and 8,792,988 to Alataris et al. |
| Asserted patents | The seven patents Nevro asserts in this case, including the Alataris patents and U.S. patent 8,768,472 |
| BSC | Defendants Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation |
| Ex. __ | Exhibit to the Declaration of Clara Wang, filed herewith |
| Fridman Decl. | Excerpts of the Expert Report and Declaration of Gene Fridman, Ph.D., Regarding Claim Construction, dated January 18, 2018, filed herewith |
| Fridman Reb. | Excerpts of the Rebuttal Expert Report and Declaration of Gene Fridman, Ph.D., Regarding Claim Construction, dated February 14, 2018, filed herewith |
| Lanovaz Decl. | Excerpts of the Rebuttal Expert Report and Declaration of Daniel Lanovaz, dated February 14, 2018, filed herewith |
| Mihran Rpt. | Exhibit A to the Declaration of Richard T. Mihran, filed herewith |
| Mihran Reb. | Exhibit B to the Declaration of Richard T. Mihran, filed herewith |
| Mot. | Nevro's Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Nevro's Motion for Summary Adjudication, D.N. 341-37 |
| Nevro | Plaintiff Nevro Corp. |
| Pai Ex. __ | Exhibit to the Declaration of Eric C. Pai in support of Nevro's Motion for Summary Adjudication, D.N. 343 |

**NOTICE**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 20, 2018, or as soon thereafter as counsel may be heard before the Honorable Vince Chhabria in Courtroom 2, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, BSC will and hereby does move for summary judgment.  BSC's motion is based on the pleadings, records, and files in this action; documents in the public record; the accompanying memorandum of points and authorities; the Declarations of Gene Fridman, Daniel Lanovaz, Richard T. Mihran and Clara Wang and accompanying exhibits, and any material the parties may present in briefing or at the hearing.

**CONCISE STATEMENT OF RELIEF SOUGHT**

BSC seeks an order from the Court construing certain terms.  BSC's response to Nevro's opening claim construction and opening motion for summary adjudication is also included below. BSC seeks summary judgment that:  (1) BSC does not directly infringe any asserted claim pursuant to 35 U.S.C. §§ 271(a), 271(e)(1) or 271(f); (2) all asserted claims are anticipated by BSC's prior art Precision SCS system; (3) the asserted claims of the Alataris patents are anticipated by the Fang application; and (4) certain asserted claims are invalid under 35 U.S.C. § 101.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Nevro's infringement case suffers from a fatal flaw—it applies a different claim interpretation to infringement than to validity.  On the one hand, Nevro contends that BSC's current accused products *infringe* because they are "designed to" generate high-frequency stimulation above 1.5 kHz—even though one of those products cannot provide stimulation above 1.2 kHz unless that capability is enabled through a software modification.  Conversely, to avoid *invalidity*, Nevro argues that an older BSC product—released years before Nevro's patents—does not practice the asserted claims, even though it had the same built-in capability to generate high-rate signals with a simple software modification.  Only by applying inconsistent standards can Nevro distinguish BSC's newer products from its older ones, because all of BSC's SCS systems

BSC'S RESPONSIVE CC BR., MSJ OPP AND MSJ                                    Case No. 3:16-cv-06830 VC

have operated in essentially the same way since 2004.  Simply put, if the claims are applied in a consistent manner, either BSC does not infringe or Nevro's claims are invalid.

Nevro attempts to cure this deficiency by rewriting its claims, proposing in particular to construe "configured" to mean "designed."  This altered meaning lacks support in the intrinsic and extrinsic record and would impermissibly inject the subjective intent of the designer into the claims.  In any event, if the Court were to adopt Nevro's construction, the claims would cover many prior art systems available since 2004 and earlier (including BSC's own Precision SCS system), which were designed to provide high-frequency signals if programmed to do so.  Thus, under Nevro's construction, BSC would be entitled to summary adjudication of invalidity.

BSC's proposed constructions of disputed claim terms, on the other hand, are true to the intrinsic record and consistent with applicable legal principles.  In particular, the plain meaning of "configured" is that the device is actually configured to provide high-frequency therapy signals—not that the device may later be configured to do so.  Because it is undisputed that none of BSC's accused products is configured (programmed) to provide a high-frequency signal when made and sold, applying this construction, BSC cannot infringe under 35 U.S.C. § 271(a) or § 271(f).  While BSC has made products that are programmable to a high frequency, these have been used in the United States only in clinical trials—a non-infringing use under the safe harbor provision of 35 U.S.C. § 271(e).  Should the Court adopt BSC's claim constructions, BSC is entitled to summary adjudication of no infringement under 271(a) and 271(f).

Nevro's case suffers from other defects.  For example, the asserted claims are directed to the body's response to electrical signals (no paresthesia) provided by otherwise conventional devices, which is not patentable under 35 U.S.C. § 101.  At minimum, Nevro's motions for summary judgment should be denied because there is substantial record evidence on which a reasonable fact-finder could rely to find for BSC.  For the reasons set forth herein, the Court should grant BSC's motions for summary judgment and deny Nevro's motions.

## II.     RESPONSE TO NEVRO'S "FACTUAL BACKGROUND"

Although Nevro's Factual Background (Mot. 3-5) is unrelated to claim construction or summary judgment, BSC is compelled to correct Nevro's misleading portrayal of the record.

2

### A.     BSC Is A Pioneer In The SCS Market

BSC has been a pioneer in spinal cord stimulation ("SCS") systems since 2004, when it launched the world's first rechargeable spinal cord stimulator.  This device included a number of foundational (and patented) SCS technologies that BSC continues to use today, including multi-channel capability, recharging devices and methods, data transmission to and from the implant, and other critical SCS features.

BSC's first-generation "Precision" product was launched to treat pain using frequencies below 1.2 kHz, but it was also designed to stimulate up to 10 kHz.  (*See, e.g.*, Ex. 1 at BSC-NVRO_00472605 ("the Precision system is capable" of "very high rate (~10kHz)").)  In addition, Precision could deliver "subthreshold" therapy, which used a relatively low amplitude so that the patient felt pain relief without the tingling sensation of paresthesia caused by the electrical signal from the device.  (*See* Section I, below.)  Although BSC's product was designed to have these functions in 2004, they are the same features that Nevro now touts as its own technology—*i.e.*, high-frequency stimulation with no paresthesia.

Nevro, a relatively new player in the SCS market, acknowledges that its Senza and Senza II systems ██████████████████████████████████████████ ████████ (Ex. 2, ████████████████████████████████████████.  This is not surprising, since the group that designed and developed Nevro's product included former BSC engineers that were intimately familiar with BSC's technology and had access to tens of thousands of BSC's confidential documents.[1]  In fact, ███████████████████████ ██████████████████████████████████████████████████ (Ex. 3 at NEVRO_BSXCA0389055 ██████████████████████████████ ████████████████████████████████████████████████

Nevro entered the European market in 2011 and the U.S. market in 2015, but still has not reported a profitable quarter or year.

---

[1] Nevro's infringement of BSC's patents is the subject of another pending action.  *Boston Scientific Corporation et. al. v. Nevro Corp.*, C.A. No. 16-1163-GMS (D. Del); *see* D.N. 193 at 2-4 (providing examples of Nevro's possession and use of BSC's trade secret information).

### B.    Nevro's 10 kHz Therapy Is Neither New Nor Superior

Nevro attempts to differentiate itself in the market, not with any new, tangible technology, but instead it points to the set of parameters with which its device is programmed to deliver stimulation—*e.g.*, frequency, pulse width, etc., with the aim of avoiding paresthesia.  While Nevro's product was the first FDA-approved SCS system to stimulate at 10 kHz in a commercial setting, such stimulation had been described and performed by many others in the past.  (*E.g.*, Section VIII.C., below)  As Nevro touted its "new" therapy, the industry was understandably curious as to whether its product would provide unique benefits.  The mounting evidence shows that Nevro's claims are overstated and that SCS therapy at 10 kHz is ***not*** superior to therapy below 1.2 kHz—frequencies that have been available from BSC and others for decades.

As a publicly-traded, one-product company desperate to meet investors' expectations, Nevro's claims of superiority are based on years of questionable practices:

- The results of Nevro's "Senza-RCT [randomized clinical trial]" study are undermined by bias due to the fact that neither the patients nor the physicians were blinded as to which treatment was administered.  (Ex. 4 at NEVRO_BSXCA0056902 (FDA noted that failure to conduct blinded study "may have ***resulted in investigator and patient bias***…." (emphasis added).)  More recent studies—including the only independent, ***blinded***, RCT study of Nevro's device—have shown that the therapy at 10 kHz does not meaningfully impact patient outcomes compared with therapy at conventional frequencies below 1.2 kHz.  (Exs. 5, 6.)

- Nevro's contention that "the FDA approved Nevro's therapy with a rare superiority label, allowing it to promote its system as superior to BSC's traditional SCS therapy" (Mot. at 4) is demonstrably false.  The FDA's "Effectiveness Conclusions" found that the data "demonstrated ***non-inferiority***"—not superiority.  (Ex. 4 at NEVRO_BSXCA0056903 (emphasis added).)  Moreover, Nevro's clinical study compared its Senza product to one early version of BSC's Precision system—not to BSC's later devices or those of other manufacturers.  (*See* Ex. 7 at NEVRO_BSXCA0053587 ██████████ ████)

- Nevro touts improved results at the "24-month mark" after its clinical study concluded (Mot.

4

at 4), but ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Exs. 8, 9 at

NEVRO_BSXCA049357.)

### C.   Nevro Mischaracterizes BSC's Competitive Intelligence Activities

One fact should be absolutely clear:  BSC has not copied Nevro's technology.  Other than the MultiWave product with minimal sales only in Europe, none of BSC's commercial products is even capable of being programmed by users at frequencies above 1.2 kHz.  To be sure, BSC investigated Nevro's high-frequency feature as part of routine competitive intelligence, to test Nevro's marketing claims, and to determine whether Nevro was "developing their system based on [BSC's]."  (Ex. 10 at  688:21-689:19; Ex. 11 at 416:10-15, 420:9-16.)  Nevro cites internal BSC documents discussing these investigations but none of them shows that BSC ever actually commercialized any products based on this work.  While BSC has conducted clinical trials using products at high frequencies, these clinical uses do not, under 35 U.S.C. § 271(e)(1), constitute infringement.  In fact, BSC deliberately designed its commercial WaveWriter product so that it could *not* be programmed for high-frequency use.

When Nevro filed suit in November 2016, it falsely alleged that "FDA approval and full-scale commercial launch of Boston Scientific's infringing paresthesia-free high-frequency SCS in the United States is imminent."  (D.N. 1 at ¶ 61.) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬ (D.N. 52 at 4; Ex. 12 at 510:2-19.) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬ (Ex. 13 at 709:25-710:12) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬ (Ex. 14.)  This conduct is the opposite of copying.

### III.      LEGAL STANDARDS

### A.   Summary Judgment

"Summary judgment is proper where 'the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *D Now, Inc. v. TPF*

5

*Toys, Ltd.*, 267 F. Supp. 3d 1254, 1257 (N.D. Cal. 2017) (quoting Fed. R. Civ. P. 56(a)).  If a nonmoving party bears the burden of proof, then the Court should grant summary judgment if there is a "complete failure of proof concerning an essential element of the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To oppose summary judgment, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.    Claim Construction

It is well settled that the ordinary and customary meaning of a claim term applies unless there is a good reason to deviate from it.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  Indeed, "***a heavy presumption [exists]*** that claim terms carry their full ordinary and customary meaning, unless it can [be] show[n] the patentee expressly relinquished claim scope."  *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (emphasis added).  The Federal Circuit has identified "only two exceptions" to this rule:  "1) when a [patentee] sets out a definition and acts as his own lexicographer, or 2) when the [patentee] disavows the full scope of a claim term either in the specification or during prosecution."  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013), *vacated on other grounds,* 135 S. Ct. 831 (2015).

The claims must also be read in light of specification and prosecution history to determine whether they are "precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them."  *Nautilus, Inc. v. BioSig Instrs., Inc*., 134 S. Ct. 2120, 2128, 2129 (2014) (quotations omitted).  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id*. at 2124.

## IV.    CLAIM CONSTRUCTION

### A.    "Configured to generate" and "configured to deliver"

| BSC's Construction | Nevro's Construction |
|---|---|
| No construction necessary.  If a construction is required:  "a signal generator which requires no further configuration to generate/deliver;" "a signal delivery device which requires no further configuration to deliver" | Designed to [generate/deliver] |

Many of the asserted claims recite a signal generator that is "configured" to generate a high-frequency therapy signal and an implantable lead that is "configured" to deliver that therapy signal.  BSC proposes that "configured" means "without requiring any further configuration."  If further configuration were necessary to perform a function, then the device would not already be "configured" to do so.  Nevro interprets "configured" to mean "designed," a subjective and ambiguous construction that Nevro wishes to mean one thing for infringement and another for validity.  For infringement, Nevro would like "designed to" to mean "capable of with modification," so that it can accuse BSC's current product that could only be programmed at high rates with a software modification.  For validity, Nevro would like "designed to" to require a specific intent by the designer that the product be used clinically at high rates without modification, so as to avoid BSC's older product that could be programmed at high rates with a software modification.  Neither meaning is supported by the evidence.

The parties' dispute arises because BSC does not make, use or sell devices that are "configured" to generate a high-frequency signal.  The factory default settings on all of the accused products are for low frequencies below 1.2 kHz.  (Ex. 15 at BSC-NVRO_00000978 ("Removed Default Settings"); Ex. 16 at BSC-NVRO_00033274 (rates above 1.2 kHz are "default disabled"); Lanovaz Decl., ¶¶ 61-72.)  Two of the accused products—the Precision MultiWave and the Spectra WaveWriter Version 1—can provide higher frequencies, but only if they are further configured to do so by the user; they are not configured to do so by BSC.  A third accused product, the Spectra WaveWriter Version 2, cannot be configured for high frequencies by any user because this feature has been disabled at the factory; it is not designed to generate high-frequency signals.  (Ex. 17, 178:10-18, 183:16-184:4.)  BSC's original Precision SCS system, like WaveWriter Version 2, could not be programmed at high frequencies by commercial users, but had the capability to provide high frequencies with software modification.  (*See* Section VIII, below.)

