Krista M. Carter (State Bar No. 225229)
Email address:  krista.carter@arnoldporter.com
Thomas T. Carmack (State Bar No. 229324)
Email address:  tom.carmack@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, California  94306
Telephone:     (650) 319-4500
Facsimile:     (650) 319-4700

Matthew M. Wolf (admitted *pro hac vice*)
Email address:  matthew.wolf@arnoldporter.com
Edward Han (admitted *pro hac vice*)
Email address:  edward.han@arnoldporter.com
Marc A. Cohn (admitted *pro hac vice*)
Email address:  marc.cohn@arnoldporter.com
Amy L. DeWitt (admitted *pro hac vice*)
Email address:  amy.dewitt@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:     (202) 942-5000
Facsimile:     (202) 942-5999

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC NEUROMODULATION
CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEVRO CORP., | Case No. 3:16-cv-06830-VC |
| Plaintiff, | **DECLARATION OF J. LAWRENCE STEVENS IN SUPPORT OF BOSTON SCIENTIFIC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (ECF NO. 357-4)** |
| v. | |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION, | Date:        July 6, 2018 |
| Defendants. | Time:        10:30 a.m. |
| | Courtroom: 4, 17th Floor |
| | Judge:       Hon. Vince Chhabria |

1.     I have over 40 years of experience in FDA regulation of medical devices from my work at the FDA, within the industry, and as a consultant.  I have been retained as an independent expert witness in this case on behalf of Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation (collectively, "BSC").  I have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could and would testify competently thereto.

2.     I submitted a rebuttal expert report in this case on February 14, 2018 ("my Report").  The statements and opinions in my Report were true and correct to the best of my knowledge.

3.     Attached hereto as **Exhibit 1** is a true and correct copy of Exhibit A to my Report, which is a copy of my CV.

4.     Included below are true and correct copies of paragraphs 33-61 from my Report which are incorporated herein exactly as they appear in my Report.

5.     Attached hereto as **Exhibit 2** are true and correct copies of Exhibits C and D to my Report, which are cited in the below paragraphs from my Report.


## REBUTTAL EXPERT REPORT OF J. LAWRENCE STEVENS PARAGRAPHS 33-61

### B.     The report of Nevro's witness Dr. Robert Schiff contains inaccurate misrepresentations of the FDA's communications with Nevro.

33.     As detailed below, contrary to the assertions in Section XI of Dr. Schiff's report, Nevro's documents show that despite representing to the FDA on numerous occasions throughout the IDE approval process that it would ***not*** perform a superiority analysis as part of the Senza-RCT clinical trial, and despite deleting from its IDE submissions all language pertaining to the conduction of such an analysis, Nevro nonetheless went ahead and performed a

STEVENS DECL. ISO BSC REPLY ISO MSJ                                    Case No. 3:16-cv-06830 VC

superiority analysis anyways, and then submitted the results as part of its Senza-RCT clinical study report.[1]

34.    In 2011, FDA outlined deficiencies in Nevro's application for approval of its IDE submission to conduct the Senza-RCT clinical trial (IDE G110156).  Among the deficiencies was FDA Deficiency #44, in which the FDA stated that:

> FDA Deficiency #44 - Investigational Plan: One of the objectives of your study is to demonstrate the superiority of the Senza system, as compared to PMA-approved, commercially available SCS devices for the treatment of chronic pain of the trunk and limbs. Additionally, you include several secondary endpoints on which you will perform a superiority analysis. ***To demonstrate superiority, it is necessary to blind subjects as to their SCS system.*** Therefore, please either revise your protocol to assure that subjects and evaluators are blinded to the device used or revise your objectives and secondary analyses to ***exclude a demonstration of superiority***.[2]

35.    On October 27, 2011, Nevro submitted Amendment 1 to IDE G110156 in which it responded to the deficiencies raised in the FDA's letter.  With respect to FDA Deficiency # 44, Nevro's response to the FDA was that it had chosen the latter option of excluding demonstration of superiority from its objectives and analyses:

> As FDA suggests, ***the study objectives and secondary analyses have been revised to exclude a demonstration of superiority***. Consequently, new secondary and tertiary were defined. These changes have been implemented in Investigational Plan sections B.2. Study Objectives and B.8.2. Secondary Endpoints.[3]

36.    In a letter dated November 22, 2011, the FDA set forth additional deficiencies in Nevro's IDE submission, including FDA Deficiency # 14 where the FDA pointed to an inconsistency between Nevro's responses to FDA Deficiency # 48, in which Nevro had indicated that "three of [its] secondary endpoints would include a superiority analysis," and FDA

---

[1] NEVRO_B5XCA0064603.

[2] NEVRO_BSXCA0052495 at NEVRO_BSXCA0052563 (emphasis added).

[3] NEVRO_BSXCA0052495 at NEVRO_BSXCA0052563 (emphasis added).

Deficiency # 44 where Nevro had represented that its proposed superiority analyses had been deleted.  The FDA therefore directed Nevro to once again "please revise section B.8.2 to **exclude the superiority analyses**." (emphasis added).[4]

37.     In its December 20, 2011 responses to the deficiencies raised in the FDA's letter dated November 22, 2011, Nevro addressed FDA Deficiency # 14 by stating that it had "inadvertently failed to update the text in Deficiency response #48. Nevro apologizes for this oversight and any confusion it generated."  Nevro also confirmed to the FDA that it had removed all such references to superiority analyses within its Investigational Plan, and replaced them with non-inferiority analyses.

> Per Nevro's response to Deficiency #44, the three secondary endpoints noted in the deficiency text above (endpoints #4-6 listed below) were modified slightly and **changed from including superiority analyses to non-inferiority analyses**. As such, section B.8.2. Secondary Endpoints of the Investigation Plan was revised to reflect this change as shown in the revised Investigational Plan that was sent to FDA in Appendix 1 of as part of IDE Amendment #1.[5]

38.     In February 2016, Nevro requested a call with the FDA to discuss their ability to add a superiority analysis back into their plan for studying the Senza-RCT data.  Prior to the call, Nevro circulated an agenda detailing their position.[6]  In it, Nevro explained that:

> In Nevro's original IDE, Nevro proposed comparing the Senza System to commercially available control devices from 3 different SCS device manufacturers and pooling the efficacy results for the control group. In our upcoming IDE Amendment #3, Nevro will no longer be including 3 commercial devices; rather, we will specify one device system as the comparator, as FDA previously requested (FDA Deficiency #1 in response to the original IDE. Thus, there will be a larger sample size for the single control device system (rather than divided among three control systems) for comparison against the Senza System. As such, **Nevro would like to perform a secondary superiority analysis** on the

---

[4] NEVRO_BSXCA0053788 at NEVRO_BSXCA0053812 (emphasis added).

[5] NEVRO_BSXCA0053788 at NEVRO_BSXCA0053812- NEVRO_BSXCA0053813 (emphasis added).

[6] NEVRO_BSXCA0053918.

