Krista M. Carter (State Bar No. 225229)
Email address:  krista.carter@arnoldporter.com
Thomas T. Carmack (State Bar No. 229324)
Email address:  tom.carmack@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, California  94306
Telephone:     (650) 319-4500
Facsimile:      (650) 319-4700

Matthew M. Wolf (admitted *pro hac vice*)
Email address:  matthew.wolf@arnoldporter.com
Edward Han (admitted *pro hac vice*)
Email address:  edward.han@arnoldporter.com
Marc A. Cohn (admitted *pro hac vice*)
Email address:  marc.cohn@arnoldporter.com
Amy L. DeWitt (admitted *pro hac vice*)
Email address:  amy.dewitt@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:     (202) 942-5000
Facsimile:      (202) 942-5999

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC NEUROMODULATION
CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEVRO CORP.,<br><br>                Plaintiff,<br><br>      v.<br><br>BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION,<br><br>           Defendants. | Case No. 3:16-cv-06830-VC<br><br>**BOSTON SCIENTIFIC'S SUPPLEMENTAL BRIEF REGARDING CLAIM CONSTRUCTION AND SUMMARY JUDGMENT PURSUANT TO ECF NO. 423**<br><br>Judge:    Hon. Vince Chhabria |

1

**TABLE OF CONTENTS**

2

**Page(s)**

3

I. INTRODUCTION ........................................................................................................... 1

4

II. THE PHRASE "CONFIGURED TO" RENDERS THE ASSERTED CLAIMS
INDEFINITE ................................................................................................................... 2

5

6

A. The Evidence Supports The Construction Of "Configured To" To Mean
"Programmed To"—*i.e.*, Requiring Nothing Further ............................................. 2

7

B. If The Court Finds That "Configured To" Can Also Reasonably Be
Interpreted As "Programmable To," Then The Claims Would Be Indefinite ........ 6

8

C. A "Programmable To" Construction Renders The Claims Indefinite For
Failing To Claim What The Applicant Regards As The Invention ......................... 8

9

III. BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONINFRINGEMENT OF
CLAIMS 1 AND 22 OF THE '842 PATENT ................................................................ 9

10

11

A. The Court Should Grant Summary Judgment Of Noninfringement For
WaveWriter Version 2 ............................................................................................ 9

12

B. The Court Should Grant Summary Judgment For Boston Scientific On
Precision With MultiWave ................................................................................... 10

13

14

1. Under A Construction Of "Programmed To," The Court Should
Grant Summary Judgment Of Noninfringement........................................ 10

15

2 Under A Construction Of "Programmable To," The Court Should
Find The Claims Invalid As A Matter Of Law ......................................... 12

16

IV. THE "PARESTHESIA-FREE" CLAIMS ARE INDEFINITE ...................................... 12

17

A. The Court's Tentative Ruling That The "Paresthesia-Free" Claims Are
Indefinite Is Correct ............................................................................................ 13

18

B. Nevro's "Effective Amount" Cases Should Not Alter The Court's Tentative
Conclusion That The "Paresthesia-Free" Claims Are Indefinite ......................... 16

19

V. CONCLUSION.............................................................................................................. 20

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

<u>Cases</u>

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
   299 F.3d 1336 (Fed. Cir. 2002)..................................................................... 8

*Asetek Holdings, Inc. v. CoolIT Sys., Inc.*,
   Case No. C-12-4498 EMC, 2014 WL 4090400 (N.D. Cal. Aug. 19, 2014).................... 10

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
   803 F.3d 620 (Fed. Cir. 2015)................................................................. 7, 8

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003)................................................. 15, 16, 19, 20

*In Re Halleck*,
   422 F.2d 911 (C.C.P.A. 1970) ................................................................ 17

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)............................................................. 14, 15

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003)................................................................. 8

*Horizon Pharma Ireland Ltd. v. Actavis Labs., UT, Inc.*,
   Nos. 1:15-cv-07742-NLH-AMD, 2016 WL 4432681 (D.N.J Aug. 17, 2016) .......... 18, 19

*Merrill v. Yeomans*,
   94 U.S. 568 (1876)............................................................................ 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014)................................................................*passim*

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)............................................................. 3, 4, 5

*Paice LLC v. Ford Motor Co.*,
   881 F.3d 894 (Fed. Cir. 2018)................................................................. 3

*Pfizer, Inc. v. Teva Pharma. USA, Inc.*, ,
   855. F. Supp. 2d 286, 300 (D. N.J. 2012) ................................................. 16, 18

*STX, Inc. v. Brine, Inc.*,
   37 F. Supp. 2d 740 (D. Md. 1999) ......................................................... 15, 16

*Takeda Pharm. Co. v. Mylan, Inc.*,
   No. 13-CV-04001-LHK, 2014 WL 5862134 (N.D. Cal. Nov. 11, 2014).................. 17, 18

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015)............................................................. 3, 7

*WesternGeco LLC v. ION Geophysical Corp.*,
   791 F.3d 1340 (Fed. Cir. 2015) ............................................................. 11

## <u>Statutes</u>

35 U.S.C. § 102(b) ............................................................................ 12

35 U.S.C. § 102(f) ............................................................................ 11

35 U.S.C. § 112 ............................................................................. 8, 9

35 U.S.C. § 271(a) ........................................................................... 11

35 U.S.C. § 271(f) ........................................................................... 11

ii

1

## I.       INTRODUCTION

2          BSC respectfully submits this supplemental brief addressing the three points raised at the

3  July 6, 2018 hearing:  (1) whether the claim term "configured to" renders certain asserted claims

4  indefinite; (2) whether summary judgment of infringement or noninfringement should be granted

5  on claims 1 and 22 of the '842 patent; and (3) whether the Court should disturb its tentative ruling

6  that the "paresthesia-free" claims are indefinite on the basis of Nevro's "effective amount" cases.

7          *First*, the intrinsic record strongly supports BSC's construction of "configured to"—*i.e.*,

8  "programm***ed*** to"—requiring no further action to perform the claimed function.  If the Court

9  declines to adopt that construction of "configured to" and finds that other constructions, such as

10 "programm***able*** to," are also supported by the evidence, then the claims using that term (including

11 claims 1 and 22 of the '842 patent) would be indefinite.[1]  In that case, a person of ordinary skill in

12 the art could not know with reasonable certainty whether a device infringes.

