1    MICHAEL A. JACOBS (CA SBN 111664)
     MJacobs@mofo.com
2    ARTURO J. GONZALEZ (CA SBN 121490)
     AGonzalez@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, California  94105-2482
     Telephone: 415.268.7000
5    Facsimile: 415.268.7522

6    KENNETH A. KUWAYTI (CA SBN 145384)
     KKuwayti@mofo.com
7    ERIC C. PAI (CA SBN 247604)
     EPai@mofo.com
8    MORRISON & FOERSTER LLP
     755 Page Mill Road
9    Palo Alto, California  94304-1018
     Telephone: 650.813.5600
10   Facsimile: 650.494.0794

11   Attorneys for Plaintiff
     NEVRO CORP.

12

13                   UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16

17   NEVRO CORP.,                          Case No.   3:16-cv-06830-VC-MEJ

18                       Plaintiff,         **NEVRO'S SUPPLEMENTAL
                                            BRIEF ON SUMMARY
19          v.                              JUDGMENT**

20   BOSTON SCIENTIFIC CORPORATION and      Ctrm:    4, 17th Floor
     BOSTON SCIENTIFIC NEUROMODULATION      Judge:   Hon. Vince Chhabria
21   CORPORATION,
                                            Trial Date:  November 5, 2018
22                       Defendants.

23

24

25

26
              **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**
27

28

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ............................................................................................... 1

I.     THE PARESTHESIA-FREE CLAIM TERMS ARE NOT INDEFINITE ....................... 1

     A.     Clear and Convincing Evidence Precludes Summary Judgment .......................... 2

         1.     The Intrinsic Record Demonstrates the Scope of Paresthesia-Free
Limitations with Reasonable Certainty ...................................................... 2

         2.     The Unrebutted Extrinsic Evidence Precludes Summary Judgment .......... 3

             a.     Both Parties' Experts Agree That Programming a System to
Deliver Paresthesia-Free Therapy is Routine ................................. 3

             b.     The Entire SCS Industry, Including BSC and All of Nevro's
Competitors, Understands the Meaning of Paresthesia-Free ......... 5

     B.     BSC's Indefiniteness Arguments Misstate or Misapply Controlling Law ............. 6

II.     THE "CONFIGURED TO" LIMITATION IS NOT INDEFINITE ................................ 10

     A.     The Intrinsic Evidence Shows the "Configured to" Claims Are Not
Indefinite ......................................................................................................... 12

     B.     Extrinsic Evidence Confirms the "Configured to" Claims Are Not
Indefinite ......................................................................................................... 15

III.    PRECISION WITH MULTIWAVE INFRINGES CLAIMS 1, 22 OF '842
PATENT ...................................................................................................................... 16

     A.     The Precision with MultiWave System Infringes Claim 1 of the '842 Patent ...... 16

         1.     Claim 1, Preamble: "A spinal cord modulation system,
comprising:" .......................................................................................... 16

         2.     Claim 1, [a]: "a signal generator configured to generate a therapy
signal having a frequency of 10 kHz, an amplitude up to 6 mA, and
pulses having a pulse width between 30 microseconds and 35
microseconds" ........................................................................................ 16

         3.     Claim 1, [b]: "an implantable signal delivery device electrically
coupleable to the signal generator and configured to be implanted
within a patient's epidural space to deliver the therapy signal from
the signal generator to the patient's spinal cord." ................................... 18

     B.     The Precision with MultiWave System Infringes Claim 22 of the '842
Patent ............................................................................................................. 19

         1.     Claim 22, Preamble: "A spinal cord modulation system,
comprising: ............................................................................................ 19

         2.     Claim 22, [a]: "a signal generator configured to generate a therapy
signal in accordance with one or more therapy signal parameters" ......... 19

         3.     Claim 22, [b]: "an implantable signal delivery device configured to
electrically couple to the signal generator and configured to be
implanted in the patient's epidural space to deliver the therapy
signal to the patient's spinal cord" ......................................................... 19

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

    4.    Claim 22, [c]: "a programmer configured to be in wireless communication with the signal generator and configured to modify at least one of the one or more therapy signal parameters in the signal generator" .......................................................................... 20

5

    5.    Claim 22, [d]: "wherein the one or more therapy signal parameters include, for at least a portion of the therapy signal, (a) a frequency of 10 kHz, (b) an amplitude up to 6 mA, and (c) pulses with a pulse width between 30 microseconds and 35 microseconds." .......................... 20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Amgen Inc. v. Sandoz Inc.*,
   No. 14-CV-04741-RS, 2016 WL 4137563 (N.D. Cal. Aug. 4, 2016) ..................................3, 6

5

6

*Animal Care Sys., Inc. v. Hydropac/Lab Prods., Inc.*,
   No. 13-CV-00143-MSK-BNB, 2015 U.S. Dist. LEXIS 15987
   (D. Colo. Feb. 9, 2015) .................................................................................................11

7

8

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)........................................................................................1

9

10

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374 (Fed. Cir. 2015)................................................................................ *passim*

11

*Cap Exp., Ltd. Liab. Co. v. Zinus, Inc.*,
   722 F. App'x 1004 (Fed. Cir. 2018) ................................................................................10

12

13

*Charleston Med. Therapeutics, Inc. v. AstraZeneca Pharm. LP*,
   No. 2013-CV-2078-RMC, 2014 WL 12607083
   (D.S.C. Nov. 25, 2014) ...................................................................................................7

14

15

*Compare Ormco Corp. v. Align Tech., Inc.*,
   609 F. Supp. 2d 1057, 1072 (C.D. Cal. 2009) ...............................................................18

16

17

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*,
   291 F.3d 1317 (Fed. Cir. 2002)........................................................................................9

18

19

*Crane Co. v. Sandenvendo Am., Inc.*,
   No. 2:07-CV-42-CE, 2009 WL 1586704
   (E.D. Tex. June 5, 2009) .................................................................................................7

20

21

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)........................................................................................7

22

23

*Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*,
   279 F.3d 1022 (Fed. Cir. 2002)......................................................................................14

24

25

*Gentry Gallery, Inc. v. Berkline Corp.*,
   134 F.3d 1473 (Fed. Cir. 1998)........................................................................................9

26

*Halliburton Energy Servs.,Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)........................................................................................9

27

28

*In re Giannelli*,
   739 F.3d 1375 (Fed. Cir. 2014)......................................................................................13

*In re Maxim Integrated Prods., Inc.*,
  No. 12-244, 2014 U.S. Dist. LEXIS 100448
  (W.D. Pa. July 23, 2014) ........................................................................................... 11

*In re Swinehart*,
  439 F.2d 210 (C.C.P.A. 1971) .................................................................................. 10

*Immunomedics, Inc. v. Roger Williams Med. Ctr.*,
  No. CV 15-4526 (JLL), 2017 WL 788122
  (D.N.J. Feb. 28, 2017) ................................................................................................ 5

*Invensys Sys., Inc. v. Emerson Elec. Co.*,
  63 F. Supp. 3d 663 (E.D. Tex. 2014) ....................................................................... 10

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005) .................................................................................. 8

*Juniper Networks, Inc. v. Toshiba Am., Inc.*,
  No. 2-05-CV-479 (TJW), 2007 U.S. Dist. LEXIS 29660
  (E.D. Tex. Apr. 23, 2007) ........................................................................................ 14

*Kaneka Corp. v. Zhejiang Med. Co.*,
  No. CV 11-02389 SJO, 2018 U.S. Dist. LEXIS 82023
  (C.D. Cal. Apr. 5, 2018) ............................................................................................. 8

*King Pharm., Inc. v. Purdue Pharma, L.P.*,
  718 F. Supp. 2d 703 (W.D. Va. 2010) ....................................................................... 7

*Largan Precision Co v. Genius Elec. Optical Co.*,
  No. 13-cv-02502-JD, 2014 U.S. Dist. LEXIS 149623
  (N.D. Cal. Oct. 20, 2014) ....................................................................................... 8, 9

*Life Techs. Corp. v. Biosearch Techs., Inc.*,
  No. 2:09-CV-283-TJW-CE, 2011 WL 4431854
  (E.D. Tex. Sept. 22, 2011) .......................................................................................... 4

*Lifescan Scotland, Inc. v. Shasta Techs., LLC*,
  No. 11-CV-04494-WHO, 2016 U.S. Dist. LEXIS 190243
  (N.D. Cal. Mar. 8, 2016) ......................................................................................... 1, 8

