UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEVRO CORP, <br><br> Plaintiff, <br><br> v. <br><br> BOSTON SCIENTIFIC CORPORATION, et al., <br><br> Defendants. | Case No. 16-cv-06830-VC <br><br> **ORDER RE CLAIM CONSTRUCTION AND CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

The following asserted claims are invalid as indefinite: claims 18, 34, and 55 of the '125 patent, claims 5 and 34 of the '357 patent, claims 7, 12, 35, 37, and 58 of the '533 patent, and claims 1 and 22 of the '842 patent. Therefore, summary judgment is granted to Boston Scientific on those claims. For the remaining asserted claims, summary judgment of noninfringement is granted to Boston Scientific.

Claim Construction

1. The term "frequency" means "fundamental frequency" or "pulse rate," as it is defined in the '533 patent specification. *See, e.g.*, Dkt. No. 343-3, Pai Decl. Ex. 3, '533 Patent at 2:49-53; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'").

2. The term "therapy signal" means "electrical impulse" or "electrical signal," as it is defined in the '472 patent specification. *See* Dkt. No. 343-4, Pai Decl. Ex. 4, '472 Patent at 5:44-

49; *see also* Pai Decl. Ex. 3, '533 Patent at 3:45-53, 4:43-50.

3. The term "implantable" means "suitable for long-term implantation." *See, e.g.*, Dkt. No. 343-75, Pai Decl. Ex. 75; *see also* Council Directive 90/385, Art. 2, 1990 O.J. (L 189) (EC) [https://perma.cc/Y36M-GAW8].

4. The term "paresthesia" means "a sensation usually described as tingling, pins and needles, or numbness." *See, e.g.*, Pai Decl. Ex. 4, '472 Patent at 1:62-66.

5. Nevro argued that the term "configured to" means "designed to"; Boston Scientific argued that no construction of the term is necessary, but that if construction is required, configured to should be interpreted to mean "which requires no further configuration to."

"Configured to" is used in a number of patents as part of the phrase: a signal generator configured to generate (or deliver) an electrical signal with set parameters or functions. This phrase could be reasonably construed by a person of ordinary skill in the art at the time the patent applications were filed to mean one of two things: (1) the signal generator, as a matter of hardware and firmware, has the capacity to generate the described electrical signals (either without further programing or after further programming by the clinical programming software); or (2) the signal generator has been programmed by the clinical programmer to generate the described electrical signals.

Significant language in the patent claims and specifications suggests that a signal generator is "configured to generate" electrical signals with set parameters or functions whenever it has the capacity to generate those signals. Claim 22 of the '842 patent suggests that a signal generator is configured to produce a signal before it has been programmed to produce that signal, because that claim describes both a "signal generator configured to generate a therapy signal in accordance with one or more therapy signal parameters" and a "programmer configured to be in

2

wireless communication with the signal generator and configured to modify at least one of the one or more therapy signal parameters." Dkt. No. 343-8, Pai Decl. Ex. 8, '842 Patent at Claim 22. So does claim 14 of the '988 patent, which describes a method for programming a signal generator that has already been "configured to deliver the therapy signal to the patient's spinal cord." Dkt. No. 343-5, Pai Decl. Ex. 5, '988 Patent at Claim 14.

The specifications for the Alataris patents – the '102, '125, '357, '533, '842, and '988 patents – also suggest that programming and configuration are not analogous; at one point, these specifications describe a system or device that is "configured and programmed to deliberately produce paresthesia." *See, e.g.*, Pai Decl. Ex. 3, '533 Patent at 24:15-20; *but see id.*, '533 Patent at 1:47-49 (describing "a tingling or paresthesia," two synonymous terms, in the alternative).

Moreover, "configured to" is used throughout the claims in conjunction with the term "implantable signal generator." *See, e.g.*, *id.*, '533 Patent at Claim 37. The term is also used to describe an implantable lead that is "electrically coupleable to the signal generator and configured to be implanted within a patient's epidural space." *Id.*, '533 Patent at Claim 1. The terms "implantable," "coupleable," and "to be implanted" all indicate that the patent claims encompass signal generators and leads that have not yet been implanted in the human body. The term "coupleable" further suggests that the claims encompass signal generators and leads even before those two elements have been coupled to each other. Yet both sides seem to agree that signal generators are not in fact programmed by the clinical programmer until, at a minimum, the leads have been implanted within a patient's body and those leads have been coupled to the signal generator. Dkt. No. 438-1, Nevro Supp. Br. at 3; *see also* Pai Decl. Ex. 3, '533 Patent at 5:16-20 ("Assuming the trial therapy is effective or shows the promise of being effective, the practitioner then replaces the external programmer 105 with the implanted pulse generator 101,

3

and programs the pulse generator 101 with parameters selected based on the experience gained during the trial period."); Dkt. No. 421, Tutorial Hearing Tr. at 14:10-15:4, 42:6-23.

