MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZALEZ (CA SBN 121490)
AGonzalez@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
ERIC C. PAI (CA SBN 247604)
EPai@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0794

Attorneys for Plaintiff
NEVRO CORP.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEVRO CORP.,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION,<br><br>Defendants. | Case No.   3:16-cv-06830-VC-MEJ<br><br>**NEVRO'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   January 14, 2021<br>Time:   10:00 a.m.<br>Ctrm:   4, 17th Floor<br>Judge:   Hon. Vince Chhabria |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................. 1

CONCISE STATEMENT OF RELIEF SOUGHT ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.    INTRODUCTION .......................................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................................ 3

    A.    Nevro's Novel High-Frequency Paresthesia-Free SCS Technology ..................... 3

    B.    BSC Copied Nevro's Technology ......................................................................... 4

    C.    BSC Challenged Nevro's '102 Patent Before the PTO and Lost ........................... 5

    D.    Nevro Filed This Lawsuit ..................................................................................... 6

III.    BSC'S PRECISION WITH MULTIWAVE INFRINGES NEVRO'S CLAIMS ............. 7

    A.    BSC Supplied "All or a Substantial Portion of the Components" of the Precision with MultiWave from the United States ................................................ 7

    B.    The Components of the Precision with MultiWave Are Combined in an Infringing Manner in Europe ............................................................................... 8

        1.    The Precision with MultiWave Infringes Claim 7 of the '533 Patent ......... 8

            a.    Claim 1, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:" ................................................................................... 9

            b.    Claim 1, Element [a]: "a signal generator configured to generate a non-paresthesia-producing therapy signal" .................. 9

            c.    Claim 1, Element [c]: "an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region" ................................................................ 9

            d.    Claim 7: "The system of claim 1, wherein the frequency range is from 1.5 kHz to 50 kHz." ................................................. 10

        2.    The Precision with MultiWave Infringes Claim 35 of the '533 Patent ................................................................................................ 10

            a.    Claim 21, Preamble: "A spinal cord stimulation system for reducing or eliminating pain in a patient, the system comprising:" ................................................................................. 10

            b.    Claim 21, Element [a]: "an implantable signal generator configured to generate a non-paresthesia-producing therapy signal" .................................................................................... 11

            c.    Claim 21, Element [b]: "wherein at least a portion of the therapy signal is at a frequency in a frequency range from 3 kHz to 20 kHz" ............................................................................. 11

            d.    Claim 21, Element [c]: "a current amplitude in a current amplitude range from 0.1 mA to 20 mA" ................................... 11

**TABLE OF CONTENTS**
**(continued)**

Page

   e. Claim 21, Element [d]: "a signal delivery device electrically coupled to the implantable signal generator and configured to deliver the therapy signal to the patient's spinal cord"............ 11

   f. Claim 35: "The system of claim 21, wherein at least a portion of the therapy signal has a pulse width in a pulse width range from 25 microseconds to 166 microseconds." .......... 12

  3. The Precision with MultiWave Infringes Claim 22 of the '842 Patent............................................................................................................ 12

   a. Claim 22, Preamble: "A spinal cord modulation system, comprising:"............................................................................ 12

   b. Claim 22, Element [a]: "a signal generator configured to generate a therapy signal in accordance with one or more therapy signal parameters"............................................................. 12

   c. Claim 22, Element [b]: "an implantable signal delivery device configured to electrically couple to the signal generator and configured to be implanted in the patient's epidural space to deliver the therapy signal to the patient's spinal cord" ........................................................................... 13

   d. Claim 22, Element [c]: "a programmer configured to be in wireless communication with the signal generator and configured to modify at least one of the one or more therapy signal parameters in the signal generator" ................................... 13

   e. Claim 22, Element [d]: "wherein the one or more therapy signal parameters include, for at least a portion of the therapy signal, (a) a frequency of 10 kHz, (b) an amplitude up to 6 mA, and (c) pulses with a pulse width between 30 microseconds and 35 microseconds." ........................................... 13

  4. The Precision with MultiWave Infringes Claim 55 of the '125 Patent............................................................................................................ 14

   a. Claim 55, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:"............................................................................ 14

   b. Claim 55, Element [a]: "means for generating a non-paresthesia-producing therapy signal, wherein: at least a portion of the therapy signal is at a frequency in a frequency range from 3 kHz to 20 kHz"........................................................ 14

   c. Claim 55, Element [b]: "the therapy signal includes pulses having a pulse width in a pulse width range from 25 microseconds to 166 microseconds".......................................... 15

   d. Claim 55, Element [c]: "the therapy signal includes a current amplitude in a current amplitude range from 0.5 milliamps to 10 milliamps"........................................................ 15

e.   Claim 55, Element [d]: "wherein the system further comprises: means for delivering the therapy signal to the patient's spinal cord region, wherein the means for delivering the therapy signal is configured to be implanted in the patient's epidural space" ...................................... 16

C.   BSC Actively Induced the Infringing Combination of the Precision with MultiWave ............................................................................................ 16

IV.   THE VALIDITY OF NEVRO'S ASSERTED PATENT CLAIMS................................. 17

A.   BSC's Undisclosed New Theories Concerning the Precision SCS System Fail ............................................................................................................ 17

1.   "Frequency harmonics" do not meet the "frequency" limitations ............ 17

2.   The Precision SCS system was not programmed to generate the claimed stimulation frequencies................................................................. 18

B.   The Fang Reference Is Not Section 102(e) Prior Art............................................. 20

1.   Section 102(e) Forbids Using an Inventor's Own Work Against Him .......................................................................................................... 20

2.   BSC Relies on Fang's Disclosure of High-Frequency, Paresthesia-Free .......................................................................................................... 22

3.   The Later Addition of Dr. Alataris and Mr. Walker to Fang Does Not Undermine the Sworn Testimony of the Nine Nevro Inventors ........ 25

4.   None of the Other Portions of Fang Relied Upon by BSC for a High Frequency, Paresthesia-free Signal Is Prior Art....................................... 26

V.   BSC'S INEQUITABLE CONDUCT AFFIRMATIVE DEFENSE FAILS ..................... 26

A.   BSC Cannot Establish That the Yearwood References Are But-For Material ...................................................................................................... 27

1.   BSC's Expert Admits He Has No "But-For" Materiality Analysis and, Instead, Applied a Standard Rejected by Therasense........................ 28

2.   BSC Performed No Analysis of Whether the Yearwood References Are Cumulative of Information Disclosed to the PTO ............................. 29

3.   BSC Presented No Invalidity Analysis for the Yearwood References and Did Not Include Them on its List of Prior Art ................ 30

4.   The Yearwood References Teach Away from Paresthesia-Free Therapy ..................................................................................................... 31

B.   BSC Cannot Rely on Attorney Argument to Cover its Failure to Perform the Required Factual, Technical Analysis............................................................... 32

VI.   CONCLUSION ..................................................................................................... 32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AAT Bioquest, Inc. v. Tex. Fluorescence Labs., Inc.,*
2015 WL 1738402 (N.D. Cal. Apr. 13, 2015) .......................................................... 32

*Am. Calcar, Inc. v. Am. Honda Motor Co.,*
768 F.3d 1185 (Fed. Cir. 2014) ....................................................................... 26, 28

*Barry v. Medtronic, Inc.,*
914 F.3d 1310 (Fed. Cir. 2019) ....................................................................... 19, 20

*BASF Corp. v. SNF Holding Co.,*
955 F.3d 958 (Fed. Cir. 2020) .............................................................................. 19

*Biotec Biologische v. Biocorp, Inc.,*
249 F.3d 1341 (Fed. Cir. 2001) ............................................................................. 32

*Cumberland Pharm. Inc. v. Mylan Inst. LLC,*
846 F.3d 1213 (Fed. Cir. 2017) ............................................................................. 25

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
567 F.3d 1314 (Fed. Cir. 2009) ............................................................................. 31

*Dey, L.P. v. Sunovion Pharm., Inc.,*
715 F.3d 1351 (Fed. Cir. 2013) ............................................................................. 20

*Dimension One Spas, Inc. v. Coverplay, Inc.,*
2007 WL 2815042 (S.D. Cal. Sept. 25, 2007) ....................................................... 29

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.,*
914 F.3d 1347 (Fed. Cir. 2019) ............................................................................. 21

*Eaton Corp. v. Rockwell Int'l Corp.,*
323 F.3d 1332 (Fed. Cir. 2003) ............................................................................. 25

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am. Inc.,*
859 F.3d 1341 (Fed. Cir. 2017) ....................................................................... 21, 22

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
575 F.3d 1312 (Fed. Cir. 2009) ............................................................................. 27

*Giuliano v. SanDisk Corp.,*
224 F. Supp. 3d 851 (N.D. Cal. 2016) ................................................................... 32

*Intermec Techs. Corp. v. Palm Inc.,*
738 F. Supp. 2d 522 (D. Del. 2010) ...................................................................... 29

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Katz Interactive Call Processing Pat. Litig.*,
    2009 WL 8635983 (C.D. Cal. Aug. 14, 2009)........................................................................30

*In re Katz Interactive Call Processing Pat. Litig.*,
    821 F. Supp. 2d 1135 (C.D. Cal. 2011) ...............................................................................30

*Kegel Co. v. AMF Bowling, Inc.*,
    127 F.3d 1420 (Fed. Cir. 1997)................................................................................................7

*Liquid Dynamics Corp. v. Vaughan Co.*,
    449 F.3d 1209 (Fed. Cir. 2006)..................................................................................7, 8, 16

*Microsoft Corp. v. I4I Ltd.*,
    564 U.S. 91 (2011) ..................................................................................................................21

*Nalco Co. v. Turner Designs, Inc.*,
    2014 WL 645365 (N.D. Cal. Feb. 19, 2014) .....................................................................29

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
    719 F.3d 1346 (Fed. Cir. 2013)......................................................................................21, 22

*Oracle Corp. v. DrugLogic, Inc.*,
    807 F. Supp. 2d 885 (N.D. Cal. 2011) ...............................................................................30

*Ormco Corp. v. Align Tech., Inc.*,
    609 F. Supp. 2d 1057 (C.D. Cal. 2009) ..............................................................................8

*Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*,
    2011 WL 5143630 (C.D. Cal. Oct. 28, 2011) ...................................................................29

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
    882 F.3d 1056 (Fed. Cir. 2018)..............................................................................................32

*Regents of the U. of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)..............................................................................................29

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    725 F.3d 1377 (Fed. Cir. 2013)..............................................................................................28

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
    324 F.3d 1346 (Fed. Cir. 2003)..............................................................................................21

*Sciele Pharm. Inc. v. Lupin Ltd.*,
    684 F.3d 1253 (Fed. Cir. 2012)..............................................................................................22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Siemens, AG v. Seagate Tech.*,
   2009 U.S. Dist. LEXIS 132523 (C.D. Cal. Jan. 8, 2009) ..........................................................31

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008)..........................................................................................29

*Suffolk Techs., LLC v. AOL Inc.*,
   752 F.3d 1358 (Fed. Cir. 2014)..........................................................................................32

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) (en banc).................................................................26, 27, 28

*Vapor Point LLC v. Moorhead*,
   832 F.3d 1343 (Fed. Cir. 2016)..........................................................................................25

**Statutes**

35 U.S.C.
   § 102..................................................................................................................................19
   § 102(e) ....................................................................................................................20, 21, 26
   § 271(f)(1) .......................................................................................................................2, 7, 8, 16

Fed. R. Civ. P.
   § 9(b)..................................................................................................................................27
   § 26(a)(2)(B)(i).................................................................................................................28
   § 56(a) ..................................................................................................................................7

## TABLE OF EXHIBITS

All exhibits listed below are exhibits to the Pai Declaration.

