1    MICHAEL A. JACOBS (CA SBN 111664)
     MJacobs@mofo.com
2    ARTURO J. GONZALEZ (CA SBN 121490)
     AGonzalez@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, California  94105-2482
     Telephone: 415.268.7000
5    Facsimile: 415.268.7522

6    KENNETH A. KUWAYTI (CA SBN 145384)
     KKuwayti@mofo.com
7    ERIC C. PAI (CA SBN 247604)
     EPai@mofo.com
8    MORRISON & FOERSTER LLP
     755 Page Mill Road
9    Palo Alto, California  94304-1018
     Telephone: 650.813.5600
10   Facsimile: 650.494.0794

11   Attorneys for Plaintiff
     NEVRO CORP.

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                      SAN FRANCISCO DIVISION

16

17   NEVRO CORP.,                          Case No.   3:16-cv-06830-VC-MEJ

18                Plaintiff,                **NEVRO'S NOTICE OF MOTION,
                                            MOTION, AND MEMORANDUM
19          v.                              OF POINTS AND AUTHORITIES
                                            IN SUPPORT OF MOTION TO
20   BOSTON SCIENTIFIC CORPORATION and      STRIKE BSC'S UNDISCLOSED
     BOSTON SCIENTIFIC NEUROMODULATION      INVALIDITY THEORIES**
21   CORPORATION,
                                            Date:    January 14, 2021
22                Defendants.               Time:    10:00 a.m.
                                            Ctrm:    4, 17th Floor
23                                          Judge:   Hon. Vince Chhabria

24                                          Trial Date:  Not Set

25

26          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. 1

CONCISE STATEMENT OF RELIEF SOUGHT ................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I.      LEGAL STANDARD ................................................................................................... 3

II.      FACTUAL BACKGROUND ....................................................................................... 4

     A.      BSC Repeatedly Told Nevro and the Court That Its Precision SCS Prior Art System *Did Not* Allow Frequencies Above 1.2 kHz ....................................... 4

     B.      BSC Serves Expert Reports Claiming That the Precision SCS Prior Art System *Did*, and Was "*Designed to*," Deliver Frequencies Above 1.2 kHz .......... 5

III.      ARGUMENT ................................................................................................................ 6

     A.      BSC's New Frequency Harmonics Invalidity Theory Must Be Stricken ............... 6

            1.      BSC Did Not Disclose the Frequency Harmonics Invalidity Theory ......... 7

            2.      BSC's Frequency Harmonics Invalidity Theory Is Inconsistent with Its Prior Representations ............................................................... 8

     B.      BSC's New ███████████ Invalidity Theory Must Be Stricken .................... 9

            1.      BSC's ██████████ Invalidity Theory Was Created After BSC Served its Invalidity Expert Report ................................................. 10

            2.      BSC's ██████████ Invalidity Theory Is Inconsistent with Its Past Representations ................................................................. 11

            3.      Nevro Has Not Opened the Door to the New ███████ Theory ....................................................................................... 12

     C.      BSC's New Theories Are Based on Experimentation with a System That BSC Failed to Produce as Required by the Patent Local Rules ........................... 12

            1.      BSC Withheld the Prior Art System Until Just Before Expert Reports ......................................................................................... 13

            2.      BSC Cannot Rely On Its Production of a Precision *Plus* SCS System ...................................................................................... 14

     D.      BSC Cannot Possibly Establish Diligence or Lack of Prejudice ......................... 15

IV.      CONCLUSION ........................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5

*Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*,
  No. C05-03117 MJJ,
  2007 U.S. Dist. LEXIS 59161 (N.D. Cal. Jul. 30, 2017) .........................................................15

6
7

*ASUS Comput. Int'l v. Round Rock Research, LLC*,
  No. 12-cv-02099 JST (NC),
  2014 U.S. Dist. LEXIS 50728 (N.D. Cal. Apr. 11, 2014) ...........................................3, 8, 9, 11

8

9

*Brilliant Instruments, Inc. v. GuideTech, Inc.*,
  No. C 09-5517 CW,
  2011 U.S. Dist. LEXIS 30835 (N.D. Cal. Mar. 15, 2011) ...........................................................3

10

11

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  No. 13-cv-03999-BLF,
  2015 U.S. Dist. LEXIS 88760 (N.D. Cal. July 8, 2015) ...........................................................13

12

13

*IXYS Corp. v. Advanced Power Tech., Inc.*,
  No. C 02-03942 MHP,
  2004 U.S. Dist. LEXIS 10934 (N.D. Cal. June 15, 2004) ..................................................13, 14

14

15

*Largan Precision Co. v. Genius Elec. Optical Co.*,
  No. 13-cv-02502-JD,
  2014 U.S. Dist. LEXIS 169052 (N.D. Cal. Dec. 5, 2014) ................................................3, 8, 10

16

17

*Life Techs. Corp. v. Biosearch Techs., Inc.*,
  No. C 12-00852 WHA,
  2012 U.S. Dist. LEXIS 132478 (N.D. Cal. Sept. 17, 2012) .....................................................14

18

19

*Nationwide Life Ins. Co. v. Richards*,
  541 F.3d 903 (9th Cir. 2008)......................................................................................................14

20

21

*Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*,
  417 F. Supp. 2d 1121 (N.D. Cal. 2006) ......................................................................................3

22

23

*Oracle Am., Inc. v. Google Inc.*,
  No. C 10-03561 WHA,
  2011 U.S. Dist. LEXIS 87251 (N.D. Cal. Aug. 8, 2011).........................................................15

24

25

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
  No. C-09-01201 RMW,
  2011 WL 11709387 (N.D. Cal. Aug. 19, 2011).......................................................................11

26

27

28

*Takeda Pharm. Co. v. Twi Pharms., Inc.*,
      No. 13-CV-02420-LHK,
      2015 U.S. Dist. LEXIS 32948 (N.D. Cal. Mar. 17, 2015).................................................8, 11, 15

**Other Authorities**

Patent Local Rules,
      Rule 3-3..................................................................................................................................3, 8, 11
      Rule 3-4........................................................................................................................................3, 13
      Rule 3-6........................................................................................................................................8, 11

1

## **TABLE OF EXHIBITS**

2

All exhibits listed below are exhibits to the Pai Declaration.

