Thomas T. Carmack (State Bar No. 229324)
Email address: tom.carmack@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, California 94306
Telephone:    (650) 319-4500
Facsimile:    (650) 319-4700

Matthew M. Wolf (admitted *pro hac vice*)
Email address: matthew.wolf@arnoldporter.com
Edward Han (admitted *pro hac vice*)
Email address: edward.han@arnoldporter.com
Marc A. Cohn (admitted *pro hac vice*)
Email address: marc.cohn@arnoldporter.com
Amy L. DeWitt (admitted *pro hac vice*)
Email address: amy.dewitt@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:    (202) 942-5000
Facsimile:    (202) 942-5999

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC NEUROMODULATION
CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEVRO CORP., | Case No. 3:16-cv-06830-VC |
| Plaintiff, | **BOSTON SCIENTIFIC'S OPPOSITION TO NEVRO'S MOTION FOR SUMMARY JUDGMENT AND OPENING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION, | Date:         January 14, 2021<br>Time:         10:00 A.M.<br>Courtroom:   4, 17th Floor<br>Judge:        Hon. Vince Chhabria |
| Defendants. | |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

**TABLE OF CONTENTS**

**NOTICE**..................................................................................................................... 1

**CONCISE STATEMENT OF RELIEF SOUGHT**............................................... 1

**MEMORANDUM OF POINTS AND AUTHORITIES**........................................ 1

**I.     INTRODUCTION**......................................................................................... 1

**II.    RESPONSE TO NEVRO'S "FACTUAL BACKGROUND"**.................... 4

    A.   Nevro's High-Frequency Stimulation Is Not Novel .............................. 4

    B.   BSC Independently Developed Its Own Technology ............................. 4

    C.   IPRs Regarding Non-Asserted Method Claims Under An Obsolete Claim
         Construction Are Irrelevant ................................................................... 5

**III.   NEVRO'S INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW** ................ 5

    A.   Legal And Factual Background .............................................................. 6

    B.   The Court Should Grant BSC's Motion For Summary Judgment Of
         Noninfringement And Deny Nevro's Motion For Summary Judgment Of
         Infringement .......................................................................................... 8

         1.   None Of The Accused Products Infringes The Asserted Device
             Claims Under Sections 271(a) & (b) ......................................... 8

         2.   Nevro Cannot Satisfy Section 271(f)(1)'s "Combination"
             Requirement ............................................................................... 10

**IV.    FANG INVALIDATES ALL ASSERTED CLAIMS** ............................... 14

    A.   Fang Is Prior Art Under 35 U.S.C. § 102(e) ......................................... 14

         1.   Nevro Admitted That Fang Is § 102(e) Prior Art And Is Judicially
             Estopped From Taking A Contrary Position Here.................... 15

         2.   Nevro Was Right:  Fang Is § 102(e) Prior Art ......................... 16

    B.   Fang Discloses Each Element Of Every Asserted Claim ..................... 18

         1.   Fang Discloses Groups (i) & (ii):  Implantable SCS Signal Generator
             And Leads .................................................................................. 18

         2.   Fang Discloses Group (iii):  High-Frequency Therapy .......... 19

          3.   Fang Discloses Groups (iv) & (v):  Amplitude And Pulse Width ........... 19

          4.   Fang Discloses Group (vi):  Paresthesia-Free Therapy ........... 21

          5.   Fang Discloses Group (vii):  Other Elements ........................... 21

**V.     KNUDSON INVALIDATES THE FREQUENCY RANGE CLAIMS** ............ 22

    A.   Knudson Anticipates Nevro's Frequency Range Claims...................... 22

         1.   Knudson Discloses Groups (i) & (ii):  Implantable SCS Signal
             Generator And Leads ................................................................. 22

         2.   Knudson Discloses Group (iii):  High-Frequency Therapy..... 22

          3.   Knudson Discloses Groups (iv) & (v):  Amplitude & Pulse Width ........ 22

          4.   Knudson Discloses Group (vi):  Paresthesia-Free Therapy..... 23

          5.   Knudson Discloses Group (vii):  Other Elements.................... 25

    B.   Knudson Renders Nevro's Frequency Range Claims Obvious ............ 25

ii

**VI.     THE ASSERTED FREQUENCY RANGE CLAIMS ARE INVALID UNDER
35 U.S.C. § 112 DUE TO LACK OF ENABLEMENT ................................................. 27**

    A.     Nevro's Specification Provides No Guidance For Practicing The Full Scope
Of The Frequency Range Claims (*Wands* Factors 2, 3, 4, 7, & 8) ...................... 28

    B.     Nevro Still Has Not Enabled The Full Scope Of Its Claims To This Day
(*Wands* Factors 1, 2, 3, 4, 7, & 8) ........................................................................... 29

    C.     Undue Experimentation Was Required To Practice The Claims At Any
Frequency Other Than 10 kHz (*Wands* Factors 1, 4, 5, 6, & 7) ........................... 31

    D.     Paresthesia-Free Therapy Is Inherently And Notoriously Unpredictable
(*Wands* Factors 2, 3, 4, 5, 6, & 7) ........................................................................... 34

**VII.     NEVRO IS NOT ENTITLED TO SUMMARY JUDGMENT OF NO
INVALIDITY IN VIEW OF THE PRIOR ART PRECISION SYSTEM................. 35**

**VIII.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT OF NO INEQUITABLE CONDUCT........................................................ 37**

    A.     A Reasonable Jury Could Find That Yearwood Was Material............................. 38

    B.     A Reasonable Jury Could Find That Yearwood Was Not Cumulative ............... 40

**CONCLUSION ................................................................................................................. 40**

1

## TABLE OF AUTHORITIES

**Cases**

*Ah Quin v. Cty. of Kauai Dep't of Transp.*,
   733 F.3d 267 (9th Cir. 2013) ........................................................................ 17

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014)........................................................................ 19

*ALZA Corp. v. Andrx Pharm., LLC*,
   603 F.3d 935 (Fed. Cir. 2010)........................................................................ 34

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991)...................................................................... 31

*Application of Swinehart*,
   439 F.2d 210 (C.C.P.A. 1971) ....................................................................... 26

*Atlas Powder Co. v. Ireco, Inc.*,
   190 F.3d 1342 (Fed. Cir. 1999)...................................................................... 26

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994)........................................................................ 20

*Cardiac Pacemarkers, Inc. v. St. Jude Med., Inc.*,
   576 F.3d 1348 (Fed. Cir. 2009) (en banc)............................................... 6, 7, 13

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
   668 F.3d 1340 (Fed. Cir. 2012)...................................................................... 21

*Davis v. Reddy*,
   620 F.2d 885 (C.C.P.A. 1980)........................................................................ 19

*Dawson v. Dawson*,
   710 F.3d 1347 (Fed. Cir. 2013) ..................................................................... 19

*Deepsouth Packing Co. v. Laitram Corp.*,
   406 U.S. 518 (1972) .......................................................................................... 6

*Dow Jones & Co. v. Ablaise Ltd.* ,
   *606 F.3d 1338 (Fed. Cir. 2010)*.................................................................... 28

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
   914 F.3d 1347 (Fed. Cir. 2019)................................................................. 18, 20

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
   859 F.3d 1341 (Fed. Cir. 2017)............................................................. 18, 19, 20

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*,
   928 F.3d 1340 (Fed. Cir. 2019),
   *cert. denied*, 140 S. Ct. 2634 (2020) .......................................................... 31

*Gen. Elec. Co. v. Wilkins*,
   750 F.3d 1324 (Fed. Cir. 2014)...................................................................... 18

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)...................................................................... 26

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)........................................................................ 31

*Indus., Inc. v. Rheem Mfg. Co.*,
   1984 WL 1243 (M.D. Tenn. June 5,1984),
   *aff'd in part, rev'd in part*, 769 F.2d 762 (Fed. Cir. 1985) .............................. 17

iv

*Ineos USA LLC v. Berry Plastics Corp.*,
   783 F.3d 865 (Fed. Cir. 2015)..................................................................... 21

*Koninklijke Philips N.V. v. Google LLC*,
   948 F.3d 1330 (Fed. Cir. 2020).................................................................. 28

*Krippelz v. Ford Motor Co.*,
   667 F.3d 1261 (Fed. Cir. 2012).................................................................. 43

KSR Int'l Co. v. Teleflex Inc.,
   *550 U.S. 398 (2007)* ........................................................................... 28, 40

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007).................................................................. 34

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   572 U.S. 915 (2014)............................................................................... 6, 9

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004)................................................................... 9

*Lucent Techs. Inc. v. Gateway, Inc.*,
   470 F. Supp. 2d 1163 (S.D. Cal. 2007)....................................................... 18

*MagSil Corp. v. Hitachi Glob. Storage Techs.*,
   687 F.3d 1377 (Fed. Cir. 2012)............................................................. 30, 31

*Meiresonne v. Google, Inc.*,
   849 F.3d 1379 (Fed. Cir. 2017).................................................................. 43

*Merial Ltd. v. Cipla Ltd.*,
   681 F.3d 1283 (Fed. Cir. 2012)................................................................... 6

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)........................................................................... passim

*National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*,
   166 F.3d 1190 (Fed. Cir. 1999).................................................................. 30

*Netword, LLC v. Centraal Corp.*,
   242 F.3d 1347 (Fed. Cir. 2001)................................................................... 9

*Nevro Corp. v. Boston Sci. Corp.*,
   955 F.3d 35 (Fed. Cir. 2020)............................................................. 4, 8, 26

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)............................................................................... 17

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007).................................................................. 34

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013).................................................................. 11

*Regeneron Pharms., Inc. v. Merus N.V.*,
   864 F.3d 1343 (Fed. Cir. 2017).................................................................. 42

*Regents of the Univ. of Calif. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997).................................................................. 44

*Round Rock Rsch., LLC v. SanDisk Corp.*,
   75 F. Supp. 3d 674 (D. Del. 2014).............................................................. 40

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008)................................................................... 32

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Therasense, Inc. v. Becton, Dickinson & Co.*,
 649 F.3d 1276 (Fed. Cir. 2011)..................................................................................... 43

*Trustees of Boston University v. Everlight Electronics Co.*,
 896 F.3d 1357 (Fed. Cir. 2018)..................................................................................... 30

*Tyler Refrigeration Corp. v. Kysor Indus. Corp.*,
 601 F. Supp. 590 (D. Del. 1985), *aff'd*, 777 F.2d 687 (Fed. Cir. 1985) ......................... 17

*WesternGeco LLC v. ION Geophysical Corp.*,
 791 F.3d 1340 (Fed. Cir. 2015)..................................................................................... 14

*Wyeth & Cordis Corp. v. Abbott Labs.*,
 720 F.3d 1380 (Fed. Cir. 2013)................................................................................. 30, 31

*Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*,
 476 F. Supp. 2d 1024 (N.D. Ind. 2007) ......................................................................... 40

**Statutes**

35 U.S.C. § 102(b) ................................................................................................................. 24

35 U.S.C. § 102(e) .............................................................................................. 16, 17, 18, 20

35 U.S.C. § 112 ............................................................................................................. 1, 4, 29

35 U.S.C. § 271(a) ..................................................................................................... 1, 6, 9, 10

35 U.S.C. § 271(b) ..................................................................................................... 1, 9, 11

35 U.S.C. § 271(e) ......................................................................................................... 8, 10

35 U.S.C. § 271(f) ......................................................................................................... passim

35 U.S.C. § 271(f)(1) ..................................................................................................... passim

BSC'S MSJ OPP AND MSJ                                                        Case No. 3:16-cv-06830-VC

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| The '102 patent | U.S. Patent No. 8,359,102 (Pai Ex. 1) |
| The '533 patent | U.S. Patent No. 8,712,533 (Pai Ex. 2) |
| The '472 patent | U.S. Patent No. 8,768,472 (Pai Ex. 3) |
| The '988 patent | U.S. Patent No. 8,792,988 (Pai Ex. 4) |
| The '125 patent | U.S. Patent No. 9,327,125 (Pai Ex. 5) |
| The '357 patent | U.S. Patent No. 9,333,357 (Pai Ex. 6) |
| The '842 patent | U.S. Patent No. 9,480,842 (Pai Ex. 7) |
| Ex. __ | Exhibit to the Declaration of Carson D. Anderson, filed herewith |
| Lanovaz Decl. | Excerpts of the Rebuttal Expert Report and Declaration of Daniel Lanovaz, dated February 14, 2018, filed herewith |
| Lipson Rpt. | Excerpts of the Expert Report and Declaration of Adam Lipson, dated January 18, 2018, filed herewith |
| Mihran Rpt. | Exhibit A to the Declaration of Richard T. Mihran, filed herewith |
| Mihran Reb. | Exhibit B to the Declaration of Richard T. Mihran, filed herewith |
| Mot. | Nevro's Notice of Motion and Motion For Summary Judgment, D.N. 522-4 |
| Pai. Ex. __ | Exhibit to the Declaration of Eric C. Pai in support of Nevro's Motion for Summary Judgment, D.N. 525 |
| Pless Decl. | Reference to the Declaration of Ben Pless in support of Nevro's Motion for Summary Judgment, D.N. 522-41 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 14, 2021, or as soon thereafter as counsel may be heard before the Honorable Vince Chhabria in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation (collectively, "BSC"), will and hereby do move for summary judgment.  BSC's motion is based on the pleadings, records, and files in this action; documents in the public record; the accompanying memorandum of points and authorities; the Declarations of Richard T. Mihran, Daniel Lanovaz, Adam Lipson, and Carson D. Anderson and accompanying exhibits; and any other evidence and argument that may be presented in briefing or at the hearing.