These limitations on the capabilities of BSC's products are not disputed.  To make its case, Nevro tries to change the words of the patent from "configured to" to "designed to."  (Mot. at 2.) Altering the claim language in this manner should be avoided because it leads to follow-on disputes about the new interpretation.  Indeed, conspicuously absent from Nevro's brief is any explanation of what it thinks the phrase "designed to" means.[2]  Based on the testimony of Nevro's expert, "designed" appears to require that ███████████████████████████████████████ ███████████████████████████████████████

██████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████

(Ex. 17 at 200:8-20 (emphasis added; objections omitted).)[3] ████████████████████ ████████████████████████:

██████████████████████████████████ ████████████████████████████████

(*Id*. at 204:25-205:16 (emphasis added).)

Yet any effort to interpret "designed to" to require the subjective intent of the manufacturer, would be legally erroneous.[4]  The scope of a patent claim cannot depend on such intent.  In

---

[2] In its Complaint, Nevro stated that the "claims of the '533 patent cover implantable SCS systems and devices *capable* of providing high frequency SCS therapy without creating paresthesia."  (D.N. 158, ¶ 59 (emphasis added).)  It is unclear whether Nevro's proposed "designed" interpretation means something different than "capable."  As discussed below, the prior art was clearly "capable" of providing such therapy signals without paresthesia.

[3] Nevro's expert was ████████████████████████████████████████ ████████████████████████████████████ (Ex. 17 at 197:7 - 205:23.)

[4] The plain meaning of "design" inherently refers to the intent of a designer.  (*See, e.g.,* Ex. 18 at BSC-NVRO_00182817 (defining "design" as "to have as a purpose").)

*Flexuspine, Inc. v. Globus Medical, Inc.*, No. 6:15-CV-201-JRG-KNM, 2016 WL 4161887, at *5-7 (E.D. Tex. 2016), the court refused to construe "configured" to mean "intentionally designed":

> [T]he asserted claims are apparatus claims, and ***the subjective intent of the designer does not expand or contract the claim's scope***. In other words, the infringement inquiry is based on the structure of the accused devices as claimed.... Defendant … argues that '"configured to" does not mean "capable of," and instead requires that the component is intentionally designed to perform the claimed function.' ***It is hard to understand how 'intentionally designed' would not require determining the 'intent' of the designer.*** Accordingly, the Court rejects Defendant's construction.

(Emphasis added). Similarly, in *Solocron Media, LLC v. Verizon Communications Inc.*, No. 2:13-CV-1059-JRG-RSP, 2015 WL 1011310 (E.D. Tex. 2015), the court construed "configured " to mean "actually configured," rejecting "specifically designed and set up":

> Defendants' proposal would tend to confuse rather than clarify the scope of the claims, for example by suggesting that the intent of a designer must be established. ***The Court therefore hereby expressly rejects Defendants' proposal of "specifically designed and set up to perform the claimed function."*** No further construction is necessary. The Court accordingly hereby construes "configured to" to have its plain meaning, "which the Court understands to require not merely being capable of being configured but rather *being actually configured*."

*Id.* at *11-12 (emphasis added); *see Amazon.com, Inc. v. barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001) ("We are not prepared to assign a meaning to a patent claim that depends on the state of mind of the accused infringer."); *Plantronics, Inc. v. Aliph, Inc.*, No. C 09-01714 WHA, 2014 WL 789115, at *2-4 (N.D. Cal. 2014) ("Aliph is barred from arguing … that the claim limitation requires intent….").

The Court should abide by the "heavy presumption" that the plain meaning of "configured" governs. Dictionaries at the time of the invention define "configure" as "to set up for operation esp. in a particular way" or "arrange or order (a computer system) so as to fit it for a designated task." (*See* Exs. 19 at BSC-NVRO_00148917, 20 at BSC-NVRO_00148914.) *See Phillips*, 415 F.3d at 1314 (dictionaries are useful tools for claim construction). Furthermore, during the prosecution of a continuation of the asserted '125 patent, which shares the same specification, the Patent Office stated that "the signal generator being configured to generate the therapy signal would already imply it is programmed with instructions to generate the therapy signal." (*See* Ex.

9

21 at BSC-NVRO_00563786.)  This is precisely what BSC proposes as the construction for "configured" in the asserted patents; that the device requires no further configuration (*e.g.*, programming) to generate or deliver the therapy signal.  In another Nevro patent, Nevro again equates configuring with programming:  a clinician "configures" the pulse generator by entering "an initial set of operating ... parameters."  (Ex. 22 at 6:8-37 ("After implanting the pulse generator 101, a caregiver (e.g., a physician or a pulse generator company representative) can ***first configure the pulse generator 101 with an initial set of operating programs and/or parameters*** using an external programmer (not shown)." (emphasis added)).

Nevro's corporate designee agreed with this interpretation, testifying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 23 at 226:13-230:18.)  Nevro thus acknowledges that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

It is significant that the claim recites "configu***red*** to generate" in the past tense, rather than "configu***rable*** to generate."  The suffix "-able" would suggest that the claim covered the capability of performing the function.  *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("Because the language of claim 1 refers to 'program***mable*** selection means' … the accused device, to be infringing, need only be capable of operating in the page mode.") (emphasis in original); *Edwards Lifesciences AG v. Corevalve, Inc.*, No. CV 08-91-GMS, 2010 WL 11032982, at *1-2 (D. Del. Feb. 16, 2010) (construing "radially collapsible," "circumferentially-expandable section," "radially-expandable," and "radially collapsible and expandable" to each mean "capable of").  By contrast, the use of the past tense—"configu***red*** to generate"—means the claim is directed to a device requiring no further configuration to generate the signal.  *See Fortinet, Inc. v. SRI Int'l, Inc.*, No. C 12-02540 JSW, 2013 WL 12174686, at *5 (N.D. Cal. Oct. 22, 2013) ("Here, the patentee chose to describe the claimed invention using past or present tense language…. The language the patentee chose does not reflect mere capability, but instead, the claimed invention does not exist until the network monitors have been deployed and are adapted to automatically receive and integrate.") (citations omitted); *MiiCs & Partners, Inc. v. Funai Elec. Co.*, Case No. 14-804-

10

1  RGA, 2017 WL 5985561, at *1 (D. Del. Dec. 1, 2017) (where the claim covered a television with a
2  "liquid crystal layer being divided into a plurality of regions," and division did not occur unless the
3  televisions were powered on, it was not sufficient that the accused televisions were capable of
4  being or designed to be powered on) (emphasis added).

5         Other parts of the asserted claims further support BSC's construction.  For example, the
6  claims require that the generated signal "***is at*** a frequency;" the use of the present tense means that
7  the claimed device must be currently configured and programmed to deliver the high-frequency
8  signal, not merely that it is capable of being programmed to do so at a later time.  *See Fortinet*,
9  2013 WL 12174686, at *5 ("past or present tense language" means the claim requires actual
10 configuration, not merely the capability of configuration at a later time).  The claimed device should
11 require no further configuration to provide the high-frequency signal.

12        The specification of the asserted patents also supports BSC's construction and undermines
13 Nevro's.  For instance, the terms "configure" and "design" are used differently—"design" refers to
14 the mental process of product design, while "configure" refers to how the device is set up by the
15 physician to produce effects in the patient.  (Pai Ex. 3 at 23:36-37 ("As noted above, one feature of
16 the foregoing arrangements is that they can be easy to design and manufacture."); *id.* at 24:15-20
17 (how "the system is configured and programmed" determines how the patient will be affected).)
18 The '533 patent also provides that the device is configured to generate the therapy signal only
19 "after" it has been programmed to do so, not before.  (*Id.* at col. 5:8-12 ("***After*** the position of the
20 signal delivery element 110 and ***appropriate signal delivery parameters are established*** using the
21 external programmer 105, the patient 190 can receive therapy via signals generated by the external
22 programmer 105 …") (emphasis added).)  Thus, a device is "configured to" perform a function
23 when it requires no further configuration to perform that function.

24        Nevro cites no dictionaries or other evidence of the plain meaning of "configured."  Instead,
25 it points to three Federal Circuit cases observing that "adapted to" has been interpreted in various
26 ways to mean "made to," "designed to," "configured to," "capable of," or "suitable for," depending
27 on context.  (Mot. at 7.)  These cases do not suggest that all of these words mean the same thing.
28 The district court cases cited by Nevro are equally unhelpful.  In *Mount Hamilton*, which is on

appeal, the parties agreed that the claimed software module must be "designed to perform a specified function." *Mount Hamilton Partners, LLC v. Groupon, Inc.*, No. C-12-1700-SI, 2014 WL 1047408, *6 (N.D. Cal. Mar. 14, 2014).  In the *Boston Scientific* case, the term "adapted to" was construed to mean "configured to," which the court defined as "[t]o design, arrange, set up, or shape with a view to specific applications or uses." *Boston Scientific Corp. v. Cordis Corp.*, No. C 02-01474 JW, 2006 WL 3782840, at *2 (N.D. Cal. Dec. 20, 2006).  Neither case suggests that the subjective intent of the designer is relevant to infringement, as Nevro appears to assert here.

In sum, the Court should follow the "heavy presumption" that the plain and ordinary meaning of "configured to" applies in this case, such that "configured to perform a function" means "requiring no further configuration to perform that function."  The Court should reject Nevro's attempt to re-write the term to mean "designed to," which would erroneously inject the subjective intention of the designer into the claim.

**B.      "Frequency"**

| BSC's Construction | Nevro's Construction |
|---|---|
| The therapy signal has … a frequency component in a frequency range | Plain and Ordinary Meaning |

The word "frequency" is used in several terms in the asserted claims—*e.g.*, a "signal has a frequency" or "the frequency is in a frequency range."  In the field of signal processing and in neurostimulation, it is well known that the term "frequency" can be used in two senses:  (1) the rate at which a waveform repeats itself (*i.e.*, pulse rate); and (2) a "frequency component" or "spectral component" of the signal.  (Mihran Rpt., ¶ 406; Fridman Decl., ¶ 82; Fridman Reb., ¶ 28.)  This second usage reflects the fact that an electrical signal may be composed of multiple different frequencies blended together—like notes in a symphony—and that individual frequencies in a complex electrical signal are known as "frequency components" or "spectral components." (Fridman Decl., ¶ 83.)  Importantly, the asserted patents use "frequency" in both of its well-known senses—*i.e.*, pulses-per-minute and also frequency components of a signal.  (Fridman Reb., ¶ 29.)

To avoid having its claims read on prior art, which would invalidate them, Nevro seeks to limit "frequency" to only the first usage.  There is no reason, however, to exclude the well-known

1   second usage from the meaning of "frequency."  BSC's construction finds support in the

2   specification of the asserted patents, whereas Nevro's does not.  *See Housey Pharms., Inc. v.*

3   *Astrazeneca UK Ltd.*, 366 F.3d 1348, 1356 (Fed. Cir. 2004) (rejecting argument that between

4   competing broad and narrow claim constructions, the narrow claim construction must be used).

5   Although Nevro argues that the patents use "frequency" in just one way—pulse rate (*see,*

6   *e.g.*, Ex. 24, ¶ 99)—the patents actually describe the invention as directed to "waveforms with ***high***

7   ***frequency elements or components***."  (Pai Ex. 3 at 2:49-56.)  The '472 patent describes

8   representative examples of high-frequency waveforms based on their pulse shape—*i.e.*, "square

9   wave pulses," "sinusoidal pulses," or other waveforms.  (Pai Ex. 4 at 7:52-8:5.)  A signal with the

10  same number of pulses-per-second will have different frequency components depending on the

11  pulse shape.  (Mihran Rpt., ¶¶ 418, 419.)  The '533 patent specification refers to "at least a portion

12  of the signal"—*i.e.*, a frequency component—as being in a certain range.  (Pai Ex. 3 at 10:16-24;

13  Mihran Rpt., ¶ 413; Ex. 25 at 112:6-18.)  Thus, in the context of the asserted patents, "frequency"

14  is used in the broader spectral sense.  *See Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 605 (Fed.

15  Cir. 2015) (rejecting plain meaning construction because the context of the patent required it).

16  Nevro wrongly asserts that BSC's proposed construction does not make sense in the context

17  of claim 5 of the '357 patent, which recites "the therapy signal has a frequency of 10kHz."  (Mot.

18  at 11.)  BSC's construction is entirely consistent with this claim; the therapy signal has a frequency

19  component at 10 kHz.  (Fridman Decl., ¶ 82.)  This frequency component could be the fundamental

20  frequency (pulses per second) or a harmonic frequency component that is part of a signal at a

21  different pulse rate or shape.  (Mihran Rpt., ¶¶ 415-420.)

22  Nevro's reliance on a BSC product manual to show that frequency always means pulse rate

23  (Ex. 24, ¶ 217) is also misplaced.  While frequency can sometimes refer to pulse rate, it can also

24  refer to frequency components of a signal, and the BSC product manual is not contradictory.  In

25  any event, a product manual, which is extrinsic to the patents, is of little relevance to the meaning

26  of the claims.  *Phillips*, 415 F.3d at 1318-19.

27

28

Nor is Nevro's observation that the standard unit "Hertz" means "per second" (Ex. 26,

¶ 127) inconsistent with the knowledge of persons of skill in the art that a signal may contain many

frequency components within it.  (*Id.*)  As one prior art patent publication explained:

> The actual frequency spectrum of a train of stimulation output pulses with, for
> example, a pulse repetition rate of 150 Hz, or more clearly 150 Hz (pps), can
> actually have significant and dominant frequency components well into the
> KiloHertz (kHz) frequency range with relatively insignificant frequency
> components at 150 Hz or even below 1 kHz.

(Ex. 27, ¶ 3)  This passage reflects both uses of the term "frequency," referring to "pulse

repetition" (first usage) and "frequency components" (second usage).  The asserted patents also use

the term "frequency" in both ways.  The Court should not limit the term to only the first usage.