STEVENS DECL. ISO BSC REPLY ISO MSJ                                    Case No. 3:16-cv-06830 VC

ITT population comparing the response rates between test and control groups. In Nevro's original IDE, Nevro proposed performing a secondary analysis to demonstrate superiority of the Senza System as compared with the pooled results of the control group. *In response to the original IDE, FDA requested that Nevro revise our secondary analyses to exclude a demonstration of superiority, stating "To demonstrate superiority, it is necessary to blind subjects as to their SCS system."* Although subjects will still not be blinded to their SCS system, given that the Senza System will now be compared to a single commercial SCS system, *does FDA still have an issue related to subject blinding as it relates to performing a secondary superiority analysis?* If so, Nevro would like FDA to clarify the statistical basis for not being allowed to include a superiority analysis as a secondary endpoint.[7]

39.     During Nevro's call with the FDA, which occurred on February 16, 2012, Nevro reiterated their request to conduct a superiority analysis in the Senza-RCT study.[8]  On the call, Ann Costello of the FDA stated:

> Before I say anything about superiority vs. non-inferiority *I want to push for a blinded study. It's a much, much better study design if you could do it. The results would much more convincing if you could do a double-blinded study.*

When Nevro argued that they did not expect that the open label design would impact the results of the study, Ms. Costello noted: "*The bias issue is really hard to get around.* It's really unfortunate."[9]  Jack Zhou of the FDA added that,

> I think then, if you do, if we decide this analysis is appropriate, *certainly whatever you put into the labeling, is going to be very watered down because it was not blinded.* I think *the issue of investigator bias* etc — I know this is a patient reported outcome but at the same time *could be patient as well as investigator bias* in terms of that.[10]

Ms. Costello reiterated that:

> If blinding is not possible then that's an unfortunate fact. Then you do have to do an unblinded study. *I just want to emphasize that with an unblinded study*

---

[7] *Id.* at NEVRO_BSXCA0053919- NEVRO_BSXCA0053920.

[8] NEVRO_B5XCA0053942 at NEVRO_B5XCA0053946 (emphasis added).

[9] *Id.* at NEVRO_B5XCA0053947 (emphasis added).

[10] *Id.* (emphasis added).

***especially with patient reported outcomes is not going to produce as quality data as a double-blinded study. The result is going to be less convincing because there is intrinsic biases there***. So you have to take that into consideration. We probably need to discuss this internally . . . before getting back to you.[11]

Ms. Costello closed by stated that, "If it were a ***double-blinded study***, I don't see any reason why you shouldn't move from non-inferiority to superiority."[12]

40.      The FDA followed up with Nevro on February 25, 2012, explaining that their decision was that they could not allow Nevro to move from non-inferiority to superiority in its analysis of the Senza-RCT study unless the study was double blinded.  Specifically, the FDA stated that:

Regarding the superiority issue, you would like to demonstrate that 10KHz is preferable to other settings. ***We continue to believe that a double blinded study is necessary to assess this, considering that the endpoint is a patient-reported outcome***.[13]

The reviewer went on to suggest "several ways" for Nevro to obtain a double blind assessment in its Senza study.[14]  Nevro responded on February 27, 2012 with the representation that, "Nevro will ***not be adding a secondary superiority analysis*** to the study Investigational Plan; therefore, this item will not be addressed further in the upcoming IDE amendment."[15]

41.      Nevro failed to explain in its Senza-RCT clinical study report that the superiority analysis contained therein constituted a major unilateral departure from the FDA's approved investigation design.  Instead, Nevro included such analysis as though it were consistent with the Investigational Plan that was approved by the FDA in granting Nevro's IDE G110156 application for the Senza-RCT.  For example, the Senza-RCT clinical study report states that, in

---

[11] *Id*. at NEVRO_B5XCA0053947- NEVRO_B5XCA0053948 (emphasis added).
[12] *Id*.
[13] NEVRO_B5XCA0053934 at NEVRO_B5XCA0053934-NEVRO_B5XCA0053935 (emphasis added).
[14] *Id.*
[15] *Id.* at NEVRO_B5XCA0053934(emphasis added).

STEVENS DECL. ISO BSC REPLY ISO MSJ                                    Case No. 3:16-cv-06830 VC

addition to supporting non-inferiority, "the between-group analysis supports the superiority of

the Test group responder rate over the Control group responder rate (p<0.001)."[16]  Yet, this is

precisely the type of superiority analysis that Nevro had sought the FDA's permission to

perform, and that the FDA had repeatedly and explicitly disallowed on the basis of concerns

regarding the existence of bias in the unblinded, open-label design of Nevro's Senza-RCT study.

42.     After Nevro incorporated data and conclusions from its unauthorized superiority

analysis within the Senza-RCT clinical study report submitted to the FDA, Nevro thereafter

characterized such findings within its PMA submissions as being the accepted results of an FDA-

approved IDE study, and used them to justify incorporating the superiority analysis in the SSED

and labeling for the Senza device.

43.     In my opinion, it is improper that Nevro conducted an unauthorized statistical

superiority analysis on data obtained from the Senza-RCT, and included the results of such

analyses within its clinical study reports, PMA summaries, and draft SSEDs filed with the FDA,

without seeking prior approval for such changes, or explaining to the Agency how such analyses

were a departure from the Protocol, SAP and Investigational Plan that were approved as part of

the IDE (particularly in view of how Nevro's prior attempts to include such analyses were

*rejected* by the FDA).

44.     The FDA had good reasons for rejecting Nevro's requests to include superiority

analyses in its SAP and Investigational Plan for the Senza-RCT given the study's open-label,

non-inferiority design that did not include a placebo, and which was measuring a notoriously

subjective outcome measure of pain.[17]  As the FDA has stressed in numerous guidance

---

[16] NEVRO_BSXCA0065227 at NEVRO_BSXCA0065304.

[17] FDA. *Good Review Practice: Clinical Review of Investigational New Drug Applications*, 40-41

STEVENS DECL. ISO BSC REPLY ISO MSJ                          Case No. 3:16-cv-06830 VC

documents, "Deviation from a [double-blinded] study design is especially problematic in situations where there is a possible placebo effect, or when subjective outcome measures are used as study endpoints."[18]  Likewise, "[i]f study participants are not blinded, it is very difficult to assess the size of the resulting bias, and it can threaten the scientific validity of an otherwise solid study, even when a truly objective endpoint is used."[19]

45.    Nevro's actions in conducting its post hoc superiority analysis, without the parameters having been reviewed and pre-specified in advance, makes it even less reliable.  FDA guidance on the proper conduct of clinical studies recognizes that "[b]ias can be introduced in subject selection, *study design, study conduct, and data analysis procedures*. In a clinical study, bias may lead to an incorrect determination of safety and effectiveness."[20]  The Agency's guidance emphasizes that, as one safeguard against bias, a clinical study must have a pre-specified statistical analysis plan.[21]  FDA guidance further points to how "post-hoc analyses may adversely affect the usefulness of the evidence to support the safety and effectiveness of a device" and "endanger the scientific validity of an otherwise well-designed and well-conducted study."[22]  Indeed, the guidance indicates that only time post-hoc data analyses may be

---

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/UCM377108.pdf ("*Patient or investigator knowledge of the treatment being administered can introduce bias into a trial through influences on patient management or assessment or by affecting expectations on outcomes*. Whenever possible, investigators should be blinded to the drug they are administering and evaluating. *Blinding is especially important for those trials in which endpoints contain elements of subjectivity, whether patient-reported or physician-reported outcomes (e.g., pain* or depression), outcomes (or reporting of an outcome) that can be influenced by expectations (e.g., hospitalization for pneumonia), or outcomes that can depend on patient effort (e.g., exercise test).") (emphasis added).