13         *Second*, if the Court finds that claims 1 and 22 of the '842 patent are not indefinite, then

14 summary judgment of noninfringement should be granted as to WaveWriter Version 2 under ***any***

15 construction of the disputed claims.  As to Precision with MultiWave, if the Court construes

16 "configured to" to mean "programmed to," there is no dispute that it does not infringe.  If the

17 Court construes "configured to" to mean "programm***able*** to," then the Court should not reach the

18 issue of infringement; it should instead grant summary judgment that the 2004 Precision prior art

19 invalidates claims 1 and 22.  BSC has demonstrated that Precision practiced every limitation of

20 those claims, including programmability to generate signals at 10 kHz without modification.

21         *Third*, the Court's tentative ruling regarding the "paresthesia-free" limitations—which

22 renders all asserted claims except 1 and 22 of the '842 patent indefinite—was correct.  It is

23 undisputed that, for any set of signal parameters within the claimed ranges, the presence or absence

24 of paresthesia is uncertain.  Thus, a person of ordinary skill will not know, until after a device is

25 implanted and the therapy is applied, whether the claims are infringed.  The cases cited by Nevro

26

27 [1] Claims 7, 12, 35, 37 and 58 of the '533 patent (D.N. 343-3), claim 55 of the '125 patent (D.N. 343-6), claims 1 and 22 of the '842 patent (D.N. 343-8), claims 5 and 34 of the '357 patent (D.N. 343-7), and claim 18 of the '988 patent (D.N. 343-5).

28

discussing the term "effective amount" or similar terms are inapposite.

## II.   THE PHRASE "CONFIGURED TO" RENDERS THE ASSERTED CLAIMS INDEFINITE

"Configured to" means "programmed to"—*i.e.*, that no further programming is required to perform the recited function. Both the intrinsic and extrinsic record support this construction. If, however, it is determined that "configured to" may also be reasonably understood to mean "programmable to"—*i.e.*, that the limitation may be satisfied even though further steps are required to perform the recited function—then the claims would be indefinite because a person of ordinary skill in the art could not determine their scope with "reasonable certainty," as required by the Supreme Court's decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The *Nautilus* Court rejected the Federal Circuit's previous "amenable to construction" standard because it was too forgiving of ambiguity and fostered an "innovation-discouraging 'zone of uncertainty.'" *Id.* at 2130. The Supreme Court also affirmed that a patent claim cannot rely on subjectivity. *Id.* at 2128 ("Patent claims … should be construed from an ***objective perspective*** of a [skilled artisan]…." (citation omitted)).[2]

### A.   The Evidence Supports The Construction Of "Configured To" To Mean "Programmed To"—*i.e.*, Requiring Nothing Further

In its claim construction briefing, BSC showed that there is extensive evidence supporting the "nothing further" interpretation. (*See* D.N. 358 at 6-12.) Several of Nevro's patent claims are also consistent with this construction. For example, as discussed at the hearing, claim 1 of the '125 patent recites a "step for ***configuring*** the signal generator, ***including programming***." Thus, "programming" is part of "configuring" the signal generator—not something that happens after the signal generator is "configured." Nevro's U.S. Patent No. 8,886,328 is similar. (*See* Ex. 1 at claims 1, 8, 15, and 24.) Further, U.S. Patent No. 9,387,327 claims a "method of programming a spinal cord stimulation system … comprising … ***using the external programmer to configure the pulse generator***" wherein "***the pulse generator is <u>configurable</u>*** to generate the paresthesia-inducing electrical signal…." (Ex. 2 at claims 14, 15.) This language shows that, until the

_____

[2] Emphasis added unless otherwise indicated.

BSC'S SUPPLEMENTAL CLAIM CONSTR. & MSJ BRIEF                    Case No. 3:16-cv-06830 VC

external "programmer" is used to "configure" the pulse generator, the pulse generator is merely "configurable."  Nevro knew the difference between "configur*ed*" and "configur*able*," and it chose to use the former in the asserted claims.  The tense of the claim language is important and should not be altered:  configur*ed* means programm*ed* and configur*able* means programm*able*.

The prosecution history also reveals that "configured to" means "programmed to."  The Court asked "how much of this is sloppy drafting and how much of it is sort of deliberate, super-sophisticated effort on the part of the drafters to ... create a patent that is going to go out and grab whatever ... comes close to practicing the invention?"  (D.N. 427 at 64:25-65:4.)  Regardless of the answer (although it is the latter that seems likely), Nevro should not be allowed to rely on a "zone of uncertainty" (*Nautilus*, 134 S. Ct. at 2130) around its indefinite claims to monopolize the concept of high-frequency stimulation, which was already known.  Since 2011, Nevro has filed at least 40 patent applications that claim priority to the '533 patent.  (Ex. 3.)  Each application, which may use claim terms in common with other applications, has its own prosecution history, in which the evolving meaning of those claim terms may be reflected.  To ascertain the meaning of these terms, all of the prosecutions in which those terms are discussed must be considered.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents….").  Moreover, the same term should have the same meaning in different claims of the same or related patents.  *See Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 904 (Fed. Cir. 2018); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.")  Accordingly, "configured to" cannot mean one thing in one patent and something else in the same or related patent.

The term "configured to" has been discussed during prosecution of related applications, including U.S. Patent App. No. 14/522,405 (the "'405 application") in which Nevro and the Patent Office agreed that "configured" meant "programmed," not "programmable."[3]  The '405

---

[3] The '405 application has the same specification as, and claims priority to, the '533 patent, which Nevro has asserted in this case.  The '405 application issued as the '327 patent discussed above.