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
  449 F.3d 1209 (Fed. Cir. 2006) ........................................................................... 17, 18

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  720 F. App'x 623 (Fed. Cir. 2018) ........................................................................ 5, 15

*MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*,
  No. 13-303-LPS, 2015 U.S. Dist. LEXIS 84582
  (D. Del. June 30, 2015) ............................................................................................ 10

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
271 F. Supp. 3d 990 (E.D. Wis. 2017)................................................................10

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
857 F.3d 858 (Fed. Cir. 2017)...........................................................................5

*Nautilus, Inc. v. Biosig Intruments, Inc.*,
739 F.3d 1375 (Fed. Cir. 2014)..........................................................................11

*Norse v. City of Santa Cruz*,
629 F.3d 966 (9th Cir. 2010)............................................................................100

*Ormco Corp. v. Align Tech., Inc.*,
609 F. Supp. 2d 1057 (C.D. Cal. 2009) ............................................................18

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986)...........................................................................8

*Palmetto Pharm. LLC v. AstraZeneca Pharm. LP*,
No. 2:11-807-SB, 2015 WL 7721822
(D.S.C. Nov. 30, 2015), *aff'd*, 671 F. App'x 788 (Fed. Cir. 2016)............................3

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
855 F. Supp. 2d 286 (D.N.J. 2012) .....................................................................6

*Prostrakan, Inc. v. Actavis Labs. UT, Inc.*,
No. 2-16-CU-0044-TWS-RSP, 2017 WL 3028876
(E.D. Tex. July 15, 2017)...................................................................................4

*Purdue Pharm. Prod. L.P. v. Actavis Elizabeth LLC*,
No. CV 12-5311 (JLL)(JAD), 2015 WL 5032650
(D.N.J. Aug. 25, 2015)......................................................................................6

*Purdue Pharma L.P. v. Amneal Pharms., LLC*,
No. 04-Md-1603 (SHS), 2015 U.S. Dist. LEXIS 45967
(S.D.N.Y. Apr. 8, 2015).....................................................................................12

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*,
824 F.3d 999 (Fed. Cir. 2016)......................................................................12, 16

*Semmler v. Am. Honda Motor Co.*,
990 F. Supp. 967 (S.D. Ohio 1997) .....................................................................8

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)...........................................................................8

*Spansion, Inc. v. Int'l Trade Comm'n*,
629 F.3d 1331 (Fed. Cir. 2010)...........................................................................8

*STX, Inc. v. Brine, Inc.*,
    37 F. Supp. 2d 740 (D. Md. 1999) ............................................................................8

*Takeda Pharm. Co. v. Mylan Inc.*,
    No. 13-CV-04001-LHK, 2014 WL 5862134
    (N.D. Cal. Nov. 11, 2014)...................................................................................4, 7

*Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*,
    743 F.3d 1359 (Fed. Cir. 2014)................................................................................6

*Thomas Swan & Co. v. Finisar Corp.*,
    No. 2:13-CV-00178-JRG, 2014 U.S. Dist. LEXIS 86209
    (E.D. Tex. June 25, 2014) ......................................................................................12

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    No. 16-679-RGA, 2018 U.S. Dist. LEXIS 102055
    (D. Del. June 19, 2018) ..........................................................................................11

**Statutes**

35 U.S.C. § 271 ....................................................................................................16, 17, 18

**TABLE OF ABBREVIATIONS**

| Abbreviation / ECF No. | Description |
|---|---|
| '102 patent | U.S. Patent No. 8,359,102 (ECF No. 343-2) |
| '533 patent | U.S. Patent No. 8,712,533 (ECF No. 343-3) |
| '472 patent | U.S. Patent No. 8,768,472 (ECF No. 343-4) |
| '988 patent | U.S. Patent No. 8,792,988 (ECF No. 343-5) |
| '125 patent | U.S. Patent No. 9,327,125 (ECF No. 343-6) |
| '357 patent | U.S. Patent No. 9,333,357 (ECF No. 343-7) |
| '842 patent | U.S. Patent No. 9,480,842 (ECF No. 343-8) |
| Asserted Claims | · U.S. Patent No. 8,712,533: claims 7, 12, 35, 37, 58<br><br>· U.S. Patent No. 9,327,125: claims 18, 34, 55<br><br>· U.S. Patent No. 8,359,102: claims 11, 21, 23<br><br>· U.S. Patent No. 9,480,842: claims 1, 22<br><br>· U.S. Patent No. 9,333,357: claims 5, 34<br><br>· U.S. Patent No. 8,792,988: claim 18<br><br>· U.S. Patent No. 8,768,472: claims 1, 5 |
| Asserted Patents | U.S. Patent Nos. 8,359,102, 8,712,533, 8,792,988, 9,327,125, 9,333,357, 9,480,842, and U.S. Patent No. 8,768,472. |
| Fung Decl. | Declaration of Nicholas Fung in Support of Nevro's Supplemental Brief on Summary Adjudication |
| Pless Decl. | Declaration of Ben Pless in Support of Nevro's Supplemental Brief on Summary Adjudication |
| Rosenberg Supp. Decl. | Declaration of William Rosenberg in Support of Nevro's Supplemental Brief on Summary Adjudication |
| ECF No. 341-4 | Declaration of Ben Pless in Support of Nevro's Motion for Summary Adjudication |
| ECF No. 341-5 | Deposition transcript of BSC witness Rafael Carbunaru, dated November 15, 2017 (excerpts) |
| ECF No. 341-10 | Deposition transcript of BSC witness Rafael Carbunaru, dated May 18, 2017 (excerpts) |
| ECF No. 341-16 | Boston Scientific's Second Supplemental Responses and Objections to Nevro's First Set of Interrogatory Requests (1-8) (excerpts) |
| ECF No. 341-19 | Deposition transcript of Richard T. Mihran, dated March 12, 2018 (excerpts) |

| Abbreviation / ECF No. | Description |
|---|---|
| ECF No. 341-27 | Correspondence from Boston Scientific to the FDA, dated December 1, 2015 (BSC-NVRO_00019702 -19703) |
| ECF No. 343-11 | SENZA 24-month study results (NEVRO_BSXCA0057245 – 57255) |
| ECF No. 343-13 | Summary of Safety and Effectiveness Data (Ex. 3128 to the Deposition Of David Caraway) |
| ECF No. 343-39 | Precision SCS with MultiWave Clinician Manual (BSC-NVRO_00000034 – 101) |
| ECF No. 357-4 | Boston Scientific's Responsive Claim Construction Brief, Opposition to Nevro's Motion for Summary Judgment and Opening Motion for Summary Judgment |
| ECF No. 358-68 | Deposition transcript of Nevro Expert William S. Rosenberg, dated March 21, 2018 (excerpts) |
| ECF No. 372-4 | Nevro's Reply in Support of Nevro's Motion for Summary Adjudication and Opposition to BSC's Motion for Summary Judgment |
| ECF No. 372-8 | Opening Expert Report of William S. Rosenberg, dated January 18, 2018 |
| ECF No. 372-10 | Opening Expert Report of Ben Pless, dated January 18, 2018 |
| ECF No. 373-3 | Boston Scientific's Supplemental Responses and Objections to Nevro's First Set of Interrogatory Requests (1-8) (excerpts) |
| ECF No. 373-7 | Deposition transcript of BSC witness Richard T. Mihran, dated March 12, 2018 (excerpts) |
| ECF No. 373-9 | Deposition transcript of BSC witness Jim Cassidy, dated May 17, 2017 (excerpts) |
| ECF No. 373-19 | Email correspondence dated February 15, 2016 (BSC-NVRO_00720938 – 720940) |
| ECF No. 379-15 | U.S. Patent 9,339,655 (NEVRO_BSXCA0094055 -94076) |
| ECF No. 379-18 | Deposition transcript of BSC Expert Adam Lipson, dated April 12, 2018 (excerpts) |
| ECF No. 397-3 | Boston Scientific's Reply in Support of Motion for Summary Judgment |
| ECF No. 422 | Tentative Ruling dated July 5, 2018 |

I.    **THE PARESTHESIA-FREE CLAIM TERMS ARE NOT INDEFINITE**

A finding of indefiniteness requires clear and convincing evidence that a skilled artisan cannot understand the scope of the claim with reasonable certainty. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) (finding no indefiniteness on remand). Determining indefiniteness requires examining the intrinsic and extrinsic evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (reversing trial court indefiniteness determination after considering intrinsic and extrinsic evidence *de novo*). "[T]he test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement." *Lifescan Scotland, Ltd. v. Shasta Techs., LLC*, 2016 U.S. Dist. LEXIS 190243, at *30 n.3 (N.D. Cal. Mar. 8, 2016).