But there is also evidence to suggest that a signal generator is not "configured to generate" a signal with specific parameters until it has been programmed to generate those signals. Most importantly, many of the '125 patent claims seem to equate "configuring [a] signal generator" with "programming [a] signal generator." Dkt. No. 343-6, Pai Decl. Ex. 6, '125 Patent at Claims 1-2, 6, 9. Claims from another patent within the same family – the '327 patent – also equate configuring a signal generator with programming a signal generator. *See* Dkt. No. 423-3, Reidy Supp. Decl. Ex. 2, '327 Patent at Claim 14 (describing method step of "using the external programmer to configure the pulse generator to deliver the at least one electrical signal to the patient's spinal cord region via the signal delivery device"); *see also Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 & n.5 (Fed. Cir. 2015). The '327 patent claims also describe a "pulse generator [that] is configurable to generate the paresthesia-inducing electrical signal"; this, of course, implies that a signal generator that is "configurable to generate" a set signal, and thus has the capability to generate that signal, is nonetheless not yet programmed to generate that same signal. *Id.*, '327 Patent at Claim 15. And during the prosecution of the '327 patent, the patent examiner believed that "configured" was analogous to "programmed," while "configurable," as used in that patent application, meant that a signal generator had the "capability to be configured/programmed" to set parameters. *See* Dkt. No. 432-8, Reidy Supp. Decl. Ex. 7.

Under *Nautilus, Inc. v. Biosig Instruments, Inc.*, a claim is indefinite if it does not "inform those skilled in the art [at the time of the patent application] about the scope of the invention with reasonable certainty." 134 S. Ct. 2120, 2129 (2014). Although "configured to" is a commonly

4

used term in patent drafting, in this particular circumstance a skilled artisan would not be able to ascertain the meaning of the phrase "a signal generator configured to generate" – as that phrase is used within the asserted claims – with reasonable certainty. Specifically, a person of ordinary skill would not be able to know whether the signal generator limitation is met when a signal generator with the necessary capacity was created, or whether infringement only occurred after the signal generator was programmed by a clinical programmer to generate and deliver signals with the claimed parameters. *See Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 634-35 (Fed. Cir. 2015); *Teva Pharmaceuticals*, 789 F.3d at 1343-45; *see also MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1314-16 (Fed. Cir. 2017) (noting that claims are indefinite when it is not clear whether infringement occurs when system is created or when system is used). Thus, claims 1 and 22 of the '842 patent, and claims 7, 12, 35, and 37 of the '533 patent are invalid as indefinite.[1]

6. The asserted claims use a number of related phrases, such as "does not produce paresthesia," to express the idea that an electrical signal or a therapy does not produce paresthesia. These phrases have a clear meaning. They mean: "does not produce a sensation usually described as tingling, pins and needles, or numbness." *See supra* at 2 (defining paresthesia).

Nonetheless, the claims describing a system or device that use these phrases are indefinite. In these claims, "non-paresthesia-producing" and similar phrases are used to describe a characteristic of an electrical signal that the signal generator is configured to generate. *See,*

---

[1] Perhaps claim 18 of the '988 patent, a method claim that describes a "signal generator [that] is configured to deliver the therapy signal at a frequency above 1.5 kHz," is also indefinite for these same reasons. Even if this claim is sufficiently definite, there is no infringement of this claim, as discussed below.

*e.g.*, Pai Decl. Ex. 6, '125 Patent at Claim 18 (describing "means for generating a non-paresthesia-producing therapy signal"); Pai Decl. Ex. 3, '533 Patent at Claim 7 (describing "signal generator configured to generate a non-paresthesia-producing therapy signal"); *see also* Dkt. No. 343-7, Pai Decl. Ex. 7, '357 Patent at Claim 34 (describing electrical signal with "amplitude between 0.5 mA and 10 mA, which at least partially reduces the patient's sensation of pain without generating paresthesia").  But whether a signal produces paresthesia depends on a patient's response to a signal; the same signal that produces paresthesia in one patient may not produce paresthesia in another patient.  *See* Dkt. No. 435-15, Rosenberg Supp. Decl. Ex. A at ¶¶ 5-8.  In other words, paresthesia is not a signal parameter; it is a signal effect.  *See* Pai Decl. Ex. 4, '472 Patent at 1:24-27 (describing "pulse width, frequency, and amplitude" as signal parameters); Pai Decl. Ex. 3, '533 Patent at 6:51-7:5 (describing frequency, duty cycle, pulse width, and amplitude as signal parameters). Thus, depending on the characteristics of the patient who uses a spinal cord stimulation system, the same system would either infringe or not infringe the asserted system patents.  Because of this variability, a skilled artisan cannot identify the bounds of these claims with reasonable certainty.  *See Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite."); *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (finding indefinite reading of term that would make infringement "depend[ent] on [the formulation's] usage in changing circumstances"); *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005).  Thus, claims 18, 34, and 55 of the '125 patent,

6

claims 5 and 34 of the '357 patent, and claims 7, 12, 35, 37, and 58 of the '533 patent are invalid as indefinite.