| Ex. No. | Description |
|---|---|
| 1 | U.S. Patent No. 8,359,102, bearing an issue date of January 22, 2013, produced in this case as NEVRO_BSXCA0018510-18542 |
| 2 | U.S. Patent No. 8,712,533, bearing an issue date of April 29, 2014, produced in this case as NEVRO_BSXCA0018543-18578 |
| 3 | U.S. Patent No. 8,768,472, bearing an issue date of July 1, 2014, produced in this case as NEVRO_BSXCA0047304-47339 |
| 4 | U.S. Patent No. 8,792,988, bearing an issue date of July 29, 2014, produced in this case as NEVRO_BSXCA0018579-18612 |
| 5 | U.S. Patent No. 9,327,125, bearing an issue date of May 3, 2016, produced in this case as NEVRO_BSXCA0018613-18651 |
| 6 | U.S. Patent No. 9,333,357, bearing an issue date of May 10, 2016, produced in this case as NEVRO_BSXCA0018652-18689 |
| 7 | U.S. Patent No. 9,480,842, bearing an issue date of November 1, 2016, produced in this case as NEVRO_BSXCA0018690-18726 |
| 9 | L. Kapural et al., Novel 10-kHz High-frequency Therapy (HF10 Therapy) Is Superior to Traditional Low-frequency Spinal Cord Stimulation for the Treatment of Chronic Back and Leg Pain:  The SENZA-RCT Randomized Controlled Trial, produced in this case as NEVRO_BSXCA0057094-57103 |
| 10 | A. Foletti et al., Neurostimulation Technology for the Treatment of Chronic Pain: A Focus on Spinal Cord Stimulation, produced in this case as NEVRO_BSXCA0177703-177716 |
| 11 | L. Kapural et al., Comparison of 10-kHz High-Frequency and Traditional Low-Frequency Spinal Cord Stimulation for the Treatment of Chronic Back and Leg Pain: 24-Month Results From a Multicenter, Randomized, Controlled Pivotal Trial, produced in this case as NEVRO_BSXCA0057245-57255 |
| 12 | M. Wallace et al., ACCELERATE:  A Prospective Multicenter Trial Evaluating the Use of High Rate Spinal Cord Stimulation in the Management of Chronic Intractable Pain, produced in this case as NEVRO_BSXCA0016109 |
| 13 | Excerpts of Exhibit 3128 to the deposition of David Caraway, taken on November 14, 2017, which is a Summary of Safety and Effectiveness Data (SSED) document for the Senza Spinal Cord Stimulation (SCS) System |
| 14 | Excerpts of the deposition of David Caraway, taken on November 14, 2017 |
| 15 | Excerpts from the Bank of America Merrill Lynch analyst document titled "Notes from Las Vegas & our survey of 50 US pain docs," dated May 17, 2017, and produced in this case as NEVRO_BSXCA0093967-93984 |
| 16 | Excerpts from the JMP Securities analyst document titled "Initating Coverage on Nevro Corp. with a Market Outperform Rating," dated December 1, 2014, and produced in this case as NEVRO_BSXCA0057005-57046 |
| 17 | Excerpt of the Canaccord Genuity analyst document titled "Compelling growth engine with plenty of fuel in the tank; initiate at BUY, $120 target," dated March 23, 2017, and produced in this case as NEVRO_BSXCA0095672-95728 |
| 18 | Presentation titled "Nevro Study Insights," dated June 2016, and produced in this case as BSC-NVRO_00039303-39352 |
| 19 | Exhibit 149 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is an email chain dated April 17, 2012, produced in this case as BSC-NVRO_00310704-310707 |
| 20 | Excerpts of the deposition of Rafael Carbunaru, taken on November 15, 2017 |

| Ex. No. | Description |
|---|---|
| 21 | Exhibit 151 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is a presentation produced in this case as BSC-NVRO_00123858-123869 |
| 22 | Exhibit 150 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is a BSC document produced in this case as BSC-NVRO_00123853-123857 |
| 23 | Exhibit 152 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is an email chain dated November 8, 2012, produced in this case as BSC-NVRO_00301646-301656 |
| 24 | Excerpts of the deposition of Rafael Carbunaru, taken on May 18, 2017 |
| 25 | BSC's 11/10/17 Supplemental Responses and Objections to Nevro's Interrogatory Requests Nos. 2, 4, 5, and 7 |
| 26 | BSC's Second Supplemental Responses and Objections to Nevro's First Set of Interrogatory Requests (1-8), dated March 31, 2017 |
| 27 | Excerpts of the deposition of Jim Cassidy, taken on May 17, 2017 |
| 28 | Decision Denying Institution of Inter Partes Review, Boston Scientific Neuromodulation Corp. v. Nevro Corp., Case IPR2015-01203 (PTAB Nov. 30, 2015) |
| 29 | Decision Denying Institution of Inter Partes Review, Boston Scientific Neuromodulation Corp. v. Nevro Corp., Case IPR2015-01204 (PTAB Nov. 30, 2015) |
| 30 | Excerpts of Exhibit 36 to the deposition of Rafael Carbunaru, taken on May 18, 2017, which is a PrecisionTM Spinal Cord Stimulator System with MultiWave Technology Clinician Manual, produced in this case as BSC-NVRO_00000034-325 |
| 31 | Excerpts of the deposition of Richard T. Mihran, Ph.D., taken on March 12, 2018 |
| 32 | Excerpts of BSC's Amended and Supplemental Responses and Objections to Nevro's Second Set of Interrogatories (Nos. 9, 10), dated August 24, 2017 |
| 33 | Excerpts of Rebuttal Expert Report of Richard T. Mihran, Ph.D., dated February 14, 2018 |
| 34 | Exhibit 166 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is a document produced by Boston Scientific bearing bates numbers BSC-NVRO_00369788-369789 |
| 35 | Exhibit 167 to the deposition of Rafael Carbunaru, taken on November 15, 2017, which is a document produced by Boston Scientific bearing bates numbers BSC-NVRO_00369790-369791 |
| 36 | Exhibit 24 to the deposition of Jim Cassidy, taken on May 17, 2017, which is a document produced by Boston Scientific bearing bates numbers BSC_NVRO_00014631-14692 |
| 37 | Excerpts of the deposition of Adam Lipson, taken on April 12, 2018 |
| 38 | Excerpts of Boston Scientific Precision Spinal Cord Stimulator system with MultiWave Technology Bionic Navigator HR 1.0 Software Guide, produced in this case as BSC-NVRO_00006798-6849 |
| 39 | Excerpts of BSC's 11/6/17 Supplemental Responses and Objections to Nevro's Second Set of Interrogatories (No. 11), dated November 6, 2017 |
| 40 | Email produced by Boston Scientific bearing bates numbers BSC-NVRO_00720938-720940 |
| 41 | Declaration of Rafael Carbunaru in Support of Boston Scientific's Invalidity Contentions, dated March 17, 2017 |
| 42 | Declaration of Kaoru Lee Adair in Support of Boston Scientific's Motion to Dismiss Nevro's Declaratory Judgment Claims, as redacted by BSC for public filing, filed by BSC in this case on December 27, 2016, at ECF No. 31-1 |

| Ex. No. | Description |
|---------|-------------|
| 43 | Expert Report of Richard T. Mihran, Ph.D., dated January 18, 2018 |
| 44 | Excerpts of Rebuttal Expert Report and Declaration of Daniel Lanovaz, dated February 14, 2018 |
| 45 | Excerpts of the deposition of Sridhar Kothandaraman, taken on November 17, 2017 |
| 46 | Excerpts of Defendants' Second Amended Preliminary Invalidity Contentions, dated August 10, 2017 |
| 47 | Excerpts of the certified file history for U.S. Patent No. 8,712,533 produced in this case as NEVRO_BSXCA0000510-12841 |
| 48 | U.S. Patent Application Publication No. 2009/0204173, bearing a publication date of August 13, 2009, produced in this case as BSC-NVRO_00005950-5981 |
| 49 | Excerpts of the deposition of Konstantinos Alataris, taken on November 14, 2017 |
| 50 | Excerpts of the deposition of Andre B. Walker, taken on November 10, 2017 |
| 51 | Excerpts of the deposition of Zi-Ping Fang, Ph.D., taken on November 2, 2017 |
| 52 | Excerpts of the deposition of Anthony Vincent Caparso, taken on November 2, 2017 |
| 53 | Excerpts of the deposition of Brian Erickson, taken on December 15, 2017 |
| 54 | Excerpts of the deposition of Yougandh Chitre, taken on November 20, 2017 |
| 55 | Excerpts of the deposition of Sangsoo Wesley Park, taken on November 27, 2017 |
| 56 | Excerpts of the deposition of Jon Parker, taken on November 16, 2017 |
| 57 | Excerpts of the deposition of James Thacker, taken on December 7, 2017 |
| 58 | BSC's 12/1/2017 Supplemental Responses and Objections to Nevro's Second Set of Interrogatories (Nos. 10 and 14) dated December 1, 2017 |
| 59 | U.S. Provisional Patent Application No. 60/985,353 to Fang, produced in this case as NEVRO_BSXCA0381455-381520 |
| 60 | U.S. Patent Application No. 12/264,836 to Fang, produced in this case as NEVRO_BSXCA0381386-813454 |
| 61 | U.S. Patent Application No. 12/264,836 to Fang, produced in this case as NEVRO_BSXCA0427767-429023 |
| 62 | Exhibit 3017 to the deposition of Andre B. Walker, taken on November 10, 2017, which consists of August 13, 2012 filings with the U.S. Patent and Trademark Office in connection with U.S. Patent Application No. 12/264,836, produced in this case as BSC-NVRO_00132448-132473 |
| 63 | Exhibit 138 to the deposition of Rafael Carbunaru, taken on November 14, 2017, which is a poster by Yearwood et al., titled A Prospective Comparison of Spinal Cord Stimulation (SCS) Using Dorsal Column Stimulation (DCS), Intraspinal Nerve Root Stimulation (INRS), and Varying Pulse Width in the Treatment of Chronic Low Back Pain, produced in this case as BSC-NVRO_00006057-6063 |
| 64 | Exhibit 137 to the deposition of Rafael Carbunaru, taken on November 14, 2017, which is a case report by Yearwood et al., titled A Prospective Comparison of Spinal Cord Stimulation (SCS) Using Dorsal Column Stimulation (DCS), Intraspinal Nerve Root Stimulation (INRS), and Varying Pulse Width in the Treatment of Chronic Low Back Pain, produced in this case as BSC-NVRO_00006055-6056 |
| 65 | Excerpts of the certified copy of the file history for U.S. Patent No. 8,792,988 produced in this case as NEVRO_BSXCA0002281-3073 |
| 66 | Excerpts of the certified copy of the file history for U.S. Patent No.9,333,357, produced in this case as NEVRO_BSXCA0006238-9351 |

| Ex. No. | Description |
|---|---|
| 67 | Office Action from U.S. Patent Application No. 15/134,285 dated November 28, 2017 |
| 68 | Excerpts of Defendants' Preliminary Invalidity Contentions dated March 17, 2017 |
| 69 | Defendants' Identification of 40 Prior Art Grounds for Invalidity dated December 22, 2017 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 14, 2021, or as soon thereafter as counsel may be heard before the Honorable Vince Chhabria in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff Nevro Corp. will and hereby does move for an order granting summary judgment.  Nevro's motion is based on the pleadings, records, and files in this action; documents in the public record; the accompanying memorandum of points and authorities; the declarations of Eric C. Pai, Konstantinos Alataris, and Ben Pless and accompanying exhibits; and any other evidence and argument that the parties may present.

**CONCISE STATEMENT OF RELIEF SOUGHT**

Nevro seeks summary judgment that:  (1) BSC infringes claims 7 and 35 of the '533 patent, claim 22 of the '842 patent, and claim 55 of the '125 patent in connection with its Precision with MultiWave; (2) BSC's new theories concerning the Precision SCS system do not invalidate the Patents-in-Suit; (3) an application ("Fang") owned by Nevro and related to the '472 patent is not prior art to the other six Patents-in-Suit; and (4) no claim of the Patents-in-Suit is unenforceable as alleged in BSC's inequitable conduct affirmative defense.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Nevro pioneered a new and far more effective form of spinal cord stimulation therapy for pain relief.  Its implantable systems rely on stimulation with a high-frequency signal that does not generate "paresthesia," while traditional SCS providers like Boston Scientific rely on stimulation with low-frequency signals that mask the pain by generating paresthesia.

The clinical effectiveness and other benefits Nevro demonstrated with its innovations led to marketplace success.  BSC, facing what the company itself proclaimed as a significant "threat" from Nevro's high-frequency therapy, decided to copy Nevro.  BSC developed two infringing systems: the Precision with MultiWave and the Spectra WaveWriter.  It also attempted to invalidate Nevro patent claims through two IPR petitions.  Those petitions failed.  BSC nonetheless commercially launched the Precision with MultiWave system in Europe.  Since the

filing of this lawsuit, however, BSC has thus far opted not to commercially launch a high-frequency system in the United States.

This case is on remand after a prior round of summary judgment motions and a Federal Circuit appeal.  Together, this Court's rulings and the Federal Circuit's rulings have eliminated several of BSC's invalidity defenses.  This motion addresses some of the remaining defenses BSC has thrown up to try to defend its copy products.

BSC's Precision with MultiWave in Europe infringes Nevro's patent claims under 35 U.S.C. § 271(f)(1).  BSC supplies the components of the Precision with MultiWave from the United States so as to actively induce their combination in an infringing manner in Europe.  Applying this Court's and the Federal Circuit's claim constructions to the undisputed facts, BSC has no non-infringement arguments.  Nevro therefore seeks partial summary judgment on each element of § 271(f)(1) and summary judgment of infringement with respect to four of Nevro's asserted patent claims.