3

| Ex. No. | Description |
|---------|-------------|
| 8 | Email chain between Bita Rahebi, counsel for Nevro, and Tom Carmack, counsel for BSC, Re: Nevro v BSC (CAND) – Precision device, dated March 23, 2018 |
| 20 | Excerpts of the deposition of Rafael Carbunaru, taken on November 15, 2017 |
| 26 | BSC's Second Supplemental Responses and Objections to Nevro's First Set of Interrogatory Requests (1-8), dated March 31, 2017 |
| 31 | Excerpts of the deposition of Richard T. Mihran, Ph.D., taken on March 12, 2018 |
| 33 | Excerpts of Rebuttal Expert Report of Richard T. Mihran, Ph.D., dated February 14, 2018 |
| 41 | Declaration of Rafael Carbunaru in Support of Boston Scientific's Invalidity Contentions, dated March 17, 2017 |
| 42 | Declaration of Kaoru Lee Adair in Support of Boston Scientific's Motion to Dismiss Nevro's Declaratory Judgment Claims, as redacted by BSC for public filing, filed by BSC in this case on December 27, 2016, at ECF No. 31-1 |
| 44 | Excerpts of Rebuttal Expert Report and Declaration of Daniel Lanovaz, dated February 14, 2018 |
| 70 | Excerpts of Exhibit B1 to Boston Scientific Corporation's and Boston Scientific Neuromodulation Corporation's (together "BSC") Invalidity Contentions, served by BSC on August 10, 2017 |
| 71 | Email from Tom Carmack, outside counsel for BSC, to MoFo-NevroBSX, the email distribution list for outside counsel for Nevro, Re: Nevro v BSC (CAND) – Precision device, dated January 5, 2018 |
| 72 | Excerpts of the deposition of Daniel Lanovaz, taken on March 21, 2018 |
| 73 | Excerpts of the deposition of Joshua Goshorn, taken on March 23, 2018 |
| 74 | Excerpts of Nevro Corp.'s First Set of Interrogatories, dated January 4, 2017 |
| 75 | Exhibit A to Nevro's First Amended Infringement Contentions, served by Nevro on May 23, 2017 |
| 76 | Plaintiff Nevro Corp.'s Third Supplemental Response to Defendants' Interrogatory No. 11, served by Nevro on December 1, 2017 |
| 77 | Email from Krista Carter, counsel for BSC, to Nick Fung and Bita Rahebi, counsel for Nevro, Re: BSX Cal: Product sample question, dated August 8, 2017 |
| 78 | Email from Krista Carter, counsel for BSC, to counsel for Nevro, Re: BSX Cal.: Product sample question, dated August 11, 2017 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 14, 2021, or as soon thereafter as counsel may be heard before the Honorable Vince Chhabria in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff Nevro Corp. will and hereby does move to strike portions of the expert reports of Dr. Richard Mihran and Mr. Daniel Lanovaz.  Nevro's motion is based on the pleadings, records, and files in this action; documents in the public record; the accompanying memorandum of points and authorities; the declaration of Eric C. Pai in Support of Nevro's Motion for Summary Judgment and Motion to Strike BSC's Undisclosed Invalidity Theories ("Pai Decl.") and accompanying exhibits; and any other evidence and argument that the parties may present.

**CONCISE STATEMENT OF RELIEF SOUGHT**

Nevro seeks an order (1) striking BSC's undisclosed frequency harmonics invalidity theory from the expert reports of Dr. Mihran; (2) striking BSC's undisclosed ████████ invalidity theory from the expert reports of Dr. Mihran and Mr. Lanovaz; and (3) striking any reference to experimentation with the unproduced Precision SCS system from the expert reports of Dr. Mihran and Mr. Lanovaz.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Patent Local Rules are clear:  they required BSC to disclose its invalidity theories, with a chart specifying where and how each prior art reference teaches each limitation of each asserted claim.  BSC cannot argue a theory of invalidity that was not disclosed in its contentions. It cannot use its expert reports as an end-run around the Patent Local Rules disclosure requirements.  As the Court recognized in its Order denying BSC's motion for leave to assert other new invalidity theories, BSC evidently did little to ensure that its invalidity contentions remained up to date.  (ECF No. 330.)  Similarly here, BSC made a last-minute decision to reinvent its invalidity case to present two entirely new theories why the alleged prior art Precision SCS device discloses the high frequency limitations from Nevro's asserted claims:  a "frequency harmonics" theory and a ████████████ theory.  Because these theories were not

1    included in BSC's invalidity contentions, they should be stricken.  They also should be stricken

2    because they are based on experimentation with an SCS device that BSC failed to produce to

3    Nevro.  BSC advanced its frequency harmonics theory for the first time in the opening report of

4    its technical expert, Dr. Richard Mihran.  According to BSC's frequency harmonics theory, even

5    though the Precision SCS system only operated at frequencies up to 1.2 kHz, if the frequency is

6    broken down into its spectral components, some portion of the waveform is actually operating at

7    frequencies up to 100 kHz.  This theory was never disclosed in BSC's invalidity contentions.