**CONCISE STATEMENT OF RELIEF SOUGHT**

BSC seeks summary judgment that:  (1) BSC does not infringe any asserted claim pursuant 35 U.S.C. §§ 271(a), (b), and (f)(1); (2) all asserted claims are invalid in view of Fang; (3) the Frequency Range claims[1] are invalid in view of Knudson; and (4) the Frequency Range claims are invalid under 35 U.S.C. § 112 for lack of enablement.  BSC also opposes Nevro's motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Spinal cord stimulation ("SCS") therapy has been around for decades.  In 2004, BSC commercialized the first rechargeable SCS system called the Precision system, which provided stimulation signals at frequencies up to 1,200 Hz (or 1.2 kHz) and was designed to generate "paresthesia"—defined as "a sensation usually described as tingling, pins and needles, or numbness" (D.N. 449 at 2)—to mask the patient's pain.

In the mid-2000s, BSC investigated other spinal cord stimulation techniques.  In 2005, BSC considered frequencies well above 1.2 kHz, including 10,000 Hz (or 10 kHz).  (*See* Ex. 59.) Others in the field also investigated high-frequency therapy, and they published articles and patent applications describing their work.  For example, Mark Knudson described an implantable

---

[1] The "Frequency Range claims" are '533 patent claims 7, 12, 35, and 58, '125 patent claims 18 and 55, and '357 patent claim 34.

1   SCS system delivering "a frequency in excess of 3,000 Hz and more preferably about 5,000 Hz or

2   more" in 2007.  (Ex. 26, ¶ [0083].)  Years earlier, Alexander JR MacDonald had described

3   therapies at 2 kHz, 10 kHz, and 100 kHz.  (Ex. 30 at 654, 656, 659.)

4   BSC, among others, also studied paresthesia-free therapy.  In 2006, James Thacker—then

5   a BSC clinical engineer—collaborated with Thomas Yearwood on a clinical study about "sub-

6   perception" or "subthreshold" therapy in which patients using BSC's Precision system did not

7   feel paresthesia.  As Nevro's Chief Medical Officer, David Caraway, admitted:  "Subthreshold

8   means that the amplitude is ramped down, turned way down, until the patient generally can't feel

9   it.  So, during that time where the amplitude is very low, and they're not getting any paresthesias,

10  they are, at least at that point in time, paresthesia free."  (Ex. 57 at 49:7-23.)  Caraway admitted

11  that such paresthesia-free therapies had been used "for decades" simply by turning the amplitude

12  down on existing SCS systems.  (*Id.* at 50:13-25.)  Knudson and MacDonald also describe

13  paresthesia-free therapy.

14  Late in the game, Nevro was founded to investigate high-frequency, paresthesia-free SCS

15  therapy.  In the late-2000s, after BSC's, Knudson's, MacDonald's, and Yearwood's work, and

16  after hiring many BSC employees, including Thacker, Nevro developed a device to provide

17  paresthesia-free therapy at 10 kHz.  Nevro then embarked on a patent monopoly spree:  it

18  patented paresthesia-free therapy at frequencies from 1.5 kHz to 100 kHz; it patented 10 kHz

19  therapy regardless of whether it was paresthesia-free; and it patented paresthesia-free therapy

20  regardless of frequency.  It now asserts some of these patents against BSC.

21  BSC has never commercialized a product in the United States that was actually

22  programmed to provide stimulation above 1.2 kHz.  Before remand, Nevro had asserted that BSC

23  infringed because its devices were physically capable of delivering high frequencies, even though

24  a user could not program them to do so.  Since the Federal Circuit rejected that interpretation of

25  Nevro's patents, Nevro has abandoned its infringement claims based on U.S. sales and turned its

26  focus to about 300 European sales of a product programmable to 10 kHz.  As a matter of law,

27  however, BSC's export of a product that must be programmed by a user in Europe—

28

2

noninfringing even if shipped within the United States without such after-the-fact programming—does not meet the narrow strictures of 35 U.S.C. § 271(f)(1) for infringing combinations abroad.

More fundamentally, the great disparity between the breadth of Nevro's patents and the narrowness of its 10 kHz development work is a fatal defect in the validity of its patents. Nevro's clinical studies and regulatory approvals were limited to 10 kHz, and Nevro built its brand on "HF10"—*i.e.*, 10 kHz—therapy. Nevro differentiates itself in the market from conventional SCS by stating publicly (and internally) that stimulation at 5 kHz and below simply does not work to provide paresthesia-free therapy. And, Nevro's patent specification does not teach how to achieve paresthesia-free therapy except at 10 kHz. Yet, only some of Nevro's asserted claims recite a 10 kHz frequency—the Frequency Range claims cover a wide range of frequencies and some non-asserted claims do not have any frequency limitations at all. These latter claims cover devices that Nevro did not invent and—more to the point—that were described in the prior art.

For example, Knudson describes the same device in Nevro's Frequency Range claims—it delivers the same frequencies, pulse widths, and amplitudes to the same part of the spine for the same purposes of treating pain. It is axiomatic that the same electrical signal applied to the same part of the body would get the same physiological result—*i.e.*, in some patients, the therapy would be paresthesia-free. Indeed, Nevro made it absolutely clear on appeal that, to infringe, it was sufficient that paresthesia-free therapy was generated in only ***some*** patients ***some*** of the time, not necessarily in all patients all the time, which is a physical impossibility. Because infringement and anticipation must be analyzed under the same standard, Knudson anticipates Nevro's Frequency Range claims. In addition, it would have been obvious to use Knudson's high-frequency signals at a sub-perception level—as described in Yearwood and, as Nevro admits, known "for decades"—to provide paresthesia-free therapy.

To the extent Nevro attempts to distinguish its Frequency Range claims from Knudson by arguing that something more must be done to achieve paresthesia-free therapy beyond setting the recited stimulation parameters as claimed, then those claims are invalid for failing to meet 35 U.S.C. § 112's enablement requirement. Enablement is the *quid pro quo* for receiving a patent monopoly, in return for which the patentee must teach the public how to make and use the

1  invention without undue experimentation.  Nevro's specification, however, does not describe any

2  "secret sauce" for generating paresthesia-free therapy other than the stimulation parameters.  The

3  Federal Circuit acknowledged this in its opinion in this case:

> Indeed, the focus of the specifications is on setting the signal generator's parameters; ***they
> are silent as to any other steps the inventors took to configure the signal generator***.  *See,
> e.g.*, '533 patent at 6:34–7:5 (distinguishing the claimed spinal cord stimulation systems
> from conventional systems based on the parameters used to generate the therapy signals).

*Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) (emphasis added).  Thus,

either Knudson invalidates the Frequency Range claims, or, if there is any difference between

Knudson and those claims, then they are invalid because that difference is not enabled.

For these reasons and those discussed in more detail below, BSC should be granted

summary judgment of noninfringement and invalidity, and Nevro's motions should be denied.

## II.    RESPONSE TO NEVRO'S "FACTUAL BACKGROUND"

Nevro's factual background section is not relevant to any of its summary judgment

arguments, but BSC is compelled to correct Nevro's misleading portrayal of the record.

### A.    Nevro's High-Frequency Stimulation Is Not Novel

Nevro touts its purportedly novel introduction of "high-frequency" SCS therapy in the

commercial context (Mot. at 3-4), but commercialization is not the benchmark for patentability.

Nevro's patent claims are broad, covering any implantable SCS device that is programmed to

deliver stimulation with certain parameters with the aim of avoiding paresthesia, and two of the

claims do not even require that the therapy be paresthesia-free.  Implantable SCS devices using

the same parameters as Nevro's patents and generating paresthesia-free therapy were already

described (and actually used) in the prior art, as discussed in more detail below.

### B.    BSC Independently Developed Its Own Technology

Long ago, after BSC had been selling SCS systems for years and when Nevro was just

beginning, BSC investigated Nevro's high frequency signals as part of routine competitive

intelligence, to test its new competitor's marketing claims and to determine whether Nevro was

"developing their system based on [BSC's]."  (Ex. 4 at 688:21-689:19; Ex. 5 at 416:10-15, 420:9-

16.)  But, BSC did not copy Nevro.  (*See* Mot. at 4-5.)  In fact, BSC designed its commercial

4

products so that they could **not** be programmed for high-frequency use.  Other than about 300

European sales of the "Precision with MultiWave"—now the sole focus of Nevro's infringement

case—BSC has never commercialized an SCS product that could be programmed for use above

1.2 kHz.  When Nevro filed suit in November 2016, it falsely alleged that "FDA approval and

full-scale commercial launch of Boston Scientific's infringing paresthesia-free high frequency

SCS systems in the United States is imminent."  (D.N. 1, ¶ 61.)  Nevro was wrong.  Even today—

nearly four years later—BSC still has not sought FDA approval to sell such an SCS system.

(D.N. 52 at 4; D.N. 453 at 1; D.N. 515 at 6-7.)  This conduct is the opposite of copying.

In fact, BSC independently developed its own treatment protocols, including paresthesia-

free pain relief at **lower** frequencies.  For example, BSC's "PROCO" study has shown that

stimulation at 1 and 4 kHz provides paresthesia-free therapy that is as effective as 10 kHz while

using far less battery power.  (Ex. 40.)  While BSC established the efficacy of such therapy,

Nevro was telling the public that paresthesia-free pain relief below 5 kHz was not possible.  (*See*

*infra* § VI.B.)  Yet, Nevro's patent claims cover frequencies all the way down to 1.5 kHz—it

attempts to claim what it did not invent or enable.

### C.    IPRs Regarding Non-Asserted Method Claims Under An Obsolete Claim Construction Are Irrelevant

Nevro makes much of the fact that the Patent Office declined to institute *inter partes*

review ("IPR") of one Nevro patent that it abandoned in view of the Court's and the Federal

Circuit's decisions.  (Mot. at 5.)  That preliminary IPR decision, which does not give rise to any

estoppel and is not binding, challenged only method claims, not device claims, and was based on

claim constructions that are now obsolete.  It is irrelevant here.

### III.   NEVRO'S INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW

Having declined to appeal this Court's prior summary judgment of noninfringement as to

various patent claims, and no longer pursuing its direct infringement theory under 35 U.S.C.

§ 271(a), Nevro now seeks (for the first time) summary judgment on *some* of the surviving patent

claims under 35 U.S.C. § 271(f).  But it is BSC that is entitled to summary judgment of

noninfringement under sections 271(a), (b), and (f)(1) as to *all* remaining patent claims.  This Court should grant BSC's cross-motion and deny Nevro's motion.

### A.  Legal And Factual Background

**1.**  Section 271(a) of the Patent Act has long provided that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . infringes the patent."  35 U.S.C. § 271(a).  By its terms, "§ 271(a) direct infringement claims require domestic infringing acts."  *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302 (Fed. Cir. 2012).  "[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b)."  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 922 (2014).

After the Supreme Court in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972), held that section 271(a) does not apply to a manufacturer that ships parts of a patented invention for assembly and use abroad, Congress in 1984 adopted section 271(f).  *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359-60 (Fed. Cir. 2009) (en banc).  Section 271(f) "expands the definition of infringement to include supplying from the United States a patented invention's components" in specifically defined circumstances.  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 444-45 (2007).  As relevant here, section 271(f)(1) states:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(1).