## C.     "Paresthesia"

| BSC's Construction | Nevro's Construction |
| --- | --- |
| Tingling | Any abnormal sensation caused by a spinal cord stimulation or modulation signal.  Examples of paresthesia include the sensation of burning, pricking, pressure, formication, tickling, numbness, tingling, a 'pins and needles' feeling, or creeping on the skin. |

Nevro presents two supposed disputes:  "(1) whether the claimed 'paresthesia' is a

sensation caused by spinal cord stimulation signals, and (2) whether 'paresthesia' includes

abnormal sensations other than tingling."  (Mot. at 12-13.)  Only the second issue is actually

disputed.  The parties agree that paresthesia is a sensation caused by spinal cord stimulation.  The

asserted patents define paresthesia in terms of prior art SCS therapies that relied on the creation of

paresthesia to mask pain.  (Pai Ex. 3 at 1:44-49; *see* Pai Ex. 4 at 1:66-67.)  Both sides' experts

agree.  (Pai Ex. 30 at 82:16-83:1 ("paresthesia 'is the effect of spinal cord stimulation."); Ex. 28, ¶

19 ("Fundamentally, successful LF [low frequency] SCS is predicated on replacing the painful

sensations with paresthesias ... the means by which the therapy works.").)[5]

---

[5] Nevro wrongly suggests that BSC's proposed construction fails to link "paresthesia" to SCS.
(Mot. at 13.)  Every asserted claim makes clear that whether there is paresthesia is the result of
SCS.  It would be redundant to also add these limitations to the definition of "paresthesia."
*HVAC Tech. LLC v. Southland Indus.*, No. 5:15-cv-02934-PSG, 2016 WL 3092182, at *8 (N.D.
Cal. June 2, 2016) (refusing to import limitation already present in claim).

Defining paresthesia as "*any* abnormal sensation," however, is inconsistent with the term's plain meaning and the intrinsic evidence in the patent specifications.  Nevro includes within its definition painful sensations, such as "burning," that would not mask pain.  If, as both parties agree, paresthesia is a sensation that is induced to mask pain, then "burning" would not fit this understanding—it would make no sense to induce pain (such as burning) in order to mask pain. (Fridman Decl., ¶¶ 33-35; Fridman Reb., ¶¶ 13-17.)

The Patent Office has already found that "paresthesia" means "tingling."  In a Petition for *inter partes* review of Nevro's '102 patent, BSC asserted that "paresthesia" meant "tingling" and Nevro proposed a broader construction, as it does here.  The Patent Office considered the plain meaning and the intrinsic evidence and rejected Nevro's approach, ruling that the broadest reasonable interpretation of "does not create paresthesia" is "does not create tingling."  *Boston Scientific Neuromodulation Corp., v. Nevro Corp.*, IPR2015-01203, Decision at 7 (P.T.A.B. Nov. 20, 2015).  In making this finding, the Patent Office applied the "broadest reasonable interpretation" standard, which allows for broader interpretations than in a district court.  Thus, Nevro's effort to resuscitate its broad construction in this Court should be particularly disfavored.

The specification of the asserted patents describe paresthesia as "tingling" or, in the case of the '472 patent, tingling or numbness.[6]  (*See* Pai Ex. 3 at 1:44-49; Pai Ex. 4 at 1:62-67, 7:18-31; claim 1.)  While some of the other specific sensations that Nevro proposes may be synonyms for "tingling," these terms are not found in the intrinsic evidence and should not be included in the claim construction.  And nowhere does the specification suggest that "paresthesia" may encompass "*any* abnormal sensation."  As Nevro admits, "paresthesia" in this case is limited to the sensation produced by electrical stimulation, while the extrinsic definitions describe paresthesia generally from any source.  (*See, e.g.*, Pai Ex. 37.)  When examined in the context of electrical SCS, the

---

[6] Because "paresthesia" is an affirmative sensation caused by electrical stimulation, "numbness" in this context is used to describe the unique feel of the tingling sensation arising from direct stimulation of the nerve.  It can be likened to the affirmative sensation experienced when a limb starts to recover from having fallen asleep.  It does not mean the *absence* of sensation.  (Fridman Decl., ¶ 31; Fridman Reb., ¶ 17; Ex. 25 at 71:15-73:6.)

intrinsic and extrinsic record are in accord that "paresthesia" is best described as "tingling," and the specifications use these two words interchangeably.

There is more evidence from Nevro that the plain meaning of paresthesia is "tingling." Nevro's Chief Medical Officer ("CMO") has stated under oath that paresthesia is tingling.  (Ex. 29, ¶¶ 11 ("the constant tingling sensation that is the basis of traditional SCS therapy,") 12 ("tingling sensation (i.e., paresthesia)").) ███████████████████████████████████████ ███████████████████████████████████████████████ (Ex. 30 at NEVRO-BSXCA0073299.)

Nevro's attempt to include "pressure" in the definition of paresthesia is particularly improper and, as Nevro is admits, the result of its desire to "distinguish the relevance of certain prior art."  (Mot. at 13.)  Nevro offers no evidence that "paresthesia" may mean "pressure."  The MacDonald references, while mentioning that some patients experience a "light pressure," are also clear that their disclosed therapy may be paresthesia-free.  (*See, e.g.*, Ex. 31 at BSC-NVRO_00003703 ("there are no paraesthesiae").)  In fact, the prior art distinguishes between paresthesia and pressure, which actually supports BSC's construction because it shows that the plain meaning of paresthesia does ***not*** include pressure.  (Ex. 32 at 5:51-57.)  The Court should reject Nevro's effort to include "pressure" in the definition of "paresthesia."

In sum, Nevro's patents, its CMO, ██████████████, and the Patent Office have all defined "paresthesia" as "tingling."  This Court should do so as well.

### D.    "Therapy signal"

| BSC's Construction | Nevro's Construction |
|---|---|
| Indefinite.  Alternatively, "a signal which produces a measurable therapeutic effect." | "a spinal cord stimulation or modulation signal to treat pain" |

One of ordinary skill in the art would consider "therapy signal" to be indefinite because the claims and specifications do not convey the claim scope with reasonable certainty.  While the prosecution history confirms that a "therapy signal" is a specific kind of signal, different than a "diagnostic signal," there is no objective way to determine whether a signal provides "therapy"

1  until it is used.  (*See, e.g.*, Ex. 33 at NEVRO_BSXCA 0009918-19 ("Applicant asserted that the

2  signal of Peterson is directed to a diagnostic rather than a stimulating therapy signal.").)

3       Nevro's proposed construction imports a subjective intent element into the claim

4  limitation that contributes further to its indefiniteness.  (*See* Fridman Decl., ¶¶ 44, 65-66.)  While

5  the patents describe objectively measurable electrical characteristics of the claimed signal—*e.g.*,

6  amplitude, pulse width, and frequency—they provide no guidance regarding how to identify a

7  signal "to treat pain," as required by Nevro's proposed construction.  (*Id.*, ¶ 66.)  *See Crane Co. v.*

8  *Sandenvendo Am., Inc.*, No. 2:07-CV-42-CE, 2009 WL 1586704, at *13 (N.D. Cal. Jun. 5, 2009)

9  ("Although Crane suggests that it may be possible to measure the average time of vending

10  machines and then determine a competitively advantageous time, the patent does not disclose any

11  such method.").  There is no way to differentiate between two electrically-identical signals, only

12  one of which is ***intended*** to produce a measurable therapeutic effect or to treat pain.  (Fridman

13  Decl., ¶ 66.)  In other words, if electrically-identical signals are delivered to two patients—one

14  healthy and one in pain—only the signal delivered to the patient in pain would infringe.  The

15  claim is, therefore, indefinite.  *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244,

16  1254-55 (Fed. Cir. 2008) (term indefinite when it requires that "an artisan make a separate

17  infringement determination for every set of circumstances in which the composition may be used,

18  and when such determinations are likely to result in differing outcomes (sometimes infringing and

19  sometimes not)"); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir.

20  2003) (term indefinite because a formulation "might infringe or not depending on its usage in

21  changing circumstances"); *STX, Inc. v. Brine, Inc.*, 37 F. Supp. 2d 740, 755 (D. Md. 1999) ("The

22  notion that one reasonably skilled in the art would have to infringe the patent claim in order to

23  discern the *boundaries of the claim* is repugnant to long-standing principles of patent

24  jurisprudence." (emphasis in original)).

25       Even if the "intent" of a particular use could somehow be determined, it would still be

26  impossible to predict if the device will actually produce the intended effect of "treat[ing] pain" in

27  any given patient.  (Fridman Decl., ¶ 69.)  Nevro admits this to be true.  (*See* Ex. 34 at

28  NEVRO_BSXCA 0108384, (█████████████████████████████████

███████████████████████████████████████████████).)  Every patient is different, and pain is self-identified, measured, and reported by the patient.  (Fridman Decl., ¶ 74.)  Whether a particular signal produces a therapeutic effect or treats pain is thus an entirely subjective determination made by each patient.  *Crane Co.*, 2009 WL 1586704, at *13 (term indefinite because "entirely subjective" and "judged purely from the consumer's standpoint"); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (term indefinite because "completely dependent on a person's subjective opinion") (abrogated on other grounds).  Accordingly, because (1) the claim must be practiced in order to determine infringement, and (2) one cannot objectively measure pain relief, a person of skill in the art would not be able to understand the scope of "therapy signal" with any reasonable certainty, rendering it indefinite.

If the Court finds the term not indefinite, then "therapy signal" should be construed as "a signal which produces a measurable therapeutic effect."[7]  The claims and specifications of the asserted patents use the term "therapy signal" to describe a signal that produces the therapeutic effect of "reducing or eliminating pain."  (*See* Pai Ex. 3 at 3:11-13 ("In general terms, aspects of many of the following embodiments are directed to ***producing a therapeutic effect*** that includes ***pain reduction*** in the patient.") (emphasis added).)  As Nevro acknowledged during prosecution of the '357 patent, one of ordinary skill in the art would recognize that there must be a difference between a patient's pre- and post-treatment states (which are measured) that indicates whether a particular signal is therapeutic.  (*See, e.g.*, Ex. 35 at NEVRO_BSXCA0006836 ("Still further, producing pain relief is not an abstract idea for at least the reason that pain relief is ***measurable*** using any of a variety of commonly accepted techniques (e.g., VAS pain scores and Oswestry disability indices.)  Neither is the absence of paresthesia an abstract idea for at least the reason that it is detectable, for example, via a patient's response, and ***measurable***.") (emphasis added).)

---

[7] BSC's expert, Dr. Fridman, did not testify that "therapy signal means a signal that is delivered with the intent of relieving pain," as Nevro contends.  (*See* Mot. at 15.)  Dr. Fridman was, in fact, merely clarifying whether a question posed by Nevro's counsel used "therapy signal" according to Nevro's proposed construction.  (Ex. 25 at 95:6-16 ("I don't know ***what you mean*** by 'therapy signal.' ... ***I'm assuming*** therapy signal means a signal that is—that is delivered with the intent of relieving—relieving pain.") (emphasis added).)

While Nevro's proposed construction improperly imports a subjective intent that is indefinite, BSC's construction requires at least obtaining a measurable response from the patient. In other words, one can determine whether a "signal" is a "therapy signal" when a patient reports pain relief. Thus, to the extent that the Court considers the term "therapy signal" not indefinite, the proper construction should be "a signal that produces a measurable therapeutic effect."[8]

### E.    "Implantable"

| BSC's Construction | Nevro's Construction |
|---|---|
| Plain and Ordinary Meaning | "Suitable for long-term implantation" |

Persons of skill in the art (and even laypersons) understand that, when something is implant*able*, it is capable of being implanted—*i.e.*, it can be put in the body. (Ex. 25, at 131:18-31.) In the context of the asserted patents, "implantable" signal generators and "implantable" signal delivery devices (*i.e.*, leads) are capable of being implanted. This well-understood term should not take on a special meaning in this case. Nevro's proposal to shoehorn "long-term" into the definition of "implantable" is inconsistent with the asserted patents, which provide that "implantable" leads may be implanted temporarily during a short trial period. (Fridman Reb., ¶ 34.) "Long-term" is not defined in the asserted patents or the art and is inherently subjective. (*Id.*, ¶ 111.) The patents describe patients receiving therapy using leads implanted for only a few days, after which the leads are removed and re-implanted to deliver a different therapy for another few days. (Pai Ex. 3 at 6:34-7:5.) These examples contradict Nevro's proposed construction. (Fridman Reb., ¶ 34.) Because it is unsupported by the specifications and introduces unnecessary confusion, Nevro's construction should be rejected.[9]

_____

[8] Nevro makes much ado about nothing regarding BSC's omission of "spinal cord stimulation or modulation" before "signal." (Mot. at 15.) There is no dispute that the asserted claims are directed to spinal cord stimulation. (*See, e.g.*, Pai Ex. 3, claim 1 (claiming "a spinal cord modulation system" that "deliver[s] the therapy signal to the patient's spinal cord region").)

[9] Nevro's attempt to exclude "electrodes inserted into the skin" should also be rejected. (Ex. 24, ¶ 227.) The asserted patents describe surgical implantations that include insertion of the leads into the patient. (*See, e.g.*, Pai Ex. 3 at 22:15-24.) For instance, they provide that "leads are implanted percutaneously through a large needle inserted into the epidural space." (*Id.* at 1:37-38.) Insertion of the lead into the patient is one way that an implantable lead is implanted. (Fridman Reb., ¶ 33.)

1

F.    "Means for generating ..." and "means for delivering ..."

2

| BSC's Construction | Nevro's Construction |
| --- | --- |
| Corresponding structure:  a signal generator configured to generate. | A pulse generator |

3

4     These claim terms are in "means-plus-function" format in that they recite a "means" for

5     performing some function.  Such claim terms are governed by 35 U.S.C. § 112 ¶ 6.  The

6     construction of means-plus-function claims requires an identification of the claimed function as

7     well as the claimed corresponding structure.  *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279

8     F.3d 1022, 1032 (Fed. Cir. 2002).  The corresponding structure must be found in the specification

9     and be clearly linked to the function.  *Id.*

10    As an initial matter, in the parties' Joint Claim Construction evidence, Nevro failed to

11    identify the claimed function, the corresponding structure, or any expert testimony upon which it

12    would rely to support its construction of these claim terms.  (*See* D.N. 185, Ex. A at 116-117.)

13    Accordingly, Nevro should be precluded from relying on its current proposal for corresponding

14    structure or upon the testimony of its expert.  *Largan Precision Co., Ltd. v. Fujifilm Corp.*, No. C

15    10-01318 SBA, 2012 WL 4097719, at *4 (N.D. Cal. Sept. 17, 2012).  BSC intends to move to

16    strike this improper evidence, along with other evidence related to the present briefing.