[18] FDA. *Design Considerations for Pivotal Clinical Investigations for Medical Devices Guidance for Industry, Clinical Investigators, Institutional Review Boards and Food and Drug Administration Staff* (Nov. 7, 2013) https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm373766.pdf

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

appropriate is when they "complement pre-specified analyses, as long as they are clearly described and interpreted with the appropriate degree of skepticism that comes with this type of analysis."[23]

46.     Dr. Schiff states that "the FDA drafted a Summary of Safety and Effectiveness Data ("SSED")" and "[b]ased on its review of the Senza PMA the FDA concluded in the Senza SSED" that the Senza-RCT study had demonstrated superiority.[24]  What Dr. Schiff fails to note, however, is that a preliminary draft SSED was prepared by Nevro as early as September 24, 2013,[25] and Nevro submitted a new draft to the FDA on June 25, 2014 as part of its Amendment 3 PMA materials.[26]

47.     Having been an FDA employee, I find particularly troubling Dr. Schiff's assertions regarding "conclusions" purportedly reached by the FDA regarding Nevro's superiority findings in the Senza-RCT study.  For example, Dr. Schiff states in his report:

- at ¶61 that the FDA "*concluded* that the Nevro Senza system *exhibited overwhelming superiority* over the *traditional* SCS system and *granted a superiority claim*."  (emphasis added).

- at ¶67 that "the FDA appropriately *concluded* that *such a marked difference* between the results for the Nevro Senza system and the *traditional* SCS system *warranted a superiority claim*."  (emphasis added).

- at ¶71 that "the FDA *awarded* Nevro's Senza system *a superiority claim* and *instructed* Nevro to *include that claim in its labeling*." (emphasis added).

- at ¶99 that "[a]fter reviewing the Nevro RCT study, the FDA *concluded* that it was *well-designed*" (emphasis added).

None of these statements accurately reflect the FDA's actions

---

[23] *Id.*

[24] Schiff Report at ¶¶62-64.

[25] NEVRO_B5XCA0065212.

[26] NEVRO_B5XCA0068168.

48.    In support of his statements  Dr. Schiff inexplicably points to the Senza SSED and an email attaching an early draft of the SSED.  Although the final Senza SSED references Nevro's superiority findings from the Senza-RCT study, the FDA's summary of the resulting clinical information is made explicitly in the context of  the results being limited by issues of bias resulting from the study's unblinded, open label design.[27]  Specifically, under the SSED's "Summary of Clinical Information," the FDA explained that:

> ***The noninferiority design did not blind subjects as to which device they had implanted. This may have resulted in investigator and patient bias, which may have resulted in the response rate in the control group being different than that reported in the literature.*** Although the data supports the superiority of the Nevro device to the comparator, ***the comparator response rate was different than that reported in the literature*** (as summarized in Table 24 above.) The assessment of the comparator response to the published literature, however, is challenged by differences in study populations, methods of reporting pain reduction, and statistical analysis methods.[28]

49.    There is also no support in the December 23, 2014 email from Kristen Bowsher at the FDA regarding "content" to be included in Senza's "Clinical Summary" labeling document, since in the attached document "superiority" only appears in relation to a chart originally prepared by Nevro.[29]  Also telling is that Ms. Bowsher explains how the document may be changed by the FDA since "our statistician is on vacation and I did not get a chance to run the final version by her."[30]

50.    To the extent Dr. Schiff is relying on Nevro's Clinical Summary labeling document (P/N 12057), I note that such document is not publicly available on the FDA's website, despite the availability of other Senza labeling.  Furthermore, Nevro's documents show

---

[27] NEVRO_BSXCA0056851.

[28] *Id.*

[29] NEVRO_BSXCA0067353; NEVRO_BSXCA0067354 at NEVRO_BSXCA0067383.

[30] NEVRO_BSXCA0067353.

STEVENS DECL. ISO BSC REPLY ISO MSJ                    Case No. 3:16-cv-06830 VC

1  that FDA directed Nevro to revise its draft Clinical Summary labeling document in order to

2  include a statement that "conclusions regarding the response rate of the comparator group in the

3  non-inferiority trial are limited."[31]   The deficiency as noted by the FDA, and Nevro's response

4  are included in the below excerpt from Nevro's June 2015 submission to the FDA with which it

5  also submitted its "final labeling."[32]

6

7  *FDA Deficiency #1:* Be advised that FDA is continuing to review your labeling and will
8  communicate any remaining changes via interactive review. In addition, as discussed in an email to
   you dated January 20, 2015, please revise your clinical labeling summary to state the following or
9  provide a justification for not doing so: "Due to the variability of the study methods regarding
   published literature supporting the effectiveness of SCS in the 2 to 1,200 Hz range, conclusions
10 regarding the response rate of the comparator group in the non-inferiority trial are limited. However,
   the published literature used to support approval of the Senza SCS System in the 2 to 1200 Hz range
11 suggests a 30 to 80% reduction in back and/or leg pain."

12 *Nevro's Response*:  Nevro received the clinical labeling summary from FDA  on 12/23/14. This
13 document was revised via interactive review with FDA and a final version was agreed upon by FDA
   and Nevro on 2/20/15. The final Clinical Summary Manual (P/N 12057) and all other final labeling is
14 included in Volume 002 of this submission.

15

16      51.      Redlines circulated during Nevro's "interactive review" of its Clinical Summary

17 labeling document with Kristen Bowsher of the FDA indicate that Nevro made numerous

18 substantive changes to the document that Ms. Bowsher had initially provided (despite Ms.

19 Bowsher having directed in her initial email that "***the content should stay the same***").[33]  Many

20 of Nevro's changes concerned its inclusion of additional superiority claims.[34]

21

22

23 ───────────────
   [31] NEVRO_B5XCA0186421.

24 [32] NEVRO_B5XCA0063404.

25 [33] NEVRO_BSXCA0067353 (emphasis added); NEVRO_BSXCA0067876.

26 [34] *See, e.g.*, NEVRO_BSXCA0067392 (Nevro email circulating markup to K. Bowsher of FDA and noting, "I also
   made a few clarifications and stylistic changes throughout"); NEVRO_B5XCA0067393 (attached draft).