BSC'S SUPPLEMENTAL CLAIM CONSTR. & MSJ BRIEF                    Case No. 3:16-cv-06830 VC

1    application sought to claim a "method of programming a spinal cord stimulation system."  (*See,*

2    *e.g.*, Ex. 4 at BSC-NVRO_00103123-4, claims 160, 169.)  In the preamble to original claim 160,

3    the "signal generator is ***configured to generate*** an electrical therapy signal."  In the first limitation

4    of claim 160, an "external programmer" is used to select signal parameters, and in the last

5    limitation, "the external programmer" is used "to configure the signal generator to deliver the

6    electrical therapy signal to the patient's spinal cord."  (*Id*. at BSC-NVRO_00103123.)  Dependent

7    claim 169 adds that the therapy signal is delivered "to a dorsal root…."  (*Id*. at BSC-

8    NVRO_00103124.)  The examiner rejected the claims (Ex. 5 at BSC-NVRO_00102526), and then

9    Nevro amended them.  (Ex. 6 at BSC-NVRO_00102457-9.)  The amendment is telling:  claim 160

10   was changed so that the signal generator was "configurable," instead of "configured to."  In the

11   remarks submitted with the amendment, Nevro clarified that in claim 169, "the pulse generator is

12   configured to deliver the electrical signals ***by selecting one or more contacts of the signal delivery***

13   ***device***" on the external programmer.  (*Id.* at BSC-NVRO_00102466.)  Thus, in these claims,

14   configuring the signal generator explicitly requires using the external programmer to select the

15   contacts for stimulation.  Until then, the generator is merely "configurable" (rather than

16   "configured," as the claim previously read) to generate the required signal.

17          In a subsequent interview, the examiner stated that the amended claims covering a

18   "configurable/programmable" system "only requires the capability to be configured/programmed

19   as such" and thus the claims "still read on prior art devices."  (Ex. 7 at BSC-NVRO_00102409.)

20   To overcome the prior art, the examiner suggested that Nevro use the word ***"'configured' to***

21   ***generate the particular signals" because that "would then require at least one instance of***

22   ***actually programming...."***  (*Id*.)  The parties discussed alternative language and agreed that the

23   claims would require that "the programmer is configured to transmit [programming instructions],"

24   thus requiring that the signal parameters are "actually configured in the programmer and ready to

25   transmit (i.e., programmer is not just relaying a transmission or just 'capable of transmission)."

26   (*Id*.)  In other words, the examiner and Nevro agreed that "configured" has the same meaning as

27   "programmed," as BSC proposes here.

28          The prosecution history of the asserted '842 patent is also instructive.  Throughout

---

4

prosecution, Nevro distinguished high-rate SCS prior art because it supposedly failed to disclose Nevro's specifically-selected parameters. These "not-specific-enough" arguments are premised on an interpretation of "configured to" that is synonymous with "programmed to." For example, Nevro distinguished the Peterson prior art by arguing that Peterson does not teach "the specific combination of therapy signal parameters in the claimed ranges." (Ex. 8 at NEVRO_ BSXCA0009938.) Although Peterson undisputedly discloses high-rate signals ("20-100 kHz"), with low amplitudes ("less than 1 mA"), and short pulse widths ("pulse width of less than or equal to 30 microseconds") (*id.* at NEVRO_BSXCA0009939), and is thus program***able*** to generate signals in the claimed range, Nevro argued that Peterson does not anticipate its "configured to" claims with a frequency of 10 kHz, an amplitude of 0.5 mA to 10 mA, and a pulse width between 25 microseconds and 168 microseconds. (*Id.* at NEVRO_ BSXCA0009938.)

Nevro took a similar position regarding the Cameron prior art, arguing that "Cameron's frequency range of 1-[25 kHz] fails to disclose applicant's claimed [10 kHz] with sufficient specificity." (Ex. 9 at NEVRO_ BSXCA0011155.) As noted above, these arguments rest on the premise that a signal generator "configured to" generate a signal is the same as a signal generator "programmed" to generate a signal. Although Cameron clearly discloses a signal generator "programmable to," "capable of," or "designed to" generate electrical signals at a frequency between 1 - 25 kHz, Nevro distinguished Cameron on the ground that it did not meet claim limitations requiring a signal generator "configured to" generate an electrical signal at 10 kHz.[4]

Nevro used "configured" to mean "programmed" and "configurable" to mean "programmable" in related patents. It agreed with the Patent Office in related prosecutions that the

---

[4] Nevro made these same arguments regardless of whether the claims recited "configured to generate," "means for generating," or "instructions to generate." *See, e.g.*, Ex. 10 at NEVRO_ BSXCA0003666-7 (although MacDonald prior art reference discloses a frequency range "up to about 250 kHz" and specifically mentions "150 kHz" and "5 kHz," Nevro argued that this is not specific enough to disclose a limitation requiring "means for generating" a signal with a frequency "from 1.5 kHz to 100 kHz."); Ex. 11 at NEVRO_BSXCA0006844 (although Gillbe prior art reference discloses a pulse width range of 10 to 160 microseconds and an amplitude range of less than or equal to 20 mA, Nevro argued that was not specific enough to disclose Nevro's claimed ranges for these parameters).

term "configured to" did not refer to mere capability or programmability, but rather to the state of being already programmed, without requiring further programming.  The statements in the '405 application deserve repeating:  "the programmer is configured to transmit [programming instructions]," thus requiring that the signal parameters are "actually configured in the programmer and ready to transmit (i.e., programmer is not just relaying a transmission or just 'capable of transmission)."  (Ex. 7 at BSC-NVRO_00102409.)  For the same reasons, a signal generator "configured to" generate a therapy signal with certain parameters must be "actually configured ... and ready to transmit" that therapy signal.  Configured should be construed to mean "programmed to," without a requirement of further programming.

**B.    If The Court Finds That "Configured To" Can Also Reasonably Be Interpreted As "Programmable To," Then The Claims Would Be Indefinite**

At the hearing, the Court and the parties discussed two inconsistent interpretations of "configured to"—one requiring a structure "where nothing further needs to be done" and the other requiring a structure where "something further would need to be done to accomplish what it is configured to do."  (D.N. 427 at 99:5-13.)  "[A]t some points in the patent they use 'configured' as distinct from 'programmed.'  And at other points in the patent they use 'configured as sort of the same as 'programmed.'"  (*Id*. at 62:15-18.)  Thus, the Court asked whether, if there were two "equally reasonable constructions" of the "configured to" phrase, "[a]re you supposed to choose the construction that saves the claims?"  (*Id*. at 63:14-64:13.)  The answer is no.