Far from supporting BSC, the undisputed evidence—including the testimony of BSC's own experts—shows that a skilled artisan would have understood the scope of Nevro's "paresthesia-free" claims with reasonable certainty. *BASF*, 875 F.3d at 1365-66.[1] Paresthesia has been a key concept in SCS from its inception. Before Nevro's invention, SCS therapies modulated the spinal cord in a manner similar to drugs by utilizing electrical doses of low-frequencies and higher, paresthesia-generating amplitudes.[2] To achieve paresthesia, "it was a routine process in SCS to determine a patient's sensory perception threshold, which involved gradually turning up the power (amplitude) of the SCS signal until the patient reported a sensation. This process was done in the same manner regardless of frequency." (ECF 357-4 at 46 (citing Rosenberg Tr. at 126:2-128:11).) This is not disputed; BSC's brief adopted Nevro's expert testimony on this point. (*Id.*)

Nevro's invention revolutionized SCS pain treatments. For the first time, SCS therapies

---

[1] The claim limitations recite this concept in various ways, such as "non-paresthesia-producing [therapy/spinal modulation] signal," ('533 patent), "does not create paresthesia" ('102 patent), "without generating [the sensation of] paresthesia" ('988 and '357 patents), "paresthesia-free therapy signal" ('125 patent) and "without relying on paresthesia" ('472 patent). These are collectively referred to in this brief as "paresthesia-free" limitations.

[2] In pharmaceuticals, a chemical dosage is used to achieve a desired medical effect (e.g., an effective amount of opioids to treat pain). Similarly, in SCS, electrical dosage is used to achieve a desired medical effect (e.g., an effective amount of frequency and amplitude to treat pain). In both cases, an effective dosage is required. BSC and others in the industry commonly analogizes SCS therapy to medication dosages.

1   used high-frequency and low-amplitude dosages to provide pain relief without crossing the

2   sensory threshold to create paresthesia.  As the intrinsic evidence shows, the result was an entirely

3   different process for implanting and programming an SCS system, utilizing anatomical lead

4   placement instead of paresthesia mapping thus eliminating the need to wake a patient.  (*See* '533

5   patent at 6:34-7:5.)  To perform Nevro's high-frequency therapy, practitioners intentionally set

6   the signal's amplitude at a level below the sensory threshold such that paresthesia is not

7   experienced.  (Rosenberg Supp. Decl. Ex. A, ¶ 7.)  Critically, BSC's expert Dr. Lipson agrees that

8   obtaining a paresthesia-free signal is a routine process that can be accomplished in minutes at any

9   of Nevro's claimed frequencies.  And BSC's own patents, products, and medical studies are rife

10  with references to paresthesia-free therapy signals.  BSC cannot dispute that persons of skill in

11  the art knew the meaning of the term in the context of Nevro's invention and how to create and

12  identify the presence or absence of paresthesia in patients when administering or designing

13  systems to administer SCS therapies.

14      **A.    Clear and Convincing Evidence Precludes Summary Judgment.**

15          **1.    The Intrinsic Record Demonstrates the Scope of Paresthesia-Free
                    Limitations with Reasonable Certainty.**

16

17      The patent specifications clearly inform the scope of the paresthesia-free limitations with

18  reasonable certainty.  The specifications contrast prior SCS treatments that rely on paresthesia

19  with the disclosed therapy that is achieved without paresthesia.  (*See* '533 patent at 6:34-7:5

20  (describing testing in which "[a]fter the patient completed the standard SCS treatment . . . the

21  patient then received modulation in accordance with the presently disclosed techniques"); *see*

22  *also id.* at 3:16-19; 10:48-51; 21:29-34; 24:15-20.)  The specifications also describe how a

23  practitioner can determine the paresthesia threshold for particular patients and how Nevro's high-

24  frequency paresthesia-free treatment can be achieved.  (*Id.* at 4:43-50, 5:16-20, 6:51-7:5, 9:6-15;

25  19:54-57, Fig. 6C.)  The specifications make clear that frequency and paresthesia-free are distinct

26  concepts and that paresthesia-free therapy can be achieved at each of the claimed frequency

27  ranges.  (*Id.* at 10:16-51.)  The specifications explain that Nevro's therapy can be achieved by

28  applying a claimed frequency and modulating the signal amplitude below the threshold at which

1   the patient experiences paresthesia.  (*Id.* at 10:16-51, 12:55-66, Fig. 6C.)  The specifications'

2   guidance for achieving paresthesia-free therapy using specified frequency and amplitude dosages

3   defeats indefiniteness under the prevailing law.  *Palmetto Pharm. LLC v. AstraZeneca Pharm.*

4   *LP*, 2015 WL 7721822, at *6 (D.S.C. Nov. 30, 2015), *aff'd*, 671 F. App'x 788 (Fed. Cir. 2016)

5   (finding "amount effective" not indefinite because "specification discloses certain dosing ratios"

6   for similar treatments); *Amgen Inc. v. Sandoz Inc.*, 2016 WL 4137563, at *5 (N.D. Cal. Aug. 4,

7   2016) (claim for dosages in ranges not indefinite because "a skilled artisan is not without any

8   guidance to figure out how much [] to administer").

9                **2.**      **The Unrebutted Extrinsic Evidence Precludes Summary Judgment.**

10                     **a.**      **Both Parties' Experts Agree That Programming a System to**
                                   **Deliver Paresthesia-Free Therapy is Routine.**

11

12          The parties' experts agree that a skilled artisan would understand how to program a signal

13   to be paresthesia-free and that this process is routine.  Nevro's expert Dr. Rosenberg opined that

14   determining the "sensory threshold at which a patient experiences paresthesia is a routine part of

15   the procedure for implanting an SCS device and is one that a physician of ordinary skill in the art

16   is very familiar with" and that "[a]n SCS physician of ordinary skill in the art would be able to

17   determine the parameters for generating paresthesia-free therapy using the frequency and

18   amplitude ranges provided in the patents," including "frequencies between 1.5 kHz to 100 kHz."

19   (Rosenberg Suppl. Decl. Ex. A) ¶¶ 5-7; *see also* ECF. 358-68 at 126:7-19, 128:6-11.)  BSC

20   endorses this portion of Dr. Rosenberg's report, citing to it in its summary judgment briefing.

21   (ECF 357-4 at 46.)  Dr. Rosenberg stated that this procedure "does not take long – normally from

22   seconds to minutes."  (Rosenberg Supp. Decl. Ex. A, ¶ 7.)

23          BSC's expert Dr. Lipson agrees and his testimony addresses the Court's concern that the

24   breadth of Nevro's claimed frequency ranges aggravates the perceived indefiniteness problem.

25   Dr. Lipson testified that, for any given frequency in the patented range, he could achieve a

26   paresthesia-free signal within minutes and that it takes only "[a] minute" to determine whether the

27   patient is sensing paresthesia, and at which parameters.  (Fung Decl. Ex 2, Lipson Dep. at 205:14-

28   19; *see also id.* at 302:13-303: 11 (describing routine "iterative process" to determine parameters

for treatment).)  Dr. Lipson testified that because physicians in the field are familiar with the "routine . . . iterative process of reprogramming a simulator," they would be able to successfully deliver "paresthesia-free therapy" at every parameter range in the patents.  (*Id.* at 305:20-309:21); *see Life Techs. Corp. v. Biosearch Techs., Inc.*, 2011 WL 4431854, at *13 (E.D. Tex. Sept. 22, 2011) (no indefiniteness where step was "routine and well known" and "skilled artisans knew how to" perform it).[3]