But the "non-paresthesia-producing" language does not render any of the asserted method claims indefinite.  For example, in the '102 patent, the asserted claims describe a method of "delivering . . . an electrical signal to the patient's spinal cord," where "the electrical signal . . . does not create paresthesia in the patient."  Dkt. No. 343-2, Pai Decl. Ex. 2, '102 Patent at Claim 11.  The '472 patent claims describe a method for "alleviating patient pain or discomfort, without relying on paresthesia or tingling to mask the patient's sensation of the pain."  Pai Decl. Ex. 4, '472 Patent at Claims 1 and 5.  Although the parameters that would result in a signal that does not create paresthesia may vary between patients, a skilled artisan would be able to quickly determine whether a signal creates paresthesia for any given patient.  *See* Dkt. No. 435-15, Rosenberg Supp. Decl. Ex. A at ¶¶ 5-8; Dkt. No. 435-3, Fung Supp. Decl. Ex. 2, Lipson Dep. at 205:14-19.  And because an artisan could quickly ascertain whether a signal generates paresthesia in a patient, the non-paresthesia-producing signal limitations would not prevent a skilled artisan from being able to determine whether she was practicing a claimed method with reasonable certainty.

7. A "means for generating a paresthesia-free therapy signal in a frequency range of 1.5 kHz to 100 kHz" and similar limitations in claims 34 and 55 of the '125 patent are invalid as indefinite because there is not an adequate disclosure of a corresponding structure in the patent specification.  Dkt. No. 343-6, Pai Decl. Ex. 6, '125 Patent at Claims 18, 34, 55.  The mere disclosure of a generic signal generator, which was already known in the prior art, is not sufficient.  *Cf. Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

Patentability

    1.  The claims asserted by Nevro that are not invalid as indefinite are claims 11, 21, and 23 of the '102 patent, claim 18 of the '988 patent, and claims 1 and 5 of the '472 patent.  The remaining claims are not directed to an abstract idea.  *See Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016) (holding that a patent directed to a "new and useful laboratory technique" was not directed to an abstract idea).

Infringement

    1.  The use of the Spectra WaveWriter and the Precision with MultiWave systems in patients that have participated in the ACCELLERATE trial fits within the safe harbor provision of 35 U.S.C. § 271(e), even after the patients have completed their participation in the trial.  This use is "reasonably related to the development and submission of information" to the FDA for device approval.  The FDA specifically approved a trial plan that allowed participants to continue to receive treatment after results were collected.  Dkt. No. 358-48, Wang Decl. Ex. 42 at BSCNVRO_00019250-51.  And international standards for medical research require trial sponsors allow participants to access studied treatments even after the trial's conclusion.  Dkt. No. 358-49, Wang Decl. Ex. 43, World Medical Association, *Helsinki Decl.: Ethical Principles for Medical Research Involving Human Subjects* ¶ 34 (2013) [https://perma.cc/7XYQ-M6R9].  Thus, Boston Scientific's motion for summary judgment on noninfringement with regard to both Spectra WaveWriter and Precision with MultiWave systems used in the ACCELLERATE trial is granted.

    2.  Boston Scientific cannot be liable for direct or induced infringement of the remaining method claims with respect to Spectra WaveWriter systems sold for commercial use in the United States, because those systems cannot be programmed to generate signals above 1.2 kHz.

*See* Dkt. No. 398-9, Anderson Decl. Ex. 8, Pless Rpt. re: Infringement at ¶¶ 99-101; Dkt. No. 376-1, Pless Reply Decl. Ex. A, Pless Rpt. re: Infringement at ¶¶ 315-17; Dkt. No. 372-6, Goshorn Decl. Ex. A, Goshorn Rpt. at ¶¶ 46-48; Dkt. No. 358-23, Wang Decl. Ex. 17, Pless Dep. Tr. at 183:16-184:4; *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016).

3. Summary judgment on noninfringement under section 271(f) regarding the Precision with MultiWave systems sold in Europe is granted with respect to the remaining method claims. Section 271(f) does not apply to method claims. *Cardiac Pacemakers Inc. v. St. Jude Medical Center Inc.*, 576 F.3d 1348, 1364-65 (Fed Cir. 2009).

\* \* \*

A telephonic case management conference is scheduled for Thursday, August 2, 2018 at 9:30 a.m. to confirm that no live claims remain and that judgment can be entered in full for Boston Scientific. The parties should file a joint case management statement by close of business on Friday, July 27, 2018. The motions to strike filed by both parties are denied as moot.

**IT IS SO ORDERED.**

Dated: July 24, 2018

VINCE CHHABRIA
United States District Judge