Nevro also seeks summary judgment on two of BSC's remaining invalidity arguments.  BSC's theories with respect to the Precision SCS system were untimely and improperly disclosed only in BSC's expert reports; Nevro's co-pending motion to strike is all the Court needs to review in order to grant Nevro's motion on these theories.  But these invalidity arguments are also meritless under the Court's construction of "frequency" and the Federal Circuit's construction of "configured to."

Another of BSC's invalidity theories seeks to hold Nevro's later patents invalid on the basis of an earlier filed application—the Fang application.  But under the "common inventive entity" rule, the Fang application is not cognizable as prior art to Nevro's later patents because the relevant subject matter in all of them was invented by the same individuals.

Finally, Nevro seeks summary judgment on BSC's remaining inequitable conduct defense.  BSC's defense fails because BSC has no evidence that an allegedly withheld set of documents—the Yearwood References—are material to patentability, as the Federal Circuit's *Therasense en banc* decision requires.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    FACTUAL BACKGROUND

### A.    Nevro's Novel High-Frequency Paresthesia-Free SCS Technology

Nevro was founded to provide a solution to chronic pain without the drawbacks of traditional SCS therapy.  Nevro's patented SCS technology represents a paradigm shift in SCS therapy and is significantly more effective than traditional systems.

Nevro's SCS technology differs from traditional SCS technology in two fundamental ways.  First, it operates at higher frequencies.  Traditional SCS systems typically operate at a frequency range of between 40-60 Hz, with an upper FDA-approved limit of 1,200 Hz.  (Ex.[1] 9 at NEVRO_BSXCA0057095.)  The commercial embodiment of Nevro's differentiating technology, HF10® therapy, operates at 10 kHz.  (*See id.*)  Applying such high frequencies to the spinal cord was previously viewed as unnecessary and potentially unsafe.  (Pless Decl. ¶¶ 5-9; *see also* Ex. 10 at NEVRO_BSXCA01777703 ("there is no physiological evidence that increasing the pulse rate beyond physiological limits (~300 pps) will provide therapeutic benefit").)

Second, Nevro's therapy is paresthesia-free.  Before Nevro performed its clinical studies, the overwhelming view in the industry was that generating paresthesia was not a mere side effect but *the means* for providing pain relief.  (Ex. 11 at NEVRO_BSXCA0057246.)  This was BSC's view as well.  When BSC presented the poster for its ACCELERATE clinical study comparing high- and low-frequency therapies, it stated:

> Spinal Cord Stimulation (SCS) has been shown to be an effective treatment option for the treatment of chronic intractable pain since the 1990s.  *This has relied on the understanding that in order to successfully achieve pain relief, paresthesia has to be generated to cover the area of pain.*  However, studies indicate that effective pain relief may be obtained by employing stimulation without paresthesia at high frequency settings up to 10 kHz.

(Ex.12 (emphasis added).)  The referenced 10 kHz studies used Nevro's system.

To obtain FDA approval, Nevro was required to conduct an extensive randomized clinical study monitored by the FDA ("the Senza-RCT"), which consisted of a head-to-head comparison of Nevro's systems with BSC's then most-current system, the Precision Plus.  In the study, BSC's

---

[1] "Ex." are documents attached to the Pai Declaration unless otherwise noted.

1  systems were implanted by physicians who normally worked with BSC systems and were

2  programmed by BSC's representatives at parameters of their choosing.  (*See* Ex. 9 at

3  NEVRO_BSXCA0057094-96.)  The outcome was stunning.  After 12 months, a much higher

4  number of patients responded to Nevro's therapy compared to BSC's traditional therapy (78.7%

5  vs. 51.3%) and Nevro's therapy was nearly *twice as effective* as BSC's in providing pain relief for

6  both leg and back pain.  (*Id.* at NEVRO_BSXCA0057099-100.)  The study results were so strong

7  that the FDA approved Nevro's therapy with a rare superiority label, allowing it to promote its

8  system as superior to BSC's traditional SCS therapy.  (Ex. 13 (SSED); Ex. 14, Caraway Dep.

9  163:4-164:23.)  At the 24-month mark, the results of the Senza-RCT study continued to be

10  sustained.  (*See* Ex. 11 at NEVRO_BSXCA0057249-50.)  These same outcomes are reflected in

11  commercial use outside the study.  (Ex. 15 at NEVRO_BSXCA0093967.)

12       In addition to dramatically better pain relief, Nevro's therapy provides other important

13  benefits.  Patients receiving paresthesia-based therapy often experience uncomfortable jolts or

14  shocks, which means the therapy cannot be used while driving or sleeping and limits physical

15  movements.  (*See* Pless Decl. ¶¶ 10-13.)  Because Nevro's therapy is paresthesia-free, it has no

16  such restrictions, allowing patients to return to their normal daily lives.  (*Id.*)

17       The industry recognized Nevro's groundbreaking innovations.  Market analysts praised

18  Nevro's therapy as "a significant leap forward in SCS technology (not just a small advancement,

19  but a fundamental game changer)" and "a truly disruptive technology" that is "driving a paradigm

20  stampede in the spinal cord stimulation field."  (Ex. 16 at 6; Ex. 17 at 1.)  ████████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████  (Ex. 18 at BSC-

23  NVRO_00039321, 322.)

24       **B.   BSC Copied Nevro's Technology**

25       BSC began to lose market share to Nevro and decided to develop its own high-frequency

26  SCS system in response.  In an April 2012 email chain, BSC lamented losing business from one

27  of its previously loyal physicians who was switching to Nevro.  (Ex. 19 at BSC-

28  NVRO_00310706; Ex. 20, Carbunaru Dep. 624:20-628:7.)  BSC VP of Engineering, Rafael

1    Carbunaru, instructed his team, "We should take this as very important.  We should also ask

2    Marketing to get as much information as possible on what Nevro's use model and programming

3    is so that we can make something that addresses the need and not something that gets close to it

4    only." (Ex. 19 at BSC-NVRO_00310705; Ex. 20, Carbunaru Dep. 624:20-627:24.)

5          Just weeks later, on May 17, 2012, BSC authorized the Sprint High Rate Project to

6    develop a high frequency SCS system, which it released as the infringing Precision with

7    MultiWave.  In authorizing this project, BSC focused on emulating Nevro's new technology, with

8    a presentation headlined, "Nevro's high frequency technology presents a threat to BSN." (Ex. 21

9    at BSC-NVRO_00123862; Ex. 22 at BSC-NVRO_00123853; Ex. 20, Carbunaru Dep. 630:20-

10   635:18.)  BSC also gathered information on Nevro's programming parameters to make its

11   competing product.  (Ex. 23 at BSC-NVRO_00301646; Ex. 20, Carbunaru Dep. 658:10-684:19.)

12   Using that information, BSC invested significant resources to develop the Precision with

13   MultiWave: an estimated 50 engineers worked approximately one year on the system.  (Ex. 24,

14   Carbunaru Dep. 136:2-139:21.)

15         In 2014, BSC launched the Precision with MultiWave in Europe.  (Ex. 25 at 5, BSC's

16   Resp. to Rog No. 4.)  BSC manufactured the Precision with MultiWave in the United States and

17   shipped the systems to Europe for distribution.  (Ex. 26 at 6-7, BSC's 2nd Suppl. Resp. to Rog

18   No. 2 (manufacturing in Valencia, CA); Ex. 27, Cassidy Dep. 535:22-537:3.) ███████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ████████████         (Ex. 27, Cassidy Dep. 489:16-21, 491:8-492:17, 729:11-19.)

22         **C.     BSC Challenged Nevro's '102 Patent Before the PTO and Lost**

23         On May 14, 2015, just six days after Nevro received FDA approval, BSC filed two

24   petitions for *inter partes* review seeking to challenge the validity of 16 claims of asserted U.S.

25   Patent No. 8,359,102 (the "'102 patent").  Between its two petitions, Boston Scientific raised four

26   allegedly anticipatory grounds and over 25 obviousness allegations using various combinations of

27   references.  The PTO denied both petitions in their entirety.  (*See* Exs. 28-29.)

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.     Nevro Filed This Lawsuit

Nevro filed suit in November 2016 on six patents that are from the same family—the "'533 patent family"—and share the same specification.[2]  Nevro later added U.S. Patent No. 8,768,472 (the "'472 patent"), which has an earlier November 2007 priority date, to the case.

The Court issued a claim construction and summary judgment order in July 2018. (ECF 449.)  The Court held that the asserted claims of the '533, '125, '357, and '842 patents were invalid as indefinite.  (*Id.* at 1-7.)  The Court held that the remaining asserted claims were not invalid, but that BSC did not infringe these claims.  (*Id.* at 7-9.)

The Court's order did not resolve Nevro's declaratory judgment claims.  The parties agreed to dismiss those claims without prejudice on ripeness grounds, based on BSC's representation that no U.S. launch of a high-rate product was imminent and that BSC had not decided whether to launch such a product; had not established a timeline for when such a decision might be made, if ever; and had not determined what frequencies would be enabled if it were to decide to launch such a product in the future.  (ECF 453.)  The Court entered the parties' stipulated final judgment.  (ECF 477.)  Nevro appealed the judgment of invalidity and BSC cross-appealed the Court's ruling that the remaining claims were not indefinite.

In April 2020, the Federal Circuit issued its opinion and judgment, which vacated the judgment of invalidity and remanded.  (ECF 509, 510.)  The Federal Circuit held that the claims challenged in BSC's cross-appeal are not indefinite.  (ECF 509 at 6, 16.)  The Federal Circuit also construed the following claim terms:

| Claim Term | Federal Circuit's Construction |
|---|---|
| "paresthesia-free" (including "non-paresthesia-producing" and similar phrases) | "does not produce a sensation usually described as tingling, pins and needles, or numbness" (ECF 509 at 8-9.) |
| "configured to" | "programmed to" (ECF 509 at 12.) |

---

[2] In addition to the '102 patent, the six patents are U.S. Patent Nos. 8,712,533 (the "'533 patent"), 8,792,988 (the "'988 patent"), 9,327,125 (the "'125 patent"), 9,333,357 (the "'357 patent"), and 9,480,842 (the "'842 patent") (Exs. 1-7).

| Claim Term | Federal Circuit's Construction |
|---|---|
| "means for generating" | "means-plus-function term, having a function of 'generating' and a structure of 'a signal/pulse generator configured to generate' the claimed signals" (ECF 509 at 14.) |
| "therapy signal" | "a spinal cord stimulation or modulation signal to treat pain" (ECF 509 at 16.) |

### III.   BSC'S PRECISION WITH MULTIWAVE INFRINGES NEVRO'S CLAIMS

Nevro bears the burden of proving infringement under a "preponderance of the evidence" standard. *See Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997) (affirming summary judgment of infringement). Nevro readily meets this burden. BSC infringes claims 7 and 35 of the '533 patent, claim 22 of the '842 patent, and claim 55 of the '125 patent under 35 U.S.C. § 271(f)(1), which provides:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

As discussed below, the undisputed facts show that BSC supplied the components of the Precision with MultiWave from the United States so as to actively induce their combination in an infringing manner in Europe. BSC did so with specific intent, satisfying the "actively induce" element of § 271(f). *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1222 (Fed. Cir. 2006). Therefore, Nevro seeks partial summary judgment on each element of § 271(f)(1) individually, including intent. *See* Fed. R. Civ. P. 56(a) (summary judgment may be sought on "part of each claim or defense"). If the Court determines that summary judgment is appropriate on every element of § 271(f)(1), it should grant summary judgment of infringement.

#### A.   BSC Supplied "All or a Substantial Portion of the Components" of the Precision with MultiWave from the United States

The Precision with MultiWave system includes an implantable pulse generator ("IPG") that generates therapy signals, and "leads" (wires containing electrodes) that are implanted epidurally to deliver the therapy signals to the patient's spinal cord. (Ex. 24, Carbanaru Dep.

11:7-17, 168:13-169:2; Ex. 30 at 2.)  BSC manufactured both the IPG and the leads in the United States and shipped them to Europe.  (Ex. 26 at 6-7, BSC's 2nd Suppl. Resp. to Rog No. 2 (manufacturing in Valencia, CA); Ex. 27, Cassidy Dep. 535:22-538:25.) ███████████████ █████████████████████████████████████████████████████  (*Id.* 538:4-17.)  Thus, BSC supplied these components from the United States in "uncombined" form under § 271(f).