8         BSC laid out its ███████████████ invalidity argument for the first time in its

9    *rebuttal* reports from Dr. Mihran and its source code expert Mr. Lanovaz.  BSC's ██████████

10   theory goes a step further, claiming for the first time that the Precision SCS device was actually

11   designed to operate at frequencies up to 20 kHz because ████████████████████████

12   ████████████████████████████████████████████████████████████

13   ██████████████████████████  This theory, too, was never disclosed in BSC's

14   invalidity contentions.  In fact, Dr. Mihran admits that he only came up with this theory *in the*

15   *course of preparing his rebuttal report*.

16        The Patent Local Rules require striking these new theories.  Confirming the untimeliness

17   of BSC's new invalidity arguments, both theories are irreconcilable with representations that BSC

18   made about its SCS systems from the inception of this litigation, including representations in

19   sworn statements and filings with the Court.

20        Moreover, both new theories are based on Dr. Mihran's extensive experimentation with

21   what BSC represents is a sample of the prior art Precision SCS system.  The Patent Local Rules

22   required BSC to produce this sample to Nevro with its invalidity contentions in March 2017, but

23   BSC never did.  BSC also failed to produce this sample to Nevro during fact discovery, despite

24   Nevro's repeated requests.  BSC should be barred from relying on experimentation with this

25   unproduced system.

26        BSC's untimely theories are particularly inappropriate because they do not follow this

27   Court's construction of "frequency" or the Federal Circuit's conclusion that Nevro's asserted

28   claims contemplate not that a system be "designed to" generate high frequency, but "that

1   'configured to' requires programming the signal generator (i.e., setting parameters) to generate

2   the claimed signals." (ECF No. 509 at 10.)  The contested theories are inconsistent with these

3   constructions, as discussed in detail in Nevro's accompanying motion for summary adjudication,

4   but BSC has still not withdrawn them and opposes this motion and the motion for summary

5   adjudication.  Nevro's motion for summary adjudication seeks a merits determination on BSC's

6   untimely theories, which consume over a hundred pages of expert reports.  Striking these theories

7   will significantly reduce the Court's burden and help mitigate the prejudice caused by BSC's

8   last-minute reinvention of its invalidity theories.

9   **I.      LEGAL STANDARD**

10          Patent Local Rule 3 is "designed to require parties to crystallize their theories of the case

11   early in the litigation and to adhere to those theories once they have been disclosed." *Nova*

12   *Measuring Instruments Ltd. v. Nanometrics, Inc.*, 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006).

13   The Patent Local Rules require the accused infringer to disclose all prior art and to provide a chart

14   specifying where and how each piece of prior art teaches each limitation of each asserted claim.

15   Patent L.R. 3-3(a)-(d).  These disclosures must contain the theories that the party later wishes to

16   present at trial or on summary judgment, not merely general disclosures of invalidity positions.

17   *Largan Precision Co. v. Genius Elec. Optical Co.*, No. 13-cv-02502-JD, 2014 U.S. Dist. LEXIS

18   169052, at *14 (N.D. Cal. Dec. 5, 2014) (striking expert opinion that prior art references had

19   properties not previously disclosed).  The Patent Local Rules also expressly require parties to

20   "produce or make available for inspection and copying . . . [a] copy or sample of the prior art

21   identified pursuant to Patent L.R. 3-3(a)."  Patent L.R. 3-4.

22          A "party may not use an expert report to introduce . . . new invalidity theories, or new

23   prior art references not disclosed in the parties' . . . invalidity contentions."  *ASUS Comput. Int'l*

24   *v. Round Rock Research, LLC*, No. 12-cv-02099 JST (NC), 2014 U.S. Dist. LEXIS 50728, at *5

25   (N.D. Cal. Apr. 11, 2014) (citation omitted).  Thus, when a party's expert report contains patent

26   invalidity theories that were not disclosed in its invalidity contentions, the proper remedy is to

27   strike those portions of the report.  *See id.* at *30; *Brilliant Instruments, Inc. v. GuideTech, Inc.*,

28   No. C 09-5517 CW, 2011 U.S. Dist. LEXIS 30835, at *4-5 (N.D. Cal. Mar. 15, 2011).

## II.     FACTUAL BACKGROUND

### A.     BSC Repeatedly Told Nevro and the Court That Its Precision SCS Prior Art System *Did Not* Allow Frequencies Above 1.2 kHz

BSC's invalidity contentions disclosed a single prior art SCS device:  its own Precision SCS system, purportedly introduced in 2004.  BSC's contentions set forth two related positions as to why the Precision SCS System disclosed the high frequency limitations in Nevro's claims.

First, BSC disclosed that if Nevro contends that a SCS system that is capable of producing high frequency therapy "*with a software change*" practices the high frequency claim limitations of Nevro's patents, then "the Precision SCS System expressly and/or inherently discloses this limitation." (Pai Decl. Ex. 70 at 4 (emphasis added).)  Second, BSC disclosed that if Nevro was not contending that a SCS system with a software change expressly and/or inherently disclosed these limitations, then it would have been obvious to *modify* the Precision SCS prior art system to generate frequencies over 1.5 kHz.  (*Id.*)

BSC's contentions explicitly represented that, absent software and firmware modification, the Precision SCS system was not capable of being programmed to generate pulse frequencies above 1.2 kHz.  Together with its invalidity contentions, BSC submitted the declaration of its Vice President of R&D, Dr. Carbunaru, who stated:

> As described in the Physician Implant Manual and elsewhere, the PrecisionTM SCS System was capable of being programmed by a user to generate pulse frequencies in the range of 0 to 1,200 Hz. . . . The clinician programmer's software and the remote control firmware could have been changed to render the Precision SCS System programmable by a user to generate pulse frequencies much greater than 1,200 Hz, including up to approximately 7,000 Hz, with no changes to the IPG hardware or firmware. The IPG's firmware could have been changed (in addition to the programmer's software and remote control firmware) to render the PrecisionTM SCS System capable to generate pulse frequencies up to approximately 14,300 Hz, with no hardware changes to the IPG. (Pai Decl. Ex. 41 ¶ 11 (emphasis added).)