Both the Supreme Court and the Federal Circuit take a narrow view of section 271(f).  As a general matter, "[t]he presumption that United States law governs domestically but does not rule the world"—which "applies with particular force in patent law"—"remains instructive in determining the *extent* of the statutory exception."  *Microsoft*, 550 U.S. at 454-56.  "[T]he presumption is not defeated . . . just because [a statute] specifically addresses [an] issue of extraterritorial application."  *Id.* at 455-56 (alterations except first and ellipsis in original) (citation omitted).  In addition, it is now settled law that "[s]ection 271(f) does not apply to method patents."  *Cardiac Pacemakers*, 576 F.3d at 1365.

**2.**   Nevro's original infringement case concerned three BSC SCS systems (the "Accused Products") made in the United States:  (1) the Precision with MultiWave, which was used within the United States only as part of a clinical trial known as "ACCELERATE," as well as exported to Europe for sale; (2) the Spectra WaveWriter 1, which also was used in the United States only as part of the ACCELERATE trial, but was not commercially available anywhere in the world; and (3) the Spectra WaveWriter 2, which was sold commercially in the United States and nowhere else.

In prior proceedings, Nevro sought summary judgment of infringement as to one device claim and one method claim in connection with the domestic use of the Precision with MultiWave as part of the ACCELERATE trial.  (D.N. 341-37 at 1.)  BSC, in turn, moved for summary judgment of noninfringement as to all Accused Products and the 18 asserted claims spanning seven patents.  (D.N. 357-4 at 1.)  This Court determined that the domestic use of two Accused Products—the Precision with MultiWave and the Spectra WaveWriter 1—in "the ACCELLERATE [sic] trial fits within the safe harbor provision of 35 U.S.C. § 271(e)" for uses "reasonably related to the development and submission of information to the FDA for device approval."  (D.N. 449 at 8 (internal quotation marks omitted).)  The Court also held that BSC "cannot be liable for direct or induced infringement of the remaining method claims with respect to Spectra WaveWriter systems sold for commercial use in the United States"—*i.e.*, the Spectra WaveWriter 2—"because those systems cannot be programmed to generate signals above 1.2 kHz."  (*Id.*)  And the Court granted BSC "[s]ummary judgment on noninfringement under section 271(f) regarding the Precision with MultiWave systems sold in Europe . . . with respect to the remaining method claims."  (*Id.* at 9.)  Nevro elected not to appeal any of those infringement rulings.  *See Nevro*, 955 F.3d at 37.

In light of that (undisturbed) award of summary judgment to BSC, the only remaining claims at issue are the following device claims (the "Asserted Device Claims"):  (i) claims 7, 12, 35, 37, and 58 of the '533 patent; (ii) claims 18, 34, and 55 of the '125 patent; (iii) claims 5 and 34 of the '357 patent; and (iv) claims 1 and 22 of the '842 patent.  Generally, each claims an SCS system comprising a signal generator and a signal delivery device "configured to" generate and

7

deliver (or with the means for generating and delivering) a high-frequency electrical therapy signal of at least 1.5 kHz and having certain other characteristics.  (*See* Ex. 1.)

At present, Nevro's motion seeks summary judgment of infringement only under section 271(f)(1) and only as to claims 7 and 35 of the '533 patent, claim 55 of the '125 patent, and claim 22 of the '842 patent.  (Mot. at 1.)  BSC's cross-motion seeks summary judgment of noninfringement under sections 271(a), (b), and (f)(1) as to all Asserted Device Claims.

### B.   The Court Should Grant BSC's Motion For Summary Judgment Of Noninfringement And Deny Nevro's Motion For Summary Judgment Of Infringement

"Because [Nevro] bears the burden of establishing infringement at trial, in moving for summary judgment [BSC] need only establish a deficiency concerning an element of [an] infringement claim."  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1325-26 (Fed. Cir. 2004).  In this case, the record does not permit a reasonable factfinder to conclude that any of the Accused Products infringes the high-frequency limitations of any of the Asserted Device Claims under sections 271(a), (b), or (f)(1).  Accordingly, summary judgment should be awarded to BSC in all respects (and denied to Nevro regarding its limited motion).

#### 1.   None Of The Accused Products Infringes The Asserted Device Claims Under Sections 271(a) & (b)

Under the Federal Circuit's decision, the Accused Products cannot infringe the Asserted Device Claims under sections 271(a) and (b) as a matter of law.  "To establish literal infringement [under section 271(a)], all of the elements of the claim, as correctly construed, must be present in the accused system."  *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).  The absence of direct infringement under section 271(a) precludes a finding of induced infringement under section 271(b).  *See Limelight Networks*, 572 U.S. at 922.

Nevro previously argued as a matter of claim construction that an infringing device need only be "designed to" or "capable of" generating and delivering the claimed high-frequency signal.  The Federal Circuit rejected Nevro's argument.  In particular, the Federal Circuit held that the limitation "configured to"—used in the claims of the '533 and '842 patents—"requires programming . . . i.e., setting parameters" of the claimed high-frequency electrical signals.

8

955 F.3d at 41; *see id.* (equating "configured" to "programmed" and distinguishing "programmed" from "programmable").  Importantly, the Federal Circuit held that it is not enough for a device to be capable of producing those electrical signals.  *Id.* at 41-42.  The same is true of the limitation "means for generating"—used in the claims of the '125 patent—which is a means-plus-function term that "ha[s] a function of 'generating' and a structure of 'a signal/pulse generator *configured to* generate.'"  *Id.* at 42-43 (emphasis added).  Similarly, the '533 and '357 patents by their terms claim "executable instructions to generate" a high-frequency electrical signal.

None of the Accused Products meets those closely related claim limitations.  This Court already granted summary judgment of noninfringement to BSC with respect to method claims that are no longer at issue, finding that the Spectra WaveWriter 2 "cannot be programmed to generate signals above 1.2 kHz."  (D.N. 449 at 8.)  Although it is *possible* for the Precision with MultiWave and the Spectra WaveWriter 1 to be programmed to generate or deliver a high-frequency signal, it is undisputed that those devices are not manufactured and sold (the former was sold commercially only in Europe and the latter was never sold commercially anywhere) in a manner "configured to" do so.  (*See* Ex. 9 at -978 ("Removed Default Settings"); Ex. 10 at -33274 (rates above 1.2 kHz are "default disabled"); Lanovaz Decl., ¶¶ 59-73.)  Both of those devices require further programming to generate or deliver the high frequencies claimed in the Asserted Device Claims.  (*See, e.g.*, Pless Decl., ¶ 24; *see also* Mihran Reb., ¶¶ 48-79.)  And it is now law of the case that any domestic use of those devices in connection with "the ACCELLERATE [sic] trial fits within the safe harbor provision of 35 U.S.C. § 271(e)." (D.N. 449 at 8.)

Nevro essentially concedes these points now.  Despite opposing "immediate dismissal with prejudice of United States infringement claims" of direct infringement under section 271(a) and induced infringement under section 271(b) (thereby necessitating BSC's motion on those issues), Nevro stated in the Joint Case Management Statement and Report submitted on remand that based on discovery to date it "does not intend to pursue infringement claims against BSC's United States sales" given "the Federal Circuit's claim constructions."  (D.N. 515 at 4-5.)

9

Instead, Nevro now focuses on BSC's export of the Precision with MultiWave's components to Europe under section 271(f)(1).  For reasons discussed next, Nevro cannot salvage its infringement case by shifting its focus to that provision's limited exception for infringing combinations abroad.

### 2.   Nevro Cannot Satisfy Section 271(f)(1)'s "Combination" Requirement

Section 271(f) is a narrow exception to the "axiomatic" principle "that U.S. patent law does not operate extraterritorially to prohibit infringement abroad."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013).  To prove infringement under section 271(f)(1), Nevro bears the burden of establishing that BSC "supplie[d] . . . from the United States all or a substantial portion of the *components* of a patented invention" and "actively induce[d] the combination of such components outside of the United States in a manner that would infringe the patent if such *combination* occurred within the United States."  35 U.S.C. § 271(f)(1) (emphases added).  Nevro does not come close to carrying the burden of meeting that limited exception.

In trying to expand this limited exception to cover the Precision with MultiWave (the only Accused Product sold abroad), Nevro conflates the "combination" of the Precision with MultiWave's components (*i.e.*, the implantable pulse generator and leads) with the distinct act of programming the system.  The programming of the Precision with MultiWave cannot be deemed a "combination" with other "components."  Accordingly, summary judgment of noninfringement is warranted on all of Nevro's section 271(f)(1) infringement claims, and the Court should deny Nevro's limited request for summary judgment (for claims 7 and 35 of the '533 patent, claim 55 of the '125 patent, and claim 22 of the '842 patent).

### a.   Signal Parameters Are Not Combinable Components

Nevro's application of section 271(f)'s "combination" requirement consists of the following description:  BSC supplies two "components from the United States in 'uncombined' form":  (1) the Precision with MultiWave's implantable pulse generator ("IPG") that generates the therapy signal; and (2) the wires containing electrodes, known as "leads," that deliver the

10

therapy signal.  (Mot. at 7-8.)  Once combined, the resulting system still does not infringe.  So Nevro adds that such "combination" includes programming, such that "[s]o combined, the Precision with MultiWave system infringes."  (*Id.* at 8.)

The fact that the combination does not infringe without programming, however, dooms Nevro's section 271(f)(1) claim.  According to Nevro's infringement expert, once "clinical staff" or a "BSC representative" in Europe "conduct[s] the programming" of the Precision with MultiWave by "enter[ing] the parameters necessary" (Pless Decl., ¶¶ 115-117), the device may be "configured to" deliver a high-frequency electrical signal.  Or, in the words of Nevro's practitioner witness, "programming of the SCS device" occurs by "selecting . . . specific parameters"—*i.e.*, "pulse width, amplitude and frequency"—and inputting them into the device. (Rosenberg Decl. Ex. B (D.N. 372-8), ¶¶ 99-100, 104.)

The act of inputting parameters is not a "component" that results in an infringing "combination" within the meaning of section 271(f)(1).  The statute refers to "components of a patented invention, where *such components* are uncombined in whole or in part, in such manner as to actively induce the combination of *such components*," and "thus applies only to 'such components' as are combined to form the 'patented invention' at issue."  *Microsoft*, 550 U.S. at 449 (footnote omitted).  And the Federal Circuit has made clear that method claims fall outside of section 271(f)(1) because the "series of acts or steps" comprising a method claim are not a combination of "physical components" or "physical object[s]" to which section 271(f)(1) is directed.  *Cardiac Pacemakers*, 576 F.3d at 1363-64 (holding that statutory "'supplied' . . . requirement eliminates method patents from Section 271(f)'s reach" because "ordinary meaning" of that term "impl[ies] the transfer of a physical object").

Nor are the inputted parameters themselves combinable components.  In *Microsoft*, the Supreme Court drew a distinction in the context of "software components" between "[a]bstract software code" and a "computer-readable 'copy.'"  550 U.S. at 449.  The Court held the former to be an "idea without physical embodiment"—"more like notes of music in the head of a composer than a roller that causes a player piano to produce sound"—that was "uncombinable information." *Id.* at 449, 451 n.12 (internal quotation marks omitted).

The information entered into the Precision with MultiWave is no less abstract or uncombinable.  Nevro emphasizes that, under BSC's business model, the company's representative may "select the specific parameters to bring about the desired result in the operating procedure"; "[f]or example, the physician might say that he or she wants a greater degree of paresthesia in a particular spot, and the . . . company representative would program the device as needed to bring about that result."  (Rosenberg Decl. Ex. B (D.N. 372-8), ¶ 100.)  But knowing how to program the Precision with MultiWave in that manner is insufficient to trigger section 271(f)(1).  *Cf. Microsoft*, 550 U.S. at 449-50 ("A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device.").  And inputting that "intangible, uncombinable information" into the Precision with MultiWave, *id.* at 451 n.12, cannot result in an infringing "combination of . . . components outside of the United States" as a matter of law, 35 U.S.C. § 271(f)(1).