17    BSC proposes a construction of these terms that is similar to what it proposes for the

18    "configured to" elements discussed above in Section IV.A.[10]  In other words, the structure that

19    corresponds to a "means for generating" is "a signal generator configured to generate."  This is

20    consistent with what Nevro told the Patent Office regarding these terms.  During prosecution of the

21    '125 patent, the Examiner found that the corresponding structure for the term "means for

22    generating" was an "implantable/external pulse generator…***configured with particular parameters***

23    ***to achieve the function as recited***."  (Ex. 36 at NEVRO_BSXCA0005949.)  The examiner

24    emphasized that "the corresponding structure (pulse generator) is not simply a general purpose

25    pulse generator by itself, but a special purpose pulse generator programmed to perform the

26

27    ───────────────

[10] The parties do not dispute the function of these terms, and BSC will stipulate to Nevro's

28    proposed construction for the corresponding structure of the "means for delivering," as "a lead."

particular function." (*Id.* at 6 (citation omitted).)  He further explained that, if Nevro disputed the

interpretation, Nevro must say so and explain why—but Nevro did not dispute the construction in

the public prosecution record.  *Id.*  Nevro should not now be able to say that the term "means for

generating" means something different.  *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346

F.3d 1075, 1079 (Fed. Cir. 2003) ("We conclude that the pin clause of claim 10 must be construed

in the same way as the pin clause of claim 1, for the examiner's Reasons for Allowance make clear

that the examiner and the applicant understood that the invention requires that the pin extends

(actively) into the slot after rotation.").  Thus, the corresponding structure for "means for

generating" should be "a signal generator configured to generate."

### G.   "Programming [a/the] signal generator"

| BSC's Construction | Nevro's Construction |
|---|---|
| Entering selected signal parameters into the signal generator | This term does not require construction and should have its plain and ordinary meaning. |

Nevro concedes that "the parties now do not appear to have a substantive dispute over the

meaning of these terms."  Although Nevro states that BSC's proposed construction introduces a

"potential ambiguity," this appears to have been based on a prior concern regarding programming

that has now been resolved—as Nevro acknowledges.  (Mot. at 18.)  BSC's proposed construction

explains what "programming a signal generator" means in practical terms that a lay jury can

understand.  BSC defers to the Court as to whether this construction would assist the trier of fact.

### H.   "Machine-readable medium containing instructions for generating and transmitting" / "executable instructions to generate"

| BSC's Construction | Nevro's Construction |
|---|---|
| No construction required.  If a construction is required: "a signal generator having instructions which require no further programming to generate and deliver / transmit" | This term does not require construction and should have its plain and ordinary meaning |

The dispute regarding this term is similar to that addressed in Section IV.A, above.  A

person of ordinary skill in the art at the time of invention would have understood the term to

impart a structural limitation as a signal generator having instructions which require no further

programming to generate and deliver / transmit.  (*See* Fridman Decl., ¶¶ 124-128.)  The intrinsic

and extrinsic evidence supports BSC's interpretation for reasons similar to those stated above in

21

Section IV.A.  (*See, e.g.*, Pai Ex. 3 at 5:8-12; Ex. 23 at 227:11-23 (████████████████

█████████████████); *see* Ex. 37 at BSC-NVRO_ 00563785-86 ("Examiner is not

convinced that a signal generator programmed with instructions to generate a therapy signal is

more limiting than a signal generator configured to generate a therapy signal....  [T]he signal

generator being configured to generate the therapy signal would already imply it is programmed

with instructions to generate the therapy signal.").)

### I.       The "paresthesia-free" Limitations[11]

| BSC's Construction | Nevro's Construction |
|---|---|
| Indefinite or "a signal which does not produce paresthesia in a patient" / "the signal does not produce paresthesia in a patient" | "a spinal cord stimulation or modulation signal to treat pain without causing paresthesia" / "the spinal cord stimulation or modulation signal treats pain without causing paresthesia" |

One of ordinary skill in the art would consider these terms indefinite because the asserted

claims and specifications do not provide any objective basis for determining with reasonable

certainty whether a particular signal is "paresthesia-free."  Nevro's proposed construction imports

a subjective element of intent into the claims to describe the intended outcome of delivering the

claimed signal to a patient.[12]  As with "therapy signal," discussed above, it cannot be known

whether a particular signal produces paresthesia until it is delivered to a patient who reports his or

her subjective perception of paresthesia.  (*See* Fridman Decl., ¶¶ 65-80; Fridman Reb., ¶¶ 61-65.)

A person of ordinary skill in the art, given a system generating a signal, would have no way of

knowing in advance whether the signal was intended to produce paresthesia in a patient.  *Crane*

*Co.*, 2009 WL 1586704, at *13; *Halliburton Energy Servs.*, 514 F.3d at 1254-55; *Geneva*

---

[11] These limitations appear in all asserted claims and are as follows:  "Non-paresthesia-producing therapy signal" / "non-paresthesia-producing spinal modulation signal" / "paresthesia-free therapy signal" / "does not create paresthesia in the patient" / "without generating paresthesia" / "without using paresthesia or tingling to mask the patient's sensation of pain" / "without generating the sensation of paresthesia in the patient"/ "without relying on paresthesia or tingling to mask the patient's sensation or pain."  (Pai Ex. 1.)

[12] Nevro's Motion does not address its proposed constructions for "does not create paresthesia in the patient," "without using paresthesia or tingling to mask the patient's sensation of pain," and "without relying on paresthesia or tingling to mask the patient's sensation or pain."  These terms should also be found indefinite or be construed as "does not produce paresthesia in a patient."

22

1    *Pharms.*, 349 F.3d at 1384.  Further, like pain, the feeling of paresthesia is a subjective one

2    perceived differently by each patient.  (Fridman Decl., ¶ 74.)  One of ordinary skill in the art must

3    therefore rely on the subjective determination of a patient to determine whether a given signal

4    produced paresthesia, which renders the claim indefinite.  *See Crane Co.*, 2009 WL 1586704, at

5    *13; *Datamize*, 417 F.3d at 1347; *STX, Inc.*, 37 F. Supp. 2d at 755 (D. Md. 1999).  Because

6    paresthesia is a subjectively-reported sensation, one of skill in the art does not know what

7    measure of tingling can be felt while still characterizing the signal as not having caused

8    paresthesia.  *See Semmler v. Am. Honda Co.*, 990 F. Supp. 967, 974-75 (S.D. Ohio 1997).

9         If the Court finds the terms not indefinite, then it should construe them to mean "a signal

10   which does not produce paresthesia in a patient" or "the signal does not produce paresthesia in a

11   patient" (as grammatically appropriate for the particular claim).  (Fridman Decl., ¶ 59.)  BSC's

12   proposed construction, under which a signal is "paresthesia-free" if a patient reports not feeling

13   paresthesia, is supported by both the claims and specification.  Some of the claims state that the

14   signal "does not create paresthesia ***in the patient***."  (Pai Ex. 2, claims 11, 21, 23 (emphasis

15   added).)  The specifications explain that "88% of the patients preferred the presently disclosed

16   therapy to standard SCS therapy because it ***reduced their pain without creating paresthesia***."

17   (Pai Ex. 3 at 9:7-10; *see* Pai Ex. 4 at 8:27-29 ("This HF blocking signal can be applied to the

18   dorsal column DC in place of an LF stimulation signal to replace the pain relief provided by the

19   paresthesia.").)

20        As shown above, Nevro's proposed constructions improperly import a subjective intent

21   element into the claim.  Moreover, Nevro's proposed constructions are erroneous because they

22   seek to limit "paresthesia-free" and its variants "to treat pain" or "treats pain."  (Fridman Reb., ¶

23   62.)  Whether a signal reduces pain is separate from whether the signal produces paresthesia—a

24   point that Nevro itself argued during the prosecution of the '842 patent.  (*See* Ex. 33 at

25   NEVRO_BSXCA0009938-39 (distinguishing a ***diagnostic*** signal that did not produce paresthesia

26   from a ***therapy*** signal that did not produce paresthesia).)

27        Additionally, Nevro's proposed construction includes "spinal cord stimulation and

28   modulation signal," whereas BSC's construction omits the type of signal to avoid cumbersome

redundancies.[13]  For instance, claim 1 of the '533 patent refers to a "non-paresthesia-producing therapy signal."  If the Court were to adopt Nevro's proposed constructions for "non-paresthesia" as well as "therapy signal," the result would be "a signal generator configured to generate a [spinal cord stimulation or modulation signal to treat pain without causing paresthesia] [a spinal cord stimulation or modulation signal to treat pain]."  The fact that Nevro's constructions are redundant and, in some cases, incompatible further justifies rejecting them.

## V.   BSC IS ENTITLED TO SUMMARY JUDGMENT OF NO DIRECT INFRINGEMENT WITH RESPECT TO ALL ACCUSED PRODUCTS

If BSC can show that only one element of the asserted claims is missing from the accused products, then summary judgment of no direct infringement should be granted.  *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, Case No. C-12-4498 EMC, 2014 WL 4090400 at *5 (N.D. Cal. Aug. 19, 2014).  Because BSC's products are not configured to generate high-frequency stimulation when made or sold, there can be no infringement under 35 U.S.C. § 271(a).  In addition, certain acts accused of infringement either cannot constitute infringement under § 271(f) or are protected from infringement by the safe harbor of § 271(e)(1).  For these reasons, summary judgment of no direct infringement should be granted with respect to all asserted claims and all accused products. Nevro's motion for summary judgment of infringement of two claims by one accused product should be denied for the same and additional reasons.

### A.   BSC Does Not Directly Infringe The Asserted Claims Under 35 U.S.C § 271(a)

There are three related limitations that are missing from the accused products:  (1) a signal generator "configured to generate" a signal with specific parameters and/or that is paresthesia-free ('533 patent claims 7, 35, and 37; and '842 patent claims 1 and 22); (2) "means for generating" such a signal ('125 patent claims 18, 34 and 55); and (3) a signal generator with

---

[13] Nevro's Motion incorrectly states that Dr. Fridman argued that the terms "without generating paresthesia" and "without generating the sensation of paresthesia" do not include a signal. (*Compare* Mot. at 19:18-24 *with* Fridman Reb., ¶ 64.)  There is no dispute that the terms are related to characteristics of a signal.  Additionally, Paragraph 64 of Dr. Fridman's Rebuttal Report actually addresses the terms "does not create paresthesia in the patient" and "without relying on paresthesia or tingling to mask the patient's sensation or pain," which Nevro failed to include in its Motion.  (*See supra* n.12.)

1    "instructions to generate" such a signal ('533 patent claim 58; and '357 patent claims 5 and 34).

2    (*See* Pai Ex. 1.)  As detailed in Sections IV.A, IV.F and IV.H, above, each of these limitations

3    requires a signal generator programmed (*i.e.*, "configured to," or with "instructions to") generate

4    a "therapy" signal with specific signal parameters that provides paresthesia-free therapy.  Because

5    the accused products are missing these claim elements, summary judgment should be granted.

6         It is undisputed that, when the accused products are made and sold by BSC, they are not

7    programmed with specific signal parameters to generate a paresthesia-free therapy signal.  (*See*

8    Ex. 26, ¶¶ 188-203, 209.)  With respect to product capabilities, Mr. Pless opines that the accused

9    systems are "configured ***to allow*** stimulation" at particular frequencies—he conspicuously does

10   not say, despite Nevro bearing the burden on infringement, that these devices are programmed to

11   output specific frequencies at the factory.  (*See id.*, ¶¶ 199, 209 (emphasis added).)

12        In addition, Mr. Pless concedes that the accused products "can provide therapy with

13   paresthesia.  And [they] can provide therapy without paresthesia."  (*See id.* ¶ 191 (internal citation

14   omitted).)  Mr. Pless also relies on BSC's statement that "[t]he Precision™ SCS system with

15   MultiWave™ is ***capable*** of being programmed to generate stimulation signals at low stimulation

16   amplitude (0-9mA)…."  (*Id.*, ¶ 191 (internal citations omitted; emphasis added).)  There is no

17   dispute that the accused devices must be ***programmed*** by users after the products are made and

18   sold so as to generate paresthesia-free signals.  (*See* Mihran Reb., ¶¶ 16-36.)  Because they are

19   not made or sold in such a state, BSC does not directly infringe.

20        In opining about infringement, Mr. Pless relies exclusively on the programming of

21   accused devices ***subsequent to their manufacture and sale***.  For example, with respect to claim 7

22   of the '533 patent, Mr. Pless relies on the specific programming of accused devices either in

23   Europe, or as part of the ACCELERATE clinical trial.  (*See, e.g.*, Ex. 26, ¶¶ 192 ("patients []

24   have been ***programmed*** using the Precision with MultiWave in Europe") (emphasis added), 197

25   (ACCELERATE patients "were provided with programs" utilizing certain frequencies for

26   "paresthesia-free therapy optimization").)  Thus, the accused products must be programmed

27   subsequent to their manufacture and sale in order to provide the allegedly infringing stimulations.

28

The present facts are similar to those in *MiiCs & Partner*, 2017 WL 5985561, at *1, which interpreted a claim term related to liquid crystal displays used in televisions.  As discussed above in Section IV.A, the court held that the accused televisions could infringe only when powered on. *Id.* at *3.  Because the televisions were not powered on when made and sold, they did not infringe.  *Id.*  Similarly, Nevro's claims require the accused systems to be programmed with specific signal parameters that do not produce paresthesia.  This programming takes place, if at all, only after the system has been made and sold.  Thus, as a matter of law, there can be no direct infringement under 35 U.S.C. § 271(a) as to any of the asserted system claims.

Nevro's motion alleges infringement based on BSC's manufacture of the accused systems. (Mot. at 20); it is unclear whether it also alleges infringement arising from uses of the systems. Even if Nevro did so, there would still be no direct infringement under § 271(a) of either the asserted system or method claims.  The accused Precision with MultiWave has been used in the U.S. only in conjunction with the ACCELERATE clinical trial (Ex. 26, ¶ 92); as discussed in Section V.C below, under the safe harbor of § 271(e)(1), this use does not constitute infringement.  Nor can any use of the Precision with MultiWave abroad infringe under § 271(a), which applies only to uses "within the United States."  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000).  WaveWriter Version 1 has been used only in the ACCELERATE clinical trial (Ex. 26, ¶ 96) and is therefore also covered by the safe harbor.  And it is undisputed that Wave Writer Version 2 cannot be programmed above 1.2 kHz by any user. (Ex. 17 at 178:10-18, 183:16-184:4.)  Because every asserted claim requires a signal of at least 1.5 kHz (*see* Pai Ex. 1), under a proper construction, there can be no direct infringement.