27

28
                                          10
   ─────────────────────────────────────────────────────

52.     Dr. Schiff states that, "[i]n my experience, superiority claims are rare.  Rarer still are instances in which the FDA itself recommends a superiority claim based on a non-inferiority trial."[35]  I agree with Dr. Schiff, as this is entirely consistent with my experience as well.

53.     Based on my experience, and my review of the documents cited by Dr. Schiff, I find completely baseless his assertions that the FDA "instructed" Nevro to include superiority claims in its Senza labeling and promotional materials, and that it "awarded" and "granted" Nevro the ability to make such claims based on its having "concluded" there was "such a marked difference" between Senza and the "traditional SCS system" whereby Senza "exhibited overwhelming superiority."[36]

54.     I disagree with Dr. Schiff's conclusion in ¶58 of his report that "[t]he additional twenty-four month data confirmed the superiority of the Senza system over the traditional SCS system."  FDA did not accept Nevro's analyses obtained from the Senza-RCT study at twenty-four months. [37]  My review of Nevro's PMA submissions shows that in Nevro's PMA Supplement No. 3, Nevro sought to revise its labeling, specifically its Clinical Summary (P/N 12057) in order to incorporate its analysis of the Senza-RCT study at twenty-four months.  Yet, when the FDA raised a number of deficiencies in response,[38] Nevro submitted responses[39] and subsequently withdrew its request, as highlighted below.[40]

---

[35] Schiff Report at ¶ 66.

[36] *See*, *e.g.*, Schiff Report at ¶¶ 61, 67, 71, 99.

[37] NEVRO_BSXCA0055766

[38] NEVRO_BSXCA0055766

[39] NEVRO_B5XCA0062177

[40] NEVRO_B5XCA0049348 at NEVRO_BSXCA0049357.

| P130022/S003 | 180 Day Supplement - Labeling - Etiologies and 24 month update | Withdrawn (10/20/2016) |
|---|---|---|

55.     I also note that my review of Nevro's Senza-RCT clinical study reports, IDE and PMA submissions, and source data from the Senza-RCT trial causes me to take issue with Dr. Schiff's assertion in ¶19 of his report that "[t]he Senza-RCT trial . . . demonstrated that the Nevro Senza® system . . . did not induce paresthesia."  My issue is the inconsistency between Dr. Schiff's definition of "paresthesia" in ¶18 as "a tingling numbness, buzzing, or pins and needles sensation," and the definition that was used and measured for in the Senza-RCT study— (in which it was specifically defined as "a tingling sensation caused by neurostimulation").[41] Because of the more limited definition of paresthesia used by Nervo, it follows that, at most, the Senza-RCT study's findings with respect to "paresthesia" only goes to whether or not the subjects in the trial reported experiencing "tingling."

### C.      Promotional materials for Nevro's Senza device contain misleading, incomplete, and unsupported claims contrary to FDA regulatory requirements.

56.     Dr. Schiff notes how the FDA requires that "[a]n explicit claim of superior or similar effectiveness must be supported by substantial evidence."  Schiff Report at ¶59.  I agree. The FDA guidance document that Dr. Schiff quotes in support of this point explains that, "[f]or superiority claims, such evidence would include adequate and well-controlled trials *designed to establish superiority* of one treatment over another."[42]  The guidance further provides that in instances where a treatment's effectiveness is predicated on comparison to an active control, "the

---

[41] *See, e.g.*, NEVRO_BSXCA0073295 at NEVRO_BSXCA0073299.

[42] FDA. *Clinical Studies Section of Labeling for Human Prescription Drug and Biological Products - Content and Format* (Jan. 2006), https://www.fda.gov/downloads/RegulatoryInformation/Guidances/ucm127534.pdf  (emphasis added).

STEVENS DECL. ISO BSC REPLY ISO MSJ                                    Case No. 3:16-cv-06830 VC

active control data and [the] *identity of the comparator* should be included in labeling" and that the

labeling "should *disclose any limitations* of the comparative data."[43]  I agree with this as well.  As to

the amount of detail to be included in labeling, the guidance directs that, "applicants should include

*more detail*" in instances where "[t]he study results demonstrate that a new agent offers a clear

advantage over existing therapy," "[t]he study results are not what would be expected," and/or

"there are important limitations and uncertainties associated with an endpoint."[44]  I also agree

with this FDA guidance.  Additional guidance is found in other FDA guidance documents as

well.[45]

57.     The superiority claims within Nevro's labeling and promotional materials for the

Senza device are inconsistent with FDA device labeling requirements.  Specifically, Nevro's

claims that Senza is superior to "traditional" low-frequency SCS devices extend well beyond the

limited language in the Senza SSED upon which Nevro purports to rely, and they omit the

requisite context of the FDA's characterization of such findings as being limited by the design

weaknesses of the Senza-RCT study.

58.     Examples of Nevro's numerous promotional violations are described and

catalogued within correspondence that was sent to the FDA on behalf of BSC in letters dated

May 18, 2015 and July 15, 2015, and an email dated January 19, 2016.  I have reviewed each of

these and their enclosures, and I agree with the analyses therein.

59.     As highlighted in BSC's correspondence to the FDA, despite failing to test Senza

against other commercially available SCS devices, Nevro's promotional materials include

---

[43] *Id.* (emphasis added).

[44] *Id.* (emphasis added).

[45] *See, e.g.*, FDA. *Medical Product Communications That Are Consistent With the FDA-Required Labeling — Questions and Answers Guidance for Industry* (Draft Guidance) (January 2017). https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm537130.pdf

numerous broad claims of superiority to "traditional SCS therapy" that were not approved by the FDA and are unsupported by the data collected in the Senza-RCT study.  In paragraph 75 of Dr. Schiff's report, he counters this by stating that "there is ample evidence supporting the view that traditional SCS systems are generally equivalent such that the FDA could grant to Nevro a broad superiority claim."  I disagree.  Instead of arguing that the FDA **did** grant Nevro a broad superiority claim compared to traditional low-frequency SCS devices generally (as opposed to just BSC's Precision, the only device Senza was tested against), Dr. Schiff states that FDA "**could** grant" Nevro such a claim.  There are two problems with this argument.  First, even if there were sufficient evidence upon which the FDA "could" grant Nevro such a claim, the fact remains that the FDA did not do so.  Dr. Schiff does not argue otherwise.  This is an important distinction, since the FDA does not permit companies to make broad effectiveness claims outside the scope of the approval that they obtain for a device through the submission of evidentiary support in the form of valid scientific evidence.  Second, in seeking to show the propriety of Nevro's promotional claims of superiority to "traditional" SCS devices, Dr. Schiff's reliance on a document that he purports to reflect "Boston Scientific's own commissioned research" which "confirms that patients experience 'similar results' from traditional SCS systems 'from all major manufactures'" indicates a fundamental lack of understanding as to what constitutes valid evidence from the FDA's perspective.  The qualitative views and perceptions quoted by Dr. Schiff are irrelevant to the FDA's consideration of differences between devices that may generate variability in safety and effectiveness.  Lastly, Dr. Schiff's assertion that such perceptions somehow demonstrate that traditional SCS systems are "generally equivalent"[46] is

---

[46] Schiff Report at ¶75.