If, despite the overwhelming evidence to the contrary, Nevro maintains that a "something further" interpretation is more consistent with the intrinsic record, or if there are two equally reasonable constructions, then the claims would be indefinite.  Under the Supreme Court's decision in *Nautilus*, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them" and it is not enough "that a court can ascribe some meaning to a patent's claims."  134 S. Ct. at 2129, 2130 (internal quotations omitted).  The patent law leaves "no excuse for ambiguous language or vague descriptions," and the public "should not be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights."  *Merrill v. Yeomans*, 94 U.S. 568, 573 (1876).

At least two Federal Circuit decisions since the Supreme Court's decision in *Nautilus* are analogous to this case.  In *Teva*, 789 F.3d at 1345, the term "molecular weight of about 5 to 9 kilodaltons" rendered a claim indefinite because the evidence did not specify which of three plausible meanings for the term should be used.  The court explained that, while "'molecular weight' or average molecular weight can be ascertained by any of three possible measures: $M_p$, $M_n$, and $M_w$," the record did not indicate which measure to use.  *Id.* at 1344.  The specification did not define "molecular weight" and, during prosecution, the patentee used inconsistent definitions.  *Id.* at 1344-1345.  Because "there [was] not reasonable certainty" about how "molecular weight" should be measured, the Federal Circuit held that the claims were indefinite.  *Id.* at 1345.

In *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, the Federal Circuit reversed a previous ruling of no indefiniteness under *Nautilus*.  803 F.3d 620, 635 (Fed. Cir. 2015).  The claims required the determination of a materials property known as the maximum "slope of strain hardening."  *Id.* at 625.  "Three methods existed to determine the maximum slope, each providing, as Dow admits, 'simply a different way of determining the maximum slope.'"  *Id.* at 633.  The court framed the issue as follows:  "The question is whether the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite."  *Id.* at 634.  In resolving the issue, the court contrasted the pre-*Nautilus* method to the post-*Nautilus* method:

> Before *Nautilus*, a claim was not indefinite if someone skilled in the art could arrive at a method and practice that method.  In our previous opinion, relying on this standard, we held that the claims were not indefinite, holding that "the mere fact that the slope may be measured in more than one way does not make the claims of the patent invalid."
>
> Under *Nautilus* this is no longer sufficient.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." … Here the required guidance is not provided by the claims, specification, and prosecution history.

*Id.* at 634 (citations omitted).  The *Dow* court held that the claims at issue "are even more clearly indefinite than those in *Teva* … [because the expert's] chosen method was not even an established method but rather one developed for this particular case."  *Id.* at 635.  Relying on the principle that

"a claim term is indefinite if it 'leave[s] the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion,'" the court invalidated the claims. *Id.* Indeed, even under the less stringent "insolubly ambiguous" standard overturned by *Nautilus*, the Federal Circuit found claims requiring a particular "melting point elevation" ("MPE") indefinite because there were multiple, outcome-changing methods of determining MPE and the intrinsic record did not specify which method to use. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003).

If the phrase "configured to" is susceptible to two equally reasonable interpretations and the intrinsic record provides no guidance as to which to use, then the asserted claims would fail to meet the "reasonable certainty" standard set forth in *Nautilus*. What Nevro seeks to do in this case is argue one interpretation for infringement (programmable) but a different interpretation for invalidity (programmed) and still other interpretations in related patent prosecutions. As the Court knows, it must adopt only one construction and apply it consistently to all issues in the case. If no such construction of "configured to" can be ascertained on the intrinsic record, then, under *Teva*, *Dow*, and *Honeywell*, the asserted claims using that term are indefinite.

### C. A "Programmable To" Construction Renders The Claims Indefinite For Failing To Claim What The Applicant Regards As The Invention

As the Court alluded to in its tentative ruling, the second paragraph of 35 U.S.C. § 112 contains two requirements. In addition to the "particularity and distinctness" test described above and addressed by *Nautilus*, the claims must also set forth what "the applicant regards as his invention." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002). If the claims are construed to require a device program*able* to generate high-rate signals, then Nevro's system claims would be indefinite under § 112 for failing to claim what the applicant regards as his invention. *Id.* at 1349 ("Where it would be apparent to one of skill in the art, based on the specification, that the invention set forth in a claim is not what the patentee regarded as his invention, we must hold that claim invalid under § 112, paragraph 2.") The court in *Allen* found claims invalid because they included a requirement that, as clearly stated in the specification, was not part of the invention. *Id.* at 1349.

1    Here, if Nevro invented anything, it is a therapy algorithm that must be programmed into

2  an IPG.  Devices that were program*able* to high frequencies, pulse widths, and amplitudes were

3  already known in the prior art.  (D.N. 372-12 at ¶ 292 ("Nevro does not purport to have invented

4  neurostimulation, SCS, a new lead, or even an IPG."); Ex. 12 ("███████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████")  The specification teaches that, in order to

7  achieve the claimed paresthesia-free therapeutic results, the systems must be programmed at the

8  disclosed parameters.  (*See, e.g.*, the '533 patent (D.N. 343-3) at 5:8-12, 5:32-42, 6:55-59, 12:21-

9  24.)  Thus, any claims that are construed not to require a program*ed* device are inconsistent with

10  the invention described in the specification and, therefore, violate the first prong of § 112.

## III.    BSC IS ENTITLED TO SUMMARY JUDGMENT OF NONINFRINGEMENT OF CLAIMS 1 AND 22 OF THE '842 PATENT

For the reasons set forth above, claims 1 and 22 of the '842 patent should be held indefinite

based on the "configured to" limitations.  However, should the Court find these claims not

indefinite, then BSC would respectfully request that the Court (1) grant BSC's motion for

summary judgment of noninfringement regarding WaveWriter Version 2,[5] and (2) either grant

BSC's motion for summary of noninfringement regarding Precision with MultiWave (under BSC's

construction of "configured to") or, in the alternative, grant BSC's motion for summary judgment

that the 2004 Precision invalidates these claims (under the Court's tentative construction of

"configured to").