BSC's expert testimony "implicitly confirms that the terms at issue are ones whose scope is understood with reasonable certainty by relevant skilled artisans."  *BASF*, 875 F.3d at 1368.  Nevro's *method* claims are directed to achieving pain reduction without paresthesia by generating an SCS signal at: (1) high-frequencies that provide pain relief and (2) an amplitude that does not cause paresthesia.  (*See, e.g.,* '988 patent, claim 18; '102 patent, claim 1.)  The undisputed expert testimony cited above shows that persons of skill understand the term "paresthesia-free therapy" and are well-versed in the iterative process to select—for any frequency—the amplitude that would provide it.  *See Prostrakan, Inc. v. Actavis Labs. UT, Inc.*, 2017 WL 3028876, at *11 (E.D. Tex. July 15, 2017) (finding no indefiniteness) (citing *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003) (stating term "is not ambiguous or indefinite, provided that a person of ordinary skill in the art could determine the specific amounts without undue experimentation.").[4]

Similarly, a typical *system* claim recites a spinal cord modulation system that generates an SCS signal with certain frequency and/or amplitude ranges and that is paresthesia-free.  (*See, e.g.,* '357 patent, claim 34; '533 patent, claim 7.)  The specifications make clear that to generate a paresthesia-free signal, the SCS system can be implemented in software, firmware, and hardware that is programmable to Nevro's high-frequency paresthesia-free parameters.  ('533 patent at

---

[3] In its decision on remand from *Nautilus*, the Federal Circuit noted that "reasonable certainty" is a "familiar standard" and confirmed that *Nautilus* "does not render all of the prior Federal Circuit and district court cases inapplicable."  *Biosig*, 783 F.3d at 1381 (citation omitted).

[4] *Cf. Takeda Pharm. Co. v. Mylan Inc.*, 2014 WL 5862134, at *9 (N.D. Cal. Nov. 11, 2014) (finding "effective amount" of drug definite based on knowledge of skilled artisan while criticizing reliance on evidence regarding "undue experimentation").

1   3:56-61; 5:22-31.)  A device that is programmable to those claimed parameters can generate

2   paresthesia-free therapy.  (*Id.* at 9:66-10:5 (systems can be programmed with parameters to

3   produce signals that will reduce pain "without causing paresthesia"); 10:35-47; Fig. 6C.)

4   Nothing about those boundaries is hard to discern.

5                       **b.**       **The Entire SCS Industry, Including BSC and All of Nevro's**

6                              **Competitors, Understands the Meaning of Paresthesia-Free.**

7       Usage of similar paresthesia-free language in other patents weighs against a finding of

8   indefiniteness here.  *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 871

9   (Fed. Cir. 2017) (no indefiniteness where "other patents" and "scientific literature" used similar

10  terms).  All of Nevro's major competitors, including BSC, have filed patent applications claiming

11  paresthesia-free treatment.  In those patent applications, each company uses terms essentially

12  identical to Nevro's paresthesia-free terms, further demonstrating that a person of skill in the art

13  would ascertain the scope of the paresthesia-free limitations with reasonable certainty.  (*See* ECF

14  379-15, U.S. Patent No. 9,339,655 (BSC patent for "treat[ing] chronic pain without causing

15  paresthesia"); U.S. Patent No. 8,380,318 (Spinal Modulation, Inc. patent to "reduce pain

16  sensations without generating sensations of paresthesia"); U.S. Patent Pub. No. 2018/0056073

17  (Medtronic application for SCS therapy that "reduces pain of the patient without producing

18  substantial paresthesia"); U.S. Patent No. 8,224,453 (St. Jude patent on low-frequency therapy

19  "without causing paresthesia").)

20       BSC's own conduct also defeats summary judgment.  "[E]vidence of a challenger's own

21  ability to apply a term without unreasonable uncertainty counts against an indefiniteness

22  contention."  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 720 F. App'x 623, 631 (Fed. Cir. 2018) (citations

23  omitted); *see also Immunomedics, Inc. v. Roger Williams Med. Ctr.*, 2017 WL 788122, at *6

24  (D.N.J. Feb. 28, 2017) (finding "effective" not indefinite where "Defendants themselves have

25  used the term 'effective' in various publications.").  In addition to referring to paresthesia-free

26  pain therapy in its patents, BSC knew precisely how to achieve paresthesia-based therapy and

27  paresthesia-free therapy in designing its own studies and products. ████████████████

28  ████████████████████████████████████████████████████████

1 ▬▬▬▬▬▬▬▬▬▬▬▬▬

2 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

3 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

4 ▬▬▬▬▬▬▬▬▬▬▬▬▬

5 ▬▬▬▬▬▬▬▬▬▬▬▬▬

6 ▬▬▬▬▬▬▬▬  These statements and actions by

7 BSC show that it is reasonably certain of the scope of Nevro's asserted claims.

8       **B.**    **BSC's Indefiniteness Arguments Misstate or Misapply Controlling Law.**

9       ***Variability Does Not Render the Paresthesia-Free Terms Indefinite.***  Claims that include

10 limitations requiring a particular patient response—such as administering or creating a

11 formulation for an "effective amount" of a drug—are ubiquitous in patents related to medical

12 treatments.  The paresthesia-free limitations at issue here are analogous to those "effective

13 amount" limitations. These functional limitations are not indefinite, even when the result is

14 potentially variable depending on circumstance or measurement.  *See, e.g.*, *Takeda Pharm. Co. v.*

15 *Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1367 n.3 (Fed. Cir. 2014) ("[T]he potential for

16 inconsistent results even within the same method of measurement . . . surely does not render a

17 claim indefinite.").  Thus, many cases have upheld limitations reciting an "effective" dosage for

18 treatment or for reducing side effects demonstrating that claims accounting for variability in

19 patient outcomes are not indefinite.  *See, e.g.*, *Amgen*, 2016 WL 4137563, at *5 (dosage ranges

20 "wide and variable depending on . . . the subject" not indefinite); *Takeda*, 2014 WL 5862134, at

21 *10 ("Even if the dosage range is broad, 'breadth is not indefiniteness.'"); *Purdue Pharm. Prod.*

22 *L.P. v. Actavis Elizabeth LLC*,  2015 WL 5032650, at *2 (D.N.J. Aug. 25, 2015) (finding range of

23 drug dosages for treatment "without residual sedative effects" is not indefinite); *Pfizer Inc. v.*

24 *Teva Pharm. USA, Inc.*, 855 F. Supp. 2d 286, 300 (D.N.J. 2012) (finding "reduced undesirable

25 side effects" not indefinite).

26       In life sciences, patent claims granting a monopoly over a broad range of values, such as

27 for drug dosages, are not just common but necessary.  Courts have recognized that terms that

28 encompass a range of values are "not a basis for finding a pharmaceutical patent indefinite

1   because setting out the amounts of active ingredient necessary for an 'effect' in every person is an

2   impossible task." *King Pharm., Inc. v. Purdue Pharma, L.P.*, 718 F. Supp. 2d 703, 718 (W.D.

3   Va. 2010); *see also Charleston Med. Therapeutics, Inc. v. AstraZeneca Pharm. LP*, 2014 WL

4   12607083, at *8 (D.S.C. Nov. 25, 2014) ("If the fact that a term could vary somewhat by

5   particular patient were enough to make it indefinite, very little in the medical field could be

6   patented.").  BSC did the same thing in the "without causing paresthesia" patent it filed after

7   Nevro, claiming an unbounded frequency "equal to or greater than 1 kHz" with a dependent claim

8   that adds an upper limit of 50 kHz.  (ECF. 379-15 at claims 1, 2.)  Here, Nevro did not invest

9   hundreds of millions of dollars in researching a range of high-frequency SCS parameters, disclose

10   that range in its patents, and commercialize a superior therapy at 10,000 Hz while continuing to

11   develop the commercialization of other claimed frequencies, only to have BSC avoid

12   infringement by practicing SCS at 9 kHz.  Nevro's competitors are free to innovate their own new

13   approach to SCS therapy (e.g., different waveforms).  As discussed above, all have now filed

14   patent applications with claims relating to paresthesia-free relief.