**B.      The Components of the Precision with MultiWave Are Combined in an Infringing Manner in Europe**

In Europe, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████  Physicians following BSC's Clinician Manual implant the leads in a patient's epidural space and connect the leads to the IPG.  (Ex. 24, Carbunaru Dep. 11:1-6, 168:13-169:2; Ex. 30 at 2, 14-17, 23-26, 30-31; Ex. 27, Cassidy Dep. 478:22-479:12.) ████████████████████████████████████████ █████████████████████████████████████████.  (Ex. 27, Cassidy Dep. 489:16-21, 491:8-492:17, 729:11-19.)  So combined, the Precision with MultiWave system infringes Nevro's claims as set forth below.

**1.      The Precision with MultiWave Infringes Claim 7 of the '533 Patent**

The Precision with MultiWave meets every element of claim 7, which reads:

> Claim 1 (unasserted): A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising: a signal generator configured to generate a non-paresthesia-producing therapy signal, wherein at least a portion of the therapy signal is at a frequency in a frequency range from 1.5 kHz to 100 kHz; and an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region.
>
> Claim 7: The system of claim 1, wherein the frequency range is from 1.5 kHz to 50 kHz.

---

[3] It is unclear whether § 271(f)(1) requires that the components actually be combined or merely that the infringer intended for them to be combined in an infringing manner.  *Compare Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d 1057, 1072 (C.D. Cal. 2009) ("[T]he Federal Circuit has held that, 'At no point does the statutory language require or suggest that the infringer must actually combine or assemble the components.'") (citation omitted) *with Liquid Dynamics*, 449 F.3d at 1222-23.  Nevro's motion satisfies either interpretation of § 271(f)(1).

1

2

          **a.**      **Claim 1, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:"**

3        BSC's technical expert, Dr. Richard Mihran, confirmed that the Precision with MultiWave

4        is "a spinal-cord-modulation system for reducing or eliminating pain." (Ex. 31, Mihran Dep.

5        94:9-13.) "The Precision Spinal Cord Stimulator System with Multiwave . . . is indicated as an

6        aid in the management of chronic intractable pain." (Ex. 30 at 4; Ex. 24, Carbanaru Dep. 168:13-

7        169:2; Pless Decl. ¶¶ 16-19.) BSC has not disavowed Dr. Mihran's statement or otherwise set

8        forth any evidence that Precision with MultiWave does not meet this limitation. (*See, e.g.*, Ex. 32

9        at 13, BSC's Suppl. Resp. to Rog No. 9; Ex. 33, Mihran Rbtl. ¶¶ 234-35.)

10

          **b.**      **Claim 1, Element [a]: "a signal generator configured to generate a non-paresthesia-producing therapy signal"**

11

12        The Precision with MultiWave system includes an IPG or implantable pulse generator,

        which is a "signal generator." (Ex. 24, Carbanuru Dep. 11:7-17.) Under the Federal Circuit's

13        claim construction, a signal generator "configured to" generate a non-paresthesia-producing

14        therapy signal must be "programmed to" generate such a therapy signal. (ECF 509 at 12.) BSC

15        has admitted that commercial patients "have been programmed [] using the Precision with

16        MultiWave in Europe at frequencies higher than 1.5 kilohertz who had therapeutic results without

17        paresthesia." (Ex. 20, Carbanuru Dep. 567:9-16; Pless Decl. ¶¶ 20-27.)

18

          **c.**      **Claim 1, Element [c]: "an implantable signal delivery device electrically coupleable to the signal generator and configured to deliver the therapy signal to the patient's spinal cord region"**

19

20        Dr. Mihran admits that the Precision with MultiWave uses "implantable" leads. (Ex. 31,

21        Mihran Dep. 95:16-24.) The leads "deliver[] electrical stimulation to the nerve structures in the

22        dorsal aspect of the spinal cord." (Ex. 30 at 2; Ex. 24, Carbanaru Dep. 168:13-169:2.) BSC's

23        Clinician Manual provides specific instructions on implanting and electrically coupling the leads

24        to the signal generator. (Ex. 30 at 30-31.) Physicians following these instructions implant the

25        leads in a patient's epidural space and connect the leads to the IPG. (Ex. 24, Carbanaru Dep.

26        11:7-17, 168:13-169:2; Ex. 30 at 2, 14-17, 23-26, 30-31; Ex. 27, Cassidy Dep. 478:22-479:12.)

27        BSC admits that when the leads have been implanted and connected to the IPG, they are

28

1   configured to deliver the therapy signal to the patient's spinal cord region.  (Ex. 31, Mihran Dep.

2   93:18-101:17; Pless Decl. ¶¶ 32-36.)

3               d.      Claim 7: "The system of claim 1, wherein the frequency range
                        is from 1.5 kHz to 50 kHz."
4

5           The Precision with MultiWave has a "default" high-frequency parameter of "10,000 Hz"

6   and a programmable high-frequency range of "2 kHz – 10 kHz."  (Ex. 30 at 51.)  As discussed

7   above, commercial patients "have been programmed [] using the Precision with MultiWave in

8   Europe at frequencies higher than 1.5 kilohertz," including at frequencies of 2 kHz and 10 kHz.

9   (Ex. 20, Carbunaru Dep. 567:9-16, 762:10-765:17, 766:3-9, 768:1-773:14; Ex. 34 at BSC-

10  NVRO_00369789; Ex. 35 at BSC-NVRO_00369791; Pless Decl. ¶¶ 28-31, 37.)

11          **2.      The Precision with MultiWave Infringes Claim 35 of the '533 Patent**

12          The Precision with MultiWave meets every element of claim 35, which reads:

13          Claim 21 (unasserted): A spinal cord stimulation system for
            reducing or eliminating pain in a patient, the system comprising: an
14          implantable signal generator configured to generate a non-
            paresthesia-producing therapy signal, wherein at least a portion of
15          the therapy signal is at a frequency in a frequency range from 3 kHz
            to 20 kHz, and a current amplitude in a current amplitude range
16          from 0.1 mA to 20 mA; and a signal delivery device electrically
            coupled to the implantable signal generator and configured to
17          deliver the therapy signal to the patient's spinal cord.

18          Claim 35: The system of claim 21, wherein at least a portion of the
            therapy signal has a pulse width in a pulse width range from 25
19          microseconds to 166 microseconds.

20               a.      Claim 21, Preamble: "A spinal cord stimulation system for
                         reducing or eliminating pain in a patient, the system
21                       comprising:"

22          Dr. Mihran confirmed that the Precision with MultiWave is "a spinal-cord-modulation

23  system for reducing or eliminating pain."  (Ex. 31, Mihran Dep. 94:9-13.)  "The Precision Spinal

24  Cord Stimulator System with Multiwave . . . is indicated as an aid in the management of chronic

25  intractable pain."  (Ex. 30 at 4; Ex. 24, Carbunaru Dep. 168:13-169:2.)  A spinal cord modulation

26  system is the same as a spinal cord stimulation system—the terms are used interchangeably.

27  (Pless Decl. ¶¶ 16-19, 38.)

28

1
2

        **b.**      **Claim 21, Element [a]: "an implantable signal generator configured to generate a non-paresthesia-producing therapy signal"**

3

As discussed above, the Precision with MultiWave system includes an IPG or implantable

4

pulse generator, which is an "implantable signal generator." (Ex. 24, Carbanaru Dep. 11:7-17.)

5

BSC has admitted that commercial patients "have been programmed [] using the Precision with

6

MultiWave in Europe at frequencies higher than 1.5 kilohertz who had therapeutic results without

7

paresthesia." (Ex. 20, Carbanaru Dep. 567:9-16; Pless Decl. ¶¶ 20-27, 39.)

8
9

        **c.**      **Claim 21, Element [b]: "wherein at least a portion of the therapy signal is at a frequency in a frequency range from 3 kHz to 20 kHz"**

10

The Precision with MultiWave has a "default" high-frequency parameter of "10,000 Hz"

11

and a programmable high-frequency range of "2 kHz – 10 kHz." (Ex. 30 at 51.) Commercial

12

patients "have been programmed [] using the Precision with MultiWave in Europe at frequencies

13

higher than 1.5 kilohertz," including at a frequency of 10 kHz. (Ex. 20, Carbanaru Dep. 567:9-

14

16, 762:10-765:17, 766:3-9, 768:1-773:14; Ex. 34, at BSC-NVRO_00369789; Ex. 35 at BSC-

15

NVRO_00369791; Pless Decl. ¶¶ 28-31, 40.)

16

        **d.**      **Claim 21, Element [c]: "a current amplitude in a current amplitude range from 0.1 mA to 20 mA"**

17
18

BSC admits that "stimulation frequencies between 2,000 Hz and 10,000 Hz are used with

19

a pulse width of 20-240 µsec and an amplitude of 0-9mA." (Ex. 26 at 3, BSC's Resp. to Rog No.

20

1; Ex. 30 at 51; Ex. 36 at 51; Ex. 24, Carbanaru Dep. 168:13-169:2.) BSC's commercial patients

21

have been programmed using the Precision with MultiWave in Europe at a frequency of 10 kHz

22

and amplitudes between 2.46 and 4.9 mA. (Ex. 34 at BSC-NVRO_00369789; Ex. 35 at BSC-

23

NVRO_00369791; Ex. 20, Carbanaru Dep. 762:10-765:10, 765:12-17, 766:3-9, 768:1-770:22,

770:23-773:14; Pless Decl. ¶¶ 41-44.)

24
25

        **e.**      **Claim 21, Element [d]: "a signal delivery device electrically coupled to the implantable signal generator and configured to deliver the therapy signal to the patient's spinal cord"**

26
27

The Precision with MultiWave uses leads that "deliver[] electrical stimulation to the nerve

28

structures in the dorsal aspect of the spinal cord." (Ex. 30 at 2; Ex. 24, Carbanaru Dep. 168:13-

169:2.)  BSC's Clinician Manual provides specific instructions on implanting and electrically

coupling the leads to the signal generator.  (Ex. 30 at 30-31.)  Physicians following these

instructions implant the leads in a patient's epidural space and connect the leads to the IPG.  (Ex.

24, Carbunaru Dep. 11:1-6, 168:13-169:2; Ex. 30 at 2, 14-17, 23-26, 30-31; Ex. 27, Cassidy Dep.

478:22-479:12; Pless Decl. ¶¶ 32-36, 45-47.)

**f.     Claim 35: "The system of claim 21, wherein at least a portion of the therapy signal has a pulse width in a pulse width range from 25 microseconds to 166 microseconds."**

As discussed above, BSC's commercial patients have been programmed using the

Precision with MultiWave in Europe at a frequency of 10 kHz.  (Ex. 20, Carbunaru Dep. 567:9-

16, 762:10-765:17, 766:3-9, 768:1-773:14; Ex. 34 at BSC-NVRO_00369789; Ex. 35 at BSC-

NVRO_00369791.)  ███████████████████████████████████████████

███████████████████████████.  (Ex. 20, Carbunaru Dep. 768:1-10; Pless Decl. ¶¶ 48-50.)

**3.     The Precision with MultiWave Infringes Claim 22 of the '842 Patent**

The Precision with MultiWave meets every element of claim 22, which reads:

> Claim 22: A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising: a signal generator configured to generate a therapy signal in accordance with one or more therapy signal parameters; an implantable signal delivery device configured to electrically couple to the signal generator and configured to be implanted in the patient's epidural space to deliver the therapy signal to the patient's spinal cord; and a programmer configured to be in wireless communication with the signal generator and configured to modify at least one of the one or more therapy signal parameters in the signal generator, wherein the one or more therapy signal parameters include, for at least a portion of the therapy signal, (a) a frequency of 10 kHz, (b) an amplitude up to 6 mA, and (c) pulses with a pulse width between 30 microseconds and 35 microseconds.

**a.     Claim 22, Preamble: "A spinal cord modulation system, comprising:"**

BSC admits that the Precision with MultiWave is "a spinal-cord-modulation system."

(Ex. 31, Mihran Dep. 94:9-13; *see also* Pless Decl. ¶¶ 51-52.)

**b.     Claim 22, Element [a]: "a signal generator configured to generate a therapy signal in accordance with one or more therapy signal parameters"**

The Precision with MultiWave system includes an IPG which is a "signal generator."

1   (Ex. 24, Carbonaru Dep. 11:7-17.) ████████████████████████████████████

2   ████████████████████████████████████████████████████████████████████.

3   (Ex. 24, Carbonaru Dep. 25:15-26:22; Ex. 27 [ECF 373-9] at 43:12-44:9, 491:8-492:17; Ex. 37

4   [ECF 379-18] at 294:24-296:12; Pless Decl. ¶¶ 53-54.)