Elsewhere in its pleadings, BSC consistently told the Court and Nevro that its traditional SCS systems did not, and could not, generate frequencies over 1.5 kHz.  When BSC sought dismissal of Nevro's declaratory judgment claims, BSC cited a declaration from its Vice President of Regulatory and Clinical Affairs, Ms. Kay Adair, and argued that the SCS systems it

1   sells in the United States "cannot be programmed to stimulate at frequencies greater than 1,200

2   Hz."  (ECF No. 31 at 3-4.)  Ms. Adair also declared that "BSC's commercially distributed SCS

3   systems have been providing stimulation at a frequency range *up to* 1,200 Hz since 2004."  (Pai

4   Decl. Ex. 42 ¶ 4 (emphasis added).)

5          BSC repeated this position in its interrogatory responses, explaining that "BSC provided

6   testimony under penalty of perjury that such systems cannot be used to provide stimulation at

7   frequencies greater than 1,200 Hz."  (Pai Decl. Ex. 26 at 3.)  BSC then used its interrogatory

8   response in a motion seeking to strike Nevro's infringement contentions:

9               Nevro's contentions do not show that Precision Spectra, Precision
              Montage, or Precision Novi meet any limitation that requires a
10              specific frequency or frequency range. . . . [A]s provided in
              verified discovery responses, these systems *cannot* provide
11              stimulation at frequencies greater than 1,200 Hz, which is outside
              the claimed range of greater than 1,500 Hz.
12              (ECF No. 69 at 2.)

13      **B.     BSC Serves Expert Reports Claiming That the Precision SCS Prior Art
              System *Did*, and Was "*Designed to*," Deliver Frequencies Above 1.2 kHz**
14

15          Despite the litany of representations above, BSC's technical expert Dr. Mihran and source

16   code expert Mr. Lanovaz presented two entirely new theories that contradict these

17   representations.  First, in his opening report, Dr. Mihran opined that through the principles of

18   "frequency harmonics" and "spectral frequencies," the Precision SCS prior art system (or other

19   traditional low-frequency SCS systems) would generate signals where "at least a portion" of the

20   signal is at frequencies as high as *100 kHz* even if the system was only programmed at

21   frequencies below 1.2 kHz.  (*See, e.g.*, Pai Decl. Ex. 43 ¶¶ 460-461.)  According to Dr. Mihran,

22   under the frequency harmonics theory, no modification to the prior art device is necessary to

23   achieve these high frequencies.  (*See id.* ¶¶ 425-426, 452-461.)

24          Second, in their non-infringement rebuttal reports, both Dr. Mihran and Mr. Lanovaz

25   opined that the Precision SCS prior art system could provide a signal with a frequency as high as

26   20 kHz because one could ████████████████████████████████████

27   perform a series of steps (which would have required proprietary knowledge about the inner

28   workings of the components) to command the implantable pulse generator to deliver high

1    frequencies.  (*See, e.g.*, Pai Decl. Ex. 33 ¶¶ 133-145, Ex. 44 ¶¶ 44-58.)  According to Dr. Mihran,

2    this means the prior art system is "designed" to generate high frequency signals.  (Pai Decl. Ex.

3    33 ¶ 136.)  Dr. Mihran admitted that he came up with this theory while writing his rebuttal report.

4    (Pai Decl. Ex. 31 at 163:5-164:24.)  Nevro understands that BSC opposes this motion to strike

5    even though this theory is not only untimely, but inconsistent with the Federal Circuit's ruling

6    that the construction of "configured to generate" is "programmed to generate" and ***not*** "designed

7    to generate."  (*See* ECF No. 509 at 10.)

8           These new theories, which are discussed in greater detail in their respective sections

9    below, rely on Dr. Mihran's experimentation with what BSC asserts is a Precision SCS prior art

10   system.  This system was provided by BSC to Dr. Mihran, at his request, in December 2017.  (*See*

11   ECF No. 301 at 7.)  Despite the Patent Local Rules requirement to produce prior art samples with

12   invalidity contentions, and despite Nevro's repeated requests for a sample of the Precision SCS

13   prior art system, BSC never provided Nevro with such a system during fact discovery.  Instead,

14   BSC informed Nevro of the existence of a purported sample system only in early January 2018,

15   shortly before opening expert reports.  (Pai Decl. Ex. 71.)

16   **III.    ARGUMENT**

17          **A.    BSC's New Frequency Harmonics Invalidity Theory Must Be Stricken**

18          Substantial portions of Dr. Mihran's report are based on an invalidity theory for

19   high-frequency claim limitations that BSC never disclosed to Nevro and that run counter to

20   BSC's past representations in this case.  Each of Nevro's asserted claims requires a SCS system

21   or method with frequency rates at or above 1.5 kHz.  Dr. Mihran's opening report presents a new,

22   undisclosed invalidity theory that an unmodified Precision SCS prior art system would generate a

23   signal where "at least a portion" of the signal is above 1.5 kHz (as required by, e.g., '533 patent

24   claim 1), even when set to lower frequencies.  (*See, e.g.*, Pai Decl. Ex. 43 ¶¶ 460-461, 1409-1410,

25   1416-1423.)  Relying in part on his experimentation with BSC's Precision SCS system, Dr.