Stripped of "programming," the remaining "combination" of "components" here concerns only the IPG and the leads—a combination that, without more, cannot infringe the Asserted Device Claims.  To the extent Nevro believes that section 271(f)(1) captures a noninfringing combination of the IPG and leads that may be used in a way that meets the Asserted Device Claims' limitations—what Nevro refers to as combining "in an infringing manner" (Mot. at 7-8)—that is not the law.  The combination of the components must *itself* result in infringement:

> Section 271(f) prohibits the supply of components "from the United States . . . in such manner as to actively induce the combination of *such components*."  Under this formulation, the very components supplied from the United States . . . trigger § 271(f) liability when combined abroad *to form the patented invention at issue*.

*Microsoft*, 550 U.S. at 453 (citation omitted) (second emphasis added); *id.* at 461 (Alito, J., concurring) (explaining that "§ 271(f) requires that the component be 'combined' with other components *to form the infringing device*") (emphasis added).  Section 271(f) does not contemplate that the combination merely facilitate allegedly infringing use abroad.  *See WesternGeco LLC v. ION Geophysical Corp.*, 791 F.3d 1340, 1351 (Fed. Cir. 2015) ("[T]he United States exporter of the component parts cannot be liable for use of the infringing article

abroad."), *vacated*, 136 S. Ct. 2486 (2016), *reinstated in relevant part*, 837 F.3d 1358 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2129 (2018).

Yet, at bottom, that is what Nevro seeks to target through its section 271(f)(1) claims. Such claims fall beyond the narrow exception of section 271(f)(1) and run headlong into the principle that "[f]oreign conduct is [generally] the domain of foreign law, and in the area here involved, in particular, foreign law may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions." *Microsoft*, 550 U.S. at 455 (second alteration in original) (internal quotation marks omitted). If Nevro "desires to prevent [infringement] in foreign countries, its remedy today lies in obtaining and enforcing foreign patents." *Id.* at 456.

### b.    Section 271(f)(1) Requires Physical Incorporation Of Components

Even assuming *arguendo* that inputting signal parameters into the Precision with MultiWave results in a combination, this Court would need to confront the question left open by *Microsoft*:  whether the combination described in section 271(f) must result in a physical incorporation of components.  Of the seven Justices in the *Microsoft* majority, four Justices did not reach the question, 550 U.S. at 453 n.14 (plurality opinion), and three Justices would have imposed that requirement, *id.* at 461-62 (Alito, J., concurring).  (Justice Stevens dissented, and Chief Justice Roberts did not participate.)

As Justice Alito explained, the claims of infringement arose out of Microsoft shipping disks or sending code via electronic transmission of its Windows program abroad.  "[T]he code is copied onto other disks that are then placed into foreign-made computers for purposes of installing the Windows program," but "[n]o physical aspect of a Windows CD-ROM . . . is ever incorporated into the computer itself." *Id.* at 460.  Rather, "[t]he intact CD-ROM is then removed and may be discarded without affecting the computer's implementation of the code." *Id.*  That matters because "§ 271(f) requires that the component be 'combined' with other components to form the infringing device, meaning that the component must remain a part of any" combination. *Id.* at 461 (citing dictionary definitions of "combine," including "to become one").  In *Microsoft*,

13

1  no "physical part of the disk became a physical part of the foreign-made computer." *Id.* at 462.

2  And it followed that, "[b]ecause no physical object originating in the United States was combined

3  with these computers, there was no violation of § 271(f)." *Id.*

4       The same reasoning is applicable here. Even if entering parameters into the Precision

5  with MultiWave were to effect a combination—and it does not—that combination would not

6  cause the parameters and the Precision with MultiWave "to become one." *Id.* at 461. In fact, this

7  case does not even present the possibility in *Microsoft* that "the CD-ROMs might be components

8  of the computer" if it "could not run Windows without inserting and keeping a CD-ROM in the

9  appropriate drive." *Id.* at 462. In the end, the programming of the Precision with MultiWave is

10  little different from telling a microwave at what power setting and for what time period to run.

11  That is not a "combination" in any sense, much less one that Congress sought to capture by

12  enacting section 271(f)(1).

## IV.   FANG INVALIDATES ALL ASSERTED CLAIMS

14       The asserted claims, filed in April 2009, are invalid in view of Fang, a Nevro patent

15  application filed in November 2007 that describes all the elements of the asserted claims. (*See*

16  Ex. 11.) Because Fang was filed first and invented by a different group of inventors, it is

17  invalidating prior art as Nevro admitted numerous times during prosecution. Summary judgment

18  of anticipation should be granted.

### A.   Fang Is Prior Art Under 35 U.S.C. § 102(e)

20       35 U.S.C. § 102(e) provides that a patent or patent application "of another" can be

21  invalidating prior art if it was filed before the invention date, even if it did not issue or publish

22  until after that date. Fang is such a patent application. The parties dispute whether Fang is "of

23  another," *i.e.*, whether it has different inventors than the asserted claims. The answer is yes. On

24  its face, Fang lists a different set of inventors (Fang, Caparso, and Erickson) than the asserted

25  patents (Alataris, Walker, Parker, Chitre, Park, and Thacker). And, during prosecution of the

26  asserted patents, Nevro admitted time and again that Fang was "§102(e) prior art," a procedural

27  tactic successfully employed to avoid § 103 obviousness rejections; these admissions are binding.

28  But even if the Court does not find those admissions binding, summary judgment that Fang is

§ 102(e) art is still warranted, because no reasonable jury could find that Fang was invented by the same inventors as the asserted claims.  If the Court still does not believe that BSC is entitled to summary judgment, then the question of inventorship should be sent to the jury, and Nevro's summary judgment motion that Fang is not prior art should be denied.

### 1. Nevro Admitted That Fang Is § 102(e) Prior Art And Is Judicially Estopped From Taking A Contrary Position Here

During prosecution of the '533 patent, the Patent Office rejected Nevro's patent claims as obvious based on Fang.  Nevro then asserted that Fang was § 102(e) prior art to overcome the rejection, as § 102(e) prior art may not be part of an obviousness combination when that art is owned by the same company, even if the inventors are different:

> [T]he parties discussed and agreed that Fang discloses a signal having a frequency of from 2.5 kHz to 100 kHz, 2.5 kHz to 20 kHz, and 3 kHz to 10 kHz (Fang at, e.g., [0016]) that produces pain relief without paresthesia (Fang at [0054]). . . .  The parties further *discussed and agreed that Fang constitutes prior art to the present application only under Section 102(e)*, and is not available to support a claim rejection under Section 103(c) because Fang and the present application are commonly assigned.

(Ex. 12 at -1769 (emphasis added).)  Nevro made the same admission during the prosecutions of several related patent applications.  (*See, e.g.*, *id.* at -1639; Ex. 13 at -86417-18; Ex. 14 at -79620; Ex. 15 at -84544, -84546.)

Having benefitted from its admissions to the Patent Office, Nevro should be judicially estopped from taking the opposite position now.  The Supreme Court identified three factors to consider when applying judicial estoppel:  (i) "clearly inconsistent" positions; (ii) "whether the party has succeeded in persuading a court to accept that party's earlier position"; and (iii) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001); *see also Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) (quoting *New Hampshire*).  *First*, Nevro's argument that Fang is not § 102(e) prior art is the opposite of what it told the Patent Office.  *Second*, Nevro benefitted from its admissions, which the Patent Office accepted, by obtaining patents, including some that it asserts here.  *Third*, Nevro would derive an unfair advantage of avoiding Fang during prosecution based on one position and then avoiding it again in litigation based on the opposite

15

position.  And, BSC would be prejudiced because it should be able to rely on Fang as prior art.
Thus, summary judgment that Fang is prior art should be granted.  *See also Tyler Refrigeration
Corp. v. Kysor Indus. Corp.*, 601 F. Supp. 590, 600-01 (D. Del.) (binding patentee to its
admission during prosecution that a § 102(e) reference was prior art), *aff'd*, 777 F.2d 687 (Fed.
Cir. 1985); *State Indus., Inc. v. Rheem Mfg. Co.*, No. 3-83-0362, 1984 WL 1243, at *17 (M.D.
Tenn. June 5,1984), *aff'd in part, rev'd in part*, 769 F.2d 762 (Fed. Cir. 1985); *Lucent Techs. Inc.
v. Gateway, Inc.*, 470 F. Supp. 2d 1163, 1173 (S.D. Cal. 2007).

### 2.      Nevro Was Right:  Fang Is § 102(e) Prior Art

If Nevro's admissions are not binding, then summary judgment is still warranted, as
Nevro cannot meet its burden to show that the invalidating subject matter of Fang was invented
by the same inventors as the asserted claims.  "Inventorship is a question of law based on
underlying findings of fact . . . ."  *See Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d
1347, 1357 (Fed. Cir. 2019) (citing *Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir.
2014)).  Evidence of inventorship should be credible and corroborated.  *See EmeraChem
Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1346 (Fed. Cir. 2017) ("We have
treated uncorroborated testimony from an alleged inventor asserting priority with skepticism.").

Nevro argues that Alataris and Walker are the sole inventors of the "high-frequency,
paresthesia-free therapy" described in Fang, and, therefore, that Fang is not "of another" relative
to the asserted claims.  (Mot. at 22.)  Not only is this legally insufficient to remove Fang from
§ 102(e), but it is not supported by sufficient evidence on which a jury could find for Nevro.

### a.      Nevro Does Not Even Attempt To Show That Alataris And Walker Invented *All Elements* Of The Asserted Claims

It is not enough for Nevro to show that Alataris and Walker are the sole inventors of
"high-frequency, paresthesia-free therapy."  (*See* Mot. at 26.)  Nevro ignores all of the other
limitations of the asserted claims, such as frequencies other than 10 kHz, amplitudes, pulse
widths, vertebral levels, and biphasic signal shape.  Nevro offers no argument or evidence
whatsoever that Alataris or Walker invented any of these features in Fang.  Thus, the Court
should grant summary judgment that Fang is prior art.  *See Dawson v. Dawson*, 710 F.3d 1347,

1353-54 (Fed. Cir. 2013) (affirming PTAB's finding that alleged inventor had not shown prior

invention without evidence he had conceived of specific dosage ranges required by claims);

*Davis v. Reddy*, 620 F.2d 885, 889 (C.C.P.A. 1980) ("A party claiming conception must show

possession of every feature recited in the [claims].  This means that every limitation of the

[claims] must be shown to have been known to the inventor at the time the invention is alleged

to have been conceived.").

            b.      **No Reasonable Juror Could Find That Alataris And Walker**
                    **Invented "High-Frequency, Paresthesia-Free" Therapy**

        The record is insufficient to support a finding that Alataris and Walker invented even the

limited idea of "high-frequency, paresthesia-free therapy."  Nevro relies primarily on Alataris's

and Walker's self-serving, *post hoc* testimony that they conceived of their idea from animal

studies at Stanford University and UC Davis.  (Mot. at 22-23.)  Such litigation-inspired inventor

testimony, however, is usually insufficient absent independent corroboration.  *See EmeraChem*,

859 F.3d at 1347 ("We have recognized that contemporaneous documentary evidence can serve

as 'the most reliable proof that the inventor's testimony has been corroborated.'").  Typically,

such corroboration takes the form of laboratory notebooks or invention disclosure forms, but

Nevro has produced nothing of the sort.  *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 968

(Fed. Cir. 2014) ("This is not one of the cases . . . in which corroborating evidence is found

through multiple written documents, such as a collection of engineering notebooks.  Rather, this

is a case in which there is no corroborating document that shows anything about the claimed

invention.") (citation omitted).  Instead, Nevro cites an unnamed PowerPoint slide that does not

indicate who conceived of its contents.  (Mot. at 24 (citing D.N. 528-4 at -45438).)  Another cited

document is an email by Ken Ripley.  (*Id.* (citing D.N. 528-3 at -131357).)  This is insufficient to

show that Alataris and Walker conceived of "high-frequency, paresthesia-free therapy."[2]

---

[2] Nevro's inventors are strongly biased. ███████████████████████████████████████
███████████████████████████ (Ex. 18 at 156:4-21.) ████████████████████████████
████████████ (Ex. 19 at 267:2-268:2.) ████████████████████████████████████
(*See* Ex. 20 at 18:1-12; Ex. 21 at 115:2-8; Ex. 22 at 257:6-258:6); *EmeraChem*, 859 F.3d at 1346
(explaining concerns about corroboration "particularly arise when uncorroborated testimony
comes from an interested person recalling long-past events").