Although summary judgment for BSC is warranted, even if not granted, summary judgment for Nevro must be denied.  Its motion is directed to only one of the 12 asserted system claims ('533 patent claim 7), one of the six asserted method claims ('102 patent claim 11), and only one accused product (Precision with MultiWave).  In addition to the reasons detailed above, Nevro's motion as to claim 7 of the '533 patent should be denied because the Precision with MultiWave does not have a "an implantable signal delivery device ... configured to deliver the therapy signal to the patient's spinal cord region."  This structural limitation requires that the lead

26

be "configured" to deliver stimulation, which it cannot do until it is coupled to the IPG and implanted in a patient.  (*See, supra*, Section IV.A.)  While the leads of BSC's system are "implantable" and capable of being coupled to the IPG (Mot. at 21-22), this evidence does not show that the leads are so "configured" when made or sold.  (*See* Mihran Reb., ¶¶ 88-89, 244.)

Disputed material facts compel denial of Nevro's motion regarding method claim 11 of the '102 patent.  Nevro presents no evidence that BSC itself practices the method of claim 11.  Indeed, the accused products are prescription-only devices, and it is the physicians, not BSC personnel, who treat patients.  (Mihran Reb., ¶ 363.)  Claim 1's step of "delivering or instructing delivery of an electrical signal to the patient's spinal cord" is thus performed by the doctor, not by BSC.  (*Id.* ¶¶ 364-66.)  Moreover, the lead must be implanted and connected to the IPG in order to be "configured" to deliver a therapy signal.  This step, too, is performed by the physician, not BSC.  (*Id.* ¶ 364.)  Mr. Pless confirms this, admitting that "leads have to be implanted and coupled to the IPG."  (Ex. 26, ¶ 226; *see* Mihran Reb., ¶ 365.)

Because the BSC accused products are not "configured" to provide the required stimulation parameters when made and sold, there can be no infringement under Section 271(a).

**B.     BSC Does Not Infringe The Asserted Claims Under 35 U.S.C. § 271(f)**

Under 35 U.S.C. §271(f), a party cannot avoid liability for infringement of a U.S. patent by exporting a "component of a patented invention that is especially made or especially adapted for use in the invention … intending that such component will be combined outside of the United States ***in a manner that would infringe the patent if such combination occurred within the United States***."  (Emphasis added.)  As shown above in connection with § 271(a), BSC's Precision with MultiWave—the only accused product sold abroad—does not infringe Nevro's system patents even when fully assembled and sold in the United States.  As a matter of law, therefore, the exportation of those systems or components thereof does not violate § 271(f).  Moreover, because § 271(f) does not apply to method claims, *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1365-66 (Fed. Cir. 2009) (en banc as to §271(f)), BSC cannot, as a matter of law, be found to infringe any of Nevro's method patents under § 271(f).

1

**C.    The FDA Safe Harbor Applies, As A Matter of Law, To Patients Who Participated In The ACCELERATE Study**

2

3

The safe harbor of 35 U.S.C. § 271(e)(1) provides that the use of allegedly patented

4

medical devices "reasonably related to the development and submission of information" to obtain

5

FDA approval does not constitute patent infringement.[14]  Nevro wrongly contends that the safe

6

harbor does not apply to patients who participated in ACCELERATE, an ongoing study in the

7

United States (Ex. 38) after their participation in the data collection phase of the study ends.  (*See*

8

Mot. at 25-26.)  This dispute relates only to SCS systems that were implanted in patients during

9

the ACCELERATE Study; there is no allegation that BSC sold any high rate-enabled SCS

10

systems in the United States outside of the study.  For the reasons set forth below, the § 271(e)(1)

11

safe harbor applies, as a matter of law, to patients who participated in ACCELERATE during ***and***

12

***after*** the data collection phase.  The Court should deny Nevro's motion for summary judgment

13

and enter judgment for BSC on this issue.

14

The following facts are undisputed.  The ACCELERATE Study was conducted pursuant

15

to an Investigational Device Exemption ("IDE") from the FDA that permits BSC to conduct "a

16

clinical investigation intended to provide the primary support for the safety and effectiveness

17

evaluation of a medical device for a specified intended use…."  (Ex. 39 at BSC-

18

NVRO_00018032; Ex. 40 at BSC-NVRO_00019762).  The primary objective of the

19

ACCELERATE investigational study is to evaluate the safety and effectiveness of high rate

20

spinal cord stimulation … therapy as compared to commercial rate spinal cord stimulation.…"

21

(Ex. 41 at BSC-NVRO_00015123.)  In its IDE application, BSC sought approval to implant the

22

high rate-enabled version of BSC's SCS system in study participants.  (*Id*.)  The Clinical Protocol

23

for the study, which was an exhibit to BSC's IDE application (*Id*. at BSC-NVRO_00015152),

24

included a section entitled "End of Study Plan" that expressly provided that subjects in the study

---

[14] "It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention … solely for uses reasonably related to the development of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."  35 U.S.C. § 271(e)(1).  Courts have held that the safe harbor applies to medical devices.  *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661 (1990); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1028 (Fed. Cir. 1997).

could continue to receive therapy with their device *after the study*.  (Ex. 42 at BSC-NVRO_00019251 ("Subjects who wish to continue using their PRECISION SCS System for HR with either high rate or commercial stimulation, may receive technical, external components and clinical support, revision and/or replacement, and be followed per routine care by their physician….").)  The FDA granted the IDE without requiring any changes to the post-study provision.

Nevro does not dispute that the provision of high-frequency therapy to study participants during the data collection phase falls squarely within the safe harbor of § 271(e)(1), focusing exclusively on ████████████████████████████ as to whom ████████████████ ████████  (*See* Mot. at 25-26.)  By approving the IDE based on the Clinical Protocol, which expressly contemplates the continued treatment with high-frequency therapy ████████████ ████████  the FDA has necessarily concluded that such continued treatment is reasonably related to obtaining regulatory approval.  *See Nexell Therapeutics, Inc. v. AmCell Corp*., 143 F. Supp. 2d 407, 422 (D. Del. 2001) ("the FDA is in a better position than the courts to determine what activities are reasonably related to obtaining regulatory approval").

Section 271(e)(1) "provides a wide berth for the use of patented drugs in activities related to the federal regulatory process."  *Merck KGaA v. Integra Lifesciences I, Ltd*., 545 U.S. 193, 202 (2005) ("There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed …"); *see Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1028, 1030 (Fed. Cir. 1997) (the statute "does not look to underlying purposes or attendant consequences of the activity … as long as the use is reasonably related to FDA approval"); *Intermedics, Inc. v. Ventritex, Inc*., 775 F. Supp. 1269, 1280, 1282 (N.D. Cal. 1991), *aff'd sub nom. Intermedics, Inc. v. Ventritex Co.*, 991 F.2d 808 (Fed. Cir. 1993) (holding that "Congress used th[e] phrase ['reasonably related'] to communicate its intention that the courts give parties some latitude in making judgments about the nature and extent of … activities they would engage in as they sought to develop information to satisfy the FDA"; "[the defendant's] continuing sales of [accused devices] to clinical investigators [after submitting its application for pre-market approval to the FDA] were reasonably related to obtaining FDA

29

approval"); *Nexell*, 143 F. Supp. 2d at 421 ("The Federal Circuit has construed the § 271(e)(1)

exemption broadly") (citing *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520,

1522-23 (Fed. Cir. 1992)).  There is no genuine dispute that the continued treatment of patients

pursuant to a protocol included in an IDE approved by the FDA is "reasonably related to the

development of information" to obtain FDA approval.[15]

Moreover, Nevro's interpretation of § 271(e)(1) would undermine Congress's policy

objectives in enacting the safe harbor—*i.e.*, to encourage "potential competitors to be able to

ready themselves, fully, during the life of the patent, to enter the commercial marketplace in a

large scale way as soon as the relevant patents expired," thereby "assuring the public prompt

access to new medical products at the lowest commercially feasible prices."  *Intermedics*, 775 F.

Supp. at 1277.  Under Nevro's reasoning, to avoid liability, BSC would have to—immediately

███████████████████████—withdraw high-frequency treatment from patients who had

benefitted from such treatment during the trial, possibly requiring surgery to remove the

implanted SCS device.  Such a draconian and ethically-questionable[16] requirement would impede

BSC's ability to enroll patients in its study, undermining the congressional intent behind

§ 271(e)(1), which included facilitating the conduct of clinical trials.  *See Telectronics*, 982 F.2d

at 1523 ("demonstrations [at medical conferences] constitute an exempt use reasonably related to

FDA approval, because device sponsors are responsible for selecting qualified investigators");

---

[15] The two cases cited by Nevro—both of which involved commercial sales ***after*** FDA approval
to patients who did not participate in any pre-approval study—are inapposite. *See Classen
Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1070 (Fed. Cir. 2011) ("The statute does
not apply to information that may be routinely reported to the FDA, ***long after marketing
approval has been obtained***") (emphasis added); *Momenta Pharms., Inc. v. Teva Pharms. USA
Inc.*, 809 F.3d 610, 621 (Fed. Cir. 2015) (accused infringer "makes no claim that its accused,
***post-approval*** use of the patented method is related to obtaining FDA approval") (emphasis
added). ███████████████████████████████████████████████████
████████████████████████████ (D.N. 52 at 4; Ex. 12 at 510:2-19.)

[16] The World Medical Association's *Declaration of Helsinki – Ethical Principles for Medical
Research Involving Human Subjects* (2013) provides:  "34.  In advance of a clinical trial,
sponsors … should make provisions for post-trial access for all participants who still need an
intervention identified as beneficial in the trial."  Ex. 43 at p. 2.  Nevro's position would force
BSC to choose between avoiding liability for infringement and satisfying this ethical principle.

*Nexell*, 143 F. Supp. 2d at 420 (granting summary judgment for defendant where, "[i]n an effort to recruit clinical investigators, [it] advertised the availability and effectiveness of its device …").

Courts have not hesitated to grant summary judgment of non-infringement under the safe harbor of § 271(e)(1).  *See Abtox*, 122 F.3d at 1030 (affirming summary judgment of non-infringement); *Telectronics*, 982 F.2d at 1522 (same); *Intermedics*, 775 F. Supp. 1290-91 (granting summary judgment of non-infringement); *Nexell*, 143 F. Supp. 2d at 423 (same). Because the undisputed facts establish that the post-data collection treatment provided to ACCELERATE participants is "reasonably related to the development and submission of information" to obtain FDA approval, the Court should grant BSC's motion for summary judgment of non-infringement.  At a minimum, those facts raise material issues of fact compelling denial of Nevro's motion.

## VI.    THE CLAIMS ARE INVALID UNDER 35 U.S.C. § 101

Section 101 of the Patent Act defines patent-eligible subject matter.  This provision contains an "important implicit exception: ***Laws of nature, natural phenomena, and abstract ideas are not patentable***."  *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). At the heart of Nevro's alleged invention is the observation that some patients may experience pain relief without paresthesia when treated with high-frequency stimulation.  Nevro does not dispute that systems capable of generating high-frequency electrical signals were well-known and conventional prior to the alleged invention, and that such systems were used to treat pain by stimulating the spinal cord.  As such, if the claims are construed as Nevro proposes, then its patents claim nothing more than the body's natural response to stimulation by conventional devices in conventional ways.  Accordingly, the Court should enter summary judgment that, as construed by Nevro, the asserted paresthesia-free apparatus claims—claims 7, 12, 35, 37 and 58 of the '533 patent, claims 18, 34, and 55 of the '125 patent, and claims 5 and 34 of the '357 patent—are not directed to patent-eligible subject matter and are therefore invalid under § 101. At a minimum, Nevro's cursory motion for summary judgment that the claims are not abstract under § 101—which treats all the claims together, ignores any distinctions between the asserted

31

1  apparatus and method claims, and implicitly adopts BSC's constructions to support its

2  arguments—should be denied if Nevro's constructions are adopted.

3        Determining eligibility under § 101 is a legal question for the court to resolve.

4  *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017).

5  The Supreme Court has prescribed a two-step analysis.  *First*, the court must determine whether

6  the claims are directed to a patent-ineligible concept such as a law of nature or a natural

7  phenomenon.  *Second*, if the claims are directed to a patent-ineligible concept, the court must then

8  determine whether the claim limitations, individually or in combination, transform the claim into

9  a patent eligible application of that concept.  *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*

10  *Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)).

      **A.**    **First *Mayo* Factor:  Under Nevro's Proposed Constructions, The Paresthesia-Free Apparatus Claims Are Directed To A Patent-Ineligible Concept**

11

12        The Federal Circuit looks at the claimed advance over the prior art to determine if the

13  claim as a whole is directed to excluded subject matter.  *See Affinity Labs of Tex., LLC v.*

14  *DIRECTV, LLC*, 838 F.3d 1253, 1257–58 (Fed. Cir. 2016), *cert. denied sub nom. Affinity Labs of*

15  *Tex., LLC v. DIRECTTV, LLC*, 137 S. Ct. 1596, (2017); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818

16  F.3d 1369, 1375 (Fed. Cir. 2016).  The Federal Circuit will "determine whether the claims 'focus

17  on a specific means or method that improves the relevant technology,' or are 'directed to a result

18  or effect that itself is the abstract idea and merely invoke generic processes and machinery.'"

19  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (internal quotation omitted).

20  This Court stated that "[a] patent claim that recites a solution to a problem but not the means of

21  achieving it is not drawn to patent-eligible subject matter."  *Sungkyunkwan Univ., Research &*

22  *Bus. Found. v. LMI Techs. (USA) Inc.*, No. 16-CV-06966-VC, 2017 WL 1900737, *1-2 (N.D.

23  Cal. 2017) (Chhabria, J.) (citations omitted).  Such a claim is an "abstraction" and "[r]ather than

24  disclose a concrete solution, it seeks to monopolize the very idea of a solution."  *Id.* (citing *Alice*,

25  134 S. Ct. at 2354).