STEVENS DECL. ISO BSC REPLY ISO MSJ                           Case No. 3:16-cv-06830 VC

also wrong.  Equivalence is a technical term in the regulatory field which does not apply in the context of PMA approvals for medical devices.[47]

60.     Nevro itself recognized the significance of the differences between commercially available SCS technologies,[48] and how its Senza-RCT clinical study would need to use *multiple* commercially available SCS devices from different manufacturers for the control arm of its Senza-RCT study in order for its results to support claims regarding Senza's efficacy as compared to commercially available low frequency SCS devices generally.  Specifically, Nevro explained in its response to questions raised by the Agency that:

> ***It is also important that Nevro has intentionally not selected just one commercial SCS device for use in the control arm. Rather, the company chose to make sure the control arm was a valid representational comparison of SCS practice/use in the current US medical community/marketplace.***  In the US, the SCS market share is approximately divided as follows: 40% of the SCS devices used are Medtronic SCS systems, 30% are St. Jude Medical, and 30% are Boston Scientific.  As FDA may be aware, some Clinicians (Investigators) use SCS devices from all 3 manufacturers; however the majority favor one manufacturer for various reasons (e.g., are used to handling the device, like the manufacturer's sales representative, etc.).  ***Requiring only one commercial SCS device system would bias the study (in even selecting that one device).***  Equally important it would eliminate roughly two-thirds of the current SCS device-implanters, or have them deviate from what they typically do in SCS use, which is entirely counter to the objective of a valid control arm being representative of current SCS standard-

---

[47] The term equivalence arises in the context of obtaining clearance to market devices that are ***not*** subject to PMA requirements through the submission of a 510k showing they are "substantially equivalent" to a legally marketed predicate device.  *See* FDA website, *Premarket Notification 510k* (last updated Feb. 1, 2018), https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/default.htm#se.  Equivalence also appears in the context of pharmaceuticals, for example, "therapeutic equivalence" is used to describe drug products that can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling. See *Therapeutic Equivalence-Related Terms*, available at https://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4137B1_07_Nomenclature.pdf

[48] NEVRO_BSXCA0143631 (Nevro PowerPoint slide titled "Comparison with existing technology" showing Nevro, Medtronic, Boston Scientific, and St. Jude stimulators and stating "this whole area is very physician specific and ***little things can make a big difference***.") (emphasis added).

of-care.  All of the above characteristics make Nevro's selection of multiple commercial SCS devices appropriate for the control arm.[49]

Nevertheless, despite having made these representations in its submissions to the FDA, Nevro ultimately agreed to use only *one* manufacturer's commercial SCS device (an older model of BSC's Precision device) as the control group for the Senza-RCT study, yet still misrepresented the findings as providing support for its claims regarding "all commercially available low-frequency SCS devices."

61.     Dr. Schiff asserts that "the FDA apparently disagreed with Boston Scientific's complaints" on the basis that BSC "lodged its complaint about Nevro's 'generalized superiority' claims nearly three years ago," but that because "FDA has apparently taken no action," that he can "only conclude that the FDA's lack of action in this case indicates that the FDA does not object to Nevro's claims of Senza's superiority over traditional SCS systems."  Schiff Report at ¶76.  I strongly disagree with this statement.  The FDA releases guidance materials and recommendations on compliance with its regulations, and expects companies to police themselves accordingly.  The fact that the FDA has yet to take official action against Nevro for its advertising violations does not, as Dr. Schiff concludes, reflect that the FDA deems Nevro's conduct to be permissible, or that it disagrees with any of the points raised in BSC's communications to the FDA concerning the impropriety of Nevro's claims.  Based on my experience as an FDA official, due to significant backlogs caused by constraints on the Agency's limited resources, there are often violations which are not addressed until years after they occur, and others that evade FDA oversight altogether.  Indeed, it has come to my attention that a December 14, 2016 request submitted by BSC pursuant to the Freedom of Information Act

---

[49] INVESTIGATIONAL DEVICE EXEMPTION Appendix 1, NEVRO_B5XCA0053540 at NEVRO_B5XCA0053587 (emphasis added).

STEVENS DECL. ISO BSC REPLY ISO MSJ                    Case No. 3:16-cv-06830 VC

("FOIA") seeking "all internal and external correspondence" regarding the trade complaints submitted May 18, 2015 and July 15, 2015 concerning "the violative labeling and advertising of the SENZA Spinal Cord Stimulation System by the Nevro Corporation"[50] was denied by the FDA on January 13, 2017 on the grounds of the exemption for "[r]ecords or information *compiled for law enforcement purposes* when disclosure could reasonably be expected to interfere with *enforcement proceedings*."[51]  This is not surprising, particularly in view of Nevro's apparent history of promotional violations in its claims regarding the Senza device.[52]

I declare under penalty of perjury that the foregoing is true and correct.

J. Lawrence Stevens

Executed on May 23, 2018

---

[50] December 14, 2016 BSC FOIA Request (attached hereto as **Exhibit C**).

[51] January 13, 2017 FDA Response to BSC FOIA Request (attached hereto as **Exhibit D**) (emphasis added).

[52] *See, e.g.*, NEVRO_BSXCA0067869 (FDA Letter regarding Nevro promotional violations in conducting Senza-RCT IDE study); NEVRO_B5XCA0147580.

17

STEVENS DECLARATION - EXHIBIT 1

# EXHIBIT A

**J. Lawrence Stevens, RAC**
**833 E. Rosedale Dr.**
**East Alton, IL 62024**
**314-499-5148 (office)**
**714-473-0863 (mobile)**
Larry@fdadeviceexpert.com

**INTRODUCTION:**

Over 20 years of FDA experience encompassing virtually all of the FDA field positions.  Also eighteen years of industry experience as a mid-level manager and senior executive in clinical, regulatory, and quality in the medical device industry.   Personally designed quality systems, prepared regulatory submissions (510(k), IDE and PMA) and managed 7 multi-center clinical trials for class 3 medical devices.  From 1989-1993, was the Industry Representative on the FDA Circulatory Systems panel.  Additionally, a seasoned educator/speaker with over 250 public presentations to audiences ranging from senior executives, physicians, technical personnel, other medical personnel, major media, and the general public.  Holds regular Webinars on FDA Issues, and serves as an Expert Witness in the area of FDA regulation of medical devices.