### A.    The Court Should Grant Summary Judgment Of Noninfringement For WaveWriter Version 2

It is undisputed that WaveWriter Version 2 is not capable or programmable for frequencies

greater than 1.2 kHz.  (D.N. 397-13 ("Design Change Analysis Form" describing a change to

Wave Writer Version 2 "to limit stimulation frequency to a maximum of 1.2 kHz").)  Accordingly,

---

[5] If the Court adopts its tentative ruling that the § 271(e)(1) Safe Harbor applies to the continued use of accused products by ACCELERATE patients, there are no remaining issues of infringement regarding WaveWriter Version 1, which was used only in connection with the ACCELERATE Study, or the use of Precision with MultiWave in the United States, which occurred only in connection with the ACCELERATE Study.

WaveWriter Version 2 would not infringe, regardless of whether the "configured to" limitations were construed to mean "capable of" or "programmable to" (per the Court's tentative ruling) or "a signal delivery device which requires no further configuration to deliver" (per BSC's proposed construction).  (D.N. 427 at 69:7-12 (Nevro Counsel:  "That is why WaveWriter, Version 2, does not infringe because it is not programmable by the user to operate at high frequency.  And that was your tentative ruling.  So that's how we understand the logic of that.").)  Nevro also effectively concedes noninfringement of WaveWriter Version 2 under its proposed construction of "configured to"—*i.e*, "designed to"—because WaveWriter Version 2 is specifically designed ***not*** to provide high rate stimulation.  (*See id.* at 18:25-19:3 (Nevro Counsel:  "Now, you could conclude, and of all the tentatives in here the one that I -- that are against us -- the one that I think honestly is the strongest is that one.  That Version 2 is no longer designed.  It was de-designed.  I get that."); 24:13 (Nevro Counsel:  "Version 2 is the de-designed version.").)

**B.     The Court Should Grant Summary Judgment For Boston Scientific On Precision With MultiWave**

The Court requested supplemental briefing as to whether the Court should grant summary judgment of infringement or noninfringement of claim 1 and 22 of the '842 patent with regard to the Precision with MultiWave system under a construction of "configured to" as either "programmed to" or "programmable to."[6]  (*Id.* at 100:12-13, 24-25, 101:8-14.)

**1.     Under A Construction Of "Programmed To," The Court Should Grant Summary Judgment Of Noninfringement**

Under a construction of "programmed to," BSC has demonstrated that Precision with MultiWave lacks the "configured to" limitation, thus warranting summary judgment of noninfringement.  *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, Case No. C-12-4498 EMC, 2014 WL 4090400 at *5 (N.D. Cal. Aug. 19, 2014).  There is no genuine dispute that, when the Precision with MultiWave system is made and sold, it is not programmed with any specific parameters.

---

[6] It is undisputed that Precision with MultiWave is commercially sold and used only outside of the United States.  For this reason, should the Court find method claims 1 and 5 of the '472 patent (*i.e.*, the Fang patent) not invalid as indefinite, the Court should grant summary judgment of noninfringement.  It is undisputed that, under current Federal Circuit law, § 271(f) does not apply to method claims.  (D.N. 372-4 at 17.)

(*See, e.g.,* D.N. 357-4 at 25:6-8, 26:15-17.)  When the Precision with MultiWave system is configured (at its European destination), the user must choose between the low frequency mode and the high frequency mode before he or she is able to further program the system to generate stimulation with any set of parameters.  (D.N. 427 at 102:19-103:3; D.N. 358-21.)  Thus, the manufacture and sale of Precision with MultiWave cannot infringe under 35 U.S.C. § 271(a).

For the same reasons, the exportation of Precision with MultiWave cannot infringe under 35 U.S.C. § 271(f).  Section 271(f) requires a showing that BSC "actively induce[d] the combination of [] components outside the United States in a manner that would infringe the patent if such a combination occurred in the United States."  35 U.S.C. § 102(f).  This applies to the components *as exported*.  When the components of BSC's Precision with MultiWave system are assembled outside the United States, that system would not infringe because it is still not programmed to provide stimulation at any particular parameter settings.  Section 271(f) does not apply to subsequent acts by physicians that occur outside the United States, such as at the time of programming.  *See WesternGeco LLC v. ION Geophysical Corp.*, 791 F.3d 1340 (Fed. Cir. 2015), *vacated by* 136 S. Ct. 2486 (2016), *reinstated in pertinent part by* 837 F.3d 1358 (Fed. Cir. 2016), *cert. granted* 138 S. Ct. 734 (2018) ("Just as the United States seller or exporter of a final product cannot be liable for use abroad, so too the United States exporter of the component parts cannot be liable for use of the infringing article abroad.").[7]

Nevro tries to refute BSC's evidence by pointing to the "default" setting for the Precision with MultiWave *when set to the high frequency mode*.  (*See, e.g.*, D.N. 427 at 97:22-98:3.)  But the high frequency mode is not a default setting.  When shipped, the device is not defaulted to *any* mode—either low or high frequency.  (*Id.* at 102:19-103:3; D.N. 358-21.)[8]  The frequency mode (high or low) is selected by the physician later.  Because Precision with MultiWave is not "programmed to" any particular parameters when assembled after exportation, summary judgment

---

[7] Nevro's previously-cited cases only addressed inducement under § 271(b) and not § 271(f) at all. (D.N. 372-4 at 17.)  Those cases are therefore inapposite.

[8] If the Court finds otherwise, at the very least, this would provide a genuine issue of material fact precluding summary judgment of infringement.

1

of noninfringement should be granted.

2

      2       **Under A Construction Of "Programmable To," The Court Should Find The Claims Invalid As A Matter Of Law**

3

4

Alternatively, under a construction of "programmable to," the Court should not reach the

5

issue of infringement.  While "programmable to" may be broad enough to cover Precision with

6

MultiWave at the time of exportation, it is also broad enough to cover much of the prior art,

7

including the 2004 Precision device.[9]  For example, BSC has demonstrated that, as a matter of law,

8

the Precision system meets all of the limitations of claim 1 and 22 of the '842 patent, including

9

being "programmable to" provide high rate stimulation at a frequency of 10 kHz, and pulse widths

10

and amplitudes in the claimed ranges.[10]  (*See, e.g.*, D.N. 357-4 at 45:4-12.)  Nor is it disputed that

11

Precision, which was on sale by 2004, is prior art.  35 U.S.C. § 102(b) ("a person shall be entitled

12

to a patent **unless** [] **the invention was** ... **on sale** ... more than one year prior to the date of the

13

application for patent in the United States.").  This explains why Nevro's counsel was so insistent

14

that a construction of "capable of" or "programmable to" would be too broad; Nevro knows that

15

this broad construction would render its patent claims invalid.  Accordingly, if the '842 patent is

16

directed to a system "capable of" or "programmable to" generate a therapy signal with certain

17

parameters, then BSC's prior art Precision system invalidates the asserted '842 patent claims.