15        Unlike cases where the scope of a claim term turns on deeply subjective opinions, Nevro's

16   "paresthesia-free" claim limitations turn on a routine, readily-administered, binary test.  Courts

17   have upheld such claim limitations where, as here, they depend on objectively measurable human

18   perceptions, as opposed to mere subjective opinions.  *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844

19   F.3d 1370, 1376-77 (Fed. Cir. 2017) (artisans understand "visually negligible" with reasonable

20   certainty).  BSC's cases turned on completely subjective human opinions for which no objective

21   test existed and are inapposite.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347

22   (Fed. Cir. 2005) ("aesthetically pleasing" indefinite); *Crane Co. v. Sandenvendo Am., Inc.*, 2009

23   WL 1586704, at *13 (E.D. Tex. June 5, 2009) ("rapidly" indefinite for speed subjectivity); *STX,*

24   *Inc.v. Brine, Inc.*, 37 F. Supp. 2d at 755 (D. Md. 1999) ("easy handling," "improved playability,"

25   and "unique advantages" indefinite because no known test for such attributes); *Semmler v. Am.*

26   *Honda Motor Co.*, 990 F. Supp. 967, 974-75 (S.D. Ohio 1997) ("considerable fuel saving"

27   indefinite for extent subjectivity ).

28        ***Indefiniteness Is Not Determined By Whether Any Particular System or Use Will***

1   ***Infringe.*** BSC's argument that Nevro's patent claims are indefinite because a skilled artisan

2   would have no way of knowing in advance whether the signal generated by a system was

3   intended to produce paresthesia ignores the relevant legal standard. (ECF 357-4 at 22.) Under

4   *Nautilus*, the issue is whether a person of ordinary skill in the art can determine the scope of the

5   claim language with reasonable certainty—not whether an ordinary skilled artisan could predict

6   in a particular instance, without any testing, whether a device or use will infringe. *See Lifescan*

7   *Scotland*, 2016 U.S. Dist. LEXIS 190243, at *30 n.3. A long line of cases, both pre- and post-

8   *Nautilus*, distinguishes the definiteness inquiry from the infringement analysis. *See Spansion,*

9   *Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1346 (Fed. Cir. 2010) ("difficulty or complexity of the

10   infringement analysis does not necessarily speak to whether a claim is definite or not.");

11   *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005) (term not indefinite

12   merely because testing required to know whether limitation met); *Kaneka Corp. v. Zhejiang Med.*

13   *Co.*, 2018 U.S. Dist. LEXIS 82023, at *42 (C.D. Cal. Apr. 5, 2018) ("claim is not indefinite

14   merely because it is difficult to determine whether one's own product infringes") (citation

15   omitted); *Largan Precision Co v. Genius Elec. Optical Co*., 2014 U.S. Dist. LEXIS 149623, at

16   *24 (N.D. Cal. Oct. 20, 2014). As the Federal Circuit stated in considering a claim for a

17   wheelchair "dimensioned" to fit in a car: "That a particular chair on which the claims read may fit

18   within some automobiles and not others is of no moment." *Orthokinetics, Inc. v. Safety Travel*

19   *Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986).

20         BSC's argument is particularly flawed with respect to Nevro's method claims, the

21   performance of which allows for the practitioner to ascertain the sensory threshold and adjust the

22   programming parameters to deliver paresthesia-free therapy, a process which both sides' experts

23   testified is well understood.. Further, Nevro's clinical studies on high-frequency, paresthesia-free

24   therapy demonstrate that BSC's claims of patient variability are exaggerated. In Nevro's SENZA

25   study, every patient had paresthesia-free results. (*See* ECF 343-13 at 47; ECF 343-11 at

26   0057246.) BSC's reliance on the Thacker Declaration is misplaced; Thacker's testimony

27   confirms that testing for paresthesia is readily accomplished and routine. (ECF 397-3 at 19).

28         Even if the ability to ascertain infringement were the test for indefiniteness—which it is

1  not—BSC should not be heard to argue that it might accidentally stumble into infringement

2  unwittingly.  BSC is well-aware of what it means to deliver a paresthesia-free signal.

3

4

5

6  For

7  example, with Nevro's therapy, the lead placement is different, there is no paresthesia mapping,

8  and the onset of pain relief for the patient is delayed (in contrast to instant results of paresthesia).

9  (*See e.g.*, '533 patent at 9:47-65, 11:33-12:20, 17:43-18:61; Rosenberg Supp. Decl. Ex. A at  ¶

10  12.)  The reason BSC infringes is not by accident but rather because BSC set out to copy Nevro.

11  ***Definiteness is Not Dependent on Point of Novelty.***  At the hearing, BSC implied that the

12  indefiniteness analysis should be applied more strictly to limitations that define the point of

13  novelty.  Whether or not that principle might apply to this limitation, it is not supported by law.[5]

14  To be sure, some cases such as *Halliburton* still refer in dicta to early cases stating that the "vice

15  of functional claiming occurs 'when the inventor . . . uses conveniently functional language at the

16  exact point of novelty.'"  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed.

17  Cir. 2008).  But the *Halliburton* decision and others acknowledge that it was "later recognized

18  that there is nothing intrinsically wrong with using functional language in claims"—functional

19  claiming is no longer a "vice."  *Id.* (citation omitted).  Accordingly, *Halliburton* applied a familiar

20  test:  "[D]etermining whether that limitation is sufficiently definite is a difficult one that is highly

21  dependent on context (e.g., the disclosure in the specification and the knowledge of a person of

22  ordinary skill in the relevant art area.").  *Id.*  BSC has not cited, and Nevro has not found, any

23  case since Congress approved functional claiming which holds that a heightened indefiniteness

24

25  [5] BSC also endorsed an "omitted elements" test, which required patent claims to incorporate all elements that the inventor considered to be essential to his or her invention, citing *Gentry Gallery,*

26  *Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998).  The Federal Circuit later clarified that the purported "omitted elements" test has never been law.  *Cooper Cameron Corp.*

27  *v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002) (emphasizing that "we did not announce a new 'essential element' test mandating an inquiry into what an inventor considers to

28  be essential to his invention and requiring that the claims incorporate those elements.").

1   scrutiny applies to "point of novelty" claim limitations.  *See, e.g.*, *Milwaukee Elec. Tool Corp. v.*

2   *Snap-On Inc.*, 271 F. Supp. 3d 990, 1012 (E.D. Wis. 2017) (rejecting indefiniteness challenge to

3   functional term at point of novelty).  As recognized by *In re Swinehart*, 439 F.2d 210, 212

4   (C.C.P.A. 1971), cited approvingly by *Halliburton*:  "[W]e . . . recognized in the past the practical

5   necessity for the use of functional language. . . . We recognize that prior cases have hinted at a

6   possible distinction in this area depending on the criticality of the particular point at which such

7   language might appear. . . . [A]ny concern over the use of functional language at the so-called

8   'point of novelty' . . . is not only irrelevant, it is misplaced."  So, too, is BSC's argument.

9   **II.      THE "CONFIGURED TO" LIMITATION IS NOT INDEFINITE**

10          At the hearing, the Court raised the issue of whether "configured to" renders the claims

11   indefinite.  BSC has never contended the term is indefinite, much less sought summary judgment,

12   and the parties have not previously adduced evidence on indefiniteness or tested any such

13   evidence through discovery.  Nevro therefore objects to consideration of this issue.  *Norse v. City*

14   *of Santa Cruz*, 629 F.3d 966, 971-72 (9th Cir. 2010); *Cap Exp., Ltd. Liab. Co. v. Zinus, Inc.*, 722

15   F. App'x 1004, 1008 (Fed. Cir. 2018).

16          As discussed in prior briefing, "configured to" is a commonly used patent claim term that

17   the Federal Circuit and other courts have had no difficulty interpreting.  (ECF 372-4 at 3-4 (citing

18   cases).)  Other cases addressing indefiniteness challenges to this term have repeatedly found it

19   definite.  *See, e.g.*, *Invensys Sys., Inc. v. Emerson Elec. Co.*, 63 F. Supp. 3d 663, 670 (E.D. Tex.

20   2014) (holding "configured to" is "readily accessible to the jury" and rejecting indefiniteness

21   argument); *MAZ Encryption Techs., LLC v. Lenovo (United States) Inc.*, 2015 U.S. Dist. LEXIS

22   84582, at *32 (D. Del. June 30, 2015) (rejecting argument that "configured to . . . receive" was

23   indefinite and holding that this language did not turn the system claim into a method claim);

24   *Zimmer Surgical, Inc. v. Stryker Corp.*, 2018 U.S. Dist. LEXIS 102055, at *14-15 (D. Del. June

25   19, 2018) (rejecting argument that "configured to provide at least two different levels of suction"

26   was indefinite).[6]

27   _____

28   [6] Among all the cases holding "configured to" claims definite, we found one district court case
    that held indefinite a claim to "a bag forming apparatus designed and configured for placement at

1    Relying on this stability in the case law, over one million issued U.S. patents – about 10%

2   of all issued U.S. patents – have claims using "configured to." (Fung Decl. ¶ 3.) The percentage

3   is even higher for recent patents: over 40% of all U.S. patents issued since 2015 (seven months

4   after the *Nautilus* decision) have claims using "configured to." (Fung Decl. ¶¶ 4-5.)