5
              **c.    Claim 22, Element [b]: "an implantable signal delivery device**
6                     **configured to electrically couple to the signal generator and**
                      **configured to be implanted in the patient's epidural space to**
7                     **deliver the therapy signal to the patient's spinal cord"**

8       The Precision with MultiWave uses "implantable" leads.  (Ex. 31, Mihran Dep. 95:16-24.)

9   The leads "deliver[] electrical stimulation to the nerve structures . . . of the spinal cord."  (Ex. 30

10  at 2; Ex. 24, Carbonaru Dep. 168:13-169:2.)  BSC's Clinician Manual provides specific

11  instructions on implanting and electrically coupling the leads to the signal generator.  (Ex. 30 at

12  30-31.)  Physicians following these instructions implant the leads in a patient's epidural space and

13  connect the leads to the IPG.  (Ex. 24, Carbonaru Dep. 11:1-6, 168:13-169:2; Ex. 30 at 2, 14-17,

14  23-26, 30-31; Ex. 27, Cassidy Dep. 478:22-479:12; Pless Decl. ¶¶ 55-61.)

15
              **d.    Claim 22, Element [c]: "a programmer configured to be in**
16                    **wireless communication with the signal generator and**
                      **configured to modify at least one of the one or more therapy**
                      **signal parameters in the signal generator"**

17      The Precision with MultiWave system includes a Clinician Programmer that

18  communicates wirelessly with the IPG (Ex. 20, Carbonaru Dep. 589:3-25; Ex. 38 at BSC-

19  NVRO_00006801) and allows various signal parameters to be selected and modified.  (Ex. 24,

20  Carbonaru Dep. 25:15-26:22; Ex. 27, Cassidy Dep. 43:12-44:9, 491:8-492:17; Ex. 37, Lipson

21  Dep. 294:24-296:12; Pless Decl. ¶¶ 62-66.) ████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████  (Ex. 24, Carbonaru Dep. 25:15-26:22; Ex.

24  27, Cassidy Dep. 43:12-44:9, 491:8-492:17; Ex. 37, Lipson Dep. 294:24-296:12.)

25
              **e.    Claim 22, Element [d]: "wherein the one or more therapy signal**
26                    **parameters include, for at least a portion of the therapy signal,**
                      **(a) a frequency of 10 kHz, (b) an amplitude up to 6 mA, and (c)**
27                    **pulses with a pulse width between 30 microseconds and 35**
                      **microseconds."**

28      The Precision with MultiWave system has a "default" frequency of "10,000 Hz," a

1  programmable frequency range of "2 kHz – 10 kHz," amplitude range of 0 to 9 mA, pulse width

2  range of 20 to 240 microseconds, and a default pulse width of 30 microseconds.  (Ex. 30 at 51;

3  Ex. 24, Carbunaru Dep. 168:13-169:2.) ███████████████████████████████████████████

4  ██████████████████████████████████ (Ex. 27, Cassidy Dep. 43:12-44:9, 491:8-492:17;

5  Ex. 37, Lipson Dep. 294:24-296:12.)  BSC's commercial patients "have been programmed []

6  using the Precision with MultiWave in Europe at frequencies higher than 1.5 kilohertz" (Ex. 20,

7  Carbunaru Dep. 567:9-16), including at a frequency of 10 kHz, amplitudes between 2.46 and 4.9

8  mA, and pulse widths at 20, 30, and 40 microseconds.  (Ex. 34 at BSC-NVRO_00369789; Ex. 35

9  at BSC-NVRO_00369791; Ex. 20, Carbunaru Dep. 762:10-765:10, 765:12-17, 766:3-9, 768:1-

10  770:22, 770:23-773:14; Pless Decl. ¶¶ 67-74.)

11          **4.**        **The Precision with MultiWave Infringes Claim 55 of the '125 Patent**

12  The Precision with MultiWave meets every element of claim 55, which reads:

13      Claim 55: A spinal cord modulation system for reducing or
14  eliminating pain in a patient, the system comprising: means for
    generating a non-paresthesia-producing therapy signal, wherein: at
    least a portion of the therapy signal is at a frequency in a frequency
15  range from 3 kHz to 20 kHz; the therapy signal includes pulses
    having a pulse width in a pulse width range from 25 microseconds
16  to 166 microseconds; and the therapy signal includes a current
    amplitude in a current amplitude range from 0.5 milliamps to 10
17  milliamps; and wherein the system further comprises: means for
    delivering the therapy signal to the patient's spinal cord region,
18  wherein the means for delivering the therapy signal is configured to
    be implanted in the patient's epidural space.

19

20          **a.**        **Claim 55, Preamble: "A spinal cord modulation system for reducing or eliminating pain in a patient, the system comprising:"**

21

22  Dr. Mihran confirmed that the Precision with MultiWave is "a spinal-cord-modulation

23  system for reducing or eliminating pain."  (Ex. 31, Mihran Dep. 94:9-13.)  "The Precision Spinal

24  Cord Stimulator System with Multiwave . . . is indicated as an aid in the management of chronic

intractable pain."  (Ex. 30 at 4; Ex. 24, Carbunaru Dep. 168:13-169:2; Pless Decl. ¶¶ 75-78.)

25

26          **b.**        **Claim 55, Element [a]: "means for generating a non-paresthesia-producing therapy signal, wherein: at least a portion of the therapy signal is at a frequency in a frequency range from 3 kHz to 20 kHz"**

27

28  The Federal Circuit construed "means for generating" as a means-plus-function term, with

a function of "generating" and a structure of "a signal/pulse generator configured to generate" the claimed signals.  (ECF 509 at 14.)  As discussed above, the Precision with MultiWave system includes an IPG or implantable pulse generator, which is a signal/pulse generator.  (Ex. 24, Carbunaru Dep. 11:7-17; Pless Decl. ¶¶ 79-80.)  The IPG is configured to generate the claimed signal: BSC has admitted that commercial patients "have been programmed [] using the Precision with MultiWave in Europe at frequencies higher than 1.5 kilohertz who had therapeutic results without paresthesia," including at a frequency of 10 kHz.  (Ex. 20, Carbunaru Dep. 567:9-16, 762:10-765:17, 766:3-9, 768:1-773:14; Ex. 34 at BSC-NVRO_00369789; Ex. 35 at BSC-NVRO_00369791; Pless Decl. ¶¶ 81-85.)

        **c.**      **Claim 55, Element [b]: "the therapy signal includes pulses having a pulse width in a pulse width range from 25 microseconds to 166 microseconds"**

As discussed above, BSC's commercial patients have been programmed using the Precision with MultiWave in Europe at a frequency of 10 kHz.  (Ex. 20, Carbunaru Dep. 567:9-16, 762:10-765:17, 766:3-9, 768:1-773:14; Ex. 34 at BSC-NVRO_00369789; Ex. 35 at BSC-NVRO_00369791.)  ███████████████████████████████████████████████

████████████████████████████  (Ex. 20, Carbunaru Dep. at 768:1-10; Pless Decl. ¶¶ 86-89.)

        **d.**      **Claim 55, Element [c]: "the therapy signal includes a current amplitude in a current amplitude range from 0.5 milliamps to 10 milliamps"**

BSC admits that "stimulation frequencies between 2,000 Hz and 10,000 Hz are used with a pulse width of 20-240 µsec and an amplitude of 0-9mA."  (Ex. 26 at 3, BSC's 2nd Suppl. Resp. to Rog No. 1; Ex. 30 at 51; Ex. 36 at 51; Ex. 24, Carbunaru Dep. 168:13-169:2.)  BSC's commercial patients have been programmed using the Precision with MultiWave in Europe at a frequency of 10 kHz and amplitudes between 2.46 and 4.9 mA.  (Ex. 34 at BSC-NVRO_00369789; Ex. 35 at BSC-NVRO_00369791; Ex. 20, Carbunaru Dep. 762:10-765:10, 765:12-17, 766:3-9, 768:1-770:22, 770:23-773:14; Pless Decl. ¶¶ 90-94.)

1

               **e.**      **Claim 55, Element [d]: "wherein the system further comprises:**

2
                                **means for delivering the therapy signal to the patient's spinal cord region, wherein the means for delivering the therapy signal is configured to be implanted in the patient's epidural space"**

3

4
       In the prior claim construction briefing, the parties agreed that "means for delivering" is a

5
means-plus-function term with a function of "delivering" and a corresponding structure of "a

6
lead." (ECF 357-4 at 20 n.10.)  The Precision with MultiWave uses "implantable" leads.  (Ex.

7
31, Mihran Dep. 95:16-24.)  The leads "deliver[] electrical stimulation to the nerve structures . . .

8
of the spinal cord." (Ex. 30 at 2; Ex. 24, Carbunaru Dep. 168:13-169:2.)  Physicians following

9
the instructions in BSC's Clinician Manual implant the leads in a patient's epidural space and

10
connect the leads to the IPG. (Ex. 30 at 2, 14-17, 23-26, 30-31; Ex. 24, Carbunaru Dep. 11:7-17,

11
168:13-169:2; Ex. 27, Cassidy Dep. at 478:22-479:12; Pless Decl. ¶¶ 55-61, 95-96.)

12
    **C.**      **BSC Actively Induced the Infringing Combination of the Precision with MultiWave**

13

14
       A finding of infringement under § 271(f)(1) requires intent to cause the combination of a

15
patented invention outside the United States. *See Liquid Dynamics*, 449 F.3d at 1222-23.  Intent

may be proven through circumstantial evidence, including product manuals. *Id.* at 1223.

16
       BSC's own documents and testimony show that BSC had the requisite intent.  BSC knew

17
of the '533 patent in October 2014, and it became aware of the '842 and '125 patents in

18
November 2016. (Ex. 39, Supp. Rog. Resp. 11 at 4-5; Pless Decl. ¶¶ 97-98.)  BSC makes the

19
components of the Precision with MultiWave system in the United States and supplies these

20
components to Europe, and, as shown above, these components have been combined to generate

21
signals that fall within the claimed parameter ranges.  BSC's intent that the components be

22
combined in such an infringing manner cannot be genuinely disputed because, █████████████

23
████████████████████████████████████████████████

24
██████ (Ex. 27, Cassidy Dep. at 489:16-21, 491:8-492:17, 729:11-19.) █████████████

25
██████████████████████████████████████████████

26
███████████████████████████ (*Id.*)  BSC's intent that the components be

27
combined in such a manner is further shown in BSC's documents.  BSC provides practitioners

28

1  with "Suggested Programming Parameters" of "Frequency – 10,000 Hz," ██████████████

2  ████████████████████████████████████ for the Precision with MultiWave.

3  (Ex. 40 at BSC-NVRO_720938-40; *see also* Ex. 30 at 51; Ex. 24, Carbunaru Dep. 168:13-169:2.)

4  BSC also provides detailed instructions on implanting and coupling, setting the amplitude, and

5  the placement of leads.  (Pless Decl ¶¶ 99-120; Ex. 30 at 14-17, 30-31; Ex. 24 at 168:13-169:2.)

6  As there can be no genuine dispute that BSC had the requisite intent under § 271(f), the Court

7  should grant summary judgment in Nevro's favor on this element.

8  **IV.    THE VALIDITY OF NEVRO'S ASSERTED PATENT CLAIMS**

9          **A.    BSC's Undisclosed New Theories Concerning the Precision SCS System Fail**

10          BSC's experts opine that the asserted claims are invalid over the Precision SCS system

11  based on two untimely and improperly disclosed theories: a "frequency harmonics" theory and a

12  ██████████████████ theory.  Neither theory was disclosed in BSC's invalidity contentions.  Both

13  were disclosed for the first time in BSC's expert reports and should be stricken as set forth in

14  Nevro's motion to strike.  If this improper material is stricken, BSC will have no evidence on

15  these theories and summary judgment of no invalidity based on them will be appropriate.  And

16  even if the Court does not strike these theories, it should grant summary judgment of no invalidity

17  based on this Court's and the Federal Circuit's claim constructions.

18          **1.    "Frequency harmonics" do not meet the "frequency" limitations**

19          All of the asserted claims require SCS systems or methods for providing stimulation at a

20  frequency of 1,500 Hz or higher.  Under this Court's construction of "frequency" as "fundamental

21  frequency" or "pulse rate," the Precision SCS prior art system did not provide stimulation at a

22  frequency of 1,500 Hz or higher.

23          BSC's own witnesses have testified that the Precision SCS prior art system was not

24  capable of being programmed to generate stimulation frequencies greater than 1,200 Hz.  Dr.

25  Rafael Carbunaru stated that "the Precision™ SCS System was capable of being programmed by

26  a user to generate pulse frequencies in the range of 0 to 1,200 Hz" and described the system's

27  "frequency range" as having an "upper limit of 1,200 Hz."  (Ex. 41, Carbunaru Decl. ¶ 11.)  He

28  stated that the software and firmware of the Precision system limited the frequency to this range,

1    and that changes to the software and firmware would be required to render the system

2    programmable to generate frequencies greater than 1,200 Hz.  (*Id.*)  Ms. Adair also stated that

3    "BSC's commercially distributed SCS systems have been providing stimulation at a frequency

4    range up to 1,200 Hz since 2004."  (Ex. 42, Adair Decl. ¶ 4.)