26   Mihran now opines that the Precision SCS system, "when programmed to generate stimulation

27   signals having parameters such as those identified above that were shown not to produce

28   paresthesia, delivers the vast majority of its signal energy to the patient at frequencies in the range

1    of 1.5 kHz – 100 kHz, and thus satisfies this limitation." (*Id.* ¶ 1410.)

2        BSC's failure to disclose the frequency harmonics theory is dispositive—the Patent Local

3    Rules bar BSC from relying on it.  Moreover, BSC has repeatedly represented that its traditional

4    low-frequency systems *cannot* be used to generate frequencies above 1.2 kHz.  Even though this

5    untimely theory is inconsistent with the Court's construction of "frequency" as "fundamental

6    frequency" or "pulse rate" (thereby excluding frequency harmonics), Nevro understands that BSC

7    still opposes this motion to strike and Nevro's related request for summary adjudication.

8              **1.        BSC Did Not Disclose the Frequency Harmonics Invalidity Theory**

9        In its invalidity contentions, BSC never disclosed a theory that the Precision SCS system

10   could generate frequency harmonics of 1.5 kHz or higher in ordinary operation, so it cannot take

11   that position now.  And in prior briefing, BSC pointed to the following language from its

12   contentions as the supposed disclosure for its new theory:

13           To the extent Nevro contends that (i) any SCS system that, with a
             software change, is capable of producing high-frequency (≥ 1.5
14           kHz) therapy signals meets this limitation and/or (ii) any IPG that is
             capable of producing high-frequency (≥ 1.5 kHz) therapy signals
15           meets this imitation, the Precision SCS System expressly and/or
             inherently discloses this limitation.
16

17   (Pai Decl. Ex. 70 at 4; ECF No. 301 at 3-4.)  But this contention says nothing about how

18   frequency harmonics could lead to an unmodified Precision SCS system generating frequencies at

19   or above 1.5 kHz in ordinary operation.  In fact, BSC's 300-page invalidity chart on the Precision

20   SCS does not use the term "harmonics" once.  For comparison, Dr. Mihran's opening report uses

21   the term "harmonics" more than 40 times over roughly 100 pages of his report to explain the new

22   frequency harmonics theory.  (*See, e.g.*, Pai Decl. Ex. 43 ¶¶ 425-498, 747, 943, 982, 1231, 1409-

23   1445, 1473-1475.)

24       In BSC's contentions, the paragraph quoted above is followed by an excerpt from

25   Dr. Carbunaru's declaration explaining the basis for BSC's position.  Inconsistent with BSC's

26   new frequency harmonics theory, that declaration asserted that the Precision SCS prior art system

27   would require software and firmware ***modifications*** to make it generate frequencies over 1.5 kHz.

28   (Pai Decl. Ex. 70 at 4-5.)  Dr. Carbunaru stated that, in order to generate frequencies greater than

1.2 kHz and up to 7 kHz, both the clinician programmer's software and the remote control

firmware would need to be changed, and the IPG's firmware could further have been changed to

generate frequencies up to approximately 14.3 kHz.  (*Id.*)  In contrast, Dr. Mihran now states that,

under his frequency harmonics theory, even without modification "the prior art Precision was

capable of generating the vast majority of the energy contained in its output signal at frequencies

in Nevro's claimed range of 1.5-100 kHz" and that "frequency components out to and exceeding

100 kHz can be observed."  (*See, e.g.*, Pai Decl. Ex. 43 ¶¶ 402, 469-70.)

       BSC's failure to disclose its frequency harmonics theory in its invalidity contentions is

dispositive.  The Patent Local Rules and Northern District of California case law are clear that an

accused infringer cannot rely on invalidity theories that were not disclosed in its contentions.  *See*

Patent L.R. 3-3, 3-6; *ASUS*, 2014 U.S. Dist LEXIS 50728, at *5 (party may not use expert report

to introduce new invalidity theories); *Takeda Pharm. Co. v. Twi Pharms., Inc.*, No. 13-CV-

02420-LHK, 2015 U.S. Dist. LEXIS 32948, at *17-18 (N.D. Cal. Mar. 17, 2015) (striking

enablement theory based on formulation when contentions disclosed enablement theory based on

bioequivalency); *Largan Precision*, 2014 U.S. Dist. LEXIS 169052, at *14 (striking expert

opinion that "*fifth* lens element" has claimed feature when contentions said "second lens element"

has that feature).  BSC and its experts should not be allowed to present the undisclosed frequency

harmonics theory, including at summary judgment and trial.

      **2.**    **BSC's Frequency Harmonics Invalidity Theory Is Inconsistent with Its
Prior Representations**

       Confirming that BSC's frequency harmonics theory is a new creation, it is irreconcilable

with statements that BSC and its employees have made to Nevro and the Court.  From the

inception of this case until opening expert reports, BSC represented that none of the SCS systems

it sold in the United States could deliver high frequency therapy.  For example, BSC's Vice

President of Regulatory and Clinical affairs, Ms. Adair, declared that its United States SCS

systems cannot be used to provide stimulation at frequencies greater than 1.2 kHz.  (Pai Decl. Ex.

42 ¶ 4.)  BSC's in-house litigation counsel verified an interrogatory response repeating this

position and emphasizing that Ms. Adair's declaration was made under penalty of perjury.  (Pai

Decl. Ex. 26 at 3.)  BSC's Vice President of R&D, Dr. Carbunaru, declared that the Precision

SCS prior art system could generate frequencies at or above 1.5 kHz only with software and

firmware modification.  (Pai Decl. Ex. 41 ¶ 11.)  BSC repeated these same positions when it

asked the Court to dismiss Nevro's declaratory judgment claims (ECF No. 31 at 4) and to strike

Nevro's infringement contentions.  (ECF No. 69 at 2.)