Other evidence affirmatively shows that the concept of "high-frequency, paresthesia-free therapy" actually was not invented by Alataris or Walker. ██████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████ (Ex. 17 at 105:16-106:23; Ex. 16.)  Thus, this case is like *Duncan*, where the patentee argued that a prior art reference was not "of another," even though the prior art and the asserted claims had one inventor in common.  914 F.3d at 1359.  The PTAB agreed, but the Federal Circuit reversed, finding that a nonoverlapping inventor of the prior art had prepared a diagram showing a significant contribution to the claimed invention.  *Id.*  The facts here are even more compelling because Fang does not share any co-inventors with the asserted claims.[3]

Because Nevro has not provided evidence sufficient to find that Fang was ***not*** the work "of another," Fang is § 102(e) prior art and summary judgment should be granted accordingly.

### B.    Fang Discloses Each Element Of Every Asserted Claim

The asserted claims contain various combinations of the same seven claim elements: (i) an implantable SCS signal generator to generate a therapy signal; (ii) implanted SCS leads to deliver that signal; (iii) frequency; (iv) amplitude; (v) pulse width; (vi) paresthesia-free therapy; and (vii) other elements.  A chart showing how each of these groups applies to the asserted claims is attached as Exhibit 2.[4]  Nevro fails to raise any genuine factual disputes for a jury.

#### 1.    Fang Discloses Groups (i) & (ii):  Implantable SCS Signal Generator And Leads

Nevro's expert, Ben Pless, does not dispute that Fang discloses these elements.  (*See* Ex. 8, ¶¶ 1830-1884.)  Fang describes "treating . . . chronic pain conditions via techniques that can include stimulating and blocking neuronal tissue associated with the spinal cord."  (Ex. 11, ¶ [0002]; Mihran Rpt., ¶¶ 2509-2512.)  Fang also describes "implantable pulse generator 101 . . .

---

[3] Nevro argues that Erickson's earlier conception is irrelevant because the animal studies of his concept were "failures."  (Mot. at 24.)  "But an inventor need not know that his invention will work for conception to be complete.  He need only show that he had the idea . . . ."  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994) (citation omitted).

[4] BSC's expert explained how Fang anticipates all asserted claims.  (Mihran Rpt., ¶¶ 2498-2643.)

connected to percutaneous lead bodies 108 and 109" positioned along the spinal cord.  (*See* Ex. 11, ¶¶ [0010], [0042], [0046]-[0047]; Mihran Rpt., ¶¶ 2513, 2519.)

### 2.     Fang Discloses Group (iii):  High-Frequency Therapy

Nevro does not dispute that Fang discloses ranges for its high-frequency blocking signal from about 2.5 kHz to about 100 kHz and also 10 kHz.  (Ex. 11, ¶ [0050].)  Thus, Fang discloses all of the high-frequency limitations in the asserted claims.  (Mihran Rpt., ¶¶ 2503-2504.)  Nevro's expert argues that Fang does not disclose frequencies below 2.5 kHz and, thus, that it does not disclose the elements with frequency ranges that start at 1.5 kHz.  (*See, e.g.*, Ex. 8, ¶ 1835.)  This argument is flawed.  When claims recite a range and the prior art discloses an overlapping range, then the patentee must establish the criticality of the claimed range to avoid anticipation.  *See Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 871 (Fed. Cir. 2015) ("[T]he court must evaluate whether the patentee has established that the claimed range is critical to the operability of the claimed invention."); *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1345 (Fed. Cir. 2012) ("ClearValue has not argued that the 50 ppm limitation in claim 1 is 'critical'").  In this case, Nevro's patent specification does not provide that the claimed ranges down to 1.5 kHz are any more or less effective than the other ranges, and Pless does not even attempt to make such a showing.  (*See, e.g.*, Ex. 8, ¶¶ 1834-1835.)  In fact, Nevro has stated that stimulation at and below 5 kHz does ***not*** provide paresthesia-free therapy, undermining any assertion that the lower bounds of its claimed frequency ranges are important, much less "critical," as required.  (*See infra* § VI.B.)  Thus, Fang discloses this element.

### 3.     Fang Discloses Groups (iv) & (v):  Amplitude And Pulse Width

Some of the asserted claims recite amplitude ranges between 0 and 20 mA.  (Ex. 1.)  Nevro's expert does not dispute that Fang discloses the claimed amplitudes.  (*See* Ex. 1 at '533 patent claims 35, 37, 58, '842 patent claims 1, 22, '357 patent claims 5, 34; Mihran Rpt., ¶¶ 2525-2526; Ex. 8, ¶¶ 1819, 1830-1884.)  Fang discloses amplitudes "from about 2 mA to about 20 mA."  (Ex. 11, ¶¶ [0032], [0080], [0096]; Mihran Rpt., ¶ 2525.)

Some of the asserted claims recite pulse width ranges of 25-166 microseconds, 10-333 microseconds, and 30-35 microseconds.  (*See* Ex. 1.)  Fang inherently discloses these ranges

19

because pulse width is inherently tied to other aspects of the signal, like frequency, duty cycle, signal symmetry, and delay between pulses, all of which are described in Fang.  (Mihran Rpt., ¶¶ 2506, 2529-2530; Ex. 8, ¶ 1846.)  As Nevro's prosecution counsel acknowledged, "pulse width is necessarily linked to frequency, since, for example, a relatively long pulse width could not be used with a high frequency."  (Ex. 23 at -89585.)  Fang himself confirmed this relationship when he testified that, to determine pulse width, the only information needed is frequency and the interval between pulses.  (Ex. 20 at 61:11-14; *see id.* at 59:3-62:21.)  He added in an errata sheet that one would also need to know that the signal is "symmetrical."  (*Id.*, Errata at 2.)

Fang provides all of this information.  For example, Fang shows a symmetrical waveform:



(Ex. 11, FIGs. 4, 6.)[5]  Fang also provides that:  (i) the signal can be 3 kHz-10 kHz, (ii) with no intrapulse delay, (iii) with a duty cycle of "50%," and (iv) biphasic (having positive and negative portions).  (Ex. 11, ¶¶ [0018], [0022], [0050], [0051], FIGs. 4, 6; Ex. 6 at 138:3-8, 141:16-142:2.)  From this information, a person of ordinary skill in the art ("POSITA") could readily calculate that the pulse widths range from 25 to about 83 microseconds.  (Mihran Rpt., ¶¶ 2506-2507, 2529-2530.)  Thus, the pulse widths inherently disclosed by Fang overlap the claimed ranges.

Nevro's expert, Pless, acknowledged that the pulse widths could be calculated from Fang.  He was asked at deposition to draw a symmetrical, biphasic square waveform with no intrapulse delay, and he drew what Fang depicts in Figure 6 (below, left).  He was then asked to draw the same signal, but with a duty cycle of 50%, as described in Fang (below, right):

---

[5] Nevro's assertion that these figures do not describe a symmetrical waveform (Ex. 8, ¶¶ 1845, 1847) is simply not credible, given the images.



(Ex. 24; Ex. 25; Ex. 6 at 120:23-122:8, 126:1-9, 128:6-11; Ex. 11, ¶¶ [0050]-[0051].)  Based on the second figure, Pless was asked to calculate the pulse width at a frequency of 1 kHz, and he determined that it was 250 microseconds.  (Ex. 6 at 130:12-131:17.)  At 10 kHz, which is described in Fang, the pulse width would be ten times less, or 25 microseconds.  (Mihran Rpt., ¶ 2530.)  Pless's calculation confirms that there is no real dispute that Fang describes this element.

### 4. Fang Discloses Group (vi): Paresthesia-Free Therapy

There is no dispute that Fang discloses paresthesia-free therapy.  (Ex. 11, ¶ [0054] ("This HF blocking signal can be applied to the dorsal column DC in place of an LF stimulation signal to replace the pain relief provided by the paresthesia.").)  Nevro's expert admitted that "this description in Fang [para 0054] refers to Nevro's invention of using a high-frequency signal to provide pain relief without paresthesia."  (Ex. 8, ¶ 1818; Mihran Rpt., ¶ 2514.)

### 5. Fang Discloses Group (vii): Other Elements

Fang discloses the "biphasic" signal of '357 claim 34.  (Ex. 11, ¶¶ [0022]-[0023] ("[T]he HF therapy signal is a biphasic (alternating current) signal."); *id.*, ¶ [0050]; Mihran Rpt., ¶¶ 2602-2603, 2613.)  Fang discloses a signal delivered "at a vertebral level of from T9 to T12" in '125 claim 18.  (Ex. 11, ¶¶ [0145]-[0147] ("[T]he vertebra VT and leads can be at T10 or T11 . . . and in other embodiments, the leads can be placed at other locations."); Mihran Rpt., ¶¶ 2553-2554.)

*       *       *

Because Fang discloses all limitations of all asserted claims, summary judgment of invalidity due to anticipation should be granted.

BSC'S MSJ OPP AND MSJ                                                    Case No. 3:16-cv-06830-VC

# V.     KNUDSON INVALIDATES THE FREQUENCY RANGE CLAIMS

## A.     Knudson Anticipates Nevro's Frequency Range Claims

It is undisputed that Knudson U.S. Patent App. Pub. No. 2007/0073354 ("Knudson"), Ex. 26, is prior art under § 102(b) because it was published in March 2007, more than one year before the April 2009 priority date of the asserted claims.  (*See* Ex. 26.)  Knudson describes an SCS device generating "a frequency in excess of 3,000 Hz and more preferably about 5,000 Hz or more," "a pulse width of about 100 microseconds," and an "amplitude for such signals [of] 0.2 to 8 mA."  (Ex. 26, ¶¶ [0066], [0083].)  In other words, the device claimed by Nevro's Frequency Range claims had already been implanted to provide the same electrical stimulation for the same purpose of pain relief.  Because Knudson discloses all seven of the claim element categories discussed above, and as shown in Exhibit 3, Knudson anticipates the Frequency Range claims.

### 1.     Knudson Discloses Groups (i) & (ii):  Implantable SCS Signal Generator And Leads

Knudson describes "Spinal Cord Treatment" (Ex. 26, ¶¶ [0080]-[0086]; Mihran Rpt., ¶¶ 651-658) and provides that "[t]he controller 20 may be an implantable pulse generator." (Ex. 26, ¶ [0063]; Mihran Rpt., ¶ 659.)  "The electrode lead extends from the electrode through implantable or external pulse generator …."  (Ex. 26, ¶ [0085]; Mihran Rpt., ¶¶ 720-721.)

### 2.     Knudson Discloses Group (iii):  High-Frequency Therapy

Knudson discloses frequencies of "5,000 Hz or higher," and "in excess of 3,000 Hz and more preferably about 5,000 Hz or more."  (Ex. 26, ¶¶ [0066], [0083]; Mihran Rpt., ¶¶ 641-645.)

### 3.     Knudson Discloses Groups (iv) & (v):  Amplitude & Pulse Width

Not all of the Frequency Range claims recite amplitudes or pulse widths, but any such limitations are described in Knudson.  For amplitude, Knudson provides that "representative amplitude for such signals would be 0.2 to 8 mA."  (Ex. 26, ¶ [0066]; Mihran Rpt., ¶¶ 727-728.)  These fall within the claimed amplitude ranges of 0 to 20 mA.  For pulse widths, Knudson provides that "[a] 5,000 Hz signal will have a pulse width of about 100 microseconds."  (Ex. 26, ¶ [0066]; Mihran Rpt., ¶¶ 731-732.)  This falls within the pulse width ranges of the Frequency Range claims, *i.e.*, 10-333 microseconds and 25-133 microseconds.

#### 4.     Knudson Discloses Group (vi):  Paresthesia-Free Therapy

Because Knudson delivered the same signal parameters as the claimed device, the body's responses thereto would inherently be the same—*i.e.*, paresthesia-free therapy would inherently occur in some patients.  On appeal, in successfully arguing that "paresthesia-free" was not indefinite, Nevro made clear that paresthesia-free therapy only had to occur in some cases to infringe:  "a system or device that generates paresthesia-free therapy infringes ***even if not every use of that system or device results in a patient receiving paresthesia-free therapy***."  *See Nevro Corp. v. Bos. Sci. Corp.*, No. 18-2220, Dkt. No. 27 (Nevro's Opening Appeal Brief), at 3, 29-30, 44 (Fed. Cir. Nov. 8, 2018) (emphasis added).  The Federal Circuit observed that the specification describes how to achieve paresthesia-free therapy by applying the right stimulation parameters:

> ***To achieve paresthesia-free therapy signals, the specifications teach using "therapeutic signals at a frequency of from about 3 kHz to about 10 kHz" and amplitudes ranging "from about 1 mA to about 4 mA (normally about 2.5 mA)."*** '533 patent at 6:51–7:5.
> Accordingly, a person of ordinary skill would know whether a spinal cord stimulation system, device or method is within the claim scope.