26        Nevro's claims are patent-ineligible under the first *Mayo* factor for two reasons.  *First*, as

27  construed by Nevro, the claims are directed to a result—pain relief without paresthesia—without

28

1    reciting the means of achieving it.  To be sure, the claims recite stimulation with specific

2    parameters, *e.g.*, frequency, amplitude, and pulse width, but Nevro admits that for any given set

3    of parameters, paresthesia may or may not be sensed by the patient.  (Ex. 26, ¶ 191.)  Thus,

4    Nevro's claims do not recite the means of achieving the result of paresthesia-free therapy.  The

5    Federal Circuit has invalidated such claims under § 101.  In *Ameranth*, the claims were directed

6    to an abstract idea because they did not "claim a particular way of programming or designing the

7    software to create menus that have [the claimed] features, but instead merely claim the resulting

8    systems."  *Ameranth, Inc.*, 842 F.3d at 1241; *see Affinity*, 838 F.3d at 1258 (claims invalid where

9    nothing in the claim "directed to ***how*** to implement [the claimed result]" and the claim was

10   "drawn to the idea itself.") (emphasis added); *Internet Patents Corp. v. Active Network, Inc.*, 790

11   F.3d 1343, 1348 (Fed. Cir. 2015) (claims that recited the objective of "maintaining state" without

12   any restriction on how the result is accomplished were invalid).  Here, as construed by Nevro, the

13   claims merely recite a generic and conventional SCS system that may or may not achieve the

14   result of paresthesia-free therapy.

15        *Second*, the claims are also patent-ineligible because they are directed to the natural

16   phenomenon of the patient's reaction to conventional electrical stimulation.  In considering the

17   alleged advance over the prior art, the specification focuses extensively on patients' physiological

18   responses to the disclosed signal parameters—not on a new SCS system with a novel design.  For

19   example, the disclosed signal parameters include "a frequency of from about 3 kHz to about 10

20   kHz," a pulse width of "about 30-35 µs;" and an amplitude "from about 1 mA to about 4 mA,"

21   but the specification takes for granted that persons of ordinary skill in the art know how to design

22   and build a signal generator with those conventional capabilities.  (*See* Pai Ex. 3 at 6:51-7:5; Ex.

23   44 ("Knudson"), ¶¶ 66, 80-87; Ex. 45 ("Cameron"), ¶ 61).)  Thus, the focus of the claimed

24   invention is not the capability to generate such signals but merely the observation that these

25   conventional signals may provide paresthesia-free pain relief to some patients.

26        The prosecution history confirms that the body's response to the stimulation is the only

27   purportedly inventive aspect of the claims.  During prosecution of the '533 patent, for example,

28   Nevro argued that the Knudson reference did not invalidate the claims because Knudson's system

1   "may or may not have paresthesia"—*i.e.*, it was not inherently paresthesia-free.  (Ex. 46 at

2   NEVRO_BSXCA0001729; *see id.* at NEVRO_BSXCA0001771; Ex. 36 at

3   NEVRO_BSXCA0003666, NEVRO_BSXCA0003669; Ex. 48 at NEVRO_BSXCA0009126.)

4   Thus, the only difference between Nevro's claim and Knudson was the lack of paresthesia, which

5   is a natural phenomenon; there is nothing in the claims describing what is required beyond

6   Knudson's disclosure to achieve the paresthesia-free result.

7           The concept at the heart Nevro's patents is similar to those in *Mayo*, where the patentees

8   claimed the correlation between the "thiopurine metabolite" level in the human bloodstream and

9   the likely harm or effectiveness of a given dose of the compound, thereby enabling physicians to

10  optimize a safe and effective dosage.  *Mayo*, 132 S. Ct. at 1294-95.  The Supreme Court found

11  those claims to be directed to a natural phenomenon because "the relation [between

12  concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine

13  drug will prove ineffective or cause harm] exists in principle apart from any human action" and

14  "is a consequence of the ways in which thiopurine compounds are metabolized by the body—

15  entirely natural processes."  *Id.* at 1297.  Here, whether the patient feels pain relief without

16  paresthesia is a consequence of the ways in which electricity affects the body.  Nevro has

17  attempted to patent the natural functioning of the spinal cord.  *Cleveland Clinic Found. v. True*

18  *Health Diagnostics LLC*, 859 F.3d 1352, 1361 (Fed. Cir. 2017); *Ariosa Diagnostics, Inc. v.*

19  *Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015).

20          **B.      Second *Mayo* Factor:  The Claims Do Not Contain An Inventive Concept That
                  Transforms Them Into Something Patentable**

21          The second step of the *Mayo* analysis looks at whether the claim limitations, considered

22  individually or as an ordered combination, contain an inventive concept sufficient to transform

23  the claims into a patent-eligible application.  *Ariosa*, 788 F.3d at 1375 (citing *Mayo*, 132 S. Ct.

24  at 1298).  The claims must include additional features ensuring that the claim is more than a

25  drafting effort designed to monopolize the abstract idea, law of nature, or natural phenomenon.

26  *Ariosa,* 788 F.3d at 1377 (quoting *Mayo*, 132 S. Ct. at 1297).  That the claims recite hardware

27

28

34

1  components is not sufficient—the "mere recitation of a generic computer cannot transform a

2  patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2357-58.

3      Here, the paresthesia-free apparatus claims generally recite SCS systems with pulse

4  generators and lead components.  As discussed throughout this brief, the claims include a number

5  of limitations for each component, such as frequency, pulse width, amplitude for the pulse

6  generator and/or biphasic for the pulse generator.  Some claims also limit the lead in conventional

7  ways—*e.g.*, by requiring that it be "[partially] implantable," a percutaneous lead, include two or

8  more electrodes, capable of being placed in the epidural space, capable of delivering a signal to

9  the spinal cord or spinal cord region, capable of delivering at a vertebral level of T9 to T12,

10  coupleable to the signal generator.

11      Whether these claims and limitations are considered individually or in combination, under

12  Nevro's proposed constructions, they fail to recite anything more than a conventional and well-

13  known SCS system at the time of the alleged invention.  As Dr. Mihran explained,

14  neurostimulators applicable to SCS and capable of delivering mono- and bi-phasic pulses having

15  a wide range of programmable parameters, including frequency, pulse width, and amplitude, were

16  developed at least as early as the 1970s.  (Mihran Rpt., ¶¶ 99-103.)  Dr. Mihran identified

17  exemplary U.S. patent No. 3,7127,616 to Lenzkes which issued in 1973 and which disclosed a

18  neural stimulator capable of providing programmable pulse widths between 10 microseconds and

19  10 seconds in increments of 10 microseconds, frequencies between 0.03 Hz and 16.7 kHz, and

20  amplitudes between 0.4µA - 4mA.  (*Id.*, ¶ 102 (citing Lenzkes at 7:62-8:7).)  Numerous other

21  prior art patents similarly disclose the conventional ability to generate high rate signals and the

22  other claimed parameters.  (*See*, e.g., Ex. 32 at 4:15-16 ("Typically it is possible to use signals

23  having a frequency up to about 250 kHz"); Ex. 45 at ¶¶ [0057], [0061] (describing the use of a

24  "conventional neurostimulation device" at frequencies "from about 1 Hz to about [25 kHz]").)

25      Neither Nevro nor its expert contend that the asserted apparatus claims, either individually

26  or in combination, recite novel or unconventional hardware or software capabilities.  Nevro's

27  expert, Mr. Pless, admits that the limitations of the claims are conventional:  "Nevro does not

28  purport to have invented neurostimulation, SCS, a new lead, or even an IPG....  [T]he Asserted

35

Claims … rely on known hardware components."  (Ex. 24, ¶ 292; *see id.*, ¶ 124 ("Nevro is not claiming to have invented implantable pulse generators or leads.")).  Nevro relies only upon the body's response to these conventional components as the point of novelty.

The cases upon which Nevro relies—primarily *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016)—are distinguishable for multiple reasons.  The claims in *Rapid Litigation* were patent eligible because, although the invention was based on the discovery of a natural law, the claims required more.  *Rapid Litig.*, 827 F.3d at 1048.  The "end result of the patent claims [was] not simply an observation or detection [of the natural law]," but instead a "new and useful method of preserving hepatocyte cells."  *Id.*  The asserted claims here do not cover a new and useful method; rather, if construed as proposed by Nevro, they recite only a generic and conventional SCS systems and claim the body's natural reaction (no paresthesia)— nothing more.  This is not patentable subject matter.

## VII.   BSC IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY OF THE ALATARIS PATENTS IN VIEW OF FANG

BSC is entitled to summary judgment of invalidity of the asserted Alataris patent claims because U.S. Patent App. Pub. No. 2009/0204173 to Fang ("Fang") discloses every limitation of those claims.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007).  The Court should deny Nevro's motion for summary judgment that Fang is not prior art because Nevro admitted that it was prior art during prosecution and to the Court.

### A.   Fang Is Prior Art To The Alataris Patents Under 35 U.S.C. § 102(e)

Nevro asserts that Fang is not § 102(e) prior art because it is not the patent "of another." 35 U.S.C. § 102(e) (patents "of another" filed before priority date are prior art even if not issued until later).  Nevro has already admitted, however, that Fang's high-frequency "paresthesia-free" disclosure in ¶ 54 is prior art "of another" and that it qualifies as prior art under § 102(e).  During prosecution of the '533 patent, Nevro summarized a discussion with the Patent Office:  "The parties further discussed ***and agreed*** that ***Fang constitutes prior art to the present application only under Section 102(e)***…."  (Ex. 46 at NEVRO_BSXCA0001769 (emphasis added).) Nevro's attorney made the same admission during prosecution of related patent applications.

36

(*See, e.g.*, Ex. 46 at NEVRO_BSXCA0001639; Ex. 47 at BSC-NVRO_00086417-18; Ex. 67 at BSC-NVRO_00079620; Ex. 68 at BSC-NVRO_00084544, BSC-NVRO_00084546.)

Nevro also told the Court that Fang was prior art under 102(e). (D.I. 172 at 2 n.2. ("***the Fang reference ... qualifies as prior art only under §102(e)***" (emphasis added)) Having told the Patent Office and the Court that Fang is §102(e) prior art, Nevro should not now be allowed to walk back its admission. *See, e.g., Tyler Refrigeration Corp. v. Kysor Indus. Corp.*, 601 F. Supp. 590 (D. Del. 1985), *aff'd sub nom. Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687 (Fed. Cir. 1985). In *Tyler*, the court rejected the patentee's argument that a reference did not qualify as § 102(e) prior art because the patentee had admitted during prosecution that the reference was prior art to all of the asserted patents. 601 F. Supp. at 600-01; *see also State Indus., Inc. v. Rheem Mfg. Co.*, No. 3-83-0362, 1984 WL 1243 (M.D. Tenn. June 5,1984), *aff'd in part, rev'd in part*, 769 F.2d 762 (Fed. Cir. 1985); *Lucent Techs. Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1163, 1173 (S.D. Cal. 2007).

Although Nevro argues that the individuals who invented the subject matter in the asserted claims—Dr. Alataris and Mr. Walker—are the same people who invented the portions of Fang that BSC relies upon for invalidity, there is substantial evidence showing that they are not the "inventors" of high-frequency paresthesia-free therapy, ███████████████████████████████ ███████████████████████████████████████. (Ex. 49 at 38:23-41:22.) The Mayo Clinic was an investor in Enteromedics, which had developed a therapy involving a 5 kHz blocking signal applied to a nerve to treat obesity. (*Id.* at 33:6-20.) Before Dr. Alataris joined Nevro, he worked at a firm named Bay City Capital that was also an investor in Enteromedics. (*Id.* at 19:23-25.) In that role, Dr. Alataris monitored Enteromedics, and visited doctors at Mayo. (*Id.* at 28:12-16.) ████████████████████████████████ █████████████████████████████████. (*Id.* at 28:12-29:3; 37:6-9.) ████████████████████████████████. (*Id.* at 37:22-38:1.) ████████████████████████████████████████████ ██████████████████████████████. (*Id.* at 38:23-41:22.) The Court should find that Fang is prior art based on Nevro's admissions to the Patent

1    Office and to the Court but, even if the Court finds that those admissions are not binding, these

2    facts raise genuine issues precluding Nevro's motion for summary judgment.

3            **B.      Fang Anticipates The Asserted Claims Of The Alataris Patents**

4            Nevro's asserted claims include five groups of the similar elements:  (i) a signal generator

5    "configured to" or with "instructions" to generate, or "means for generating," the therapy signal;

6    (ii) leads positioned at the spinal cord or "spinal cord region" to deliver the signal; (iii) signal

7    parameters other than frequency (*i.e.*, amplitude and pulse width); (iv) a frequency or frequency

8    range (above 1.5 kHz); and (v) that the signal be paresthesia-free.  A chart showing how each of

9    these groups applies to the asserted claims is attached as Exhibit 50.[17]  Because the Fang

10   reference discloses all of these claim elements, it anticipates and renders the claims invalid.

11           **1.      Fang Discloses Groups (i) And (ii):  A Signal Generator To Generate A
                     Therapy Signal And Spinal Cord Leads To Deliver That Signal**

12           There is no dispute that Fang describes a device that generates a therapy signal and that it

13   uses implantable leads in the spinal cord to deliver that signal.  For example, Fang ¶ 2 describes

14   "methods and apparatuses for treating patient conditions, including chronic pain conditions, via

15   techniques that can include stimulating and blocking neuronal tissue associated with the spinal

16   cord."  (*See* Mihran Rpt., ¶¶ 2509-12.)  Fang also describes representative therapy systems,

17   including pulse generator 101, that can be implanted and connected to "percutaneous lead bodies

18   108 and 109" positioned within an epidural space of the spinal cord.  (*See* Ex. 51, ¶¶ 10, 42, 46, &

19   47; Mihran Rpt., ¶¶ 2513, 2519.)  As was conventional, the pulse generator 101 "can include a

20   computer readable medium containing the instructions" to "apply therapy signals … to the nerve

21   fibers of the patient to…down-regulate (e.g., block or partially block) the nerves."  (Ex. 51, ¶ 42;

22   Mihran Rpt., ¶ 2513.)  Nevro's expert, Mr. Pless, does not dispute that Fang discloses these

23   elements.  (*See* Ex. 24, ¶¶ 1830-84.)