**WORK EXPERIENCE:**

One Way Consultants, LLC, September 2011 – Present

Services offered to FDA regulated businesses include regulatory guidance on 510(k), IDE and PMA submissions. Also planning, creating, and auditing quality systems to USA and international standards. Creation of clinical plans including protocol development, case report form development, implementing and managing clinical trials. Also, assistance with Design Control to meet FDA requirements and representing clients in FDA meetings.  I am a professional public speaker who can train persons on all aspects of FDA requirements, and practical and successful solutions to FDA problems.

Completed writing two 510(k) submissions for electronic devices utilizing laser energy.

I also had a project to assist a foreign firm in obtaining an FDA PMA for a class 3 implantable cardiovascular device.  The first step in this process was to prepare an FDA "Pre Sub" IDE meeting request. The meeting request was accepted by FDA for an in-person meeting to finalize pre-clinical testing and the future clinical evaluation requirements for an IDE for the device.  The meeting was held at CDRH with ODE and CDER staff, and at the meeting, I assisted the client.  The FDA response was favorable and the next step is the preparation of the IDE and another meeting with FDA to discuss the final clinical trial design.

Completed a project to lead a company in resolving quality issues raised in an FDA Warning Letter.  The project involved a review of the issues raised in the Warning Letter and a complete review of the company's organizational structure and resource allocations for Quality Systems. The final report included a recommendation on reorganization needed to meet FDA QSR requirements.  In addition, the firm requested two additional audits to determine effectiveness of corrective actions.   Recently met with the FDA District Office District Director with the firm to discuss corrective actions taken to resolve the letter.  The meeting was successful in FDA saying they would close the Warning Letter.

I have performed audits of quality systems performed upon request to assess compliance multiple International regulatory systems.   A matrix has been developed that covers FDA Quality System Regulation, 21 CFR Part 820; European Standards for Medical Device Sections, European Standard ISO 13485:2003 Medical Devices; Canadian rules Medical Devices Regulations SOR/98-282; and Japan's MHLW Ministerial Ordinance No. 169 Medical Device Manufacturing.  This is more complex audit than an FDA QSR audit, and entails more time to create the written report, but the firm received a report addressing all 4 international requirements.

I worked with a major medical device firm to perform RA/QA/CA due diligence for potential acquisition.   This required more than an FDA audit as it involved detailed analysis of all international regulatory actions, as well as interviewing all key officials and reporting on their background relative to the roles they played in the firm.

Performed multiple audits for two "Virtual" firms developing combination products.  Audited contract firms for design controls, quality systems, and clinical studies, for both the drug component and the device component of the final products.

Performed vendor audits for a major manufacturer of a combination product as mock FDA PAI inspections. This included audits of facilities in England and Germany,

I regularly perform webinars, and also serve as a guest speaker at Regulatory and Quality Conferences (See the resume section on Presentations.)


UNITED STATES FOOD & DRUG ADMINISTRATION, November 2000 - September 2011.

Supervisory Investigator, FDA Saint Louis Office, March 2009 – September, 2011

Directed all of the FDA operations at the Saint Louis, MO office for FDA. This included work planning for investigators, training of investigators, reviewing inspection and investigation reports for technical and legal requirements. Received an FDA commendation for development of newly hired investigators. Trained on Incident Command Systems (ICS) to serve as a leader in multiagency response to national incidents.


Acting Director of Compliance, FDA Los Angeles District, September 2008 – March 2009

Directed the activities of 7 Compliance Officers. Monitored all on-going projects, and assured adequate resources to assure timely and accurate review of violative inspections, investigations, and sample collections. Negotiated with FDA Centers, Office of Chief Counsel, and Office of Enforcement regarding legal cases. Chaired meetings with regulated firms regarding requirements necessary to meet FDA legal requirements.


Director, Import Operations Branch -FDA Los Angeles District, November 2003 to September 2008

Responsible for managing the operations of over 100 FDA employees located at offices in San Pedro, Carson, Long Beach, Ontario, and Los Angeles International Airport. It was the responsibility of these employees to review all FDA regulated products offered for entry and sale into the United States from foreign sources through the Ports of Long Beach and Los Angeles, and Ontario and Los Angeles International Airports. Successfully reorganized the branch to optimize personnel efficiencies, regularly chaired Import Broker meetings to gain feedback on their perception of FDA Import Operations. Received a special award from

FDA's Office of Criminal Investigation for support the Import Branch provided for development of criminal cases. Acted as the FDA Los Angeles District Director, during the Director's absence.

Compliance Officer, FDA Los Angeles District, June 2002 - November 2003

Perform technical reviews of inspection reports and sample analyses and determine the potential need for further regulatory action by FDA. Work assignments were almost exclusively complex medical device and pharmaceutical inspections and require both risk and legal assessments to formulate regulatory enforcement plans. In my first six months in this position, I authored six Warning Letters. The Warning Letters involved four pharmaceutical, and two medical device firms. Charges cited in the letters ranged from cGMP (QSR), to unapproved new drugs, failure to comply with an OTC Monograph, and failure to submit a 510(k) Premarket Notification.  Also chaired meetings requested by companies to discuss their regulatory status. The meetings involved both Corporate and Private Counsel and senior executives for major device firms.

Investigator (Medical Device Specialist), FDA Los Angeles District, November 2000 – June 2002

Served as a technical specialist in the Los Angeles District for all aspects of Medical Device regulatory compliance. Performed inspections of manufacturers of high-risk medical device firms for both GMP/QSR compliance, as well as sponsor/monitor and clinical investigator inspections for IDE, IRB, and Informed Consent compliance. Certified in the QSIT Approach, and certified for knowledge of the Quality System Regulation. In a 15-month period had two warning letters issued for QSIT inspections, and one recall initiated as a result of a QSIT inspection. Served as a trainer for less experienced investigators for QSIT inspections, Bio-Research Monitoring inspections, food sampling, and recall initiation and monitoring. Selected in January 2002, as the New Hire Training Coordinator for the Los Angeles District Domestic Investigations Branch.

**INDUSTRY EXPERIENCE**

President/Founder, March 1997- November 2000
MEDICAL DEVICE DEVELOPMENT CORPORATION, Fullerton, CA

Founded this consulting firm to advise medical device manufacturers of management responsibility, organizational structures, processes, procedures, and requirements to take a medical device concept to the market. Clients were primarily start-up companies who engaged the services of the firm to provide strategic guidance in the areas of clinical studies, design development, quality systems development, product liability issues, and government approvals (both U.S. and international). Successfully developed strategic plans, and designed and implemented program planning. Services also included preparation of complex regulatory submissions (IDE, 510(k), PMA, Product Dossiers, Product Technical Files). When requested represented the client before FDA, Notified Bodies, Physicians, Investors, Corporate Partners, and Boards of Directors.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1995 -1997
CORDIS WEBSTER, INC. a Johnson & Johnson Company, Baldwin Park, CA 91706

Joined the senior staff of the company shortly after the acquisition of Webster Laboratories by Cordis Corporation. Cordis Webster was a mature company manufacturing and developing Class 2 and 3 products for the cardiac electrophysiology market. Successfully reorganized the Clinical and regulatory departments, and developed systems to assure that all clinical studies and regulatory submissions efficiently met development schedules. Developed a strategic plan that allowed the company to amend a PMA to assure

that FDA would approve it. Oversaw quality systems development and management that led to a successful FDA PMA inspection and to ISO-9001 certification and CE Marking. Designed and implemented an innovative clinical protocol that was used to support a PMA product that was approved for a $100-million-dollar market.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1994 – 1995
CARDIMA CORPORATION, Fremont, CA 94538

Key member of the senior staff of this early stage company developing products for the electrophysiology market. Utilizing team-building efforts, lead the company in a reassessment of priorities allowing for more focus and program accountability. Successfully negotiated with FDA over a complex IDE, to obtain an approval in 30 days. Set up all procedures and plans for a multi- center clinical study.  Interacted with venture capital company representatives in efforts to secure additional financing. Lead the company's ISO/GMP program, and development of management systems to assure efficient operations in an environment of total employee involvement.