18

**IV.    THE "PARESTHESIA-FREE" CLAIMS ARE INDEFINITE**

19

In its tentative ruling, the Court correctly found that the claims requiring therapy that is

20

"paresthesia-free" (or similar) are invalid as indefinite.[11]  It is undisputed that the presence or

21

absence of paresthesia in a particular patient will be uncertain, regardless of the level of

22

stimulation within the claimed ranges, as shown below.  A person of ordinary skill will not know,

23

24

[9] BSC has asserted 40 prior art grounds that it contends invalidate the asserted claims, only a few of which relate to the prior art Precision system and Fang application.  If the Court does not find claims 1 and 22 of the '842 patent indefinite, the validity of the claims based on prior art grounds, as well as other validity challenges, must be tried to the jury.

25

26

[10] Unlike WaveWriter Version 2, Precision can be programmed at frequencies of 1.5 kHz and above without modifying any source code.  (*See, e.g.*, D.N. 357-4 at 45:4-12.)

27

[11] These are all asserted claims except claims 1 and 22 of the '842 patent.

28

until after a device is implanted and the therapy is applied, whether the claims are infringed. This is the essence of indefiniteness under the governing law.

The cases cited by Nevro at the hearing, discussing claims using the term "effective amount" or similar wording, do not warrant disturbing the Court's tentative ruling on this issue. In each of those cases, the question was whether a person of ordinary skill in the art could, with reasonable certainty, determine an "effective amount" (*i.e.*, a quantity) of the compounds in question to administer, even though a specific range was not specified in the claims. There, the "effective amount" referred to a dosage that was known, or could readily be determined, *ex ante*; no particular effect on any given patient was required by the claims. Here, by contrast, the claims affirmatively recite the "effective amount" *(i.e.*, the signal parameters) but go further to require an actual result—the absence of paresthesia. Unlike the "effective amount" cases, it is undisputed that a person of ordinary skill would not be able to determine the result of the claimed signal parameters—*i.e.*, whether a patient will feel paresthesia—until the therapy is provided. This violates the public notice function of patents and results in indefiniteness.

## A. The Court's Tentative Ruling That The "Paresthesia-Free" Claims Are Indefinite Is Correct

One of ordinary skill could not determine the scope of the "paresthesia-free" claims because whether a signal with a given set of parameters will induce paresthesia can be determined, if at all, only on a patient-by-patient basis *after* delivering the signal. As BSC showed at the July 6, 2018 hearing, the same signal may satisfy the claims or not, depending on the patient:




Nevro has admitted that no set of signal parameters is inherently paresthesia-free. For example, during the prosecution of the '472 patent, James Thacker (named inventor of six of the

asserted patents) reported that some patients do experience paresthesia at high frequencies:

> I have encountered ***patients who report feeling a tingling sensation (paresthesia) while receiving spinal cord stimulation at frequencies above, 2,500 Hz***. … The specific details of the sensations reported by the patients varied from patient to patient, and in some instances, varied depending on the signal frequency, as indicated in the Paresthesia Test Worksheets.  However, t***he results of the tests show that patients can feel paresthesias at frequencies above 2,500 Hz (e.g., the tested frequencies of 3,000 Hz, 5000 Hz, and 7,000 Hz)***.

(D.N. 398-13 at NEVRO_BSXCA0047542-43.)  In characterizing this declaration, Nevro explained in another document "that high frequency stimulation, such as claimed by applicant, may or may not cause paresthesia, and thus ***it would not be inherent*** that high frequency stimulation would necessarily achieve pain relief without paresthesia being produced."  (D.N. 428-3 at NEVRO_ BSXCA0047529).  When distinguishing prior art, Nevro admitted that "the term 'high frequency' stimulation (as used in certain references), ***cannot inherently mean therapy without paresthesia***."  (D.N. 358-2 at NEVRO_BSXCA0001767-68.)  These admissions establish that specific parameters resulting in paresthesia-free therapy do not exist, regardless of the state of knowledge in the art or the amount of experimentation conducted.  Because the claimed signals are not inherently paresthesia-free, the only way to determine whether the paresthesia-free limitations are met is to make an independent determination for each patient, ***after*** delivering the therapy.

*Halliburton Energy Servs., Inc. v. M-I LLC*, which involved a claimed "method for conducting a drilling operation in a subterranean formation using a *fragile gel* drilling fluid," 514 F.3d 1244, 1246 (Fed. Cir. 2008) (emphasis in original), is on point.  Although the specification provided an express definition of "fragile gel," the Federal Circuit held that the term was still indefinite, noting that "[t]he fact that Halliburton can articulate a definition supported by the specification … does not end the inquiry."  *Id*. at 1251.  The definition required that "the fragile gel is capable of suspending drill cuttings," but "an artisan would not know from one well to the next whether a certain drilling fluid was within the scope of the claims" because " a given fluid might be adequate to suspend drill cuttings in some formations and/or well configurations, whereas in others it would not be."  *Id*. at 1254-55.  Because infringement could not be determined until after the gel was used, the claim was indefinite:

BSC'S SUPPLEMENTAL CLAIM CONSTR. & MSJ BRIEF                    Case No. 3:16-cv-06830 VC

> When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite.

*Id*. at 1255.