5    BSC asserts that, under *Nautilus*, "if there are multiple ways of reasonably interpreting

6   'configured,' then we don't know what the right answer is and the claim would be indefinite."

7   (Hearing Tr. at 64:6-13.) BSC has it backwards. In *Nautilus*, the defendant indeed advocated a

8   test that would hold a claim indefinite if "readers could reasonably interpret the claim's scope

9   differently." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128 (2014). But the

10   Supreme Court declined to adopt that test, as numerous courts applying *Nautilus* have recognized.

11   *Id.* at 2129; *see also In re OxyContin Antitrust Litig.*, 2015 U.S. Dist. LEXIS 45967, at *67

12   (S.D.N.Y. Apr. 8, 2015) ("[A] patent is not indefinite merely because 'readers could reasonably

13   interpret the claim's scope differently.'") (citation omitted); *In re Maxim Integrated Prods., Inc.*,

14   2014 U.S. Dist. LEXIS 100448, at 28 n.2 (W.D. Pa. July 23, 2014) (the Court "never accepted

15   Nautilus' position that a claim subject to more than one reasonable interpretation must be

16   indefinite."); *Thomas Swan & Co. v. Finisar Corp.*, 2014 U.S. Dist. LEXIS 86209, at *34 (E.D.

17   Tex. June 25, 2014) ("[T]he Court declined to adopt a test that would render a claim invalid when

18   'readers could reasonably interpret the claim's scope differently.'") (citation omitted). The law

19   does not punt a decision between reasonable competing constructions into indefiniteness. Far

20   from tilting in favor of finding patents invalid on indefiniteness grounds, even after *Nautilus*, the

21   Federal Circuit has held that "[i]f, after applying all other available tools of claim construction, a

22   claim is ambiguous, it should be construed to preserve its validity." *Ruckus Wireless, Inc. v.*

23   *Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016).

24    Here, although the parties and the Court have proposed different formulations, the

25

26   _____

a clean side of a laboratory washroom." *Animal Care Sys., Inc. v. Hydropac/Lab Prods., Inc.*,
27   2015 U.S. Dist. LEXIS 15987, at *34 (D. Colo. Feb. 9, 2015). The court found that the patent
offered "no meaningful explanation" of any criteria for being placed "on the clean side of a
laboratory washroom, as opposed to some other location." *Id.* at *38-39. The case is an outlier
28   and does not apply here.

1   decision for the Court to make is well-defined.  The Court could decide, as BSC has proposed,

2   that "[n]o construction [is] necessary."  (ECF 357-4 at 6-7.)  If the Court finds that a construction

3   would aid in understanding the term in the context of the asserted claims, then the question is

4   where to place "configured to" on a spectrum: "capable of" is at one end of the spectrum;

5   "requires no further configuration" is at the other end.  Neither extreme is correct here.  The

6   parties agree that "capable of" is too broad – a sedan may have the hardware to be "capable of"

7   traveling at 200 mph, but only if it is heavily modified far beyond how it was designed and

8   made.  An umbrella is capable of holding groceries, but it is not configured to hold

9   groceries.  "Requires no further configuration" is too limiting – an umbrella is configured to

10  protect a person from the rain, but it does not actually protect a person from the rain until it is

11  opened.  "Designed to," "made to," and "programmable to" have similar meanings in the context

12  of these claims and fall in the middle of the spectrum.  They clearly express what is claimed and

13  supported by the specification.  And they provide reasonable certainty about the scope of the

14  invention, especially in the context of these highly regulated medical devices that require detailed

15  design documentation and regulatory labeling.

16      **A.      The Intrinsic Evidence Shows the "Configured to" Claims Are Not Indefinite.**

17          The claims and specification provide ample basis for persons skilled in the art to

18  determine with reasonable certainty the scope of the "configured to" claims.  This satisfies the

19  controlling legal standard under *Nautilus*.  134 S. Ct. at 2124.

20          The claims containing "configured to" language are drawn to spinal cord stimulation

21  systems.  The claimed systems include a signal or pulse generator "configured to generate"

22  therapy signals and a signal delivery device or lead "configured to deliver" therapy signals.  The

23  specification describes how these systems are designed to perform these functions.  It states that

24  "[t]he pulse generator 101 can transmit signals (e.g., electrical signals) to the signal delivery

25  element."  ('533 patent at 3:50-55.)  It describes how the pulse generator can be designed to

26  generate these signals, including software, firmware and hardware.  ('533 patent at 3:56-65.)  The

27  next several paragraphs further describe the design and features of the pulse generator.  ('533

28  patent at 4:3-39.)  The specification describes and distinguishes from the prior art the parameters

1    of the paresthesia-free high frequency therapy signals that the pulse generator is designed to

2    generate.  ('533 patent at 6:34-7:5, 19:26-39.)  The specification also describes the design and

3    manufacture of the signal delivery device or lead.  ('533 patent at 21:7-21, 22:52-23:37.)  The

4    specification's description of how the systems are designed provides ample guidance for a skilled

5    person to determine the scope of the "configured to" claims with reasonable certainty.  (Pless

6    Decl. ¶¶ 6-8.)  BSC has put forth no evidence to the contrary.

7         Contrary to BSC's assertion, "designed to" does not require an inquiry into the designer's

8    subjective intent.  As discussed in Nevro's prior briefing, the Federal Circuit has repeatedly

9    endorsed constructions using "designed to," and BSC itself has argued that it is not a matter of

10   subjective intent but rather how the product is "actually made or designed."  (ECF 372-4 at 3-4

11   (citing Federal Circuit cases and BSC's claim construction briefing in *Cordis*).)  The same is true

12   here.  The specification describes how the SCS systems are designed and made; it does not

13   inquire into the hidden or unrealized intent in the mind of the designer.  Nonetheless, if the Court

14   believes that "designed to" might suggest such an inquiry, it can obviate that concern by

15   construing "configured to" as "designed and made to."  This construction is also consistent with

16   Federal Circuit precedent treating "configured to," "designed to," and "made to" as synonyms.

17   *See, e.g.*, *In re Giannelli*, 739 F.3d 1375, 1380 (Fed. Cir. 2014) (holding the "relevant question"

18   was whether the apparatus was "'made to,' 'designed to,' or 'configured to,'" allow the user to

19   perform a rowing exercise by pulling on the handles).  Interpreting "configured to" as "designed

20   to" or "designed and made to" throughout the system claims results in a logical reading of the

21   claims that is consistent with the specification's description.

22        The Court questioned why "configuring" in claim 1 of the '125 patent should be

23   interpreted differently from "configured to" in the system claims.  The answer is that

24   "configuring" must be read in the fundamentally different context of that claim, which is a

25   method of treatment claim with the "configure" word used in a different form and tense.

26   "Configured to" is used consistently in the system claims to describe how the systems are

27   designed and made by the manufacturer.  By contrast, claim 1 of the '125 patent is directed to

28   "[a] method for treating a patient" and recites two steps to be performed by a practitioner using a

system to treat a patient:

> 1. A method for treating a patient, comprising:
>
> a step for communicating with a signal generator, including establishing a wireless link with the signal generator; and
>
> a step for configuring the signal generator, including programming the signal generator to generate and deliver a paresthesia-free therapy signal to the patient's spinal cord . . . .

The language of both steps reinforces that the method is performed by the practitioner in treating a patient, not by the manufacturer in designing and making a system.  As explained in the specification, "communicating with a signal generator" by "establishing a wireless link with the signal generator" is something a practitioner would do using the wireless physician programmer. ('125 patent at 5:28.)  And it logically follows that the next step of "programming the signal generator" using that wireless programmer is also performed by the practitioner, which the specification also confirms.  ('125 patent at 5:25-34.)