5         Dr. Mihran offered an invalidity opinion in his opening expert report regarding alleged

6    "frequency harmonics" in the Precision system that is not based on the adopted construction of

7    "frequency."  His report describes a complicated series of experiments using an assembled

8    Precision system and abstract mathematical signal decomposition analyses using the Fourier

9    series purporting to show that the "spectral energy" of the "frequency harmonics" exceeds

10   1,500 Hz when the system is operated at frequencies that do not exceed the Precision system's

11   upper limit of 1,200 Hz.  (Ex. 43, Mihran Rpt. ¶¶ 402-476.)  Nevro has moved to strike this late

12   disclosed theory—even though BSC attempts to tie the new theory to its proposed claim

13   construction, it never sought leave to amend its invalidity contentions.  But even if the Court does

14   not strike it, Dr. Mihran's theory depends on BSC's rejected construction of "frequency" as

15   "frequency components in a frequency range."  (*Id.* ¶¶ 1411-1442.)  Dr. Mihran's theory fails

16   under the Court's construction of "frequency" as "fundamental frequency" or "pulse rate."  Under

17   that construction, the Court should grant summary judgment of no invalidity because it is

18   undisputed that the Precision system's stimulation pulse rates had an upper limit of 1,200 Hz and

19   do not meet the frequency limitations of the asserted claims.

20        **2.    The Precision SCS system was not programmed to generate the
             claimed stimulation frequencies**

21        In their rebuttal non-infringement reports, Dr. Mihran and Dr. Lanovaz opined for the first

22   time that ███████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████  (Ex. 33, Mihran Rbtl. ¶¶ 133-

26   145; Ex. 44, Lanovaz Rbtl. ¶¶ 44, 57-58.)  They suggest that this capability renders certain

27   asserted claims invalid.  (Ex. 33, Mihran Rbtl. ¶¶ 112-115; Ex. 44, Lanovaz Rbtl. ¶¶ 44, 57-58.)

28

1    Nevro has moved to strike this theory as untimely and improperly disclosed.  But this theory fails

2    for the additional reason that under the Federal Circuit's construction of "configured to," the

3    Precision prior art system was not "configured to" generate such signals as the claims require.

4          The Federal Circuit construed "configured to" as "programmed to."  As discussed above,

5    BSC's own witnesses have testified that the Precision prior art system was not capable of being

6    programmed to generate stimulation frequencies greater than 1,200 Hz.  (Ex. 41, Carbanuru Decl.

7    ¶ 11; Ex. 42, Adair Decl. ¶ 4.)  Dr. Carbanuru described the design process that BSC later

8    undertook to transform the Precision system into the high frequency Precision with MultiWave as

9    including software and firmware changes that required about a year of R&D development and as

10    many as 50 people.  (Ex. 24, Carbanuru Dep. 136:2-139:21.)  Drs. Mihran and Lanovaz's

11    ███████████ theory cannot change the admissions of BSC's witnesses that the Precision

12    system was not programmed to generate high frequency stimulation.  Indeed, BSC's own

13    admission that "this engineering interface was not used to program a Precision system above 1.2

14    kHz for use in a patient" is fatal to the ██████████ theory under the Federal Circuit's

15    construction.  (*See* ECF No. 358 at 45.)  BSC cannot show that Precision SCS was known or

16    shown to work for the intended purpose of high-frequency, paresthesia-free therapy.  *Barry v.*

17    *Medtronic, Inc.*, 914 F.3d 1310, 1322 (Fed. Cir. 2019).

18          There is also no evidence that Drs. Mihran and Lanovaz's ███████████

19    modification—███████████ was known or publicly used such that it even qualifies as prior

20    art.  BSC cannot show that the requirements of any section of the statute are satisfied by such a

21    secret and hypothetical revision to the system.  35 U.S.C. § 102; *see BASF Corp. v. SNF Holding*

22    *Co.*, 955 F.3d 958, 964-66 (Fed. Cir. 2020) (concluding that "known or used" prong under

23    § 102(a) must be "accessible to the public" and does not apply when knowledge or use is

24    protected by confidentiality and that public use under § 102(b) must be "not purposely hidden").

25    BSC does not even assert that any member of the public knew of Drs. Mihran and Lanovaz's

26    ███████████ before the critical date, admits that no one ever used it in a patient, and

27    hides its existence from the public.  (*See* ECF No. 358 at 45; *see also* Ex. 45, Kothandaraman

28    Dep. 32:4-33:12.)  Indeed, BSC continues to conceal the ███████████ even today and

1    has repeatedly moved to seal any filing that refers to it, admitting that it is not public information

2    and arguing that its disclosure would be a threat to "public safety."  (ECF No. 357-1 ¶ 14; ECF

3    No. 357-2 ¶ 4); *see Barry*, 914 F.3d at 1327 (finding "invention was not accessible to the public

4    before the critical date" because of confidentiality); *Dey, L.P. v. Sunovion Pharm., Inc*., 715 F.3d

5    1351, 1359 (Fed. Cir. 2013) ("[I]f members of the public are not informed of, and cannot readily

6    discern, the claimed features of the invention in the allegedly invalidating prior art, the public has

7    not been put in possession of those features.").

8         As BSC has set forth no evidence that Drs. Mihran and Lanovaz's ███████████████

9    was accessible to the public or known or used for the intended purpose of high frequency

10   paresthesia-free therapy, the Court should grant summary judgment of no invalidity based on this

11   theory.

12        **B.    The Fang Reference Is Not Section 102(e) Prior Art**

13        BSC alleges that the Fang reference, a patent application owned by Nevro that is related to

14   the asserted '472 Patent, anticipates the asserted claims of the other six Patents-in-Suit (the "'533-

15   family patents").  (*See* Ex. 46 at 22, 2nd Am. Invalidity Contentions.)  The "common inventive

16   entity" rule defeats BSC's theory.  35 U.S.C. § 102(e) (pre-AIA) does not allow challengers to

17   use an inventor's own invention against him.  Fang cannot be prior art because the disclosures

18   BSC relies on in Fang were invented by the same inventors as the inventors of the relevant

19   subject matter in the '533-family patents.  BSC asserts that Fang's disclosure of a high-frequency,

20   paresthesia-free pain treatment anticipates the high frequency, paresthesia-free claim limitations

21   in the asserted claims of the '533-family Patents.  The undisputed evidence establishes that named

22   inventors Konstantinos Alataris and Andre Walker are the sole inventors of that subject matter in

23   Fang and of that same subject matter in the '533-family Patents.  In the face of that evidence,

24   BSC cannot show a material dispute of fact sufficient to meet its burden of proof of showing

25   invalidity by clear and convincing evidence.

26        **1.    Section 102(e) Forbids Using an Inventor's Own Work Against Him**

27        Under 35 U.S.C. § 102(e), "[a] person shall be entitled to a patent unless- . . . (e) the

28   invention was described in – (1) an application for patent, published under section 122(b), *by*

1   ***another*** filed in the United States before the invention by the applicant for patent . . . ."  35

2   U.S.C. § 102(e) (emphasis added).  Because Section 102(e) requires art to be "by another," it is

3   unavailable as a defense where the subject matter in the reference asserted as prior art—here

4   Fang—and the claim limitations at issue in the later issued patents—here the '533-family

5   Patents—were invented by a common inventive entity.

6       This rule applies even if the named inventors on Fang and the '533-family patents are not

7   the same so long as the inventors of the subject matter at issue are the same.  *Riverwood Int'l*

8   *Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003).  The Court must first determine

9   what part of Fang is being asserted as prior art before deciding whether that disclosure was

10  invented by the same inventors of the claim limitations at issue in the '533-family patents.  *See id.*

11  at 1356-1357 ("We hold that by not deciding who invented the portion of the subject matter

12  disclosed in the [reference] patent that served as the basis for [the alleged infringer's] obviousness

13  contentions, the district court erred."); *see also Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914

14  F.3d 1347, 1357 (Fed. Cir. 2019) (holding that the inquiry under Section 102(e) requires one to

15  "(1) determine what portions of the reference patent were relied on as prior art to anticipate the

16  claim limitations at issue, (2) evaluate the degree to which those portions were conceived 'by

17  another,' and (3) decide whether that other person's contribution is significant enough, when

18  measured against the full anticipating disclosure"); *EmeraChem Holdings, LLC v. Volkswagen*

19  *Grp. of Am. Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017) (holding that the relevant question is not

20  whether the references list different inventors, but who invented the portions of reference relied

21  on as prior art and the subject matter of the claims in question).

22      A defendant raising an invalidity defense must prove that defense by clear and convincing

23  evidence.  *See Microsoft Corp. v. I4I Ltd.*, 564 U.S. 91, 102 (2011).  Although a patentee must

24  produce rebuttal evidence once a challenger has presented a *prima facie* case of invalidity, the

25  burden of persuasion remains with the challenger.  *See Novo Nordisk A/S v. Caraco Pharm.*

26  *Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013).  Moreover, as Fang was considered and

27  rejected as prior art during the prosecution of the '533 patent (*see* Ex. 47 at

28  NEVRO_BSXCA1598-1599), it is even more difficult for BSC to meet its "clear and convincing"

1   burden of proof.  *See Sciele Pharm. Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012)

2   ("[T]he fact that references were previously before the PTO goes to the weight the court or jury

3   might assign to the proffered evidence.") (citation omitted).

4                    **2.      BSC Relies on Fang's Disclosure of High-Frequency, Paresthesia-Free**

5                    Although most of Fang describes a combination therapy involving both high-frequency

6   and low-frequency signals (*see, e.g.*, Ex. 48, Fang at Abstract), Fang also contains a brief

7   disclosure of a high-frequency, paresthesia-free therapy signal that can be used alone.  Paragraph

8   54 of Fang states that "[t]his [high-frequency] blocking signal can be applied to the dorsal column

9   DC in place of [a low frequency] stimulation signal to replace the pain relief provided by the

10  paresthesia." (*Id.* ¶ 54.)  Claim 62 claims a high frequency signal without producing paresthesia.

11  BSC contends this disclosure anticipates the asserted claims of the '533-family patents.  (*See,*

12  *e.g.*, Ex. 43, Mihran Rpt. ¶ 2514, citing paragraph 54 and claim 62 of Fang, as well as paragraphs

13  24-25, 42, 50, and 54-55.)

14                   Nevro has put forth undisputed evidence that Dr. Alataris and Mr. Walker are the sole

15  inventors of Nevro's high frequency, paresthesia-free therapy signal in Fang and the '533-family

16  patents.  In addition, Nevro has corroborated the testimony of Dr. Alataris and Mr. Walker with

17  documents and testimony from the other named inventors and has more than met its burden of

18  production.  *See EmeraChem*, 859 F.3d, at 1345-46 (explaining that corroboration may be

19  required in certain cases).  BSC has not been able to challenge Nevro's evidence and thus cannot

20  "prov[e] to the decisionmaker by a clear and convincing standard that, after all of the evidence

21  has been placed on the table for consideration, the claim is invalid." *Novo Nordisk*, 719 F.3d at

22  1353.

23                   BSC deposed all five named inventors on Fang.  The testimony of each was consistent:

24  Dr. Alataris and Mr. Walker were the sole inventors of the high frequency, paresthesia-free

25  therapy signal in Fang and the '533-family patents.  Dr. Alataris and Mr. Walker both testified

26  that they alone invented Nevro's high frequency, paresthesia-free therapy signal based on animal

27  studies conducted at Stanford University and UC Davis.  (*See, e.g.*, Ex. 49, Alataris Dep. 183:12-

28  19 ("[T]he Stanford rat data and . . . continuation to the Davis larger animals . . . started giving

1   me -- me, at least, a lot more confidence that we can do it to have a therapeutic effect, and without

2   paresthesia . . . ."), 240:20-22 ("I think Andre [Walker] and myself were the ones that contributed

3   to the paresthesia-free pain relief."); Ex. 50, Walker Dep. 173:24-174:22 ("Who contributed to

4   what is described in Paragraph 54 of [Fang]? . . . [Walker]: I think this describes the studies

5   basically that we did at Stanford and Davis. . . . So this describes what Konstantinos [Alataris]

6   and I did at Davis . . . That particular paragraph I think was the sole contribution of Konstantinos

7   and mine."), 177:12-14 ("Myself and Konstantinos [Alataris] I would say is Paragraph 54, which

8   describes the high frequency alone."); *see also* Ex. 49, Alataris Dep. 244:20-24, 246:19-247:7,

9   249:5-12; Ex. 50, Walker Dep. 168:4-169:25.)