Thus, BSC not only failed to disclose its frequency harmonics invalidity theory, it actively

pointed Nevro in the opposite direction throughout fact discovery.  BSC's conduct flies in the

face of the Patent Local Rules requirement to crystallize theories early in the case.  *See ASUS*,

2014 U.S. Dist. LEXIS 50728, at \*5.

**B.       BSC's New ▇▇▇▇▇▇▇▇▇▇▇ Invalidity Theory Must Be Stricken**

In their non-infringement rebuttal reports, BSC's experts Dr. Mihran and Mr. Lanovaz

opine for the first time that BSC's Precision SCS system is designed for high-rate stimulation,

including frequencies as high as 20 kHz, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*See* Pai Decl. Ex. 33 ¶¶ 37, 43-45, 61,

100, 111-189; Pai Decl. Ex. 44 ¶¶ 43-58.)

Mr. Lanovaz opines that the Precision SCS system can be configured to allow high rate

stimulation because ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ can cause an

"engineering page" to appear in the clinician programmer software that then allows the IPG to

generate high rate signals.  (Pai Decl. Ex. 44 ¶¶ 44, 57-58.)  Dr. Mihran similarly opines that the

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  (Pai Decl., Ex. 33 ¶¶

128-131.)  According to Dr. Mihran, this screen can be used to command the Precision SCS IPG

to generate high frequencies within Nevro's claim limitations.  (*Id.* ¶¶ 133-145.)  Dr. Mihran

further opines that the Precision SCS clinical programmer software is "'designed to' provide

commands to the IPG to generate higher pulse rates."  (*Id.* ¶ 136.)

1          **1.    BSC's ▮▮▮▮▮▮▮▮▮ Invalidity Theory Was Created After BSC**
2               **Served its Invalidity Expert Report**

3          Neither BSC's invalidity contentions nor Dr. Carbunaru's accompanying declaration

4    make any mention of generating high frequencies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮ to generate frequencies up to 20 kHz.  (*See* Pai Decl. Exs.70, 41.)

6    Those disclosures instead state that software and firmware modifications would be necessary in

7    order to generate high-rate signals.  (*Id.*)  Because BSC did not timely disclose the new theory,

8    BSC cannot now rely on it.  *See Largan*, 2014 U.S. Dist. LEXIS 169052, at *14.  Nor can BSC

9    plausibly claim that it previously disclosed the ▮▮▮▮▮▮▮ invalidity theory, because

10   Dr. Mihran admitted that he first uncovered this theory after the exchange of opening expert

11   reports:

12          Q.  Why didn't you do that in your opening report?

13          A.  I didn't know about that functionality at that time.

14          Q.  How did you find out about that functionality?

15          A.  Well, when I read Mr. Goshorn's report and his assertions
16          about the purported limitations on the ability of the prior-art
             Precision to generate high rate and his assertions that the
17          modifications to the design that would be required in order to have
             a high-rate capability I found to be less than credible in my
18          assessment, so I *initiated a series of inquiries to try to develop my*
             *analysis on what the capabilities were in terms of what was*
19          *designed in that system.*

             And I asked, in a phone conversation, a number of pointed
20          questions to—I believe it was Sri first.  *And as I continued to pose*
             *these* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *about until that phone*
             *conversation.*  And I can give you the date if I refer to my report.
22

23   (Pai Decl. Ex. 31 at 163:21-164:18 (emphasis added).)  BSC's source code expert, Mr. Lanovaz,

24   likewise testified that he learned about the ▮▮▮▮▮▮▮ only from a call with Dr. Mihran and

25   BSC counsel (Pai Decl. Ex. 72 at 228:10-22) and that there was "[n]othing in the source code that

26   I saw that specifically called out high rate."  (*Id.* at 233:21-234:4.)  Given that BSC's experts

27   formulated the ▮▮▮▮▮▮▮ theory only while preparing their rebuttal reports, BSC

28

1  cannot plausibly claim that the theory was previously disclosed.

2        As with its untimely frequency harmonics argument, BSC's failure to disclose the

3  ████████████ theory in its invalidity contentions is dispositive for this motion.  *See, e.g.*,

4  Patent L.R. 3-3, 3-6; *ASUS*, 2014 U.S. Dist LEXIS 50728, at *5; *Takeda*, 2015 U.S. Dist. LEXIS

5  32948, at *17-18.  Moreover, BSC's new invalidity theory was improperly inserted into

6  non-infringement rebuttal reports.  *See Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. C-09-

7  01201 RMW, 2011 WL 11709387, at *10 (N.D. Cal. Aug. 19, 2011) (striking "rebuttal report"

8  containing invalidity theories).

9        Further, While Nevro necessarily describes the ████████ at a high level for purposes

10  of this motion, it is an extremely complex process that would require ████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████████  (*See* Ex. 73

14  at 137:2-139:14.)  ████████████████████████████—needed for this

15  theory underscores BSC's violation of the Patent Local Rules disclosure requirements.  BSC and

16  its experts should not be allowed to present the undisclosed ████████████ theory.