*Nevro*, 955 F.3d at 39 (emphasis added).  As discussed, Knudson discloses the same frequency ("in excess of 3,000 Hz") and the same amplitudes ("0.2 to 8 mA").  Thus, Knudson shows how "[t]o achieve paresthesia-free therapy signals," per the Federal Circuit's ruling.

Because "'[p]aresthesia-free' is a functional term, defined by what it does rather than what it is," *id.* at 39, Nevro took a risk that the prior art would be inherently capable of behaving in the same way as its claimed device.  *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) ("[C]hoosing to define an element functionally, *i.e.*, by what it does, carries with it a risk" in that "a functional limitation asserted to be critical for establishing novelty in the claimed subject matter may, in fact, be an inherent characteristic of the prior art."); *see Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("[T]he [Supreme] Court held that a vice of functional claiming occurs 'when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty.'").

Here, Nevro is claiming the same device as described in Knudson, the only purported difference being the body's response—*i.e.*, no paresthesia.  But, logically there can be no difference between the body's responses to the same electrical signals.  *See Application of*

*Swinehart*, 439 F.2d 210, 212-13 (C.C.P.A. 1971) ("[I]t is elementary that the mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not cause a claim drawn to those things to distinguish over the prior art."); *see also Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer.").

Knudson must, therefore, inherently disclose paresthesia-free therapy to the same extent as Nevro's patents, which teach that paresthesia-free therapy naturally occurs when using the claimed parameters. *See Nevro*, 955 F.3d at 39 (holding that "[t]o achieve paresthesia-free therapy signals, the specifications teaches using 'therapeutic signals …'" with the recited parameters); *see also King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1275-76 (Fed. Cir. 2010) ("To anticipate, the prior art need only meet the inherently disclosed limitation to the extent the patented method does."); *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1354-56 (Fed. Cir. 2008) ("Moreover, because the claim is written with functional rather than structural language—it requires the cold UV assembly to be 'effective to' substantially cure rather than requiring ink to be substantially cured."); *In re Schreiber*, 128 F.3d at 1478 (finding a functional limitation was inherently disclosed where "nothing in [the patent's] claim suggests" that the prior art would not function as claimed).

Although it is sufficient for anticipation that Knudson's device provides the exact same electrical signals as Nevro's claimed device, in any event, Knudson also expressly describes paresthesia-free therapy when it refers to a "blocking" therapy. Such signals are capable of blocking the "entire cross-section of the nerve" at a targeted site of stimulation. (Ex. 26, ¶ [0014]; Mihran Rpt., ¶¶ 661-664.) A POSITA would have recognized that, in some patients, blocking the entire cross section of the nerve would not produce paresthesia—because it would not produce any sensation at all—as part of the therapy. (Mihran Rpt., ¶¶ 665-676.)

Indeed, the asserted patents themselves acknowledge that "blocking" the nerve can result in paresthesia-free therapy. ('533 patent, 10:48-51 ("The process of ***blocking***, suppressing or otherwise reducing patient pain (block 640) can include doing so ***without creating paresthesia***

24

1    (block 643), or in association with a deliberately generated paresthesia (block 644).").)  Fang also

2    relies on "blocking" nerve signals as the basis for its claimed therapeutic effect, and, as discussed,

3    Nevro's expert admitted that Fang's "HF *blocking* therapy" "refers to Nevro's invention of using

4    a high-frequency signal to provide pain relief without paresthesia."  (*See supra* § IV.B.4.)

5    Further, Nevro's own documents confirm that nerve "blocking" can result in paresthesia-free

6    therapy.  (*See, e.g.*, Ex. 28 at -375119 ("Nerve blocking does not cause persistent paresthesias.

7    This may allow more effective therapy with fewer side effects."); Mihran Rpt., ¶ 675.)  Knudson

8    thus discloses this element.

9                    **5.    Knudson Discloses Group (vii):  Other Elements**

10         Knudson's Figure 8 shows a biphasic signal.  (Ex. 26, FIG. 8; Mihran Rpt., ¶¶ 842, 852.)

11   Knudson also shows that "the electrode … can be positioned over any area of the spinal cord,"

12   which includes the T9-T11 element and/or at least renders lead placement there obvious.  (Ex. 26,

13   ¶ [0086]; Mihran Rpt., ¶ 775.)  Indeed, it was well-known to place SCS leads within the T9-T11

14   range to treat pain.  (Mihran Rpt., ¶ 776.)

15                                    *        *        *

16         Because Knudson describes all the elements of the asserted Frequency Range claims, the

17   Court should enter summary judgment of invalidity due to anticipation.

18         **B.    Knudson Renders Nevro's Frequency Range Claims Obvious**

19         While anticipation is clear, Knudson also renders the "paresthesia-free" elements obvious

20   in view of the general knowledge of a POSITA.  "The obviousness inquiry turns not only on the

21   prior art," but also "on such artisan's knowledge."  *Koninklijke Philips N.V. v. Google LLC*, 948

22   F.3d 1330, 1337-38 (Fed. Cir. 2020); *see Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1349,

23   1353 (Fed. Cir. 2010) (affirming summary judgment on "grounds of obviousness under [a single

24   prior art reference] in view of general knowledge in the field," in part because the obviousness

25   "analysis requires an assessment of the '… background knowledge possessed by a person having

26   ordinary skill in the art'" (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007))).

27         In this case, a POSITA would know based on her general knowledge that the stimulation

28   parameters in Knudson could result in paresthesia-free therapy.  As discussed, Knudson itself

                                            25

provides that such stimulation yields a "block" of the nerve, one of the results of which was known to be an absence of paresthesia. (*See supra* § V.A.4.) MacDonald '170 discloses implantable SCS systems with frequencies above 2 kHz, including 10 kHz, that provided a sensation "so mild in intensity, that many patients distracted by their aches and pains are unable to perceive it." (Ex. 29, 5:51-57.) A related article by MacDonald provides that, with the same stimulation parameters, "[s]pinal cord sensation is rarely felt by patients in severe pain." (Ex. 30 at 654.) MacDonald identifies a frequency of 5 kHz as one example, exactly like Knudson. (*Id.*)

Paresthesia-free therapy was also easily achieved with Knudson simply by turning down the amplitude to sub-perception levels. Caraway admitted that this technique had been used "for decades," as reflected in a Nevro presentation:



What is "High Frequency SCS"?

∎ All current SCS systems including Nevro can provide stimulation in the higher end of traditional frequencies up to about 1200Hz

∎ This is "on-label" for all and has been used occasionally for decades

∎ ==This has also been used for decades in conjunction with sub-threshold amplitudes==
   ∎ ==All devices can operate at sub-threshold amplitudes, simply turn the output down until the patient generally does not feel the paresthesias==
   ∎ Still requires paresthesia mapping and still positional variation

∎ Medtronic refers to this as "High Density" and Boston as "High Frequency"

∎ Neither have published significant studies on these approaches

Leadership Through Innovation™

(Ex. 56 at -209811; Ex. 57 at 50:13-25.) Caraway explained the motivation for providing such therapy: "This was generally used, for example, if patients really just could not tolerate the paresthesias." (*Id.* at 49:7-23.) And, as discussed, Yearwood conducted a study and published the results showing that paresthesia-free therapy could be obtained with low amplitude stimulation. (Ex. 47.)

1
2
3
4

Because a POSITA would have understood that (i) one possible outcome of Knudson's "block" is paresthesia-free therapy and (ii) that Knudson's device could provide paresthesia-free therapy simply by turning down the amplitude to sub-perception levels, Knudson thus renders the claims obvious.  (Mihran Rpt., ¶¶ 677-690, 1600-1608.)

5

*      *      *

6
7

Accordingly, the Court should grant summary judgment that Knudson anticipates and/or renders obvious the asserted Frequency Range claims.

8
9

**VI.    THE ASSERTED FREQUENCY RANGE CLAIMS ARE INVALID UNDER 35 U.S.C. § 112 DUE TO LACK OF ENABLEMENT**

10
11
12
13
14

Under 35 U.S.C. § 112, a patent's specification must enable those skilled in the art to make and use the "full scope" of the claimed invention without undue experimentation as of the invention date.  *See Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). Enablement is an "important doctrine [that] prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented." *MagSil Corp. v. Hitachi Glob. Storage Techs.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012).

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Put simply, Nevro's Frequency Range claims cover far more than it invented.  In particular, its claims cover paresthesia-free therapy at frequencies well below 10 kHz, yet Nevro's patent is silent on *how* to achieve such therapy.  Indeed, even to this day, Nevro does not know how to provide paresthesia-free therapy at 5 kHz and below.  To the extent Nevro asserts that its specification enables paresthesia-free therapy simply by teaching the claimed parameters, it would then be squeezed against anticipation and obviousness, because Knudson describes the same device delivering the same parameters.  (*See supra* § V.)  If Nevro attempts to distinguish Knudson by arguing that something more is required to achieve paresthesia-free therapy, then Nevro's claims lack enablement, because its specification never describes what that extra something would be.  In other words, Nevro may not obtain a patent monopoly while keeping to itself the "secret sauce" that makes the device work.  *See* 3 Chisum on Patents § 7.01 (2020) ("The requirement of adequate disclosure assures that the public receives 'quid pro quo' for the limited monopoly granted to the inventor.").

27

The Federal Circuit's decision in *Trustees of Boston University v. Everlight Electronics Co.*, 896 F.3d 1357 (Fed. Cir. 2018), demonstrates the importance of enabling the "full scope" of an invention.  In *Everlight*, there was no dispute that five out of six embodiments were enabled, but the Court held this was insufficient, explaining that the specification must enable the full scope of the claims.  While a POSITA's knowledge of the prior art and routine experimentation can fill small gaps, one of the claimed embodiments required undue experimentation.  *Id.* at 1364 ("[T]his gap-filling is merely supplemental; it cannot substitute for a basic enabling disclosure" and depends "on the predictability of the art.").  "If BU wanted to exclude others from what it regarded as its invention, its patent needed to teach the public how to make and use that invention.  That is 'part of the *quid pro quo* of the patent bargain.'"  *Id.* at 1365.

Whether a patent satisfies the enablement requirement—*i.e.*, whether the full scope of the claim can be made and used without undue experimentation at the time of the invention—"is a question of law based on underlying facts."  *MagSil Corp.*, 687 F.3d at 1380.  Courts typically consider the factors from *In re Wands* to determine whether experimentation is undue:  "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988); *see Wyeth*, 720 F.3d at 1384.  The enablement inquiry should focus on the factors relevant to the specific case, and not every factor must be considered.  *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

### A.    Nevro's Specification Provides No Guidance For Practicing The Full Scope Of The Frequency Range Claims (*Wands* Factors 2, 3, 4, 7, & 8)

"An enablement analysis begins with the disclosure in the specification."  *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008).  In describing paresthesia-free therapy at 10 kHz, the specification describes combinations of parameters used during a clinical trial that resulted in paresthesia-free therapy—*i.e.*, 10 kHz combined with a pulse width of 30-35 µs, a nominal amplitude of 2.5 mA, a 50% duty cycle, and a biphasic square wave.  ('533 patent, 6:51-

28

7:5, 12:21-30.)  For all other claimed frequencies, however, Nevro does not provide any direction regarding how to generate paresthesia-free therapy, including by way of specific combinations or examples that are likely to be successful.  It merely says to "apply[]" a frequency within the claimed ranges, which are as broad as 1.5 to 100 kHz.  (*See* '533 patent, 10:16-24, 19:25-33; Mihran Rpt., ¶¶ 2712-2714, 2729-2734.)

In fact, the specification teaches that such high-frequency stimulation may or may not induce paresthesia, but it never states how to achieve which result.  (*See* '533 patent, 10:48-51.)  It notes that "in some cases, patients may prefer the sensation of paresthesia . . . and so can have the option of receiving it."  ('533 patent, 10:56-59.)  Figure 6C lists both "without creating paresthesia" and "creating paresthesia" as possible results of applying a "high frequency waveform."  Thus, Nevro's patents state that merely providing a high-frequency stimulation does not automatically result in paresthesia-free therapy, and the specification provides no information about how to achieve the claimed paresthesia-free therapy at any frequency other than 10 kHz.  (Mihran Rpt., ¶¶ 2709-2715.)