24           **2.      Fang Discloses Group (iii):  Amplitudes And Pulse Widths**

25           The asserted claims in the Alataris patents recite various amplitude ranges that fall

---

[17] BSC's expert, Dr. Mihran, explains how Fang anticipates every asserted claim of the Alataris patents.  (Mihran Rpt., ¶¶ 2498-2643.)

between 0 and 20 mA.  (*See* Pai Ex. 1.)  Fang discloses that "the current of the HF blocking

signals generally can range from about 2 mA to about 20 mA"; in a "particular embodiment, the

current of a representative HF blocking signal is about 5-10 mA."  (Ex. 51, ¶¶ 80, 32, 96; Mihran

Rpt., ¶ 2525.)  These fall within the ranges claimed in the asserted Alataris patents, which

Nevro's expert does not dispute.  (*see* Pai Ex. 1 at '533 patent, claims 35, 37, 58, '842 patent,

claims 1, 22, '357 patent claims 5, 34, and '988 patent claim 18; *see* Mihran Rpt., ¶ 2525-26; Ex.

24, ¶¶ 1819, 1830-84.)

       The asserted claims in the Alataris patents recite the following pulse width ranges:  25-

166 microseconds; 10-333 microseconds; and 30-35 microseconds.  (*See* Pai Ex. 1.)  Fang

inherently discloses these pulse widths.  (Mihran Rpt.,  ¶¶ 2506, 2529-30.)  It was well-known to

a person of ordinary skill in the art that the pulse width of a signal can be derived from other

information about that signal.  (*Id*., ¶¶ 2506, 2529-30; Ex. 24, ¶ 1846.)  As explained by Nevro's

prosecution counsel, "pulse width is necessarily linked to frequency, since, for example, a

relatively long pulse width could not be used with a high frequency."  (Ex. 52 at BSC-

NVRO_00089585.)  Fang himself confirmed this relationship when he testified that, ███████

████████████████████████████████████████████████████████████████

████████████████████  (Ex. 53 at 61:11-14; *see, id*. at 59:3-62:21.)  After his

deposition, in an errata sheet, he added that ███████████████████████████

██████████  (*Id*., Errata at 2 (providing "Clarifications" for pages 61-62 of Mr. Fang's

transcript).)

       The Fang prior art shows a symmetrical waveform in Figures 4 and 6:




1    (Ex. 51, Figs 4 & 6.)  Nevro's assertion that these figures do not describe a symmetrical

2    waveform (Ex. 24, ¶¶ 1845, 1847) is simply not credible and cannot be sufficient to raise a

3    **genuine** factual dispute.  It is clear from the Figures that they are symmetrical and bi-phasic with

4    no delay between the positive and negative phases of the pulse ("intrapulse delay").

5         Fang provides that the "HF blocking signal" can be a 3 kHz - 10 kHz, symmetrical signal

6    with no intrapulse delay.  (Ex. 51, ¶¶ 18, 22, 50, 51, FIGS. 4, 6; Ex. 17 at 141:16-142:2).)  Fang

7    provides that the signal can have a duty cycle of 50% or "50% or less."  (Ex. 51, ¶¶ 50-51.)  It

8    also provides that the signal can be bi-phasic or mono-phasic.  (*Id.*, ¶ 50, Ex. 17, at 138:3-8,

9    141:16-142:2.)  From this information, pulse widths can be calculated:

10   •  For a symmetric bi-phasic signal with a frequency of 10 kHz signal and a 50% duty cycle, the

11      maximum pulse width is inherently 25 microseconds.  (Mihran Rpt., ¶ 2530.)  For the same

12      signal with a frequency of 3 kHz, the maximum pulse width is inherently 75 microseconds.

13      (Mihran Rpt., ¶¶ 2506-07, 2529-30.)  Thus, for the 3-10 kHz frequency range at a 50% duty

14      cycle, Fang inherently discloses a range of pulse widths of 25-75 microseconds.  This

15      overlaps the claimed ranges of 25-166 microseconds and 10-333 microseconds ('533 patent

16      claims 35 and 58; '125 patent claim 55; '357 patent claim 34).

17   •  For a symmetrical, monophasic signal with a frequency of 10 kHz and a "50% or less" duty

18      cycle, the maximum pulse width is inherently 50 microseconds or less.  (Mihran Rpt.,

19      ¶¶ 2506-07, 2529-30.)  Thus, Fang also discloses pulse width ranges overlapping the claimed

20      pulse width range of 30-35 microseconds ('842 patent claims 1 and 22; '357 patent claim 5).

21        Where the claims recite a range and the prior art discloses an overlapping range, the

22   patentee must establish the criticality of the claimed range to the invention to avoid anticipation.

23   *Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 871 (Fed. Cir. 2015) ("[W]hen the prior art

24   discloses a range, rather than a point, the court must evaluate whether the patentee has established

25   that the claimed range is critical to the operability of the claimed invention"); *ClearValue, Inc. v.

26   Pearl River Polymers, Inc.*, 668 F.3d 1340, 1345 (Fed. Cir. 2012) ("ClearValue has not argued

27   that the 50 ppm limitation in claim 1 is 'critical' ….").  Nevro has no evidence or expert opinion

28   that the claimed pulse widths have any criticality over those in Fang.

Mr. Pless showed at his deposition why there is no genuine dispute about these disclosed pulse widths.  He was asked to draw a symmetrical, biphasic square waveform with no delays between or within pulses.  He drew what Fang shows in Figure 6 (left below).  He was then asked to draw the same signal, but with a duty cycle of 50 percent.  (Ex. 17 at 120:23-122:8, 126:1-9, 128:6-11.)  He then drew the figure on the right, below:



(Exs. 54, 55.)  Based on the second figure, Mr. Pless was asked to calculate the pulse width assuming the frequency was 1 kHz , and he was able to determine that it was 250 microseconds. (Ex. 17 at 130:12-31:17.)  At 10 kHz, the pulse with would be ten times less, or 25 microseconds, just as Dr. Mihran had calculated.  (Mihran Rept., ¶ 2530.)  Mr. Pless's calculation at deposition shows that a person of ordinary skill would understand that Fang inherently discloses pulse widths in the claimed ranges.

### 3.    Fang Discloses Group (iv):  High-Frequency Therapy

Fang discloses a number of ranges for its high-frequency blocking signal:  about 2.5 kHz to about 100 kHz, about 2.5 kHz to about 20 kHz, and about 3 kHz to about 10 kHz.  (Ex. 51, ¶ 50.)  As such, Fang discloses all of the high-frequency limitations in the Alataris patents. (Mihran Rept., ¶¶ 2503-04.)  With only one exception, Nevro does not dispute this showing. Nevro's expert, Mr. Pless, argues only that Fang does not disclose frequencies below 2.5 kHz and thus that it does not disclose the claim elements with frequency ranges that start at 1.5 kHz.  (*See, e.g.*, Ex. 24 ¶ 1835.)  This argument, however, is not consistent with its infringement theory that BSC's devices infringe because they are "designed to" provide the claimed frequencies, even if they do not actually do so.  The device in Fang was also designed to provide stimulation at frequencies a low as 1.5 kHz, as this is expressly described in Fang.  (Ex. 51, ¶¶ 49-50.)  If this

Court construes the claims to cover a signal generator "designed to" generate the claimed signal (as Nevro argues to establish infringement), then Fang's device would satisfy this interpretation.

Even if the Court construes the claims narrowly, Fang still anticipates. The asserted claims recite ranges with a lower limit of 1.5 kHz and an upper limit at 50 kHz, 100 kHz, or even higher. (Pai Ex. 1.) The specification of the asserted patents does not provide that the claimed ranges of 1.5 kHz is somehow more or less effective than any other range, and Mr. Pless does not even attempt to contend that there is any evidence of criticality between the ranges claimed and those disclosed by Fang; he simply asserts that they are different. (*See, e.g.*, Ex. 24, ¶¶ 1834-35.) Dr. Mihran testified that Fang disclosed range is essentially interchangeable with the claimed ranges. (Mihran Rpt., ¶ 2504.) Nevro has thus failed to present any genuine factual disputes regarding the criticality of the claimed ranges as required by *ClearValue* and *Ineos*.

### 4. Fang Discloses Group (v): A Signal Generator Designed To Generate Paresthesia-Free Therapy

There is no dispute that ¶ 54 of Fang discloses Nevro's high-frequency paresthesia-free invention. As Mr. Pless states "this description in Fang [para 0054] refers to Nevro's invention of using a high-frequency signal to provide pain relief without paresthesia." (Ex. 24, ¶ 1818; Mihran Rpt., ¶ 2514.) Because Fang discloses all limitations in all five categories of all asserted Alataris claims, summary judgment of those claims is warranted.

## VIII. BSC IS ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY OF THE ASSERTED CLAIMS IN VIEW OF BSC'S PRIOR ART PRECISION SCS SYSTEM

The Precision prior art system was first sold in the U.S. in 2004, years before Nevro was founded. (Ex. 56, ¶ 3.) Among other features, the Precision had an IPG and leads designed to be implanted in the epidural space of the spinal cord. (*Id.*, ¶¶ 11-12; Ex. 56-B at BSC-NVRO_00002434-35, 2454-59, 2472-74.) The Precision SCS system was approved for programming at pulse rates up to 1.2 kHz, with amplitudes up to 20 milliamps and pulse widths up to 1000 microseconds. (Ex. 56-A at BSC-NVRO_00002418; Ex. 2 at NEVRO_BSXCA0165832.) The Precision IPG was also designed with hardware capable of outputting signals with pulse rates above 1200 Hz, up to at least 14.3 kHz. (Ex. 56, ¶ 11.)

1    If the claims are construed as Nevro proposes, then the Precision prior art would disclose

2    all elements of the asserted claims and thereby invalidate them.  A chart showing how each of

3    these groups applies to the asserted claims is attached as Exhibit 50.  BSC's prior art Precision

4    system embodies all of these claim elements.

### A.    Precision Discloses Groups (i) And (ii):  A Signal Generator To Generate A Therapy Signal And Spinal Cord Leads To Deliver That Signal

There can be no dispute that Precision discloses an implantable signal generator and leads

for treating chronic pain.  (Ex. 56, ¶¶ 11-12, Ex. B at BSC-NVRO_00002434 -35, 2454-59, 2472-

74; Mihran Rpt., ¶¶ 1378-80, 1452-54.)  Mr. Pless does not contest that the Precision system

included a signal generator or leads designed to be, capable of being, or actually implanted in the

epidural space of the spinal cord.[18]  Thus, it is undisputed that groups (i) and (ii) recite features

that were conventional in prior art commercial SCS systems, like Precision.

### B.    Precision Discloses Group (iii):  Amplitudes And Pulse Widths

All of the amplitude ranges in the asserted claims are within the range of 20 mA or below.

(Pai Ex. 1.)  The claimed pulse width ranges are either 10-333, 25-166 or 30-35 microseconds.

(*Id*.)  These amplitude and pulse width ranges were well-known in prior art SCS systems,

including Precision, ████████████████████.  (Ex. 2 at NEVRO_ BSXCA0165832,

846-47.)  The Precision system was programmable with any amplitude up to 20 mA.  (Ex. 56-A

at BSC-NVRO_00002418 ("Amplitude:  0 – 20 mA"); Mihran Rpt., ¶¶ 1365, 1463.).  It was also

programmable with pulse widths up to 1000 microseconds.  (Ex. 56-A at BSC-NVRO_00002418

("Width:  0 – 1000 µsec"); Mihran Rpt. ¶ 1365, 1466.)

Mr. Pless offers a pair of opinions regarding Precision's amplitude and pulse width

capabilities, but neither raises a disputed issue of material fact.  He argues that (1) Precision does

not disclose amplitudes at which the therapy signal is paresthesia free and (2) no Precision device

---

[18] Mr. Pless does not dispute that many other elements are found in Precision:  implanting the
signal delivery device at a vertebral level of from T9 to T12, as required by '125 patent claim 18
(Ex. 24, ¶¶ 1158-60); treating low-back and leg pain, as required by '102 patent claim 11 (*id*.,
¶¶ 1179-81); a wireless programmer, as required by '842 patent claim 22 (*id*., ¶¶ 1199-202); and a
bi-phasic signal, as required by '357 patent claims 5 and 34 (*id*., ¶¶ 1203-22).

was actually programmed with pulse widths in the claimed ranges or a person of skill would not have been motivated to program a Precision device with such pulse widths.  Neither argument takes issue with the fact that Precision could output therapy signals with amplitudes and pulse widths in the claimed ranges.

Mr. Pless's opinions do not undermine BSC's showing that the Precision device could be programmed with the claimed amplitude ranges and pulse widths.  Rather, he argues only that the signal would not necessarily be paresthesia-free at those amplitudes or pulse widths.  This is unavailing for two reasons.  *First*, it conflates two separate limitations—the signal amplitude and whether the signal is paresthesia-free.  *Second*, it is nonsensical because the range of amplitudes to which Precision could be programmed entirely subsumes the claimed amplitude ranges that the asserted claims recite in conjunction with paresthesia-free therapy.  Moreover, Nevro has already admitted that no signal is necessarily paresthesia-free; for a given patient, the signal might or might not generate paresthesia.  Thus, one cannot say in advance whether any given signal is paresthesia-free.  If BSC's product infringes because it can provide signals in the claimed ranges, then so too does the prior art Precision, which would invalidate the claims.

## C.  Precision Discloses Group (iv):  High-Frequency Therapy

While Nevro is correct that the Precision system as a whole was approved by the FDA only for commercial use up to 1.2 kHz, the same is true of WaveWriter Version 2, which Nevro contends infringes.  If this product infringes because it is "designed" to provide high-frequency therapy, then the Precision's signal generator was also specifically designed to output higher frequency signals.  As Dr. Carbunaru testified "[t]he clinician programmer's software and the remote control firmware could have been changed to render the Precision™ SCS System programmable by a user to generate pulse frequencies much greater than 1,200 Hz, including up to approximately 7,000 Hz, with no changes to the IPG hardware or firmware."  (Ex. 56, ¶ 11.) In other words, the Precision IPG was designed—both from a hardware and firmware perspective—to output signals up to 7 kHz and was only limited by the programming parameters it received.  Mr. Pless admitted that he had no reason to dispute these facts.  (Ex. 17 at 185:8-187:7.)  Twelve of the 18 asserted claims require frequencies within ranges that would include

44

frequencies "up to approximately 7,000 Hz", *i.e.*,'533 patent claims 7, 12, 35 and 58; '125 patent claims 18 and 55; '102 patent claims 11, and 21; '357 patent claim 34; '988 patent claim 18; and '472 patent claims 1 and 5.  (*See* Pai Ex. 1.)