Vice President, Regulatory Affairs/Quality Assurance, 1993 - 1994
CARDIAC PATHWAYS CORPORATION, Sunnyvale, CA 94086

As member of the senior management team of this start-up company, developed strategic programs in the development of an integrated system for diagnosis and treatment of cardiac arrhythmias. Directed the implementation of a clinical program to comply with U.S. FDA and European Union requirements. Responsible for overseeing R&D efforts to assure adequate documentation of design control.  Prepared all regulatory submissions for both U.S. and international clinical evaluation and marketing approval of various cardiovascular catheters and diagnostic systems. Personally wrote one 510(k) and two IDE's.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1990 - 1993
BAXTER HEALTHCARE CORPORATION, Edwards LIS Division, Irvine, CA 92714

Senior management position responsible for directing all of the quality assurance programs, clinical evaluation programs, and preparation of government regulatory submissions required for marketing medical devices in the United States and throughout the world. Edwards LIS Division was a fully integrated manufacturer of medical devices for vascular surgery and interventional cardiology. Directed implementation of a preproduction quality assurance program significantly improving the product development cycle and product reliability. Effectively reorganized Quality, Regulatory, and Clinical departments to facilitate a company-wide Total Quality Assurance approach. Established an International RA function and established plans for obtaining the "CE" mark in Europe. Certified by Baxter Healthcare Corporation as an examiner for the Baldrige (Baxter) Quality Award.  Attended all FDA Circulatory Systems Advisory Panel meetings as the Industry Representative (four-year appointment by FDA 1989-1993)

Vice President, Regulatory Affairs, Clinical Research and Quality Assurance 1986 - 1990
RETROPERFUSION SYSTEMS, INC., Costa Mesa, CA

Joined the start-up company team to develop an innovative electromechanical medical device to be utilized in interventional cardiology in the treatment of coronary artery disease. Interfaced with design engineers and physicians and oversaw pre-clinical research. Prepared the original Investigational Device Exemption (IDE) application that was approved by FDA in 30 days from the first submission. Set up the clinical evaluation program, implemented and managed an international multicenter clinical evaluation

and prepared the Premarket Approval Application (PMA) which was accepted by FDA for filing in 45 days from the original submission.  Obtained international approvals for export. Organized and staffed the Quality Assurance department, established pre-production QA functions and created procedures to meet Good Manufacturing Practices (GMP) regulations.

Manager, Regulatory Affairs, 1984 - 1986
UNITEK CORPORATION, Subsidiary of Bristol-Myers Company, Monrovia, CA

Responsible for all of the regulatory requirements for this large fully integrated manufacturer of mechanical, electronic and chemical medical devices and pharmaceuticals. Managed the company employee safety program, the environmental health program, product complaint department and internal GMP Audit program. Prepared all regulatory submissions (510(k), IDE, Product Registrations). Member of the strategic planning committee for the company and a key member of all product development teams.

Manager, Regulatory and Clinical Affairs 1982 - 1984
HEYER SCHULTE DIVISION, American Hospital Supply Corporation, Goleta, CA

Responsible for the regulatory and clinical programs for this medium sized manufacturer of implantable silicone devices utilized in neurology, cardiology, orthopedics, and plastic surgery. A member of the project teams that successfully developed and introduced to the market new class II and class III products. Managed the clinical evaluation of two class III devices and the preparation of all regulatory submissions (510(k), IDE, PMA). Performed internal GMP audits and was the liaison with corporate GMP and GLP auditors, and state and federal inspectors.

EARLY FDA EXPERIENCE, 1972-1982

U. S. Food and Drug Administration, Los Angeles, CA
Small Business Representative, July 1979- March 1982

Established the first West Coast office in the Small Business Assistance program, and served as a representative of the CDRH, Division of Small Manufacturers Assistance. Trained by FDA on all aspects of the 1976 Meical Device Law and regultions.   Provided regulatory guidance to developers of new medical devices. Performed on-site visits at manufacturing locations and advised on procedures necessary to meet GMP and IDE requirements. Met with Institutional Review Board representatives to advise them of regulatory requirements. Served as an FDA spokesperson at numerous government and industry meetings, presenting regulatory requirements for medical device manufacturers.

U. S. Food and Drug Administration, Los Angeles, CA
Consumer Affairs Officer, September 1975- June 1979

Directed the consumer, industry, and press information programs for the Los Angeles District.
Prepared and implemented professional education programs for teachers, health educators, nurses, and physicians. Primary public spokesperson in Los Angeles for all FDA related matters.

U. S. Food and Drug Administration, Los Angeles, CA
Consumer Safety Officer (Investigator) June 1972 - August 1975

Performed inspections and investigations of all product areas regulated by FDA. Specialties included

sterilization and injury/illness investigations. Trained other investigators. Awarded the FDA Commendable Service Award in 1974 for outstanding performance as an investigator

## EDUCATION

California State University, Fullerton, Bachelor of Arts, 1970. Biological Sciences

Golden Gate University, Santa Barbara, CA, MBA Program: One year Completed; 1982-83

## AWARDS

FDA Commendable Service Award, 1974
FDA Special Achievement Award, FDA Office of Criminal Investigations, 2009

## CERTIFICATIONS

Certified in Regulatory Affairs (RAC) by the Regulatory Affairs Professionals Society, 1991

## APPOINTMENTS

Member, Board of Directors, National Alliance on Medical Illness, Southern Illinois Division, a non-profit organization offering assistance to persons or families dealing with mental illness, and advocating on their behalf.  August, 2011 to present

Industry Representative, FDA Circulatory Systems Advisory Panel, FDA Center for Devices and Radiological Health, four-year term, ending June 1993.