The *Halliburton* court cited *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003), which involved a similar issue:  "[A] given embodiment would simultaneously infringe and not infringe the claims, depending on the particular bacteria chosen for analysis.  Thus, one of skill would not know from one bacterium to the next whether a particular composition standing alone is within the claim scope or not."  *Id*. at 1384.  Simply put, "[a] claim that fails to provide sufficient notice to one skilled in the art so that he can avoid infringement is invalid on the ground of indefiniteness under § 112, ¶ 2."  *STX, Inc. v. Brine, Inc.*, 37 F. Supp. 2d 740, 754 (D. Md. 1999), *aff'd sub nom. STX, LLC v. Brine, Inc.*, 211 F.3d 588 (Fed. Cir. 2000), and *aff'd*, 232 F.3d 915 (Fed. Cir. 2000) (citations omitted).  "The notion that one reasonably skilled in the art would have to infringe the patent claim in order to discern the boundaries of the claim is repugnant to long-standing principles of patent jurisprudence."  *Id*. at 755.[12]

Both *Halliburton* and *Geneva* were decided before the Supreme Court (in *Nautilus*) set aside the more lenient indefiniteness standard previously applied by the Federal Circuit—*i.e*., whether the claim was "insolubly ambiguous" or was "amenable to construction"—and unanimously adopted a more stringent standard, which requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention ***with reasonable certainty***."  134 S. Ct. at 2129.  The *Nautilus* Court held that "the

---

[12] Nevro's argument at the hearing—*i.e*., that achieving paresthesia-free therapy for a given patient is a matter of "routine testing" by adjusting the amplitude of stimulation until the patient reports that no paresthesia is felt (D.N. 427 at 31:8-32:19)—merely serves to highlight the problem.  As in *Halliburton* and *Geneva*, a potential infringer must try a given dosage with each patient to see if it produces paresthesia or not.  Otherwise, no amplitude adjustments would be needed to achieve paresthesia-free stimulation.  Moreover, Nevro has made contradictory statements on this point.  For example, Dr. Rosenberg explained at the technology tutorial that some patients are unable to report whether they have felt paresthesia or not.  (D.N. 421 at 27:13-20.)

Federal Circuit's formulation, which tolerates some ambiguous claims but not others, does not satisfy the statute's definiteness requirement." *Id*. at 2124. The Supreme Court continued: "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id*. at 2129 (citations and internal quotation marks and punctuation omitted).

Claim language that was found indefinite in pre-*Nautilus* cases such as *Halliburton* and *Geneva* are even more clearly indefinite under the stricter standard imposed by the Supreme Court. By the same token, pre-*Nautilus* cases finding claims not indefinite are of questionable precedential value. For example, the court in *Pfizer, Inc. v. Teva Pharma. USA, Inc.*, 855. F. Supp. 2d 286, 300 (D. N.J. 2012), a district court case cited by Nevro at the hearing, based its ruling that "a finding of indefiniteness is not warranted" on the legal premise that "[c]laims are considered indefinite when they are not amenable to construction or are insolubly ambiguous." *Id*. (citation and quotation marks omitted). Thus, *Pfizer* rested on a legal standard that was expressly rejected by the Supreme Court two years later.

Nevro's "paresthesia-free" limitations run afoul of the principle set forth in *Halliburton* and *Geneva* because the same set of signal parameters (frequency, amplitude and/or pulse width) may result in paresthesia in one patient and no paresthesia in another. *Geneva*, 349 F.3d at 1384 ("[A] given embodiment would simultaneously infringe and not infringe the claims, depending on the particular bacteria chosen for analysis").) In other words, the same signal "would simultaneously infringe and not infringe" and a potential infringer would not have "sufficient notice ... so that he can avoid infringement." *Id.*; *STX*, 37 F. Supp. 2d at 754. The asserted claims that contain a paresthesia-free limitation—*i.e.*, all of the asserted claims, except claims 1 and 22 of the '842 patent—should, therefore, be found invalid as indefinite.

**B.     Nevro's "Effective Amount" Cases Should Not Alter The Court's Tentative Conclusion That The "Paresthesia-Free" Claims Are Indefinite**

At the hearing, Nevro cited a number of pharmaceutical cases involving patent claims requiring the administration of an "effective amount" of an active ingredient. The issue in those

cases was whether the "effective amount" was sufficiently quantified or measurable. The claims were found to be not indefinite because the "effective amount" —a quantity or range of quantities, usually in milligrams—was set forth in the specification, was known in the literature, or could be determined by a person of skill in the art through ordinary (rather than undue) experimentation. None of Nevro's cases involved claims that required the absence of a particular physiological response (such as paresthesia), which could not be known in advance, regardless of the "amount" of treatment (or stimulation parameters) administered. Nevro's claims require a particular outcome—"paresthesia-free" therapy—not merely the administration of a certain quantity of treatment. Thus, cases that "endorse" the term "effective amount," as Nevro argued at the hearing (D.N. 427 at 27:3-21), are unpersuasive, as discussed in more detail below:

- *In re Halleck*, 422 F.2d 911, 912 (C.C.P.A. 1970), involved claims for "[a]n improved growth stimulating composition for animals which comprises … an effective amount of a peristalsis-regulating substance…." The claims did not require any particular outcome, such as a specific amount or type of growth. The examiner rejected the claims because they "failed to set out specifics regarding *proportions* of the substances to be used." *Id*. at 914. The court reversed, finding that "[t]hose skilled in the art will be able to determine from the written disclosure and its examples what an effective *amount* for growth stimulation is." *Id*. Here, there is no question as to the *amount* of treatment to be administered; this is set by the stimulation parameters recited in Nevro's claims and specification. But, Nevro's claims also require the absence of paresthesia, which cannot be known in advance from the written disclosure or any other source. Those claims are therefore indefinite.

- In *Takeda Pharm. Co. v. Mylan, Inc*., No. 13-CV-04001-LHK, 2014 WL 5862134, at *7 (N.D. Cal. Nov. 11, 2014), the claim at issue taught "[a] method of treating reflux … which comprises administering … an effective amount of [dexlansoprazole] …." The claims did not require any particular outcome from the treatment. The defendant asserted "that 'effective amount' is indefinite under *Nautilus* because the patent fails to convey with reasonable certainty what *quantities* of dexlansoprazole are effective for treating reflux esophagitis…." *Id*. The court held that the claim was not indefinite, finding that "a person of ordinary skill in

the art who was trying to administer dexlansoprazole to treat reflux esophagitis would have known of other [related compounds] for treating the same disease, and would also have known of the dosing information in the scientific literature…. Overall, [the plaintiff's] literature indicates that a person of ordinary skill would have known ***proper dosing ranges*** for closely related compounds." *Id*. at 12.  Again, in the present case, there is no question as to the proper dosing ranges; these are the ranges for the stimulation parameters recited in Nevro's claims and specification.  But, Nevro's claims also require the absence of paresthesia, which cannot be known in advance from the scientific literature or any other source.  Those claims are therefore indefinite.