The fact that "configuring" includes "programming" in the different context of this method claim does not mean that "configured to" as used in the system claims is indefinite.  The proper interpretation of a claim term must take into account the context of the claim in which it is used.  "Although the same terms in different claims are typically given the same meaning, the same terms in *different types of claims* may be given *different meaning*."  *Juniper Networks, Inc. v. Toshiba Am., Inc.*, 2007 U.S. Dist. LEXIS 29660, at *14-15 (E.D. Tex. Apr. 23, 2007) (emphasis added) (citation omitted); *see also Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (holding the same term used in a different manner in two different contexts "should not necessarily be interpreted to have the same meaning in both phrases").  In *Juniper Networks*, the court construed "storing" data to mean "loading and holding" data in the context of a method claim, even though it did not make sense for "storing" to include "loading" in the context of an apparatus claim in the same patent.  "[T]he more precise statement of the axiom" of claim construction that applies here is that "[a] word or phrase *used consistently* throughout a claim should be *interpreted consistently*."  *Epcon*, 279 F.3d at 1031 (quoting *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).)  Under this rule, there is nothing improper or indefinite with Nevro's construction of "configured to."

1    "Configuring" is used differently in the different context of the method in claim 1 of the '125

2    patent, and it need not have the same meaning as "configured to" in the system claims.

3        The Court's tentative ruling construed "configured to" as "capable of" or "programmable

4    to." (ECF 422, at 1.) At the hearing, the Court clarified the latter phrase as meaning

5    "programmable by the user to." (Hearing Tr. at 68:16-20.) This construction is a more specific

6    way of expressing the same meaning as "designed to" or "designed and made to" in the context of

7    the specific elements of the claims that recite a "signal generator." In describing how the signal

8    generator is designed, the specification describes a signal generator that is programmable by the

9    user to generate therapy signals. ('533 patent at 3:56-4:2.) Thus, a construction of the "signal

10   generator configured to" limitations to mean a signal generator "programmable by the user to,"

11   would be well-supported by the specification.

12       As discussed above, the parties agree that "capable of" is too broad (Hearing Tr. at 35:15-

13   25), and it is not an appropriate construction of the "configured to" claims. Finally, Nevro

14   believes BSC's construction of "configured to" as "requires no further configuration" is wrong

15   for the reasons previously discussed, but Nevro agrees it would not render the claims indefinite.

16   (Hearing Tr. at 62:19-25.) While Nevro does not agree that BSC's construction is the only

17   construction that avoids indefiniteness, it remains good law that "[i]f, after applying all other

18   available tools of claim construction, a claim is ambiguous, it should be construed to preserve its

19   validity." *Ruckus Wireless*, 824 F.3d at 1004.

20       **B.    Extrinsic Evidence Confirms the "Configured to" Claims Are Not Indefinite.**

21       "[E]vidence of a challenger's own ability to apply a term without unreasonable

22   uncertainty counts against an indefiniteness contention." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 720 F.

23   App'x at 631. BSC never argued that "configured to" was indefinite. In its responsive claim

24   construction brief, BSC said the term did not even need to be construed. (ECF 357-4 at 6-7.) At

25   the hearing, BSC said the construction was "easy." (Hearing Tr. at 62:1.) It should not be heard

26   now to argue that the term is indefinite.

27       Moreover, BSC's own design documents show its understanding that its Precision with

28   MultiWave meets this limitation. (ECF 343-39 at BSC-NVRO00000090.) BSC has not disputed

1   that its system meet the "configured to" limitation if it is construed as "designed to."  (ECF 357-4

2   at 20-22; ECF 372-4 at 13.)

3       Finally, BSC's own patents use "configured to" the same way as Nevro's patents.  U.S.

4   Patent No. 9,764,141 claims a system with "a neural modulation generator *configured to* use at

5   least some of the electrodes to generate a modulation field" and "a controller *configured to*

6   control the neural modulation generator."  (Fung Decl. Ex.5, cl. 13 (emphasis added).)  The patent

7   states that "In various embodiments, at least some parameters of the plurality of modulation

8   parameters are programmable by a user, such as a physician or other caregiver."  (*Id.* at 7:15-18.)

9   **III.     PRECISION WITH MULTIWAVE INFRINGES CLAIMS 1, 22 OF '842 PATENT**

10      As detailed in Nevro earlier filings, BSC systematically copied Nevro's technology.  It is

11   thus unsurprising that BSC's Precision with MultiWave infringes claims 1 and 22 of the '842

12   patent under the different constructions of "configured to" presently before this Court.

13   (Supplemental Decl. of Ben Pless ("Pless Supp. Decl.") ¶¶ 2-5, ECF. 372-10 ¶¶ 402-438.)  Under

14   the Court's tentative construction and Nevro's proposed construction, BSC infringes these claims

15   under 35 U.S.C. § 271(a) by making the Precision with MultiWave in the U.S.  (ECF 341-16 at 6-

16   7.)  Even under BSC's proposed construction, BSC infringes under 35 U.S.C. § 271(f)(1) by

17   actively inducing the combination of the components of the Precision with MultiWave in Europe

18   in a manner that would infringe if such combination occurred in the U.S.  This motion relies on

19   BSC's own witnesses and documents.  There can be no genuine dispute of fact.

20      **A.     The Precision with MultiWave System Infringes Claim 1 of the '842 Patent.**

21          **1.     Claim 1, Preamble: "A spinal cord modulation system, comprising:"**

22   The system is "a spinal-cord-modulation system."  (ECF 341-19 at 94:9-13.)

23          **2.     Claim 1, [a]: "a signal generator configured to generate a therapy
            signal having a frequency of 10 kHz, an amplitude up to 6 mA, and
24           pulses having a pulse width between 30 microseconds and 35
            microseconds"**

25

26      The Precision with MultiWave system includes an implantable pulse generator ("IPG"),

27   which is a "signal generator."  (ECF 341-10 at 11:7-17; Pless Supp. Decl. at ¶ 3; ECF 372-10 ¶¶

28   407-408.)  The IPG is both "capable of" and "programmable by the user to" generate a therapy

1   signal at the signal parameter ranges recited in this claim.  The system has a "default" frequency

2   of "10,000 Hz," a programmable frequency range of "2 kHz – 10 kHz," amplitude range of 0 to 9

3   mA, pulse width range of 20 to 240 microseconds, and a default pulse width of 30 microseconds.

4   (ECF 343-39 at 00000090; ECF 341-10 at 168:13-169:2; Pless Supp. Decl. ¶¶ 2-4; ECF 372-10

5   ¶¶ 409-418.)  The users performing the programming are physicians or BSC's sales

6   representatives. (ECF 373-9 at 43:12-44:9, 491:8-492:17; ECF 379-18 at 294:24-296:12.)

7          Although not required to prove infringement, the system has been programmed to

8   generate signals within these parameters.  BSC admits that "stimulation frequencies between

9   2,000 Hz and 10,000 Hz are used with a pulse width of 20-240 μsec and an amplitude of 0-9mA."

10  (ECF 373-3 at 3; ECF 343-39 at 00000090; ECF 341-10 at 168:13-169:2.)  BSC's commercial

11  patients "have been programmed [] using the Precision with MultiWave in Europe at frequencies

12  higher than 1.5 kilohertz" (ECF 341-5 at 567:9-16), ███████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████

14  ████████  (Fung Decl. Ex.6 (Carbanaru Ex. 166); Fung Decl.  Ex.7 (Carbanaru Ex. 167); Fung

15  Decl. Ex. 8, Carbanaru Dep. 762:10-765:10, 765:12-17, 766:3-9, 768:1-770:22, 770:23-773:14.)

16         The evidence above also shows that the IPG is "designed to" (as well as "designed and

17  *made to*") generate a therapy signal at the recited parameter ranges.  (Pless Supp. Decl. ¶ 5, ECF

18  372-10 ¶¶ 407-418; ECF 341-4 ¶¶ 44-56.)

19         BSC also infringes under its own construction.  The IPG "requires no further

20  configuration to generate" a therapy signal at the claimed parameter ranges because BSC actively

21  induces the combination of the components of the system in Europe in an infringing manner.  A

22  finding of infringement under § 271(f)(1) requires knowledge of the asserted patents and intent.

23  *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1222-23 (Fed. Cir. 2006).