10       The other named inventors on Fang—Zi-Ping Fang, Anthony Caparso, and Brian

11   Erickson—confirmed that they did not invent using a high frequency signal alone to provide

12   paresthesia-free therapy.  (*See, e.g.*, Ex. 51, Fang Dep. 85:17-21 ("Q. [A]re you the person who

13   generated that idea of using high frequency blocking signal alone? . . . [Fang]: No."); Ex. 52,

14   Caparso Dep. 85:8-14 ("Q. And how about the high frequency fields, was that something on a

15   stand-alone basis, before the idea of combining them was generated, was that something you

16   came up with individually? . . . [Caparso]: No."); Ex. 53, Erickson Dep. 257:9-14 ("Q. [W]ere

17   you the person who conceived of the idea of high-frequency therapy applied to the dorsal column

18   alone? . . . [Erickson]: I was not."); *see also id.* at 257:16-258:2 ("Q. [W]ere you a contributor to

19   this aspect of the patent . . . high frequency replacing the pain relief provided by paresthesia? . . .

20   A. I was not.").)  Instead, the other named inventors testified that they contributed to the

21   combination therapy in Fang.  *See* Ex. 52, Caparso Dep. 83:23-84:21; Ex. 51, Fang Dep. 26:2-13,

22   85:13-16; Ex. 53, Erickson Dep. 254:9-21.)

23       The other named inventors on the '533-family patents—Sangsoo Wesley Park, Jon Parker,

24   Yougandh Chitre, and James Thacker—also testified that they did not invent a high-frequency,

25   paresthesia-free therapy signal and instead contributed to other aspects of the '533-family patents.

26   (*See, e.g.*, Ex. 54, Chitre Dep. at 97:6-23 (contribution was to "mechanical aspects" such as "the

27   leads and tools"); Ex. 55, Park Dep. 67:20-68:11 (contribution was to lead placement and

28   amplitude); Ex. 56, Parker Dep. 94:4-95:8 (testifying he did not contribute to any portion of '533

1   claim 1); Ex. 57, Thacker Dep. 32:8-33:25 (contribution was to selection of pulse widths.)

2   Contemporaneous documents further corroborate Dr. Alataris's and Mr. Walker's testimony that

3   they invented Nevro's high frequency, paresthesia-free therapy signal based on animal studies

4   conducted at Stanford University and UC Davis.  (*See* Alataris Decl., Ex. 4 at

5   NEVRO_BSXCA45438 (June 2007 presentation indicating that testing at Stanford and UC Davis

6   "established" Nevro's therapy); *id.* Ex. 3 at NEVRO_BSXCA131357 (Sept. 2007 email

7   indicating Nevro's therapy was different from "traditional SCS which produces paresthesia").)

8          To defeat Nevro's showing of a common inventive entity for this subject matter, BSC

9   claims that Dr. Alataris did not conceive of any of the inventions in the Patents-in-Suit because a

10  physician from the Mayo Clinic conceived of a high frequency, paresthesia-free therapy signal,

11  and that Mr. Walker also did not conceive of this idea because "those aspects of the claimed

12  invention had already been conceived prior to Mr. Walker joining Nevro."  (Ex. 58 at 7, BSC's

13  Suppl. Resp. to Rog No. 10.)  The evidence indisputably refutes BSC's allegation.  Dr. Alataris

14  and Mr. Erickson testified that the animal studies performed at the Mayo Clinic before

15  Mr. Walker joined Nevro were failures.  (*See, e.g.*, Ex. 49, Alataris Dep. 82:5-10, 94:11-16,

16  96:19-97:6; Ex. 53, Erickson Dep. 118:22-119:19, 143:2-15, 148:5-14, 149:12-17, 166:7-12,

17  233:6-238:14, 238:24-241:20, 241:21-243:3, 243:4-244:20, 251:10-252:11, 252:13-253:16.)  This

18  is corroborated by documents showing that the Mayo studies were not successful.  (*See, e.g.*,

19  Alataris Decl., Ex. 1 at NEVRO_BSXCA40739 ("Our current practice is likely to provide

20  undesirable motor block."); *id.* Ex. 2 at NEVRO_BSXCA40734 ("We have not observed nerve

21  blocking in the absence of stimulation.").)

22          Mr. Erickson further testified that, while he was working with the Mayo Clinic and at

23  Nevro, he did not see anything indicating that the idea of high frequency, paresthesia-free therapy

24  came from the Mayo Clinic instead of Nevro.  (Ex. 53, Erickson Dep. 258:4-20.)  Mr. Walker

25  testified that the work performed at the Mayo Clinic "never panned out and it never went

26  anywhere," and that Nevro "started everything from scratch" at Stanford and UC Davis and did

27  not use data from the Mayo studies.  (Ex. 50, Walker Dep. 73:11-74:6.)  Mr. Erickson also

28  testified that the Mayo Clinic studies merely involved applying heat to the foot of the animal and

1     measuring the time it would take for the animal to raise its foot in response, and that in contrast,

2     the animal studies performed by Nevro at Stanford were different and involved "measuring and

3     recording . . . individual axons instead of looking at physiological response." (Ex. 53, Erickson

4     Dep. 233:6-238:14, 245:4-20.)  BSC has adduced no evidence, much less clear and convincing

5     evidence, of such alleged inventorship by anyone at the Mayo Clinic.  Further, to prevail BSC

6     would have to show communication of that invention to the named inventors that would enable

7     one of ordinary skill in the art to make the patented invention.  BSC has no evidence of that

8     either.  *See Cumberland Pharm. Inc. v. Mylan Inst. LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017)

9     (derivation requires a prior conception of that subject matter and communication of the

10    conception to the named inventor); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344

11    (Fed. Cir. 2003) (the communication "must be sufficient to enable one of ordinary skill to make

12    the patented invention").

### 3.    The Later Addition of Dr. Alataris and Mr. Walker to Fang Does Not Undermine the Sworn Testimony of the Nine Nevro Inventors

13

14

15         BSC attempts to undermine this consistent record by arguing that Dr. Alataris and Mr.

16    Walker were not on the original Fang application, and that Nevro's request to correct inventorship

17    was improper because it occurred years after the application was filed and does not indicate the

18    relative contributions of the additional inventors.  (*See* Ex. 46, 2nd Am. Invalidity Contentions,

19    Ex. A10.)  This theory is belied by the record.  The 2008 Fang application, and the 2007

20    provisional application to which it claims priority, listed only Fang, Caparso, and Erickson as

21    inventors, but neither application originally recited claims directed to a high frequency,

22    paresthesia-free therapy signal (*see* Ex. 59 at NEVRO_BSXCA381459, 381493-381499; Ex. 60

23    at NEVRO_BSXCA381424-381434), and inventorship is determined on a claim-by-claim basis.

24    *See Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1349 (Fed. Cir. 2016).  These claims were

25    first added to the Fang application in 2009.  (*See* Ex. 61 at NEVRO_BSXCA427853-54.)  In

26    2012, over four years before this lawsuit was filed, Nevro undertook a review of its IP, discovered

27    the oversight, and filed a request to correct inventorship.  (*See* Ex. 49, Alataris Dep. 226:6-

28    231:20; Ex. 62 at BSC-NVRO_00132448-132473; Ex. 50, Walker Dep. at 115:14-117:17; Ex. 61

1    at NEVRO_BSXCA428987-429023.)  The other inventors also executed declarations

2    accompanying Nevro's request.  (*See* Ex. 62 at BSC-NVRO_00132462-132473; Ex. 50, Walker

3    Dep. 115:14-117:17; Ex. 61 at NEVRO_BSXCA428987-429023.)  BSC has identified no

4    evidence that the request was improper.

### 4.    None of the Other Portions of Fang Relied Upon by BSC for a High Frequency, Paresthesia-free Signal Is Prior Art.

        In addition to paragraph 54 and claim 62 of Fang, BSC contends that paragraphs 24-25,

42, 50, and 55 of Fang also constitute a disclosure of a high frequency, paresthesia-free therapy

signal.  (*See, e.g.*, Ex. 43, Mihran Rpt. ¶ 2514.)  Although these portions of Fang do not refer to a

signal that is paresthesia-free, to the extent BSC may argue that these other portions disclose such

a signal, they too would not be prior art under Section 102(e) for the same reason: the undisputed

evidence shows that Dr. Alataris and Mr. Walker are the inventors of a high-frequency,

paresthesia-free therapy.  As BSC has set forth no evidence to the contrary, there is no genuine

issue of material fact that Fang is not prior art under Section 102(e).

## V.    BSC'S INEQUITABLE CONDUCT AFFIRMATIVE DEFENSE FAILS

        Courts have long recognized that the inequitable conduct doctrine "has plagued not only

the courts but also the entire patent system."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649

F.3d 1276, 1289 (Fed. Cir. 2011) (en banc).  As a result, the Federal Circuit tightened the

standard for inequitable conduct and ruled that an accused infringer must show that (1) the "single

most reasonable inference" is that "the patentee acted with the specific intent to deceive the PTO"

and (2) the prior art was material such that the claims would not have issued "but-for" the failure

to disclose the prior art to the PTO.  *Id.* at 1290-1291.  The accused infringer must separately

establish but-for materiality and specific intent by clear and convincing evidence; while assessing

but-for materiality the court must look to the preponderance of the evidence standard used by the

PTO during examination.  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed.

Cir. 2014).[4]  The broadest reasonable construction of the relevant claim terms applies for

assessing materiality.  *Id.*

_____

        [4] As noted in *Network Signatures, Inc. v. State Farm Mutual Automobile Insurance Co.*,
"[t]here is some dispute in our post-*Therasense* case law over the correct standard of materiality,"

1    If BSC's affirmative defense proceeds to trial—inequitable conduct is an issue for the

2    Court—Nevro will show that BSC cannot prove the requisite intent to deceive.  But the Court

3    should dispose of BSC's defense now because BSC cannot establish but-for materiality as a

4    matter of law for two primary reasons.  First, BSC has no evidence that the Yearwood References

5    are but-for material and has waived its right even to argue that the references are invalidating

6    prior art.  Second, BSC cannot backfill its evidentiary failings with attorney argument.

7    **A.     BSC Cannot Establish That the Yearwood References Are But-For Material**

8    The Yearwood References consist of (1) the Yearwood Poster, which was presented by

9    Dr. Thomas Yearwood and Dr. Allison Foster at the 2006 Congress of Neurological Surgeons

10   (Ex. 63) and (2) the Yearwood Case Report, a two page handout reporting the same study.  (Ex.

11   64.)[5]  The Yearwood References describe a trial of just "three subjects with failed back surgery

12   syndrome." (*Id.* at 1.)  The Yearwood References do not disclose high frequency stimulation of

13   1,500 Hz or above, which each of Nevro's asserted claims require.  (*See* Ex. 31, Mihran Dep.

14   243:6-9.)  Yearwood tested three programs:  "subthreshold INRS, subthreshold DCS, and

15   suprathreshold DCS." (Exs. 63-64.)  Subthreshold can be understood to refer to paresthesia-free

16   therapy, while suprathreshold can be understood to refer to paresthesia-based therapy.  (Pless

17   Decl ¶ 124.)  Yearwood reported that "[a]fter testing each program for two days, all three subjects

18   chose suprathreshold [paresthesia-based] DCS for the stimulation programs for their permanent

19   implant." (Ex. 64 at BSC-NVRO_0006056.)  Yearwood further reported that "[s]uprathreshold

20   [paresthesia-based] DCS was reported to provide the highest percentage of pain relief, and was

21   preferred by all three subjects." (*Id.*)

22   _____

23   with some Federal Circuit panels adopting a clear and convincing standard and some adopting a
     preponderance standard.  731 F.3d 1239, 1244 n.1 (Fed. Cir. 2013) (Clevenger, J., dissenting).
24   Nevro believes this authority can be reconciled: the accused infringer bears the burden of proving
     to the district court by clear and convincing evidence that the PTO, applying its preponderance
25   of the evidence standard, would have found the reference invalidating.  Nevro is entitled to
     judgment under either standard, particularly given BSC's failure to present any technical analysis
     under the *Therasense* framework.

26       [5] BSC's affirmative defense identifies only these two references as the basis for the
27   alleged inequitable conduct.  (ECF No. 165 at 19-21); *see Exergen Corp. v. Wal-Mart Stores,*
     *Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) (inequitable conduct must be pleaded with specificity
28   satisfying Fed. R. Civ. P. 9(b)).