17        **2.    BSC's ████████████ Invalidity Theory Is Inconsistent with Its**

18              **Past Representations**

19        If there were any doubt as to the newness of the ████████████ theory, it is erased by

20  BSC's conduct during fact discovery.  Nevro's very first interrogatory requested parameters for

21  each model of BSC's SCS systems that were "capable of, or *designed to be capable of*, delivering

22  a waveform with a frequency of over 1,200 Hz."  (Pai Decl. Ex. 74 at 1.)  BSC did not identify

23  the Precision SCS prior art system in its response.  (Pai Decl. Ex. 26 at 2-3.)  Similarly, as

24  discussed above, Ms. Adair submitted a declaration stating that "BSC's commercially distributed

25  SCS systems have been providing stimulation at a frequency range *up to 1,200 Hz since 2004*."

26  (Pai Decl. Ex. 42 ¶ 4 (emphasis added).)  BSC contends that the Precision SCS system was

27  introduced in 2004.  (Pai Decl. Ex. 41 ¶ 3.)  As with its frequency harmonics theory, BSC sought

28  to avoid liability by claiming that its traditional SCS systems could not generate high-frequency

1   signals.  Now that discovery has closed, BSC has done an about-face for the sake of its invalidity

2   positions.  Such behavior should not be rewarded.

3   **3.    Nevro Has Not Opened the Door to the New ████████ Theory**

4   BSC claims that it can present the new ████████ theory because Nevro allegedly

5   offered a new infringement theory in its opening expert reports.  (*See* ECF No. 317-4 at 3-8.)

6   Specifically, BSC claims that Nevro's experts contended that the Precision SCS system does not

7   have high frequency capabilities but the Spectra WaveWriter system does, and Nevro thereby put

8   the Precision SCS system's capabilities at issue.  (*Id.* at 4.)

9   In no way did Nevro's experts present a new theory.  Nevro identified the Spectra

10   WaveWriter as an accused product in its May 2017 amended infringement contentions, alleging

11   that it meets the high-frequency limitations because "the IPG firmware, remote control firmware,

12   and clinician programmer software were modified to enable this capability."  (Pai Decl. Ex. 75 at

13   7-8.)  Nevro further contended that BSC does not avoid infringement by releasing WaveWriter

14   versions 2A and 2B, which merely disable a user interface with "one line of code or two" while

15   retaining "the other firmware and software modifications that enable frequencies above 1.2 kHz."

16   (*Id.* at 8.)  Likewise, Nevro consistently contended that the non-infringing Precision SCS system

17   does not have high frequency capabilities, including because "BSC admits that the Precision SCS

18   System would require extensive changes to both the clinician programmer's software and the

19   remote control firmware" for high frequencies and that "[s]uch extensive changes hardly render

20   the Precision SCS system 'capable' of being programmed to generate pulse frequencies greater

21   than 1,200 Hz."  (Pai Decl. Ex. 76 at 239.)  BSC's "opening the door" argument is little more

22   than a sideshow, particularly as the Federal Circuit has determined that "configured to generate"

23   does not mean "designed to generate."

24   **C.    BSC's New Theories Are Based on Experimentation with a System That BSC
        Failed to Produce as Required by the Patent Local Rules**

25

26   BSC's invalidity contention charts include just one prior art device:  BSC's Precision SCS

27   system.  A purported sample of that system was used by BSC's experts as the foundation for both

28   of its new theories.  But BSC did not produce a sample of this system with its invalidity

1    contentions, as required by Patent Local Rule 3-4(b).  That alone bars BSC from relying on

2    experimentation with the system.  *See IXYS Corp. v. Advanced Power Tech., Inc.*, No. C

3    02-03942 MHP, 2004 U.S. Dist. LEXIS 10934, at *7 (N.D. Cal. June 15, 2004) (striking use of

4    photographs and data from prior art device that were not produced with invalidity contentions);

5    *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2015 U.S. Dist. LEXIS 88760, at *10

6    (N.D. Cal. July 8, 2015) (striking reliance on reference where, by mistake, defendant did not

7    produce translation of cited portion until after fact discovery).  Any justification that BSC could

8    try to advance is defeated by its own conduct in not producing the prior art system despite

9    Nevro's requests, as well as testimony from BSC's witnesses that the Precision SCS system is

10    different from other device samples that BSC did produce in this case.

            **1.**        **BSC Withheld the Prior Art System Until Just Before Expert Reports**

12         BSC not only failed to produce the Precision SCS prior art system with its contentions; it

13    never produced a sample during fact discovery, notwithstanding Nevro's requests that it do so.

14    (*See* Pai Decl. Exs. 77, 78.)  BSC's counsel instead claimed that "we are searching for a complete

15    sample of the Precision prior art system and will make it available for inspection once it has been

16    located" and "our investigation continues but we intend to make a sample product available for

17    inspection when it is available."  (*Id.*)  Discovery closed with no sample provided.

18         Yet when BSC's expert Dr. Mihran asked for a sample in November 2017, BSC put

19    together a system in a matter of weeks and, in BSC's own words, "immediately sent it to

20    Dr. Mihran."[1]  (ECF No. 301 at 7; *see also* ECF No. 301-10 ¶ 9; ECF No. 301-11 ¶ 2.)  In

21    January 2018—less than two weeks before opening expert reports—BSC's counsel finally

22    notified Nevro that BSC could make the sample provided to Dr. Mihran available, and even then

23    only in Denver, where Dr. Mihran is located.  (Pai Decl. Ex. 71.)  BSC's failure to comply with

24    the Patent Local Rules bars BSC from relying on experimentation with the Precision SCS system.

---

26       [1] To make matters more complicated, subsequent exchanges with BSC revealed that the sample provided to Dr. Mihran may not even be a true Precision SCS system, but rather a hodgepodge of various components, from various time frames, that was specially assembled for Dr. Mihran.  (Pai Decl. Ex. 8 at 2-3.)  Regardless, that system was not timely produced to Nevro and cannot be relied on by BSC's experts.