### B.   Nevro Still Has Not Enabled The Full Scope Of Its Claims To This Day (*Wands* Factors 1, 2, 3, 4, 7, & 8)

To this day, Nevro still cannot enable paresthesia-free therapy at or below 5 kHz.  Nevro's website provides a graph showing that it believes 5 kHz and 1 kHz provide no pain relief:





(Ex. 32 at 3 (frequencies above 5 kHz have a "unique inhibitory effect"); *see* Ex. 33 at 9 ("10 kHz frequency can drive inhibitory neurons without meaningfully activating excitatory neurons.  This

1   effect was not achieved at 1 or 5 kHz.").)  Nevro also states that "frequency is positively

2   correlated with pain relief" and that, other than 10 kHz, only 5,882 Hz—not 1,200 or 3,030 Hz—

3   "demonstrated improved pain relief versus sham" (*i.e.*, placebo):



12  (Ex. 32 at 4; *see* Ex. 34 at 8; Ex. 35 at -385570 ("***Only*** 10 kHz SCS at clinical HF10 intensities

13  drives non-adapting/inhibitory dorsal horn neurons") (emphasis in original).)

14      Nevro has actually attempted to prove that stimulation at 5 kHz and below ***cannot*** provide

15  paresthesia-free therapy, even though its claims cover that very feature.  One study affiliated with

16  Nevro concluded that "low-intensity 10 kHz SCS, but not 1 kHz or 5 kHz SCS, selectively

17  activates inhibitory interneurons . . . ultimately resulting in paresthesia-free pain relief."  (Ex. 37

18  at 138.)  Another study affiliated with Nevro concluded that stimulation at 1.2 kHz and 3.03 kHz

19  had "no statistically significant differences on average back pain scores" as compared to sham

20  therapy.  (Ex. 38 at 461.)  That study built on earlier research finding that 5 kHz therapy "was

21  equivalent to sham" for the patient's global impression of change, pain intensity, and quality of

22  life.  (Ex. 39 at 368; *see* Mihran Rpt., ¶¶ 2716-2718.)

23      The same was true when Nevro filed its patents.  Jon Parker—then VP of Product

24  Development at Nevro— ██████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████" (Ex. 36 at -108671.)  Despite filing a patent application years earlier

27  covering that very therapy, Parker admitted that "████████████████████████████" (*Id.*)

28  ██████████████████████████████████████████████████  Indeed,

1

2

3                                 "  (*Id.* at -108673; *see* Ex. 60 at -156334 ("

4                                                              ").)

5           When, as here, the patentee tried and failed to make and use its claimed invention, courts

6    have routinely found lack of enablement.  *See ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935,

7    942 (Fed. Cir. 2010) (finding no enablement where the plaintiff "had in fact tried and failed for a

8    few months to produce non-osmotic ascending release dosage forms" as claimed); *Ormco Corp.*

9    *v. Align Tech., Inc.*, 498 F.3d 1307, 1318-19 (Fed. Cir. 2007) ("If an inventor attempts but fails to

10   enable his invention in a commercial product that purports to be an embodiment of the patented

11   invention, that is strong evidence that the patent specification lacks enablement."); *Liebel-*

12   *Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007) (finding no enablement

13   where the inventors "tried unsuccessfully" to produce the invention and doing so "would have

14   required more experimentation and testing").

15       **C.     Undue Experimentation Was Required To Practice The Claims At Any**
             **Frequency Other Than 10 kHz (*Wands* Factors 1, 4, 5, 6, & 7)**
16
            BSC's efforts today to prove the efficacy of paresthesia-free therapy at 1 kHz and 4 kHz
17
     in clinical trials demonstrates that undue experimentation was required to achieve the results in
18
     Nevro's Frequency Range claims.  In 2015, BSC began a multicenter, double-blind, randomized
19
     controlled trial, which it called "PROCO," to study the effectiveness of 1, 4, 7, and 10 kHz
20
     therapy signals at various pulse widths and amplitudes that built on years of earlier research and
21
     development.  (Ex. 40.)  The study concluded that "all frequencies provided equivalent back pain
22
     relief, demonstrating that stimulation rate [frequency] was not a meaningful determinant of back
23
     pain relief."  (*Id.* at 70.)[6]  PROCO occurred years after the filing date of Nevro's patents and took
24
     an incredible investment in time, money, and other resources to accomplish.  A POSITA
25

26   _____

27   [6] Remarkably, Nevro paid for research to dispute the findings of BSC's enabling PROCO study.
     (*See* Ex. 53 at 107 (citing BSC's PROCO study at footnote 8), 109 (frequencies within the
28   PROCO study "failed to show additional long-term clinical benefit"); Ex. 54 (PROCO Author
     Letter to Editor); Ex. 55 (Kapural Letter to Editor) (criticizing the "very flawed" PROCO study).)

1    engaging in routine experimentation in 2009 could not have accomplished the same feat merely

2    by using the specification's scant instructions to "apply[] a high frequency waveform."

3         Nevro itself needed to conduct extensive studies at Stanford ████████ to research its

4    10 kHz therapy (not to mention its later clinical study) after its earlier rat experiments "████."

5    (Ex. 19 at 96:10-97:6; Ex. 17 at 169:9-25, 243:3-244:25; Ex. 41.)

6    ████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████     In other words,

8    a POSITA would have had to perform the same studies that Nevro did in order to make and use

9    the technology in the Frequency Range claims.  This violates the patent law's *quid pro quo*—

10   Nevro added nothing to the public's knowledge that would justify its broad patent monopoly.

11        To obtain paresthesia-free therapy by using a frequency within the claimed ranges other

12   than 10 kHz, a POSITA would have been forced to experiment with an untold number of

13   configurations—including pulse widths, amplitudes, wave forms, duty cycles, and lead/electrode

14   placements and configurations—to determine whether such a signal is therapeutic and

15   paresthesia-free.  Each iteration of parameters and electrode configurations could take days to

16   test, as the effects of high-frequency therapy are unpredictable, often delayed by 24 to 48 hours,

17   and the only way to know whether a signal generates paresthesia is to ask the patient.  (Ex. 19 at

18   265:10-266:8; Ex. 42; Ex. 18 at 38:6-39:9, 162:22-163:3.)  This exercise would be laborious,

19   iterative, and entail "studies on animals and human beings at a large sample of frequencies in the

20   claimed ranges," as Nevro did for 10 kHz (but only 10 kHz).  (Mihran Rpt., ¶ 2721; Ex. 19 at

21   153:20-154:3, 251:11-18.)

22        According to lead inventor Alataris, Nevro left it for others to determine how to provide

23   paresthesia-free therapy using the frequencies covered by Nevro's patents:

24        Q.  So if I program at any frequency between 2.5 and 100 kilohertz and if I choose an
          amplitude of 15-20 milliamps, will I always get paresthesia-free therapy?
25
26        A.  ***I don't know what will happen.  I mean, you're going to have to go and collect the
          data set and figure it out***.

27   (Ex. 19 at 254:1-8 (emphasis added)); *see Convolve, Inc. v. Compaq Comput. Corp.*, 527 F.

28   App'x 910, 930-31 (Fed. Cir. 2013) (affirming summary judgment of lack of enablement where

                                                32

the patentee "unequivocally testified" that he did not practice the patent as of the critical date).  In

return for a patent monopoly, the law requires Nevro—not the public—to "figure it out," yet

Nevro foisted this burden on others while enjoying the benefits of its unearned monopoly  (*See*

Ex. 19 at 250:8-251:9 ("Q.  Are there frequencies in that range [2.5-100 kHz] that could produce

paresthesia when applied to the spinal cord of a human patient?  A. . . . It's a matter of the clinical

evidence that you have and – and the data that you have to support something like that."); Ex. 18

at 50:23-51:2 ( "Q.  At these frequency ranges recited in the claims of the '533 patent, do you

know what factors go into whether or not a patient will experience paresthesia?  A.  I don't.");

Ex. 43 at -159162 (████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████).)  One Nevro employee even acknowledged that ███████

████████████████████████████" (Ex. 17 at 91:11-92:4.)

 In this regard, *Wyeth* is on point.  In *Wyeth*, the claims covered a class of compounds that

exhibited a certain functionality, just as Nevro's claims cover a class of parameters (including

frequency) that exhibit the functionality of "paresthesia-free" therapy.  720 F.3d at 1385-86.  The

Court affirmed summary judgment of no enablement, citing four factors that all apply to Nevro:

(i) "[t]he scope of the claims at issue is broad" because they covered any compound that met the

"structural and functional requirements"; (ii) "the specification's guidance is limited" to one

known compound exhibiting the claimed functionality and, thus, was "only a starting point for

further iterative research in an unpredictable and poorly understood field"; (iii) "there are still at

least tens of thousands of candidates" covered by the claims that a POSITA would need to

analyze; and (iv) it would be necessary to test each candidate to determine whether it has the

required functionality because of the "unpredictability of the art."  *Id.*  Like the thousands of

candidate compounds in *Wyeth*, a POSITA here would need to explore thousands of candidate

stimulation parameter combinations to see whether paresthesia-free therapy could be achieved at

frequencies other than 10 kHz.  (Mihran Rpt., ¶¶ 2711, 2721-2728; Lipson Rpt., ¶¶ 48-54.)

### D.    Paresthesia-Free Therapy Is Inherently And Notoriously Unpredictable (*Wands* Factors 2, 3, 4, 5, 6, & 7)

The enablement requirement is particularly stringent in this case because of the body's unpredictable response to electrical stimulation, which puts Alataris's suggestion that the public "figure it out" in the proper context.  *In re Fisher*, 427 F.2d 833, 839 (C.C.P.A. 1970) ("In cases involving unpredictable factors, such as … physiological activity, the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved.").

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████.  ('533 patent, 14:15-15:41 (disclosing five "potential" mechanisms of action); Ex. 44 at -398647 (███████████████████████████████████████████████ ████████████████████████████████████████████") (emphasis added).)  To this day, experts in the field do not understand the mechanisms of action of SCS.  (*See* Mihran Rpt., ¶ 2735; Lipson Rpt., ¶¶ 42-47; Ex. 58, ¶ 27.)  Nevro was required to disclose much more than a bare list of frequency ranges.  (*See* Mihran Rpt., ¶¶ 2735-2739.)

The unpredictability of paresthesia-free therapy is highlighted by the fact that high-frequency signals within the claimed ranges often resulted in paresthesia.  (*See* Mihran Rpt., ¶¶ 2709-2715, 2723, 2725.)  Alataris admitted that "███████████████████████ ██████████████████████████████████████ ████████████  (Ex. 19 at 250:4-251:9.)  Thacker stated during the prosecution of the '472 patent:  "I have encountered patients who report feeling a tingling sensation (paresthesia) while receiving spinal cord stimulation at frequencies above 2,500 Hz."  (Ex. 50 at -47542; *see id.* at -47543 ("(e.g., the tested frequencies of 3,000 Hz, 5,000 Hz, and 7,000 Hz).")), -47544-48; Ex. 27 at 351:7-354:20 (██████████████████████████████ ███████████████).  Ex. 51.)  And, Nevro's own patents at Figure 6 provide that the high-frequency signal can result in "without creating paresthesia" or "creating paresthesia."  ('533 patent, Fig. 6.)

\*     \*     \*

Receipt of a patent monopoly is contingent on providing solutions to the public.  *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1070-71 (Fed. Cir. 2005) (patent claims

34

must be enabled "in order to extract meaningful disclosure of the invention and, by this disclosure, advance the technical arts").  As part of the patent bargain, it was incumbent on Nevro to "figure it out."  Instead, Nevro's patent strategy was to monopolize paresthesia-free therapy at every frequency between 1.5 kHz and 100 kHz, even though it had only "figure[d] it out" for 10 kHz.  Such overreaching is exactly why enablement exists as a requirement for obtaining a patent.  *See Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1324-25 (Fed. Cir. 2005) ("If mere plausibility were the test for enablement under section 112, applicants could obtain patent rights to 'inventions' consisting of little more than respectable guesses as to the likelihood of their success.  When one of the guesses later proved true, the 'inventor' would be rewarded the spoils instead of the party who demonstrated that the method actually worked.").  Because Nevro's Frequency Range claims are not enabled, summary judgment of invalidity is warranted.