Precision is also designed to allow the IPG to be programmed up to 14.3 kHz, or even higher, through an engineering interface.  (D.N. 355-6, ¶¶ 4-7; Mihran Reb., ¶¶ 99-189.)  This interface was included in all versions of the Precision system programming software in order to allow BSC engineers to program the device above pulse rates approved for use by the FDA.  (D.N. 355-6, ¶¶ 4-7.)  While this engineering interface was not used to program a Precision system above 1.2 kHz for use in a patient, the asserted claims do not require FDA approval, or actual use in a patient, under Nevro's construction—they would only require the device to be "designed" to provide such signals.  If the claims are construed to cover the product's "design," rather than its actual configuration, then Precision would meet the frequency limitations.

Nevro's argument that Precision does not meet the high-frequency limitations because it was not actually programmed at these high rates (*see* Mot. at 32-33) is belied by Nevro's assertion of infringement based on WaveWriter Version 2, which was specifically designed to not allow programming above 1.2 kHz, and which has also not actually been programmed at high rates.  (Ex. 17 at 178:10-18.)  In an attempt to reconcile this inconsistency, Nevro now argues that WaveWriter version 2 can still infringe the asserted claims—even though it cannot be programmed above 1.2 kHz—because "the IPG retains all the high rate frequency functionality" to output a high rate signal.  (Ex. 26, ¶ 316.)  The Precision IPG also contains "the high rate frequency functionality;" it needs to be programmed to use it, just like the accused WaveWriter Version 2.  The Court should find that Precision discloses the claimed frequencies ranges.

**D.      Precision Discloses Group (v):  A Signal Generator Designed To Generate Paresthesia-Free Therapy**

Every asserted claim requires "paresthesia-free therapy," or a variant, except Claims 1 and 22 of the '842 patent.  (*See* Pai Ex. 1.)  Not only was Precision designed to provide paresthesia-free therapy, it was actually used to do so before Nevro filed its patents.  Nevro's own Chief Medical Officer, Dr. David Caraway, testified that "all SCS devices" could be used to

45

provide paresthesia-free therapy, and that this has been done from time to time for decades.  (*See* Ex. 57 at 46:19-50:11; Ex. 58 at NEVRO_BSXCA0209811; Ex. 59 at 70:12-72:7; Ex. 60 at 125:20-126:16.)  In addition, a study presented in 2006 by Dr. Yearwood confirmed that patients treated with subthreshold stimulation ***using the prior art Precision device*** achieved significant pain relief.  (Ex. 61.)  As Mr. Pless concedes, "subthreshold" stimulation does not generate paresthesia.  (Ex. 24, ¶ 2072)  Nevro's expert Dr. Rosenberg also admitted that, prior to 2007, it was a routine process in SCS to determine a patient's sensory perception threshold, which involved gradually turning up the power (amplitude) of the SCS signal until the patient reported a sensation.  (Ex. 62 at 126:2-128:11.)  This process was done in the same manner regardless of frequency, including frequencies above 1.5 kHz.  (*Id*.)  Before joining Nevro, one of the named inventors, James Thacker, administered "high frequency" signals without paresthesia.  (Ex. 64 at 84:20-22, 86:9-87:14.)  The only difference between stimulation that produced paresthesia and stimulation that did not, was whether the amplitude was turned up to or below the patient's sensory threshold.  Thus, Precision, which was designed to have a programmable amplitude, was designed to generate paresthesia-free therapy.

Mr. Pless agrees that choosing subthreshold parameters in prior art SCS devices was routine.  (Ex. 24, ¶ 2030.)  He argues, however, that Precision was not designed to generate paresthesia-free therapy because (1) it was designed to produce paresthesia and (2) patients who received paresthesia-free therapy using the Precision device in the 2006 Yearwood study chose to continue with paresthesia after the study concluded.  Neither argument is persuasive.  *First*, that Precision could produce paresthesia does not mean it was not ***also*** designed to deliver paresthesia-free therapy.  It could do both, depending on how the physician chose to use it.  It is undisputed that Precision was capable of producing paresthesia-free therapy and that it had been used to do so.  (*See* Ex. 61 (showing that one patient received **80% pain relief** from subthreshold SCS).)  *Second*, the fact that some patients prefer paresthesia-based therapy over non-paresthesia therapy is irrelevant; the asserted claims do not require that the device is designed ***only*** to deliver the non-paresthesia therapy.  There is no dispute that Dr. Yearwood's patients achieved significant pain relief with paresthesia-free therapy, as he reported in 2006.  (*See id*.)

1    Accordingly, Precision discloses all the asserted claim elements under Nevro's

2  interpretation of the claims.  Because no triable issues of fact preclude this finding, summary

3  judgment of anticipation of all asserted claims is warranted.  Nevro's motion for summary

4  judgement of no invalidity based on Precision should be denied for the same reasons.[19]

5  **IX.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT
         OF NO INEQUITABLE CONDUCT**

6         In a 2006 study, Dr. Thomas Yearwood was able to achieve 50-80% pain relief by

7  applying subperception (no-paresthesia) therapy to the dorsal column of patients and 30-50% pain

8  relief by applying the therapy to the intraspinal nerve roots (a section of nerves in the spinal

9  column) using pulse widths from 100 to 1000 microseconds with BSC's Precision SCS device.

10  (Ex. 63 at BSC-NVRO_00130121; *see* Ex. 66 at 49:7-24; Mihran Rpt., ¶¶ 1385-90.)  James

11  Thacker, a named inventor on each of the Alataris patents, was employed by BSC before he

12  joined Nevro.  (Ex. 64 at 25:20-24, 80:24-81:5.)  During his time at BSC, Mr. Thacker was

13  heavily involved in Dr. Yearwood's research on subperception pain therapy in

14  humans—exchanging dozens of emails with Dr. Yearwood, contributing to the design of the

15  study protocol, and supervising the individuals supporting Dr. Yearwood.  (*See, e.g*, *id*. at 182:6-

16  186:23; 189:6-190:11; 220:25-226:18.)

17         Years later, in 2014, while the asserted patents were being prosecuted, Dr. Yearwood

18  provided to Mr. Thacker with slides that included specific information regarding Dr. Yearwood's

19  methodology.  (*Id*., at 310:14-319:25; Ex. 65.)  This document establishes that Mr. Thacker was

20  aware that the amplitudes used in the study were at 85% of the perception threshold (between 4

21  and 6 mA for the dorsal column stimulation and between 1 and 2 mA for the nerve root

22  stimulation), that pulse widths of 200-300 microseconds were used for nerve root stimulation, and

23

24  _____

25  [19] Nevro's argument regarding frequency harmonics is a repeat of its motion to strike, coupled
   with claim construction arguments.  Beyond the claim construction issues addressed above,
26  whether Precision can provide frequency harmonics above 1.2 kHz is a question of fact based on
   Dr. Mihran's testing that would preclude summary judgment in Nevro's favor.  (*See* Mihran Rpt.,
27  ¶¶ 99-189.)  As shown above, however, this theory is not necessary to reach a determination that
   Precision invalidates all asserted claims.
28

47

1    that the leads were placed with electrodes spanning vertebral levels T8 and T9 for the dorsal

2    column stimulation.  (Ex. 65 at 19, 22.)

3           The parameters used by the Yearwood study are clearly within the parameters of claim 1

4    of the '357 patent and claim 1 of the '988 patent.  For example, claim 1 of the '357 patent covers

5    an SCS system configured to deliver a therapy signal with a pulse width between 10 and 333

6    microseconds, and an amplitude between 0.5 mA and 10 mA without generating paresthesia.  (Pai

7    Ex. 7.)  Likewise, claim 1 of the '357 patent covers a method of programming a signal generator

8    is wherein the signal generator positioned to provide a signal to the patient's spinal cord at a

9    vertebral level between T9 and T12, inclusively, using pulse widths between 25 microseconds

10   and 166 microseconds.  (*Id.*)

11          Because genuine factual disputes exist as to the materiality of the Yearwood references to

12   the prosecution of the asserted Alataris patents, as well as to Mr. Thacker's (and Nevro's) intent

13   in failing to disclose the Yearwood prior art to the Patent Office during prosecution, Nevro's

14   motion for summary judgment should be denied.

15          **A.      A Reasonable Factfinder Could Find That Yearwood Was Material**

16          Generally, "the materiality required to establish inequitable conduct is but-for

17   materiality."  *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1360 (Fed. Cir. 2017).  In

18   determining the materiality of a reference, the court applies the preponderance of the evidence

19   standard and gives claims their broadest reasonable construction.  *Id.* at 1348 n.2.  "Determining

20   but-for materiality requires that the court place itself in the shoes of a patent examiner and

21   determine whether, had the reference(s) been before the examiner at the time, the claims of the

22   patent would have still issued."  *Id.* at 1350.  "Thus, the court must first determine the broadest

23   reasonable construction of the claims that the PTO would have applied during prosecution.  Next,

24   based on the broadest reasonable construction, the court must determine whether a reasonable

25   patent examiner would have allowed the claims had she known of the Withheld References."  *Id.*

26   at 1351.  A reference is but-for material if it "teaches the elements of the claim at issue."  *Id.*

27   at 1354.  Summary judgment of no inequitable conduct is inappropriate where genuine issues of

28   material fact exists as to the but-for materiality of the withheld reference.  *Ohio Willow Wood Co.*

48

1   *v. Alps S., LLC*, 735 F.3d 1333, 1345, 1351–52 (Fed. Cir. 2013); *TVIIM, LLC v. McAfee, Inc.*, No.

2   13-cv-04545-HSG, 2015 WL 3956313, at *8 (N.D. Cal. June 28, 2015).

3       Nevro argues that, because Dr. Mihran has not opined that a reasonable examiner would

4   have found Dr. Yearwood's study to be material, BSC will be unable to prove its inequitable

5   conduct case at trial.  This argument is pure sophistry.  Dr. Mihran was not required to

6   specifically state that a reasonable examiner would not have allowed the claims in order for BSC

7   to show the striking materiality of Dr. Yearwood's study and how it anticipates claim 1 of the

8   '357 patent and renders obvious claim 1 of '988 patent.  Dr. Mihran explains the disclosures of

9   the Yearwood references and how a reasonable examiner would have interpreted them.  In

10  particular, he explains that Dr. Yearwood tested biphasic therapy signals with pulse widths from

11  10 to 1000 microseconds and applies these disclosures to claim 1 the '357 patent, noting that

12  claim 1 covers the use of a therapy signal using "a plurality of sequential bi-phasic pulses having

13  a pulse width between 10 microseconds and 333 microseconds, and an amplitude between 0.5

14  mA and 10 mA, which at least partially reduces the patient's sensation of pain without generating

15  paresthesia."  (Mihran Rpt., ¶¶ 168-174.)  Thus, Dr. Mihran shows the materiality of the

16  Yearwood references to claim 1 of the '357 patent.

17      Moreover, the Yearwood article itself clearly shows materiality, without the need for an

18  expert.  Dr. Yearwood's intraspinal nerve root stimulation applied therapy within the parameters

19  in claim 1 of the '357 patent, and he showed actual pain relief in patients.  At the least, a

20  reasonable factfinder could find that Yearwood anticipates claim 1 of the '357 patent and is thus,

21  material to patentability.  Furthermore, at trial, Dr. Mihran will testify regarding the scope and

22  content of the art.  Based on that testimony, a reasonable factfinder could find that a patent

23  examiner would have found claim 1 of the '988 patent obvious in light of Yearwood.[20]  Nevro's

24  motion for summary judgment should, therefore, be denied.

[20] For example, it would have been obvious to modify the dorsal column stimulation used in

26  Yearwood's study to use a pulse width 100 microseconds because the Yearwood poster itself

suggests using pulse widths from 10 to 1000 microseconds.  (Ex. 63 at BSC-NVRO_00130121.)

27  Nevro wrongly argues that the Yearwood references "teach away" from the claimed inventions.

A reference that "merely expresses a general preference for an alternative invention but does not

28

(continued...)

49

**B.      A Reasonable Factfinder Could Find That Yearwood Was Not Cumulative**

"A reference is cumulative when it 'teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.'"  *Regeneron*, 864 F.3d at 1350 (quoting *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997)).  Nevro argues that BSC cannot prove that the Yearwood study was noncumulative because "Dr. Mihran opines that 'many additional' prior art references disclosed paresthesia-free SCS therapy, which, according to him, is central to the importance of the Yearwood References." (Mot. at 40.)  Remarkably, however, Nevro fails to identify any of the prior art references that purportedly render the Yearwood studies cumulative.  In any event, Dr. Mihran never opined that the Yearwood study disclosed only what was in the prior art already before the Examiner.

For example, during prosecution of the asserted patents, Nevro successfully argued that the high-frequency blocking therapy from Knudson did ***not*** inherently disclose paresthesia-free therapy.  (*See* Mihran Rpt., ¶¶ 251-57.)  The therapy used in the Yearwood study relies on low frequency subthreshold signals to provide therapy without causing paresthesia, which may be different than a block and thus not cumulative of Knudson.  Likewise, the Examiner allowed claims of the '988 and '357 patents over De Ridder, saying it did not clearly disclose a "plurality of bi-phasic pulses."  (*See, e.g.*, *id.*, ¶¶ 300-19.)  By this reasoning, the Yearwood study describes a plurality of bi-phasic pulses and is thus not cumulative of DeRidder.  (*Id.*, ¶ 171.)

Because there are numerous genuine issues of material fact as to the scope of the prior art before the PTO and the teachings of the Yearwood study, the Court should deny Nevro's motion.

**X.      CONCLUSION**

For the foregoing reasons, BSC respectfully requests that its motion be granted and Nevro's motion be denied.

---

criticize, discredit, or otherwise discourage investigation into" the claimed invention does not teach away.  *See Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013).

Dated:  April 26, 2018

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/  Marc A. Cohn*
_____
Marc A. Cohn

Attorney for Defendants
BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC NEUROMODULATION
CORPORATION