Instructor, Design Control Seminars, Noblitt & Rueland, 1994 - 2000

## PUBLICATIONS

 "What to Expect When You Are Inspected "
Endovascular Today Magazine, January 2004

 "Design Verification"
Medical Devices and Diagnostics Industry. Vol. 16, No. 1, January, 1994

 "Practical Aspects of the Clinical Evaluation of a Medical Device",
 Medical Devices and Diagnostics Industry. Vol. 7, No. 4, April, 1985

**PRESENTATIONS:**

**"**Establishing Quality Indicators to Assure GMP/GCP Compliance" lecture, GMP-GCP 2012, GMP & GCP USA, Europe, Japan, Asia Pacific, OMICS Group Conferences, Philadelphia, PA December, 2012

"Conducting Successful FDA Meetings" One Hour Webinar for Biopractice.com., May 2013

"Using Quality Indicators for Successful FDA QSR Management Reviews" One Hour Webinar for Biopractice.com, September, 2013

"Navigating FDA Import Requirements for all FDA Regulated Products" One Hour Webinar for Biopractice.com, July, 2015

"Understanding the Mindset of an FDA Employee" One Hour Webinar for Biopractice.com, October, 2013

"FDA cGMP for Pharmaceuticals – 2104 Expectations" cGMP 2013 Conference, Utrecht, The Netherlands, December, 2013


**AFFILIATIONS**

Regulatory Affairs Professionals Society, Member 1982 - Present,
President, Western Section, 1985 - 1986

American Society for Quality, Member 1976 – Present

FDA Alumni Association, Member 2013-Present

STEVENS DECLARATION - EXHIBIT 2

# EXHIBIT C

LAW OFFICES

# HYMAN, PHELPS & McNAMARA, P.C.

700 THIRTEENTH STREET, N.W.

SUITE 1200

WASHINGTON, D. C. 20005-5929

(202) 737-5600

FACSIMILE

(202) 737-9329

www.hpm.com

Charles D. Snow

Direct Dial (202) 737-4295
CSnow @hpm.com

December 14, 2016

Food and Drug Administration
Division of Freedom of Information
Office of the Executive Secretariat, OC
5630 Fishers Lane, Room 1035
Rockville, MD 20857

Dear Sir or Madam,

Pursuant to the Freedom of Information Act ("FOIA") at 5 U.S.C. § 552, we hereby request the following:

**Copies of all internal and external correspondence including, but not limited to, emails and meeting records concerning the two trade complaints filed by Hyman, Phelps & McNamara on behalf of Boston Scientific Corporation that were submitted to FDA on May 18 (CPT1500480) and July 15, 2015, respectively. These trade complaints documented the violative labeling and advertising of the SENZA Spinal Cord Stimulation System by the Nevro Corporation.**

We will pay all reasonable fees in supplying this information. If these fees should exceed $250, please contact me for authorization to proceed. If you have any questions regarding this request, please do not hesitate to contact me. We ask that you please adhere to the statutory and regulatory requirements governing access to public information (5 U.S.C. § 552; 45 C.F.R. Part 5) and provide the requested documents within the statutory deadline of 20 days.

Sincerely,

Charles D. Snow
Legal Assistant

{00274866}

# EXHIBIT D

**Meek, Dianne**

| | |
|---|---|
| **From:** | Charles D. Snow |
| **Sent:** | Friday, January 13, 2017 2:22 PM |
| **To:** | Jeffrey K. Shapiro |
| **Subject:** | FW: FDA FOIA 2016-10503 |

Hi Jeff,

Below is FDA's response to the FOIA request I submitted on your behalf re our two trade complaints for Boston Scientific.  They denied the entire request, citing interference with law enforcement proceedings as the reason.  I have copied the language of our original request directly below for your reference.

*Copies of all internal and external correspondence including, but not limited to, emails and meeting records concerning the two trade complaints filed by Hyman, Phelps &*
*McNamara on behalf of Boston Scientific Corporation that were submitted to FDA on May 18 (CPT1500480) and July 15, 2015, respectively. These trade complaints documented the violative labeling and advertising of the SENZA Spinal Cord Stimulation System by the Nevro Corporation.*

Charlie

---

**From:** Kotler, Sarah [mailto:Sarah.Kotler@fda.hhs.gov]
**Sent:** Friday, January 13, 2017 2:52 PM
**To:** Charles D. Snow
**Cc:** Stansbury, Claire B
**Subject:** FDA FOIA 2016-10503

Dear Mr. Snow,

The Food and Drug Administration (FDA) has completed processing your request for records under the Freedom of Information Act (FOIA).  I apologize for any delay in responding to you.

We are denying your entire request.  The estimated volume of the records we are denying is records regarding two trade complaints.

The following exemption of FOIA, 5 U.S.C. 552, is the authority for denying you access to the non-disclosable material:  Exemption (b)(7)(A) Records or information compiled for law enforcement purposes when disclosure could reasonably be expected to interfere with enforcement proceedings.

Section 5.68(a) of the implementing regulations of the Department of Health and Human Services (DHHS) is applicable to this denial.  The regulations are contained in the Code of Federal Regulations (CFR), Title 45.

The following sections of the implementing regulations of FDA and reasons applicable to this denial are contained in the CFR, Title 21

- 20.64(a)(1)  Records or information complied for law enforcement purposes when disclosure could reasonably be expected to interfere with enforcement proceedings.  Law enforcement proceedings may involve materials and information obtained from parties other than the target(s) of the proceeding.  FDA's Regulations at CFR Part 20 are available at:

http:www.access.gpo.gov/nara/cfr/waisidx_04/21cfr20_04.html

You have the right to appeal this determination.  By filing an appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider your request and the agency's decision.  Your appeal must be mailed within 90 days from the date of this response, to: Ms. Catherine Teti, Deputy Agency Chief FOIA Officer, U.S. Department of Health and Human Services, Office of the Assistant Secretary for Public Affairs, Room 729H, 200 Independence Avenue, S.W., Washington, DC 20201. Please clearly mark both the envelope and your letter "Freedom of Information Act Appeal."

If you would like to discuss our response before filing an appeal to attempt to resolve your dispute without going through the appeals process, please contact **Sarah Kotler at 301-796-8976**. You may also contact the HHS FOIA Public Liaison for assistance at: Michael Bell, HHS FOIA Public Liaison, U.S. Department of Health and Human Services, Office of the Assistant Secretary for Public Affairs, Room 729H, 200 Independence Avenue, S.W., Washington, DC 20201; telephone at (202) 260-0793; e-mail: HHS_FOIA_Public_Liaison@hhs.gov.

If you are unable to resolve your FOIA dispute through our FOIA Public Liaison, the Office of Government Information Services (OGIS), the Federal FOIA Ombudsman's office, offers mediation services to help resolve disputes between FOIA requesters and Federal agencies. The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road–OGIS, College Park, MD 20740-6001; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769; e-mail at ogis@nara.gov.

If you have any questions, please contact me at 301-796-8976.


Sincerely,

**Sarah B. Kotler, J.D.**
*Director*
**Office of the Executive Secretariat**
**Division of Freedom of Information**
**U.S. Food and Drug Administration**
Tel: 301-796-8976
Sarah.Kotler@fda.hhs.gov