- In *Pfizer, Inc. v. Teva Pharma. USA, Inc*., 855. F. Supp. 2d 286, 289, 299 (D. N.J. 2012), the claims at issue involved administering an active ingredient to treat an overactive bladder with "reduced undesirable side effects."  No one argued that a reduction in side effects would not occur following the administration of the active ingredient—the parties knew that ***some reduction*** would happen.  Rather, "Defendants contend[ed] that the term is indefinite because it is unclear as to the ***amount of reduction*** required and whether the reduction must be to the number of side effects, to the degree of side effects, or both." *Id*. at 299.  The court disagreed, finding that "Plaintiffs' proposed construction does provide a clear point of comparison for the 'reduced side effects,' in that they are reduced in comparison to the immediate release formulation of the invention." *Id*.  Thus, a reduction in side effects was known to occur; the only question was by how much.  In the present case, by contrast, Nevro's claims require the absence of paresthesia, but this may or may not occur, and whether it does cannot be determined in advance.  Nevro's claims are therefore indefinite.

- In *Horizon Pharma Ireland Ltd. v. Actavis Labs., UT, Inc*., Nos. 1:15-cv-07742-NLH-AMD, 2016 WL 4432681 at *5 (D.N.J Aug. 17, 2016), the claim at issue taught "[a] topical formulation … administered twice daily, to thereby effectively treat pain."  As with *Pfizer*, no one argued that pain relief would not occur following the administration of the drug—the parties knew that pain relief would happen.  Rather, the defendant "argue[d] that the term ['effectively treat pain'] is inherently subjective and therefore indefinite. *Id*.  The question

18

was how to measure the pain relief, not whether it would happen, and the court held the claim was not indefinite, "constru[ing] the term to mean 'effectively treat pain as **measured** by the WOMAC scale." *Id.* In the present case, BSC does not contend that there is no scale by which the presence or absence of paresthesia can be measured; rather, Nevro's claims expressly require the absence of paresthesia, which—regardless of how it is measured—cannot be known in advance. Those claims are indefinite.

In addition to these cases, Nevro also relies on *Geneva*, 349 F.3d 1373, discussed above, which involved claims requiring an "effective amount" of amoxycillin for treating bacterial infections. *Id.* at 1384. Although the court found that the term "effective amount" did not render the claims indefinite, it reached this result only after finding that a construction proposed by the patentee would have been indefinite and rejecting that construction. Specifically, in an attempt to avoid invalidation by an earlier patent that claimed a particular dosage range, "GSK seeks to read more into these claim terms to make the dosage range depend on the particular antibiotic and bacteria." *Id.* In other words, the patentee's construction required that the composition actually treat a particular bacterial infection rather than simply recite a range amount. The court found that "[t]his reading of the claim is indefinite. A claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not." *Id.* Specifically:

> By GSK's proposed construction, a formulation (including AUGMENTIN®) *might infringe or not depending on its usage in changing circumstances*. In other words, a given embodiment would simultaneously infringe and not infringe the claims, depending on the particular bacteria chosen for analysis. Thus, one of skill would not know from one bacterium to the next whether a particular composition standing alone is within the claim scope or not.

*Id.* at 1384. For this reason, the Geneva court rejected the patentee's proposed construction and found the claims to be invalid over the earlier patent. *Id.*

In sum, Nevro's cases—with the exception of *Geneva*—are categorically different from the present case. The question in those cases was whether "effective amount" rendered the claims indefinite because the specific amounts to be administered were not claimed; the claims were not indefinite because the amounts were ascertainable with reasonable certainty. Here, Nevro's claims

19

already define the specific ranges—*i.e.*, the "amount"—of stimulation to administer, but that does not inform a person of ordinary skill whether that stimulation will satisfy the paresthesia-free limitations.  Indeed, a physician may deliver stimulation in the claimed parameter ranges with the goal of avoiding paresthesia, but she might also deliver the ***same stimulation*** with the goal of ***inducing*** paresthesia.  These limitations thus present an indefiniteness problem so similar to the one in *Geneva* that the Federal Circuit's analysis can be applied to this case almost verbatim:

> By [Nevro's] proposed construction, a [stimulation] might infringe or not depending on its usage in changing circumstances.  In other words, a given embodiment would simultaneously infringe and not infringe the claims, depending on the particular [patient] chosen for analysis.  Thus, one of skill would not know from one [patient] to the next whether a particular [stimulation] standing alone is within the claim scope or not.

*Geneva*, 349 F.3d at 1384.  According to the Federal Circuit, "[t]hat is the epitome of indefiniteness."  *Id*.

## V.    CONCLUSION

For the foregoing reasons, BSC respectfully submits that the Court should grant summary judgment in BSC's favor on all of Nevro's claims by: (1) ruling that the "configured to" claim terms render claims 7, 12, 35, 27 and 58 of the '533 patent, claim 55 of the '125 patent, claims 1 and 22 of the '842 patent, claims 5 and 34 of the '357 patent, and claim 18 of the '988 patent indefinite and therefore invalid; (2) granting summary judgment that WaveWriter Version 2 does not infringe claims 1 and 22 of the '842 patent; (3) granting summary judgment that Precision with MultiWave does not infringe claims 1 and 22 of the '842 patent or, in the alternative, that those claims are invalidated by the 2005 Precision system; and (4) instituting its tentative ruling that the "paresthesia-free" limitations render all of the asserted claims, except claims 1 and 22 of the '842 patent, indefinite and therefore invalid.

Dated:  July 11, 2018                    ARNOLD & PORTER KAYE SCHOLER LLP


                                          By:  */s/ Matthew M. Wolf*
                                               Matthew M. Wolf

                                          Attorney for Defendants
                                          BOSTON SCIENTIFIC CORPORATION and
                                          BOSTON SCIENTIFIC NEUROMODULATION
                                          CORPORATION