24  Intent may be proven through circumstantial evidence, including product manuals. *Id.* at 1223.

25  All the elements of § 271(f)(1) are met.  ██████████████████████████████████████████

26  ██████  (Fung Decl. Ex.9, Supp. Resp. Int. 11 at 5; ECF 372-10 ¶ 699.)  BSC makes the

27  components of the system in the U.S. and supplies these components to Europe, and, █████████

28  ████████████████████████████████████████████████████████████████████████████████

1    ███████████ [7] BSC's intent that the components be combined in such a manner is shown in

2    its ████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████ (ECF 373-19 at BSC-NVRO_00720938-40; ECF 372-8 ¶ 99; *see also* ECF 343-39

5    at 00000090; ECF 341-10 at 168:13-169:2.)  BSC also provides detailed instructions on

6    implanting and coupling, setting the amplitude, and the placement of leads.  (ECF 372-10 ¶¶ 675-

7    77; 711-717; ECF 343-39 at 00000053-56, 69-70, ECF 341-10 at 168:13-169:2.)  BSC trains its

8    sales representatives and clinical engineers who interact with physicians using the system.  (Fung

9    Decl. Ex. 4, Cassidy Ex. 25 at 00001385, 1415-17, 1432; Fung Decl. Ex.10, Cassidy Dep. 53:23-

10   55:5, 65:22-67:4, ; ECF. 372-10 ¶¶ 711-723.)  BSC admits that under its construction, the

11   Precision with MultiWave would infringe once implanted and programmed at Nevro's claimed

12   parameters.  (*See* ECF 373-7 at 93:18-101:17.)

> **3.    Claim 1, [b]: "an implantable signal delivery device electrically coupleable to the signal generator and configured to be implanted within a patient's epidural space to deliver the therapy signal from the signal generator to the patient's spinal cord."**

16   The Precision with MultiWave uses "implantable" leads.  (ECF 341-19 at 95:16-24.)  The

17   leads "deliver[] electrical stimulation to the nerve structures . . . of the spinal cord."  (ECF 343-39

18   at 00000041; ECF 341-10 at 168:13-169:2.)  BSC provides instructions on electrically coupling

19   the leads to the IPG.  (ECF 343-39 at 00000069-70, ECF 341-10 at 168:13-169:2.)  The leads are

20   capable of being implanted within a patient's epidural space to deliver the therapy signal from the

21   signal generator to the patient's spinal cord as shown by BSC's Clinician Manual.  (ECF 343-39

22   at 00000053; ECF 341-10 at 168:13-169:2; Pless Supp. Decl. ¶¶ 2-4; ECF 372-10 ¶¶ 419-428.)

23   Based on the evidence above, the leads are also "designed to" and "made to" be implanted

24   within a patient's epidural space to deliver the therapy signal from the IPG to the patient's spinal

---

26   [7] It is unclear whether an underlying act of direct infringement is required under § 271(f)(1).
27   *Compare Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d 1057, 1072 (C.D. Cal. 2009) ("[T]he Federal Circuit has held that, 'At no point does the statutory language require or suggest that the infringer must actually combine or assemble the components.'") (citation omitted) *with Liquid*
28   *Dynamics*, 449 F.3d at 1222-23.

1   cord.  (Pless Supp. Decl. ¶5, ECF. 372-10 ¶¶ 407-418; ECF 341-4 ¶¶ 44-56.)  The leads also

2   satisfy BSC's construction of "configured to" as explained above for claim 1[a].  ████████

3   ████████████, the leads have been combined with the IPG in an infringing manner, and BSC

4   provides instructions on implanting and coupling the IPG and lead placement.

5           **B.**        **The Precision with MultiWave System Infringes Claim 22 of the '842 Patent.**

6                        **1.**        **Claim 22, Preamble: "A spinal cord modulation system, comprising:**

7          The system is a "spinal cord modulation system" as explained in claim 1 above.

8                        **2.**        **Claim 22, [a]: "a signal generator configured to generate a therapy**

9                                      **signal in accordance with one or more therapy signal parameters"**

10          The Precision with MultiWave system includes an IPG which is a "signal generator."

11   (ECF 341-10 at 11:7-17; Pless Supp. Decl. ¶ 3; ECF 372-1 ¶¶ 430-431.)  The IPG is both

12   "capable of" and "programmable by the user to" generate a therapy signal in accordance with one

13   or more therapy signal parameters because the IPG can generate signals at the parameter ranges

14   indicated in the Clinician Manual.  (ECF 343-39 at 00000090; ECF 341-10 at 168:13-169:2;

15   Pless. Supp. Decl. ¶¶ 2-4; ECF 372-10 ¶¶ 430-31.)  The IPG is programmed by physicians or

16   BSC sales representatives using the Clinician Programmer, which allows various parameters to be

17   selected.  (Fung Decl. Ex.11, Carbunaru Dep. at 25:15-26:22; ECF. 373-9 at 43:12-44:9, 491:8-

18   492:17; ECF. 379-18 at 294:24-296:12.)

19          The IPG is also "designed to" and "made to" generate a therapy signal in accordance with

20   one or more therapy signal parameters.  (Pless Supp. Decl. ¶ 5, ECF 372-10 ¶¶ 430-31; ECF 341-

21   4 ¶¶ 44-56.)  BSC infringes under its construction of "configured to" as explained for claim 1[a]:

22   ████████████████████████, the IPG has been combined with other components of the

23   system ████████████████████████, and BSC provides programming

24   guidelines and manuals to generate an electrical signal at the claimed parameter ranges.

25                        **3.**        **Claim 22, [b]: "an implantable signal delivery device configured to**

26                                    **electrically couple to the signal generator and configured to be**

                               **implanted in the patient's epidural space to deliver the therapy signal**

27                                  **to the patient's spinal cord"**

28          The system uses "implantable" leads.  (ECF 341-19 at 95:16-24.)  The leads are "capable

of" being electrically coupled to the signal generator as shown in BSC's clinician manual, which provides instructions on electrically coupling the leads to the IPG. (ECF 343-39 at 00000069-70, ECF 341-10 at 168:13-169:2; Pless Supp. Decl. ¶¶ 2-4; ECF. 372-10 ¶ 432.) As shown above, the leads are also "designed to" and "made to" electrically couple to the signal generator. (Pless Supp. Decl. ¶ 5, ECF 372-10 ¶ 432; ECF 341-4 ¶¶ 44-56.) The leads are configured to be implanted in the patient's epidural space to deliver the therapy signal to the spinal cord as explained for claim 1[b] for the different constructions.

    **4.**    **Claim 22, [c]: "a programmer configured to be in wireless communication with the signal generator and configured to modify at least one of the one or more therapy signal parameters in the signal generator"**

The system includes a Clinician Programmer "capable of" and "programmable by the user to" be in wireless communication with the IPG and "capable of" and "programmable by the user to" modify at least one of the one or more therapy signal parameters in the IPG. The Clinician Programmer used by physicians and BSC sales representatives communicates wirelessly with the IPG (Fung Decl. Ex. 8, Carbunaru Dep. at 589:3-25; Fung Decl. Ex.1, BSC-NVRO_00006798 at 6801) and allows various signal parameters to be selected and modified. (Fung Decl. Ex.11, Carbunaru Dep. at 25:15-26:22; ECF. 373-9 at 43:12-44:9, 491:8-492:17; ECF. 379-18 at 294:24-296:12; Pless Supp. Decl. ¶¶ 2-4; ECF. 372-10 ¶¶ 433-437.) Based on the evidence above, the Clinician Programmer is also both "designed to" and "made to" be in wireless communication with the IPG, and "designed to" and "made to" modify at least one of the therapy signal parameters in the IPG. (Pless Supp. Decl. ¶ 5, ECF. 372-10 ¶¶ 433-37; ECF 341-4 ¶¶ 44-56.)

The Clinician Programmer also meets this element under BSC's construction as explained for claim 1[a]: ████████████████, the Clinician Programmer has been combined with other components of the system in an infringing manner, and BSC provides instructions to use the Clinician Programmer to communicate wirelessly with the IPG to modify signal parameters.

    **5.**    **Claim 22, [d]: "wherein the one or more therapy signal parameters include, for at least a portion of the therapy signal, (a) a frequency of 10 kHz, (b) an amplitude up to 6 mA, and (c) pulses with a pulse width between 30 microseconds and 35 microseconds."**

The system meets this element as explained for claim 1[a] of the '842 Patent above.

1

2

Dated: July 11, 2018                          MORRISON & FOERSTER LLP

3

4                                          By:   /s/ Kenneth A. Kuwayti
                                                 Kenneth A. Kuwayti
5
                                                 Attorneys for Plaintiff
6                                                NEVRO CORP.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28