1    BSC has no evidence that these references are but-for material.  Its invalidity expert

2    performed no analysis of whether the Yearwood References are material or are non-cumulative of

3    art already before the PTO.  BSC did not even attempt to chart the Yearwood References as prior

4    art references, and chose to waive any invalidity arguments by excluding the Yearwood

5    References from its election of prior art grounds.  Moreover, the Yearwood References actually

6    *teach away* from Nevro's inventions, as they report that the paresthesia-free delivery and pulse

7    widths required by Nevro's claims were less effective than standard therapy.

8            **1.**     **BSC's Expert Admits He Has No "But-For" Materiality Analysis and,**

9                       **Instead, Applied a Standard Rejected by *Therasense***

10   Dr. Mihran, the only BSC expert who provides any opinions on the Yearwood References,

11   admits that he considered only whether the Yearwood References would have been "important"

12   in understanding subthreshold stimulation.  (Ex. 43, Mihran Rpt. ¶¶ 38, 167-173; Ex. 31, Mihran

13   Dep. 239:8-16.)  But in *Therasense*, the Federal Circuit expressly abrogated the importance to a

14   reasonable examiner standard as a "previous[]" and "broad view of materiality."  *Therasense*, 649

15   F.3d at 1288 (citation omitted).  The court ruled that it "now tightens" the standard for materiality

16   to require proof that "the PTO *would not have allowed the claim* if it had been aware of the

17   undisclosed [reference]."  *Id.* at 1291 (emphasis added).

18   Dr. Mihran nowhere applies the legally required "but-for" standard for materiality.

19   (Ex. 31, Mihran Dep. 241:7-13 (admitting but-for materiality test is "not the legal guideline that I

20   was provided").)  And neither Dr. Mihran nor BSC have proposed a "broadest reasonable

21   construction" of any relevant claim terms, as required for a materiality analysis.  *See Am. Calcar,*

22   768 F.3d at 1189.  Indeed, according to Dr. Mihran, "I don't have an inequitable-conduct section

23   in my report."  (Ex. 31, Mihran Dep. 240:21-241:6.)

24   Dr. Mihran thus cannot provide any relevant testimony on materiality.  Fed. R. Civ. P.

25   26(a)(2)(B)(i) (expert report must contain "a complete statement of all opinions the witness will

26   express and the basis and reasons for them"); *see also Rembrandt Vision Techs., L.P. v. Johnson*

27   *& Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (affirming JMOL based on

28   expert's failure to adequately disclose basis for opinions).  BSC's failure to set forth expert

1   analysis of but-for materiality dooms its inequitable conduct defense.

2               **2.    BSC Performed No Analysis of Whether the Yearwood References Are**
                        **Cumulative of Information Disclosed to the PTO**

3

4           "[E]ven where an applicant fails to disclose an otherwise material prior art reference, that

5   failure will  not support a finding of inequitable conduct if the reference is 'simply cumulative to

6   other references,' *i.e.*, if the reference teaches no more than what a reasonable examiner would

7   consider to be taught by the prior art already before the PTO." *Regents of the U. of California v.*

8   *Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997) (internal citation omitted).

9           BSC "bears the burden of proving that the [Yearwood] [R]eferences are not merely

10  cumulative of the prior art that was before the examiner." *Osram Sylvania, Inc. v. Am. Induction*

11  *Techs., Inc.*, 2011 WL 5143630, at *11 (C.D. Cal. Oct. 28, 2011); *Dimension One Spas, Inc. v.*

12  *Coverplay, Inc.*, 2007 WL 2815042, at *5 (S.D. Cal. Sept. 25, 2007) ("[l]ack of cumulativeness is

13  an element of materiality"); *see also Nalco Co. v. Turner Designs, Inc.*, 2014 WL 645365, at *5

14  (N.D. Cal. Feb. 19, 2014) (dismissing inequitable conduct pleading that failed to explain why the

15  reference was not cumulative).

16          There were hundreds of prior art references before the PTO for the relevant patent

17  prosecutions.  (Ex. 6 at 2-7 (listing '357 patent references); Ex. 4 at 2-4 (listing '988 patent

18  references).)  BSC's burden of proving that the Yearwood References are not cumulative to these

19  prior art references "cannot be shifted" to Nevro.  *Intermec Techs. Corp. v. Palm Inc.*, 738 F.

20  Supp. 2d 522, 561 (D. Del. 2010) ("The burden to show that non-disclosed prior art was

21  cumulative, however, cannot be shifted to [patentee]."); *see also Star Sci., Inc. v. R.J. Reynolds*

22  *Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) ("[t]he need to strictly enforce the burden of

23  proof and elevated standard of proof in the inequitable conduct context is paramount because the

24  penalty for inequitable conduct is so severe").

25          Dr. Mihran performs no analysis of whether the Yearwood References were cumulative to

26  the hundreds of references before the PTO during the prosecution of the '357 and '988 patents.

27  To the contrary, Dr. Mihran opines that "many additional" prior art references disclosed

28  paresthesia-free SCS therapy, which, according to him, is central to the importance of the

1    Yearwood References.  (Ex. 43, Mihran Rpt. ¶¶ 173-74.)  Some of this prior art was before the

2    PTO, and the PTO allowed Nevro's claims after considering that art.  (*See* Pless Decl. ¶¶ 133-

3    138; Exs. 65-66.)  And when presented with the Yearwood References during prosecution of a

4    later Nevro application for claims relating to paresthesia-free therapy, the examiner dismissed

5    their materiality, finding in part that "other references (i.e., Kishawi US 2010/0249875, DeRidder

6    US 2011/0184488) which show low frequency SCS for pain relief without paresthesia have

7    already been considered."  (Ex. 67, Appl. No. 15/134,285 Nov. 28, 2017 Office Action at 18.)

8           BSC's failure to present evidence of non-cumulativeness is fatal to its affirmative defense.

9    *See In re Katz Interactive Call Processing Pat. Litig.*, 821 F. Supp. 2d 1135, 1160 (C.D. Cal.

10   2011) (in GEICO case, granting summary judgment when defendant presented only "unsupported

11   conclusory statements" as to cumulativeness); *In re Katz Interactive Call Processing Pat. Litig.*,

12   2009 WL 8635983, at *5 (C.D. Cal. Aug. 14, 2009) (in "Group C" case, granting summary

13   judgment where defendants did not provide evidence of non-cumulativeness, and observing that

14   defendants' expert did not perform cumulativeness analysis); *Oracle Corp. v. DrugLogic, Inc.*,

15   807 F. Supp. 2d 885, 899 (N.D. Cal. 2011) (dismissing inequitable conduct claim at pleading

16   stage where defendant had not alleged facts showing non-cumulative nature of prior art).

17                    **3.    BSC Presented No Invalidity Analysis for the Yearwood References
                              and Did Not Include Them on its List of Prior Art**

18          BSC cannot cure its failure to perform a but-for materiality and cumulativeness analysis

19   by attempting to argue that the Yearwood References invalidate any of the relevant Nevro claims.

20   BSC did not identify either Yearwood Reference as anticipating or rendering obvious any Nevro

21   claim and prepared no invalidity charts for the Yearwood References.[6]  (Ex. 68 at 14, 17-19, BSC

22   Prelim. Invalidity Contentions; Ex. 46 at 15-16, 18-19, 2nd Am. Invalidity Contentions; *cf.* Patent

23   L.R. 3-3(a)-(c) (requiring identification and claim charts for art that allegedly anticipates or

24   renders obvious).)  BSC likewise chose not to include the Yearwood References in the narrowed

25

26   ───────────────

27         [6] BSC did not make such contentions even during the stage of the case in which Nevro
     asserted infringement of '357 patent claim 1 and '988 patent claim 1, which are the focus of
     BSC's inequitable conduct allegations.  (*See* ECF No. 165 at 20; Ex. 68 at 14, 17-19, BSC
28   Prelim. Invalidity Contentions.)

1    list of prior art grounds required by the Court, despite using only 38 of the available 40 prior art

2    grounds. (Ex. 69, BSC Id. of 40 Prior Art Grounds for Invalidity); ECF No. 88 (requiring BSC to

3    narrow to 40 prior art grounds).) Unsurprisingly, then, Dr. Mihran performs no anticipation or

4    obviousness analysis using the Yearwood References and fails to address the deficiencies with

5    such an argument, such as the fact that the Yearwood References never disclose the amplitude

6    required by the '357 patent claims. (Ex. 43, Mihran Rpt. ¶¶ 168-174; Pless Decl. ¶ 127

7    (unrebutted expert testimony that the Yearwood References do not teach the required amplitude

8    limitation).) BSC has no evidence that the Yearwood References anticipate or render obvious any

9    Nevro patent claim and would be barred from making such an argument in light of its failure to

10    disclose under the Patent L.R. and the Court's Order on narrowing prior art grounds.

11                        **4.    The Yearwood References Teach Away from Paresthesia-Free
                                  Therapy**

12           "A reference may be said to teach away when a person of ordinary skill, upon reading the

13    reference, would be discouraged from following the path set out in the reference, or would be led

14    in a direction divergent from the path that was taken by the applicant." *DePuy Spine, Inc. v.*

15    *Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1327 (Fed. Cir. 2009) (internal citation omitted).

16    Teaching away in a prior art reference counters any contention of obviousness or materiality.

17    *Siemens, AG v. Seagate Tech.*, 2009 U.S. Dist. LEXIS 132523, at *21-22 (C.D. Cal. Jan. 8, 2009)

18    (finding undisclosed art non-material in part due to teaching away).

19           The Yearwood References discourage a person of ordinary skill in the art from using the

20    invention claimed in Nevro's patents and instead lead toward using traditional modes of therapy.

21    All of the Nevro claims at issue require paresthesia-free therapy, but the Yearwood References

22    teach that *every patient* rejected paresthesia-free therapy in favor of paresthesia-based therapy and

23    that *every patient* received better treatment from the paresthesia-based therapy. (Ex. 63 at 1,

24    Carbunaru Ex. 138; Ex. 64 at 2, Carbunaru Ex. 137; Pless Decl. ¶¶ 124-125.) The Yearwood

25    References also teach that the majority of pulse widths chosen for permanent therapy were well

26    above the ranges required by the relevant claims. (Ex. 63 at 1 (majority of programs at 450 μsec

27    or above); Ex. 64 at 2; *see* Ex. 4 at cl. 1 ('988 patent cl. 1 requires pulse widths of 25

28

microseconds to 166 microseconds); Ex. 6 at cl. 1 ('357 patent cl. 1 requires pulse widths of 10 to 333 microseconds).)  These disclosures in the Yearwood References teach away from Nevro's inventions and, at a minimum, remove the motivation to combine the references with other art for purposes of paresthesia-free therapy.  *See Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) ("even if a reference is not found to teach away, its statements regarding preferences are relevant to a finding regarding whether a skilled artisan would be motivated to combine that reference with another reference.") (internal citation omitted).

## B.    BSC Cannot Rely on Attorney Argument to Cover its Failure to Perform the Required Factual, Technical Analysis

BSC previously contended that it will present the Yearwood References as material "without the need for an expert" and will ask the fact-finder to conclude "that Yearwood anticipates claim 1 of the '357 patent," despite having no expert testimony to that effect.  (ECF No. 358 at 49, BSC Opp. to Nevro MSJ and MSJ.)  As discussed above, BSC has waived any ability to contend that Yearwood is an invalidating prior art reference.  More fundamentally, of course, attorney argument is not evidence.  *See Suffolk Techs., LLC v. AOL Inc*., 752 F.3d 1358, 1367 (Fed. Cir. 2014) (granting summary judgment when party offered "mere attorney argument" in opposition to expert testimony); *AAT Bioquest, Inc. v. Tex. Fluorescence Labs., Inc.*, 2015 WL 1738402, at \*15 (N.D. Cal. Apr. 13, 2015) (rejecting "unsupported attorney arguments" of inequitable conduct as a "basic evidentiary failure[]"); *Giuliano v. SanDisk Corp*., 224 F. Supp. 3d 851, 865-66 (N.D. Cal. 2016) (for analogous *Walker Process* fraud claim, party could not establish but-for materiality without supporting expert testimony); *see also Biotec Biologische v. Biocorp, Inc*., 249 F.3d 1341, 1353 (Fed. Cir. 2001) ("It is not the trial judge's burden to search through lengthy technologic documents for possible evidence"); (Pless Decl. ¶¶ 133-138).  BSC cannot salvage its affirmative defense through attorney argument.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Nevro's motion for summary judgment.

1    Dated:  October 20, 2020                    MORRISON & FOERSTER LLP

2

3                                          By:    /s/ Kenneth A. Kuwayti
                                                  Kenneth A. Kuwayti
4
                                                  Attorneys for Plaintiff
5                                                 NEVRO CORP.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28