1    *See IXYS Corp.*, 2004 U.S. Dist. LEXIS 10934, at *7; *see also Nationwide Life Ins. Co. v.*

2    *Richards*, 541 F.3d 903, 910 (9th Cir. 2008) (Federal Rules contemplate full and equal discovery

3    "so as to prevent surprise, prejudice, and perjury during trial.") (citation omitted).

4              **2.      BSC Cannot Rely On Its Production of a Precision *Plus* SCS System**

5              BSC's main excuse is that it produced to Nevro during fact discovery a sample of the

6    newer Precision ***Plus*** SCS System and that the Precision SCS System and the Precision Plus SCS

7    System have the same "output capabilities." (*See* ECF No. 301 at 6.)  Even if true, this would not

8    excuse BSC's failure to comply with the Patent Local Rules.  *See Life Techs. Corp. v. Biosearch*

9    *Techs., Inc.*, No. C 12-00852 WHA, 2012 U.S. Dist. LEXIS 132478, at *11 (N.D. Cal. Sept. 17,

10   2012) ("[D]efendants do not get to ambush at this late stage by asserting that the asserted

11   [references] *allegedly share* limitations and so disclosure as to one [reference] would apply to

12   others.").  Moreover, BSC's own attorneys found it necessary to differentiate between the

13   "Precision Plus" SCS system and the "Precision prior art system."  (Pai Decl. Ex. 78 at 1.)  And if

14   the two devices actually are substantially the same, then Dr. Mihran's insistence on receiving the

15   Precision SCS system—and BSC's efforts to locate it—make no sense.

16             BSC's own witnesses, moreover, contradict BSC's claim that the Precision SCS and

17   Precision Plus SCS systems are effectively the same.  Dr. Carbunaru previously testified that "the

18   original Precision device was very short – was used for a very brief period of time . . . So the

19   original – the very original, what we call – we call it the SCS 1 – not a very original name – was

20   that original Precision.  And then called SCS 2, what we call Precision Plus."  (Pai Decl. Ex.

21   20 at 829:19-830:8.)  For this revision, BSC "changed the electronics and we changed the

22   firmware, but a lot of the components were the same."  (*Id.* at 831:5-832:4.)  Likewise, in a later

23   declaration, Dr. Carbunaru admitted that the Precision SCS and Precision Plus SCS have the

24   following differences:  different electronics; updated pulse generator; updated trial stimulator;

25   modified microprocessor; updated clinician programmer software; and modified analog and

26   digital integrated circuits.  (Carbunaru Decl., ECF No. 301-10 ¶¶ 2-6.)  Even setting aside these

27   differences, BSC never informed Nevro until after fact discovery that it considered the Precision

28   Plus to be a proxy for the Precision SCS, so Nevro had no reason to perform an analysis of that

1  system as a potential proxy for a prior art system.

2      BSC cannot credibly argue that producing a Precision Plus SCS system for use in Nevro's

3  infringement analysis excused it from producing a sample of the only claimed prior art system in

4  this case.  BSC's conduct is a clear violation of the Patent Local Rules, and the Court should

5  strike any reliance on experimentation with the Precision SCS system from BSC's expert reports.

6      **D.    BSC Cannot Possibly Establish Diligence or Lack of Prejudice**

7      BSC has not sought leave to amend its contentions to include the frequency harmonics

8  and ▮▮▮▮▮▮▮▮▮ invalidity theories, so of course it cannot establish diligence in amending.

9  Nor would the facts—including a theory developed while writing rebuttal reports and a prior art

10  system withheld throughout fact discovery—support any finding of diligence.

11      Because BSC cannot establish diligence, the Court does not need to examine whether

12  Nevro is prejudiced.  *See, e.g.*, *Takeda Pharm.*, 2015 U.S. Dist. LEXIS 32948, at *18.  But BSC's

13  untimely disclosure of its new invalidity theories and a different prior art system long after the

14  close of fact discovery, and months after Nevro elected a narrowed set of asserted claims for trial,

15  is highly prejudicial.  Nevro was not able to take fact discovery on these new theories or devices

16  and its experts were burdened by the hundreds of pages of improper opinions in Dr. Mihran's

17  opening report (and have been unable to properly address the improper opinions in BSC's rebuttal

18  report).  There has been clear prejudice to Nevro.  *See, e.g.*, *Abbott Diabetes Care Inc. v. Roche*

19  *Diagnostics Corp.*, No. C05-03117 MJJ, 2007 U.S. Dist. LEXIS 59161, at *8 (N.D. Cal. Jul. 30,

20  2017) (prejudice where two months left in fact discovery); *see also Oracle Am., Inc. v. Google*

21  *Inc.*, No. C 10-03561 WHA, 2011 U.S. Dist. LEXIS 87251, at *10-11 (N.D. Cal. Aug. 8, 2011)

22  (no leave to amend where reference disclosed after claim election).

23  **IV.    CONCLUSION**

24      Nevro requests that the Court (1) strike BSC's undisclosed frequency harmonics invalidity

25  theory from the expert reports of Dr. Mihran; (2) strike BSC's undisclosed ▮▮▮▮▮▮▮▮▮

26  invalidity theory from the expert reports of Dr. Mihran and Mr. Lanovaz; and (3) strike any

27  reference to experimentation with the unproduced Precision SCS system from the expert reports

28  of Dr. Mihran and Mr. Lanovaz.

1

2    Dated: October 20, 2020                    MORRISON & FOERSTER LLP

3

4                                          By:   _/s/ Kenneth A. Kuwayti_
                                                 Kenneth A. Kuwayti
5
                                                 Attorneys for Plaintiff
6                                                NEVRO CORP.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28