## VII. NEVRO IS NOT ENTITLED TO SUMMARY JUDGMENT OF NO INVALIDITY IN VIEW OF THE PRIOR ART PRECISION SYSTEM

BSC's prior art Precision system was first sold in the U.S. in 2004, years before Nevro was founded.  (Pai Ex. 41, ¶ 3.)  The Precision system was approved for programming at frequencies only up to 1.2 kHz.  (Ex. 45 at -2418; Ex. 46 at -165832.)  The Precision IPG was also designed with hardware capable of outputting signals with frequencies above 1.2 kHz and even beyond 10 kHz.  (Pai Ex. 41, ¶ 11.)

As discussed above with respect to infringement (*see supra* § III), prior to remand, the parties had disputed whether "configured to" required actually being programmed to provide the recited signals, as BSC contended, or merely being capable (or designed) to do so, as Nevro contended.  Because the prior art Precision system operated in essentially the same manner as the then-accused products, Nevro faced a squeeze—if Nevro's "capability" construction were adopted for purposes of infringement, then the claims would be invalidated by the virtually-identical Precision system.  BSC moved for summary judgment of anticipation based on the Precision system, but the Court declined to decide it in view of its other rulings.

On remand, Nevro now argues that the Court "should grant summary judgment of no invalidity based on this Court's and the Federal Circuit's claim constructions."  (Mot. at 17.)

35

1    Nevro's broad request is divorced from the narrow arguments in its brief, which discuss only the

2    Precision system and ignore all the other prior art on which BSC intends to rely.  Nevro also fails

3    to specify whether it seeks summary judgment under § 102, § 103, or both.  It may be that Nevro

4    seeks to preclude BSC from relying on the Precision system to support *any* invalidity argument,

5    even though Nevro only mentions two such arguments in its brief.  Whatever Nevro intends,

6    however, the Court should deny the motion.

7         *Anticipation via Precision:*  BSC no longer asserts that the Precision system anticipates

8    the asserted claims, which BSC already told Nevro during the meet and confer process.  (Ex. 52.)

9    In view of this Court's construction of "frequency," BSC does not rely on the "frequency

10   harmonics" theory.  (Mot. at 17-18.)  And, in view of the Federal Circuit's construction of

11   "configured to," BSC concedes that the Precision system is not "configured to" provide the

12   claimed stimulation signals (Mot. at 18-20)—just as the accused products lack that claim element.

13   Accordingly, the Court should deny these portions of Nevro's motion as moot.  *See Round Rock*

14   *Rsch., LLC v. SanDisk Corp.*, 75 F. Supp. 3d 674, 684 n.8, 686 n.9 (D. Del. 2014) (denying as

15   moot patentee's motion for summary judgment that certain prior art references did not anticipate

16   because accused infringer "does not intend to assert these as invalidating prior art references at

17   trial"); *Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*, 476 F. Supp. 2d 1024, 1037 (N.D. Ind.

18   2007) ("[I]t is improper for a court to grant summary judgment on an issue that a party is no

19   longer asserting because, to do so, would result in an improper advisory opinion.  Summary

20   judgment on these issues is inappropriate because such would merely be an academic exercise

21   resulting in an advisory opinion; the appropriate response is to deny these issues as moot.").

22        *Obviousness via Precision:*  To the extent Nevro argues that the Precision system cannot

23   possibly be relevant to any combination of prior art under § 103, Nevro seriously overreaches.

24   The Precision system is relevant to obviousness because it could easily be programmed to meet

25   the claim elements, which is not disputed, and POSITAs were motivated to do so at the time.

26   (*See* Mihran Rpt., ¶¶ 1446-1451; Pai Ex. 33, ¶¶ 113-145.)  In particular, BSC showed that one

27   undisputed way to operate the Precision system above 1.2 kHz was via accessing the ███████

28   ██████.  (*Id.*)  Nevro argues that the ████████ access was not publicly known and thus cannot be

36

relied on for obviousness, but this argument is wrong and misses the point.  (Mot. at 19-20.)  The fundamental question on obviousness is whether a POSITA would have been motivated to modify the Precision system to provide the claimed frequencies, and the ease with which such a modification could be made is, of course, highly relevant to this inquiry.  *KSR*, 550 U.S. at 421.

BSC proffered the testimony of its expert, Mihran, to show that the reasons for making such a modification were well known, *e.g.*: (i) Kilgore '145 showed "it was well-known that high rate stimulation systems existed and could be effectively used to treat pain, including in spinal cord stimulation"; (ii) Kilgore 2004 taught using "frequencies in the range of 2-10 kHz," and that "complete block was achieved in individual preparations at frequencies as low as 1000 Hz and as high as 20 kHz"; (iii) there was a recognized market opportunity for such a modification, as confirmed by Spinner, MacDonald '170, and Gillbe; and (iv) "the real technical barrier to implantable high rate stimulation systems was battery technology, and by the time that barrier was crossed, it would have been obvious to actually configure then-existing SCS systems such as the Precision System to perform high rate stimulation."  (Mihran Rpt., ¶¶ 1446-1451; *see also* Pai Ex. 33, ¶¶ 113-115.)

The Precision system is also relevant to obviousness because it was the system used in the Yearwood studies to achieve paresthesia-free therapy via sub-perception amplitudes.  A POSITA would have been motivated to use Knudson's high-frequency 5 kHz device in the same way if the patient could not "tolerate the paresthesias."  (Ex. 57 at 49:7-23.)

A reasonable jury could rely on this evidence and rationale to conclude that the asserted claims are obvious based in part on the Precision system.  The Court should deny Nevro's motion.

## VIII.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

In his 2006 study using BSC's prior art Precision system, Yearwood was able to achieve 50%-80% pain relief by applying sub-perception (paresthesia-free) therapy.  (Ex. 47 at -130119; *see* Ex. 48 at 49:7-24; Mihran Rpt., ¶¶ 168-174, 1385-1390.)  Thacker, a named inventor on each of the asserted patents who was employed by BSC before he joined Nevro, was heavily involved

in Yearwood's research, exchanging dozens of emails with Yearwood, contributing to the design of his study protocol, and supervising the individuals supporting Yearwood.  (*See, e.g.*, Ex. 27 at 25:20-24, 80:24-81:5, 182:6-186:23, 189:6-190:11, 220:25-226:18.)  Years later, in 2014, while the asserted patents were being prosecuted, Yearwood provided Thacker—who was then at Nevro—with slides that described Yearwood's methodology.  (*Id.* at 310:14-319:25; Ex. 49.)  Accordingly, Thacker was aware that the amplitudes used in Yearwood's study were between 1 mA and 6 mA, that pulse widths of 200-300 microseconds were used, and that the leads were placed with electrodes spanning the T8 and T9 vertebral levels.

At the same time, Thacker had purported to invent patent claims with the same parameters, which Nevro was concurrently prosecuting.  (Ex. 49 at 19, 22.)  For example, claim 1 of the '357 patent describes paresthesia-free therapy with a pulse width between 10 and 333 microseconds and an amplitude between 0.5 mA and 10 mA—at ***any*** frequency.  ('357 patent, 25:63-26:12.)  Likewise, claim 1 of the '988 patent covers therapy at a vertebral level between T8 and T12 (inclusive) using pulse widths between 25 microseconds and 166 microseconds.  ('988 patent, at 25:62-26:8; Ex. 47 at -130121.)  Yearwood teaches these features, yet Nevro did not disclose Yearwood to the Patent Office, despite Thacker's knowledge and collaboration with him.  This forms the basis of BSC's inequitable conduct claim.

Nevro contends that Yearwood cannot be material, but Nevro is very wrong.  Genuine factual disputes exist as to the materiality of Yearwood to the prosecution of the asserted patents, and Nevro's motion for summary judgment should, therefore, be denied.

### A.    A Reasonable Jury Could Find That Yearwood Was Material

"[T]he materiality required to establish inequitable conduct is but-for materiality" under a preponderance of the evidence standard.  *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017).  "Determining but-for materiality requires that the court place itself in the shoes of a patent examiner and determine whether, had the reference(s) been before the examiner at the time, the claims of the patent would have still issued."  *Id.* at 1351.  A reference is but-for material if it "teaches the elements of the claim at issue."  *Id.* at 1354.

Yearwood is clearly material because it teaches all the elements of claim 1 of the '357 patent and renders claim 1 of the '988 patent obvious (it shows placement of the leads within an overlapping vertebral range).  It is of no moment that these claims are unasserted, because "inequitable conduct regarding any single claim renders the *entire patent* unenforceable," and "the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011).  Nevro argues that these two claims, and Yearwood, do not recite high-frequency, while all of the asserted claims do (Mot. at 27), but that fact actually strengthens BSC's defense, because the breadth of the unasserted claims makes invalidity by Yearwood that much clearer, and Nevro's conduct before the Patent Office that much more egregious.  (*See* '357 patent, 25:63-26:12; '988 patent, 25:62-26:8.)

Nevro argues that BSC's expert did not opine that a reasonable examiner would have found Yearwood's study to be "but-for" material, but the expert was not required to parrot the legal standard word for word.  This is a red herring, as Mihran provided the facts on which a finding of materiality can be based.  He explained how Yearwood invalidates two of Nevro's claims.  (Mihran Rpt., ¶¶ 168-174, 1385-1390.)  He also explained that the Precision device used by Yearwood also met every element of claim 1 of the '357 patent.  (*Id.*, ¶¶ 1547-1561; Ex. 47 at -130117.)  Since a patent cannot issue if it is anticipated, a factfinder could certainly conclude that the Yearwood References are "but-for" material.

Nevro also asserts that the Yearwood References are not material because they "teach away from paresthesia-free therapy."  (Mot. at 31-32.)  This is wrong on two fronts.  *First*, "teaching away is not relevant to an anticipation analysis; it is only a component of an obviousness analysis," making this argument irrelevant to the '357 patent.  *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012).  *Second*, there is no teaching away:  "A reference that 'merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into' the claimed invention does not teach away."  *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017).  Yearwood did not "criticize, discredit, or otherwise discourage" paresthesia-free therapy.  To the contrary,

39

although he reported that his subjects "preferred" a paresthesia-based therapy, he also encouraged further research into paresthesia-free approaches, concluding that they have "proved effective in certain patient populations, and may provide more comfortable pain relief for some pain conditions." (Ex. 47 at -130120.) This is teaching *towards* paresthesia-free therapy.

### B.     A Reasonable Jury Could Find That Yearwood Was Not Cumulative

Nevro asserts that Yearwood is not material because it was cumulative of other art already of record. Nevro is wrong. "A reference is cumulative when it 'teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.'" *Regeneron*, 864 F.3d at 1350 (quoting *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997)). Mihran shows that Yearwood's description of all the elements of some of Nevro's claims directly contradicts what was considered by the Patent Office during prosecution. For example, Nevro successfully argued that the high-frequency blocking therapy from Knudson did ***not*** inherently disclose paresthesia-free therapy. (*See* Mihran Rpt., ¶¶ 251-257.) But, the therapy used in the Yearwood study relies on low frequency, low amplitude signals to provide paresthesia-free therapy, which is different than Knudson. (*Id.*, ¶¶ 171-174; Ex. 47 at -130116.) Likewise, the Examiner allowed claims of the '988 and '357 patents over De Ridder, saying it did not clearly disclose a "plurality of bi-phasic pulses." (*See, e.g.*, Mihran Rpt., ¶¶ 300-319.) But, the Yearwood study describes a plurality of bi-phasic pulses. (*Id.*, ¶ 171.)

Because there are numerous genuine issues of material fact as to the scope of the prior art before the PTO and the teachings of the Yearwood References, Nevro's Motion should be denied.

### CONCLUSION

For the forgoing reasons, the Court should grant BSC's motion for summary judgment of: (1) noninfringement; (2) anticipation by Fang; (3) anticipation and/or obviousness by Knudson; and (4) lack of enablement. The Court should deny Nevro's motion for summary judgment.

Dated:  November 13, 2020

Respectfully Submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/*        *Marc A. Cohn*
　　　　　　　Marc A. Cohn

Attorney for Defendants BOSTON SCIENTIFIC
CORPORATION and BOSTON SCIENTIFIC
NEUROMODULATION CORPORATION